IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

COLLISION COMMUNICATIONS, INC.,(   CAUSE NO. 2:23-CV-587-JRG
                                 )
          Plaintiff,             (
                                 )
vs.                              (
                                 )
SAMSUNG ELECTRONICS CO., LTD., (
et al.,                          )   MARSHALL, TEXAS
                                 (   OCTOBER 6, 2025
          Defendants.            )   8:30 A.M.
_____

VOLUME 2

_____

TRIAL ON THE MERITS


BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE
and a jury

_____


SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov


Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:      CALDWELL CASSADY & CURRY, PC
                        2121 N. PEARL ST., SUITE 1200
                        DALLAS, TEXAS   75201
                        (214) 888-4848
                        BY: MR. BRADLEY CALDWELL
                            MR. CHRISTOPHER STEWART
                            MS. AISHA HALEY
                            MR. JUSTIN NEMUNAITIS

                        MILLER FAIR HENRY, PLLC
                        1507 BILL OWENS PARKWAY
                        LONGVIEW, TEXAS   75604
                        (903) 757-6400
                        BY;  MS. ANDREA FAIR

FOR THE DEFENDANTS:     QUINN EMANUEL URQUHART &
                        SULLIVAN
                        555 TWIN DOLPHIN DR.
                        5Th FLOOR
                        REDWOOD SHORES, CA 94065
                        (650) 801-5094
                        BY:  MR. BRADY HUYNH
                             MR. BRICE LYNCH
                             MR. JOHN REED
                             MS. VICTORIA MAROULIS

                        QUINN, EMANUEL, URQUHART &
                        SULLIVAN, LLP - WASHINGTON
                        1300 I STREET NW., SUITE 900
                        WASHINGTON, DC 20005
                        (202) 538-8188
                        BY:  MR. KEVIN HARDY

                        QUINN EMANUEL URQUHART &
                        SULLIVAN, LLP - SAN FRANCISCO
                        50 CALIFORNIA ST., 22ND FLOOR
                        SAN FRANCISCO, CA 94111
                        (415) 875-6600
                        BY:  MR. SEAN PAK

                        GILLAM & SMITH, LLP
                        303 SOUTH WASHINGTON AVENUE
                        MARSHALL, TEXAS   75670
                        (903) 934-8450
                        BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                        100 E. HOUSTON STREET
                        MARSHALL, TEXAS   75670
                        (903) 923-8546

THE COURT:  Be seated, please.

All right.  Mr. Estess, do we have all of our jurors here?

THE COURT SECURITY OFFICER:  Yes, Your Honor.

THE COURT:  Please bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Please have a seat.  Welcome back.  As I indicated last Friday, we'll begin this morning with the Plaintiff's case in chief.

Plaintiff, call your first witness, please.  And before you do that, let me ask on the record, does either party wish to invoke the Rule?

MR. CALDWELL:  Yes, Your Honor.

THE COURT:  All right.  Do I understand, Mr. Caldwell, that the Rule would be invoked not including expert witnesses or corporate representatives but would apply to fact witnesses.

MR. CALDWELL:  Absolutely.  Yes, Your Honor.

THE COURT:  All right.  That means if you're a fact witness in this case, you're not a designated expert witness and you're not a designated corporate representative, you must remain the courtroom until you are called to testify.

And, counsel, I'll rely on you to make sure someone who should be outside the courtroom isn't insides the courtroom as

you look around the room.

All right.  With that, Plaintiff, call your first witness.

MR. STEWART:  Your Honor, Plaintiff calls Joseph Farkas.

THE COURT:  All right.  Mr. Farkas, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please have a seat on the witness stand, sir.

MR. STEWART:  Your Honor, Chris Stewart for the Plaintiff.  May I approach to distribute binders?

THE COURT:  Either you or someone on your trial team can distribute binders.

(Pause in proceedings.)

THE COURT:  All right.  Mr. Stewart, you may proceed with direct examination.

MR. STEWART:  May it please the Court.

JOSEPH FARKAS,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. STEWART:

Q.   Good morning, Mr. Farkas.  Could you introduce yourself to the jury?

A.   Sure.  My name is Joseph Farkas.

Q. Would you tell us a little bit about yourself. Where do you live?

A. I live in Merrimack, New Hampshire.

Q. How long have you lived there?

A. About six years now.

Q. Do you have a family?

A. I do. I have a wife, Jen, and three daughters named Ellie, Ava, and Kiera.

Q. What do you do for a living, Mr. Farkas?

A. I'm an electrical engineer. I own my own company called Signal Processing Technologies that I founded in 2019.

Q. Were you ever an employee of the Plaintiff, Collision Communications?

A. Yes. Prior to starting my own company, I worked for Collision Communications as the president and CTO.

Q. Do you still have a role at Collision today?

A. No, not as an employee. I do have a consulting agreement where I consult with them on patents and other technical matters.

Q. Are you being compensated under that consulting agreement for testifying today?

A. I am not.

Q. Does anything about your compensation under that agreement depend on what you say here or the outcome of this case?

A.    No, absolutely not.

Q.    Okay.  Let's back up a bit and talk about how you got to Collision.  Can you walk us through your educational background?

A.    Sure.  So I have a Bachelor's of Science from Boston University.  That was in 2005 in electrical engineering.  Then while working full time, I got my Master's degree from Worcester Polytechnic Institute, and that's in electrical and computer engineering.

Q.    What made you choose engineering as a career?

A.    I've always loved math and science.  I actually went in as an undeclared engineer.  And then I was taking a lot of different engineering classes, took a class called systems and systems, and that's really kind of an introductory course to communication systems and decided that's what I loved, and decided being an electrical engineer building communication systems.

Q.    Where did you start your career after college?

A.    Right after college, I went to a company called BAE Systems.

Q.    What is BAE Systems?

A.    BAE Systems, they're a defense contractor.  They do a lot of work for the U.S. military.

Q.    Why would a defense contractor making military equipment be interested in a communications engineer?

A.   So don't think of planes and tanks.  Think instead of radios like similar to how we carry cell phones, the military carries radios.

Q.   Were you actually building military radios?

A.   No, I wasn't.  I actually was in a research group.  We were trying to advance some particular aspect of a communication system.

Q.   Was there a particular technology that you ended up settling into within that research division?

A.   Yes.  I went to go work for the communications and signal exploitation research group focusing on a technology called multiuser detection, or MUD for short.

Q.   So jumping ahead a little bit, how long have you worked on this technology called MUD, or multiuser detection?

A.   Well, between my time at BAE Systems and my time at Collision Communications, about 13 years.

Q.   What kind of work have you done with respect to that MUD technology?

A.   It is all sorts of work from developing new MUD techniques to simulating them and actually implementing them in prototyping systems and demonstrating those and -- done that many different times.

Q.   What types of systems have you used MUD in in your career?

A.   Well, at BAE Systems, we were applying it to military.

And at Collision Communications, we were applying it to commercial systems.

Q.   Have you developed a thorough understanding of how this technology works from all that time?

A.   Yes, absolutely.

Q.   Now, are you the expert witness in this case who's going to actually compare the patents to Samsung's products to demonstrate infringement?

A.   No.  I have no access to the proprietary documents from Samsung.

Q.   Have you prepared a set of slides to help the jury understand a little better what multiuser detection is and how it works in the products you were working on?

A.   Yes, I have.

Q.   All right.  So starting from the top, what was the problem that BAE's engineers were trying to solve when you started working on this issue?

A.   So the problem we were trying to solve shown here is we were trying to be really efficient with how we used the spectrum.  And so the spectrum is a limited resource like often called just the air waves similar to land, and we need to be really efficient with how we use it.

Q.   Can you give us a little more detail about what this spectrum actually is?

A.   Sure.  So people are mostly familiar with maybe through

tuning to radio stations, and so you're tuning to different frequencies on the spectrum.  Like 99.9 is one radio station that's a piece of the spectrum, and like 100.1 is another piece of the spectrum.

Q.    Within that spectrum, what is the portion that devices we're familiar with usually communicate on?

A.    It's this down here called the radio spectrum.  It's essentially the portion of it which is useful for communication systems.

Q.    Within that radio spectrum, are there further subdivisions?

A.    Yes.  There's a U.S. government agency called the FCC which allocates certain portions of the spectrum to different systems.

Q.    On the part scrolling across the screen here, what portions are usually used for, for example, cellular communications?

A.    So for cellular communications, it's some of these light pink ones called mobile here.  And it's actually -- any particular location you're in, it's really -- it's not all those that you see; it's a few of them.

Q.    Why can't devices that you were working on just communicate on any portion of the spectrum?

A.    Well, if they didn't divide up the spectrum, there would be a lot of interference.  And so interference is when two

195

systems are talking at the exact same time and frequency.

Just to give you kind of a basic example, as I said, I have three daughters. And they come home from school, and a lot of times they just want to tell me about their day at the same time. So that they'll come and be talking to me, and I'll have to say, oh, hold on; now, Ellie, you tell me about your day. And then, Ava, tell me about your day, and finally Ellie again.

So that's an example of we're avoiding interference and talking at the same time and my inability to understand them all by having them take turns.

Q. So given the limited spectrum that's available, when you started working on this problem of MUD, how were networks dealing with the interference problem?

A. So they avoided interference, similar to my example of having my kids take turns. And so that's, for instance, why radio stations are on different frequencies.

Q. What does MUD allow you to do?

A. So MUD allows a couple of things. It allows you to deal with that interference better. So it allows you in this example, this is from the DIMA video that was played in opening, with need to send multiple signals at the same time, whereas systems before that could only send one, and you use that multiuser detection to deal with that interference. Also can be used to actually cancel or suppress interference in

addition to that.

MR. STEWART:  For the record, this is PX 31.

Q.   (BY MR. STEWART)  In the context of your work on wireless systems, what does the use of MUD mean for the use of that spectrum we talked about?

A.   Well, it can be used more efficiently and so we can get more data through if we can send multiple signals at the exact same time.  As I was also saying, we can help cancel and suppress other interference so there's any difference between the interference that we want to encourage, the multiple signals that we care to transmit at the same time and we actually want to decode all the information in the signals, and the ones that are just bothering us and interrupting that, and those are the ones we typically want to suppress or cancel with multiuser detection.

Q.   Now, when you talk about this concept of multiuser detection, when you were working on this, is it always that there is a different set of actual people or devices as those users?

A.   No.  That is one example.  I'll just talk maybe about generic radios where you could have multiple separate radios sending different signals.  But there's examples like with cellular systems where there's multiple signals being sent simultaneously from one device like a cell tower.

Q.   Was BAE's research limited just to wireless

communications?

A.    No.  So this is an example here of one of those old hard drives with the spinning discs.  And the way those work is, is the information that was stored on your hard drive are on these separate tracks that are really close to each other that are different colors.  And so BAE was doing work on how to improve this system using multiuser detection.  And so what they were doing is when that disk is spinning and, for instance, it's trying to read the information on that -- the orange track, the ones adjacent to it were interfering with it.  And they were using multiuser detection to suppress that interference or cancel that interference from those adjacent tracks.

Q.    All right.  So going back to wireless communications, can you back up and tell the jury a little bit about how wireless information is transmitted in cellular networks in the first place?

A.    Sure.  So as I talked about information, probably people are familiar with bits.  So we communicate information as a series of bits so 0s and 1s.  We want to move this information from one point to another.

And so in this example here, for instance, if the cell tower or the base station is trying to send that -- those bits of information on the bottom there, it transmits a signal, goes through the air as an electromagnetic wave; and then in

our receiver, the receiver attempts to recover those bits so that you can communicate that information that we're trying to.

Q.   What are the main steps of that process of transmitting those 0s and 1s over the air?

A.   So main steps are listed here.  We need to identify that data, and then we need to create the symbols from that data.  We need to use our resources that are typically things like time and frequency within cellular systems, and then finally we want to transmit that signal.

Q.   All right.  Starting from the top, what do you mean by identifying the data?

A.   So identifying the data is that step about converting information to these bits.  Right?  So -- and it may be -- a basic example could be a text message.  I could just make a decision to represent the A character as a 000 and the B character as a 001.

THE COURT:  Mr. Farkas, could you slow down just a little bit?

THE WITNESS:  Absolutely, sorry.

THE COURT:  Thank you.

THE WITNESS:  And then different forms of things I might want to communicate like my voice or this *Top Gun* video are the same just as more complicated.  We can represent those as 0s and 1s.

Q.   Turning to the next step, how do you convert those 0s and 1s into what you call here a symbol?

A.   So the next step is taking those 0s and 1s and making that into something we call a symbol, which is essentially something that's more usable for our communications system,

And so this is one attribute we can use called amplitude which is essentially like the height or the power of a wave. So I could choose to represent my bit 0 as this amplitude 1 wave, the one in red, or I can -- and I can choose to represent the bit 1 as this amplitude 3 wave here that's a higher height.

Q.   Can you also represent those amplitudes as arrows?

A.   Yes.  So the thing on the left is called an IQ diagram. It's just something that's convenient to use to represent these attributes like amplitude, and we can use the length of the arrow there to represent the different amplitudes.

Q.   Are there any other attributes of a wave you can use to help encode this data?

A.   Yes.  Another important one is phase.  And so phase is not the height of the wave like amplitude.  Phase instead you can think of as the starting point of the wave.  So if you look at the difference between the blue wave, which is phase 0, there's a different starting point.  I can kind of shift it backwards and get what that red wave is.

So similar to amplitude, I could choose that phase 0

degrees represents a bit 0 and a phase 90 degrees represents a bit 1.  And I can also represent that on my IQ diagram as kind of where it lands on a circle.

Q.    Now, how do you use those two attributes to create that symbol?

A.    Well, so we actually use them together as a combination of an amplitude and phase, and then so we can represent these, we can send these signals, each of these -- sorry, the symbols, each of these symbols representing a different series of bits.  So, for instance, if I wanted to send the bits 1100, I could send that blue symbol in the red box.

Q.    Can you do that for the remaining bits on the screen?

A.    Yes.  So maybe now we want to send a lot of information, you know, a text message or a phone call, and so it would be just you know a string of bits, each represented by different symbols.

Q.    Now, how do you select resources to send those symbols on?

A.    So the next step is we want to use our resources, and so these are typically time and frequency.  And so time is what you expect.  I can talk now or at a time later or at a time later.  Frequency is more similar to taking that spectrum we were talking about earlier and just then just dividing it up further into really small frequency chunks.  And so I take my symbols and I map those to different areas on this time and

frequency grid called a resource grid.

Q.   All right.   Taking it a little slower, could you explain what you then do with those mapped symbols?

A.   Sure.   So once we have those symbols mapped to the time and frequency resource grid, we transmit that signal over the air.

Q.   Now, when you were working on these problems, was it as simple as just sending the signal from point A to point B?

A.   No.   There's another important step about the channel. So what happens is that the -- the channel is everything that happens between when a signal is transmitted and when it's received effectively that corrupts the signal in some way.

Q.   What does that channel look like in the real world?

A.   So in the real world when a transmitter transmits, it's typically transmitting not just directly to where the receiver is, but it kind of propagates in many directions.

And so what happens with that wave is it bounces off and reflects off of different objects.   And those reflections, one, take the -- makes it so that the signal takes longer to get to its receiver, but also it does things to distort the signal and lower its power level.

And so what is actually received is some combination of the signal being transmitted with lots of different reflections that have gone through some sort of distortions all at the receiver.

Q.   What does that look like to one of the individual symbols we looked at earlier?

A.   So if you take on the left there of what we transmitted, so we're assuming we're trying to transmit that symbol which is represented by 1110, we receive something else.  It comes in with a different amplitude and phase like that red -- the red dot on the right.

Q.   How do you figure out that difference represented here by that light red arrow?

A.   It's something called a channel estimate.

Q.   Could you explain how channel estimation works in the products you were working on?

A.   Absolutely.  So instead of what we were talking about before, which is trying to communicate some information, information that is unknown at the receiver, now we actually take certain things on our transmit side that the receiver already knows we're going to do.  Those are called reference symbols.  So on the receive side, we already know that the transmitter is going to put these particular reference symbols in our resource grid.

Q.   What is an example the jury might be familiar with for these known reference signals?

A.   The known reference symbols are similar to what golfers do when they're trying to estimate the effect of the wind on the ball they're going to hit.  And so what they do is they

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

pick up some grass, they drop it, and they try and estimate how much the wind is -- the direction and the speed of the wind so that they know what's going to happen to the golf ball when they hit it later.

Q.   And so how does that work with that known reference symbol in a wireless system?

A.   So what happens is that if we sent that reference symbol on the bottom, we already know that at the receiver.  And so when we receive something, we know the effects that happen between what was actually transmitted and what was actually received, and that is what the channel estimate is.  We show it here as this red arrow, but it's a mathematical description of that.

Q.   And so once you know the amplitude and phase estimates and that channel estimate, how do you use that to decode or estimate the data symbols?

A.   So you use that channel estimate to undo all those distortions that were created by the channel.  And so those arrows on the left there represent what was transmitted but then distorted by the channel.  And then kind of notionally if you can then just divide out the channel, you can remove the effects of it, which then you could recover what was actually transmitted which represents the bits that are trying to be communicated.

Q.   All right.  And then, finally, once you estimate those

symbols and recover those 0s and 1s, what do you do with them?

A.   So now there's another step called error correction coding, and so this is something that we do within communication systems when there's still some additional errors or in case there's additional errors.

And what happens is we actually take those bits when we're transmitting and encode them with certain patterns and we use the fact that the receiver knows that they were encoded with these patterns to actually fix some of the bits that were in error.

Q.   Okay.  So going back to multiuser detection, how does that play into this process?

A.   So everything I just talked about now was single -- one signal, no interference.  So now once you have multiple signals being sent at the same time represented now by the multiple arrows in each of these boxes in the resource grid, now that's the cases where you sometimes have interference. Right?  Because there are multiple signals being sent at the same time and frequency, those often interfere with each other.  And it's the same thing for the ones with the reference symbols.

Q.   In this example we have here, what does the receiver actually see?

A.   So because now there's multiple signals and those channel effects are still there but now they're happening across many

signals, now we just receive something that doesn't look like what we transmitted at all.

Q.   Now, I want to pause for a minute and take a look at a slide that Samsung's counsel showed in opening last week.  Do you recall this?

A.   Yes.

Q.   Do you remember Mr. Pak discussing the figure on the left as related to OFDMA?

A.   I do.

Q.   How does that relate to what we were just talking about on that resource grid?

A.   So OFDMA is a method to divide up those symbols in time and frequency.  So OFDMA is exactly that resource grid.  It's using the time frequency resources to map those symbols to them.

Q.   In the work you were doing, how would multiuser detection apply to that -- the lanes of cars on the left of this figure?

A.   So up until -- I mean, just listing this as OFDMA without interference, like, that's the part I agree with.  This is a time frequency grid.  But that has nothing to do with what happens when you are sending multiple signals.  Multiple signals using this analogy would be like taking a whole bunch more cars and just dropping them on top.  That's what another set of signals do with an OFDMA system.

Q.   And taking it a little slower again?

A.   All right.

Q.   In the work you were doing, does the fact that a particular system was using OFDMA mean they couldn't use multiuser detection?

A.   No.  In fact, that's what we were talking to Samsung about.  I mean, LTE, which was the primary point of our conversations with them, is an OFDMA system, and we were talking about how to use multiuser detection to improve their products that have OFDMA in them.

Q.   We'll talk a little bit more about that in a minute.  But back to your slides, at a high level what does multiuser detection do with these symbols and channel estimates?

A.   So now in this case we have multiple signals, and so they're interfering with each other.  This example, just assume that we know those channel estimates.  So multiuser detection is designed to take what was received and recover back, even when there's interference, what was actually transmitted, the transmitted symbols.

And so this example is trying to show that suppose you received the purple arrow there, what was actually sent is the red and the blue arrow.  The point of multiuser detection is to take that purple arrow and those channel estimates you've done and reverse out that whole process and try to get back to what was actually transmitted, that red and the blue arrow.

Q.   Will you always know those two known channels when you're

doing this process?

A.    No.    That's often an equally important problem that leverages a lot of the multiuser detection techniques.

Q.    All right.    Switching back to your time at BAE, why was this MUD technology potentially useful to BAE's clients?

A.    So we were talking about that spectrum earlier and we need to be efficient with how we use that spectrum, meaning send a lot of data through that spectrum, and so that was important for military systems as well.

Q.    Were you here for opening statements last week?

A.    Yes.

Q.    And do you recall Mr. Pak making this statement, that what these patents are doing and BAE's patents were doing is something that just encourages noise as opposed to canceling it out?

A.    Yes, I heard that.

Q.    Is that all BAE was focusing on, this idea of just encouraging interference?

A.    No.    It's one aspect of it.    So I think that term -- that word comes from that DIMA video, if I'm correct, and what we're talking about is the same thing I was just saying.    If you can have multiple signals, you can send more information. That's the encourage part.

And then use this powerful technology, multidetection, to just deal with the fact there's all that interference, but

that's part of it.  There's often an awful lot of outside interference I actually don't care about decoding.  I don't care about what information they're sending.  It's just disrupting my communication system, and that's the type of thing I want to suppress or cancel.  Multidetection is about both of those things.

Q.   Now, how did BAE start working on this problem of MUD?

A.   So BAE started their work on MUD with the person on the left there.  Her name's Dr. Rachel Learned.  She had just gotten her Ph.D. from MIT.  This was the late '90s.  And then she went to BAE Systems in order to do research on multidetection and eventually form a group focused on research on multiuser detection.

Q.   Now, who are the other two faces on the screen here?

A.   The other two faces are:  in the middle, that's Mr. Mark Landy; and on the right, that's Mr. Tom McElwain.  Those are two of the other inventors of the patents in this case.

Q.   Did you work with the three individuals here on the screen?

A.   I did.  I worked alongside all of them.

Q.   You mentioned that Dr. Learned already kind of came in with some knowledge about MUD.  Does that mean the concept existed before BAE started working on it?

A.   Yes, certain multiuser detection techniques.  So at the time a lot of the MUD work was really theory and techniques

that took a lot of processing power to implement, so things that we can never -- the chips would have to be so powerful, that you could never actually put them in a device.

Q.   And so what sort of issues was BAE focused on?

A.   I think they were largely trying to address that.  And so take this more theory of multiuser detection at the time and come up with techniques, multiuser detection techniques that you can actually implement into real systems that had a reasonable amount of processing power so that we could use the these multiuser detection techniques in real devices.

Q.   Did the four patents that are in this case come out of that research that BAE was doing?

A.   Yes.

Q.   Are you familiar with the high level subject matter of those patents from your work in the field?

A.   Yes.

Q.   So starting with the '651 and the '505 Patents, at a high level what do those deal with?

A.   Those deal with that channel estimation component also called parameter estimation.  That's that golf analogy.  And so these two patents are particularly useful techniques to get very high quality estimates of the amplitude and phase components of the channel estimate.

Q.   And what about the '703 Patent?

A.   The '703 Patent also touches on that channel or parameter

210

estimation component, but shows it kind of in a context of the overall receiver or multiuser detection receiver.  So there's a multiuser detection block.  And there's these decoders and it shows how you can iterate through this process to have very high performance receivers.

Q.    And then what about the '492 Patent?

A.    And the '492 Patent is a simple sounding but very clever technique where you actually implement multiple multiuser detectors, and you have this thing they call a decision unit, which is making a decision based off of something about the interference on which of the multiuser detectors to use so that you expectantly can always be using the best technique given the real time conditions of the interference.

Q.    As a young engineer just out of college, were you excited to get to work on techniques like these at BAE?

A.    Yes, absolutely.  So this was really a group of people who were pioneering a new field in communication systems, and to get to be part of that, learn, and eventually be leading some of the projects focusing on multiuser detection was really exciting.

Q.    Now, when you said that BAE was trying to find ways to make MUD usable in real products, did you ever get to demonstrate that?

A.    We did.

Q.    What was the name of that program?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A.    So the program is called the DARPA Interference Multiple Access program.

Q.    What does DARPA stand for?

A.    DARPA is the Defense Advanced Research Programs Agency.

Q.    Can you explain a little bit about what that is?

A.    Sure.  They do really kind of future-looking research.  They -- I think they use the term high risk/high reward research, stuff that they aim to be like 10X better, ten times better than the alternative is their goal.  And so they do a lot of that like really, you know, impactful but risky research for the U.S. government.

Q.    Now, this part of the video wasn't played in opening, but who's the recent college graduate in the foreground there in that DIMA video?

A.    That's me.  I guess that's about 17 years ago now, and those are three of my colleagues on the DIMA project.

Q.    When did the demonstrations that you worked on at BAE actually take place?

A.    There were two major ones.  The first one was in 2008 and the second one was in 2010.

Q.    What was your role on those demonstrations?

A.    By the third phase in 2010, I was the system architect.

Q.    How did the demonstrations actually work?

A.    So this is a clip from that DIMA video.  I don't think this was shown, but that was played at opening.  And so this

is from the phase 2 demonstration.  And that's a test range that was in New Hampshire at one of the BAE facilities, and in each of those yellow dots was one of the antennas that was connected to this radio you see on the left there.

And from five of those yellow dots, the five of those locations, we are sending out different signals, so five simultaneous signals being received out of six of those locations, and using multiuser detection to pull all of that interference apart and decode all of those five signals simultaneously.

Q.   Did these demonstrations with that very large radio you see on the left, did it try to implement every advanced technique that BAE was working on?

A.   No.  Just a subset of the things BAE had researched.

Q.   Was BAE's research as a whole limited to just this IMA--interference multiaccess--that you heard about in opening?

A.   No.  It was just one aspect of it.

Q.   Was this a public demonstration, these demos?

A.   It was not.  It was primarily for just our government research sponsors.

Q.   Why did it have to be closed to the public?

A.   So this is still military technology at the time, and so there was -- the data that was being generated was a protected class of data so we couldn't share that with the general

public.

Q.   So after the demonstrations were completed, were they considered successful?

A.   Yes.

Q.   What sometimes happens within BAE in your time there with a successful research demonstration?

A.   So the step typically after successful research is now you want to actually transition this to a product.  Right?  Take the research, put it into a real product so that people are really using it.

Q.   Did that transition happen within BAE, to your knowledge?

A.   No.  I know that there was an attempt to transition to two different products, and it turns out in the end that neither of those were the right transition target for the technology.

Q.   So did that discourage you from wanting to work on this technology when it couldn't transition?

A.   No.  At this point I'd been studying the technology for a long time.  I knew it would have a big impact on a lot of different systems.

Q.   What happened to all this cutting edge research on MUD that BAE had developed?

A.   So now in 2010 BAE Systems decided that they wanted to sell off the technology and they approached various commercial companies and entrepreneurs to see if people were interested

in buying the technology.

Q.   Who ended up buying the technology from BAE?

A.   It was a group of entrepreneurs who would later go on to form Collision Communications.

Q.   Did you get to know Mr. Fry and the folks at Collision Communications as part of that sale process?

A.   Yes.  I actually intersected with them a lot as a BAE employee and then still as a BAE a little bit after they had purchased the technology.

Q.   What was Collision's plan to further develop this tech?

A.   They were looking to take the technology, adapt it in certain ways, and apply it to the commercial cellular systems.

Q.   Did that intrigue you?

A.   Yeah, absolutely.  As I said, I had studied the technology for a long time, and so I knew that it would have a big impact on cellular systems.  And so actually I went and eventually floated the idea of me potentially joining them.

Q.   Did they make you an offer?

A.   Yes.  They made me an offer to be the chief technology officer, the CTO.

Q.   So once you started at Collision as CTO, what was Collision's plan?  Was it to be a device company?

A.   No.  We weren't interested in building the hardware so the actual physical devices like a company like Samsung makes. We were interested in building the multiuser detection as

software modules and to work with the companies like Samsung to actually take our technology and put it into their products to make them better.

Q.   What sorts of products could benefit from Collision's technology?

A.   Well, really anything with either a current interference problem or would benefit by being more efficient with the use of the spectrum.  And so those are things like cell phones, base stations, really lots of other wireless systems and non-wireless systems, just WiFi and Bluetooth, to name a couple.

Q.   What sorts of benefits could those products expect to experience with Collision's techniques?

A.   They could get more data through, be more efficient with that spectrum.  So both in the kind of encouraging interference as we were talking about earlier, but in canceling interference that's disrupting our current communications.

Q.   Is there a technical term for this benefit you keep talking about with respect to the spectrum?

A.   Yes.  I keep just saying efficient use of the spectrum, but there's a technical term called spectral efficiency.

Q.   Did you ever have a chance to demonstrate Collision's technology to Samsung?

A.   Yes.

Q.   When was that?

A.   Well, we had pretty extensive communication with them from 2011 to 2014, but the first time I did was in early of 2012.

Q.   Does this timeline on the screen here reflect some of those interactions you had with Samsung over those three years?

A.   Yes.  Yes.  So the 2011 was the first time that Collision Communications reached out to Samsung.

Q.   How did those initial meetings come about in 2011?

A.   So those initial meetings came because our CEO at the time, Barry West, he reached out to Samsung to engage with them about, you know, what the technology that they had -- Collision Communications had purchased is about and also potential collaboration discussions.

Q.   What was Barry West's background?

A.   Barry West was -- before being the CEO of Collision Communications, he was the CTO of Sprint.  If you're not familiar with them, t-Mobile bought them a bunch of years ago.

Q.   What was it like to work with the former CTO of Sprint in this -- this start-up?

A.   Amazing.  Barry was really a pioneer in the field of bringing cellular communications to everyone, so from the early days where almost nobody had a cell phone to where we all rely on our cell phones.  So it was really exciting for

me.

Q.    And so when was your first interaction face-to-face with Samsung?

A.    Mine was in the third one there, the February 2012 meeting.  It was actually my second day as an employee of Collision Communications that I flew out to Korea to meet with them.

Q.    What did you learn at that first meeting in February of 2012?

A.    Well, I learned that they were interested in multiuser detection.  I mean, they were talking about some attempts that they were making on multiuser detection themselves.  They seemed a little I guess naive on how to use it, but they were ultimately talking about their interest in using multiuser detection for their 4G LTE product line on their MIMO systems.

Q.    Now, did you hear Mr. Pak say in opening that Collision was building a new standard, not 4G, that would cover a product that didn't exist?

A.    I did.  That didn't make sense.

Q.    Do you remember him showing this document?

A.    I do.

Q.    Why was Samsung asking you in 2012 about incorporating Collision's technology in their 4G LTE products if you had something that was totally non-standard?

A.    Yeah.  I mean, that's what we were talking to them about,

taking our technology and putting them into LTE products.  In fact, even this slide that he pointed to, what he was actually trying to communicate is the top is Collision bought something from BAE.  Right?  It bought something that was a non-standard TDD CDMA system.  So BAE wasn't trying to comply with 3G or 4G or 5G.  They were building their own military system.

But what the slide is communicating is what we Collision needs to do is build a general purpose standard supporting receiver.  So this slide that he was pointing to literally says Collision was supporting the standard.

MR. STEWART:  For the record, this is JX 22.

Q.   (BY MR. STEWART)  How was Samsung proposing to use Collision's technology in those discussions?

A.   They were talking to us about using the technology for their 4G LTE MIMO receivers.

Q.   What is MIMO?

A.   So MIMO stands for multiple input multiple output.  So the multiple input refers to the fact that there's multiple antennas on the transmit side, and the multiple output refers to there is multiple antennas on the receive side.

And the reason that that's all relevant to anything related to multiuser detection is that these are the systems where often you're actually sending multiple signals.  So on the left there, we can pick multiple signals.  Those go out.  Multiple antennas, often they get mixed and matched, but those

are the situations where there's interference.  Right?  The MIMO fact that you can send multiple signals then means that often you want to use a multiuser detection receiver just to deal with that interference.

Q.   Looking at DX 36, do you recall in opening Mr. Pak saying that your notes suggested that you thought Samsung's MIMO receiver was not MUD?

A.   Yes.  I recall that.

Q.   So I'm showing here a portion of DX 36 that wasn't shown in opening.  But what were you talking to Samsung about with respect to MIMO and MUD?

A.   So what this says here is Heewon--he's one of the Samsung engineers we were meeting with--says that he spoke of their using Samsung's system level simulation that they use to test their MUD.  So talking about a simulation testing of MUD and even wrote down like what he meant by that, something called an MMSE MUD.  And he talked about how they were using the MUD to perform simulations, testing different aspects of MIMO, called multiuser MIMO.  It's the MU-MIMO and the single user MIMO.  So he was literally talking about even Samsung's interest in using MUD in these MIMO situations.

THE COURT:  Mr. Farkas, when you give these answers, they are somewhat technical.  If you could avoid the rattling off of letters rapidly, it would just come across a lot better if you could slow down.

THE WITNESS:  I'm sorry.  Thank you.

THE COURT:  And you referred to Mr. West once as I believe Barry.  If you'd avoid first names only.

THE WITNESS:  Okay.  Thank you.

THE COURT:  All right.  Let's continue.

Q.   (BY MR. STEWART)  All right.  So going back to the slide that was shown in opening, in light of what you just said a minute ago, what did you mean at the top of these notes when you talked about Samsung not having a sophisticated MUD?

A.   So at the top there, as I was saying, there was a lot of work that was being done -- well, work being done on Samsung's part, talking about how they were trying to use multiuser detection in their MIMO receivers, and they had communicated actually multiple different types of multiuser detections that they were trying.

And all of it kind of seemed that they were almost naive on multiuser detection to me.  And so I was making the point in my notes that didn't seem like they were doing something actually sophisticated so that they were talking about multiuser detection.  It was just, in my impression, an unsophisticated version of it.

Q.   Would it be okay -- it may be hard for you, given your experience in this field, but maybe we could try to use MUD in place of multiuser detection to make --

A.   Absolutely.

Q.    -- it more understandable.

Going back to opening again, do you remember this comment about all the accused functionality that is discussed here was already put in place with the adoption of the LTE standard in 2008?

A.    Yeah, I see that.

Q.    So if Samsung is saying they already had SU-MIMO in 2008 via the LTE standard, why was Collision pitching their multiuser detection, or MUD, techniques for Samsung's products?

A.    So let me explain a little how these standards work.  So the standard specifically doesn't do something that's overspecified what you need to do, meaning if they don't need to say what you need to do in a particular aspect of the system, they won't.

And so the standard talks all about how here's how you construct the transmitted signal.  But if it doesn't need to tell you what actually happens in the receiver to get the bits back, it won't.  And the reason they do that is so companies can innovate.  They can come in and build a better receiver and improve products.  And if they don't have to tell you exact the details how to implement a particular receiver technique, they specifically don't.

Q.    Did you agree with Mr. Pak's opening statement that Samsung was just doing the standard?

A.    No.    I mean, they had talked to us about how they want to innovate within the standard.    I'm sure they were building standard supporting equipment, but that doesn't mean you're just doing the standard when you're implementing some new receiver technology knowledge.

Q.    Now, taking it slow since it might be a little technical, what are some of the performance benefits that you can get when you use multiuser detection in a MIMO system?

A.    Yeah.    So let me do my best to try and explain this succinctly.

So when you have -- I'm going to use an example of a base station sending data to a handset.    So essentially the same if we're talking about the opposite of that.    So suppose you're trying to access some website on your phone.    The website data comes to the base station; the base station is trying to send that to a phone as fast as possible.

And so it does this kind of feedback process with the phone where it's trying to send as much data to the phone as possible at a particular time without sending too much information at the exact same time or there's going to be errors like the bits that we were talking about would be an error.    So it's already doing things like trying to figure out how many simultaneous signals to send to your phone at any particular time and how much data to put in each of those signals.

223

And so now if you take some version of some phone and then put in better technology in it, it's not like you need to go and change anything on the base station side; this algorithm--it's called a scheduler--algorithm is already doing and trying to figure out how much data can push to your phone at any particular time.

Q.    All right.  What was the result of that first February meeting with Samsung?

A.    So after the February meeting, we had some discussions that eventually led to, in October 2012, them asking us to do something called a -- process something called a test vector.

Q.    All right.  Looking at PX 30, what is a test vector?

A.    So a test vector is effectively a digital file, digital meaning, stored in a file, representation of the input to a receiver.  So just imagine, for instance, if I have a cell phone and I could just reach into the phone and just save off whatever actually is the input to that receiver, those can be stored in something we call a test vector.  The idea is that you can then load it back in later and test different receiver technologies.

Q.    Why did Samsung explain it wanted you to run these tests?

A.    Well, they wanted to test the performance of our receiver and see how it does particularly relative to some competing baseline approach.  They also had the notion that they were going to take the results of the test vectors and put it into

224

their own simulation environment to not just predict the performance of that test vector but its effect on the whole entire network.

Q.   Did Samsung ever show you the results of their internal tests on the performance of Collision's techniques?

A.   No.

Q.   Looking at the first email in this chain from 2012, what were you expressing to Samsung here about these tests?

A.   So at this point it had been already a year since Collision had engaged with them, and we were concerned that since we didn't fully agree that these test vectors were the best way to test the performance of our receiver, that we were going to get in this cycle of them endlessly asking for tests that we didn't really think proved the full capability of the receiver.

And so we expressed to them that it is important for us to understand how this ultimately concludes, like we didn't want to be in a situation where they just asked for more and more and more.

Q.   Did you run those initial tests anyway?

A.   Yes, absolutely.

Q.   How did that first test go?

A.   Very well.  I believe we decoded all of the test vectors correctly.

Q.   What happened after that?

A.   So at that point now in January 2013, Samsung requested we run additional test vectors.

Q.   Looking back at PX 30, what were the results of those additional test vectors?  And I know this might get kind of technical so, again, take it slow.

A.   Yeah.  So they asked us to run these five cases.  These five cases, each of the individual cases represented 50 different test vectors, and the goal was to see how many of the 50 Collision's receiver could decode compared to some baseline which was representative of the state of the art at that time.

     And so you can see here for case 1, collision's receiver was able to decode all 50 of them, whereas the baseline was able to decode 15.  You can see the rest of the results there.

Q.   So now that you passed the second set of tests, did Samsung say, all right, let's work together, let's collaborate?

A.   No.  They actually asked us to run more test vectors and then to start running our simulation and comparing to that baseline.

Q.   What was the next milestone in that process?

A.   So the next milestone is this June 2013 meeting where we flew out to Korea to present to them the results of those simulations.

Q.   Is JX 10 the slides that you presented at that meeting?

A.    Yes.

Q.    Let's walk through a subset of those slides.  On this first one, what were you conveying to Samsung here?

A.    Well, we were talking about the patent portfolio.  We were doing this partially just to gain credibility, that there was a lot of technology behind the things that we were talking to them about, but also we wanted to talk to them about kind of the categorizations of the patents in order to tell them about the type of technology that we were pitching to them.

Q.    What did you tell them about the types of techniques that your patents related to?

A.    We told them about the multiuser detection, of course, how it relates to MIMO, and then also we talked to them about the parameter estimation, which is that channel estimation component.

Q.    Did you share anything with Samsung about Collision's future plans?

A.    Yes.  So all of this, we were meeting with the base station division in this meeting and we were talking to them about how, although our near-term efforts was to gain credibility in an initial market, the technology into the base station market, that ultimately we were looking to enter the LTE handset market.

Q.    Now, what was the main goal of this June 2013 meeting?

A.    And the main goal was to talk to them about the

simulation, the SLS, or the system level simulation.

Q.   Now, what was Samsung's expectation for you going into this meeting for your performance from that simulation?

A.   They had told us that we needed to meet certain goals in order to have a commercial relationship with them, to be working with them to put our technology into their products, and that's what on the yellow down here.  They said we need to have 100 percent cell edge or edge of cell spectral efficiency gain even if we don't improve the average subscriber at all.

Q.   Can you briefly explain what you mean by this edge of cell?

A.   Yes.  So edge of cell is a technical metric.  But what it effectively means is how well the subscribers are performing who are really, though, the worst, the most disadvantaged subscribers.  And so this would be people who are typically literally edge of cell, far from the cell.  We typically think of this as one bar.

But this also happens actually because of interference.  Some particular subscriber who's getting a lot of interference will also have poor performance and can be in this category.

Q.   How did Collision perform relative to those goals that Samsung had set?

A.   So the edge of cell one their goal was a hundred percent, and we proved well beyond that to 165 percent.  And they said that even if you don't improve the average subscriber at all,

that's the 0 percent down there, we'd be happy if you got the hundred percent.  But we got the 165 percent plus improving the average by 25 percent.

Q.   How did it feel to get to show Samsung results this good?

A.   Amazing.  I mean, these were what they said that we needed to get to to have a commercial relationship with them, to be working with them, to put our technology into their products.  And this was us exceeding that goal.

Q.   Now, if you hadn't focused on the edge of cell like Samsung had asked you to, did you test what would have happened to that average spectral efficiency?

A.   Yes.  There are certain things you can do to optimize for one versus the other.  We could have got up to 40 percent on average.

Q.   Just to clarify for the jury, when you're talking about these average spectral efficiency gains, what does that mean in real terms?

A.   Yeah.  So in reality what this means is more data to and from our devices.  So if you're talking about like on the cell phone side, maybe we can watch a video that previously was choppy, now we can watch nice high quality video; or if we were dropping calls before, now maybe we're not dropping calls.  Things like that are the end of fact of just getting more data more reliably to our devices.

Q.   Okay.  Exactly how were you demonstrating or I guess

generating these performance results?

A.    So with something called our system level simulation. And effectively what that is is it's a computer program, a simulation, that's trying to actually emulate a full cellular network.  And you can use it to add some new technology and predict the end of fact of the technology on the entire network.

Q.    Did Samsung agree that this computer simulation was an appropriate way to test out a new technology?

A.    Yes.  In fact, both the standards body and Samsung do these sort of system level simulations.  We go a little beyond even what they do to model things in more detail so we can get even better performance predictions.  But everybody is doing these system level simulations.

Q.    All right.  So to show the gains that you were showing, what was your metric you were performing against?

A.    We were performing against this baseline which I previously said was some representation of the state of the art at the time.

Q.    Looking at the top of this slide from JX 10, without rattling off too many acronyms, what do you mean by 1 by 4 MU-sIMO?

A.    So let me break that down exactly what those terms mean. The 1 by 4 means -- in this case we are talking with the base station people here, so we were talking about better receivers

in the base station.  So in this case you had four different cell phones, up to four different cell phones, that's the 4 there.  Each of those with one receive antenna.  Sorry, one transmit antenna.  That's the 1.

Each of those were sending a signal, so you have four different signals coming from four different devices.  And then we use a base station with multiple antennas, that's the multiple output there, to receive that signal ultimately using these different techniques to process them.

Q.    Is that called something different today in modern networks?

A.    Yes.  Today that's just called multiuser MIMO.

Q.    Now, was Collision pitching its technology as only relevant to multiuser MIMO?

A.    No.  We were pitching our technology as equally applicable to multiuser and single user MIMO.

Q.    Now, in the highlighted sentence, why did you say that this sort of existing state of the art approach was good for SU-MIMO?

A.    So we were there to discuss with them how to improve their system.  Right?  And so we were actually setting the stage by talking about where certain things were performing pretty well, and then we were using this slide to then talk about where our technology could do even better.

Q.    Now, what were the main features of Collision's

techniques that improved over that baseline?

A.    These two things highlighted here, the first is the equalizer and detector, that's that multiuser detection component, and the next is that parameter estimation, that's the channel estimation component.

Q.    Now, how did Collision's design improve the equalizer and detector that you mentioned?

A.    We have -- we added this non-linear multiuser detection block, sorry, MUD block that had some forms of interference cancellation in them.  We were also using these iterations so the concept behind these iterations are kind of improve things as you go through this looping process.

Q.    And what about with respect to the parameter estimation what was the improvement you did there?

A.    So a lot of the similar things.  We also had this iterative concept of improving things as we loop through, but we were modeling more signals directly and that improved the channel estimates themselves.  And we did have that similar interference cancellation concept inside of that parameter estimator.

Q.    Do you recall in opening when Mr. Pak suggested that interference cancellation was the old way of doing things and not what Collision was proposing?

A.    I do recall that.

Q.    Was that true about Collision's techniques?

A.    No.    And this is a slide from that same June 2013 meeting where we said Collision's techniques remove intercell interference, and that's using those cancellation techniques.

Q.    Was that the only time that Collision has described its own technology as interference cancellation?

A.    No.    I believe this one's now from the 2011 meeting, maybe the first time that we had sent them slides.    And so in this case we say multiuser detection, an advanced form of interference cancellation.

MR. STEWART:    That's, for the record, JX 22.

Q.    (BY MR. STEWART)    So if Samsung calls its technology interference cancellation, does that mean it can't be using Collision's multiuser detection techniques?

A.    No.    I mean, in fact, if you just look at the patents in this case and look for the word 'interference cancellation', you'll see it all over the place.    Our techniques we were using included some of those interference cancellation concepts.

Q.    All right.    Now, back to Collision's simulation, are you saying that Collision was the first person or the first company to ever use a non-linear MUD or ever use any of these iterative concepts you talked about?

A.    No.    It's -- what I was describing earlier, the multiuser detection work that BAE did and then Collision did was really about how do you find the right combinations of techniques for

a particular type of system to get really good performance with a reasonable amount of processing power.

Q.   All right.  So now that you exceeded Samsung's threshold, you'd shown them all these simulation results, did they sign up to work with Collision?

A.   No.  They actually asked us to run more simulation results at that time.

Q.   And what did that tell you about your simulation environment?

A.   Well, at this point now they were specifically requesting results from our simulation environment that complemented our simulation environment, we had gone through multiple rounds of validating simulation environment.  So at this point it was pretty clear that they had fully bought in that the simulation was effective at testing new technology and producing results.

Q.   Did you run the new tests that you ran in August of 2013?

A.   We did.  It was a harder case called the blind detection here, and we got 15 percent average spectral efficiency gains and 132 percent edge, still well above their threshold.

Q.   Now, did Samsung have any complaints with the results you were demonstrating or the complexity of those algorithms?

A.   No.  And the complexity is just a different word for processing power.  So they said they were impressed with the low complexity to implement the blind MUD algorithm, so that means that they, you know, were acknowledging that it did not

require a lot of processing power.  That's the low complexity.

Q.   So now after this additional set of tests with more performance results, what was Samsung's position on working with Collision?

A.   Well, at this point they started to talk to us about these weekly meetings that they wanted to engage with us on.

Q.   And what happened in March of 2014?

A.   So, finally, fast forwarding to March of 2014, Samsung notified us that they were not interested in working with us anymore.

Q.   So after all this effort and all these interactions, how did that make you feel?

A.   Confused.  I mean, they had set performance targets; we exceeded those performance targets by a lot.  They said you needed to have, you know, not a lot of processing power to run these really complicated techniques, and we showed them that. And then for them to just walk away didn't make sense to me.

Q.   Now, did Collision as a business just give up at that point when Samsung decided not to work with you?

A.   No.  At this point we turned to other base station manufacturers like Nokia and Ericsson to engage with them about taking multiuser detection and putting it into their products.

Q.   Did you have any sort of agreement or do a deal with Nokia?

A.    Yes.  We had a -- this is 2016 now.  We had this proof of concept where we proved the technology to them effectively. And then after that, we had an agreement with them to actually take our technology and to put it into their products.

Q.    Now, when you worked with Nokia and Ericsson, did you see evidence that they were using in their 4G products the type of advanced techniques that we've talked about today?

A.    No.  And particularly with Nokia, we had gained pretty good insight into what they were doing inside their base station.

Q.    So how did that Nokia deal end up panning out?

A.    Well, they eventually in 2018 now had this funding decision where they decided to pull funding for the development we were doing.

Q.    What did that mean for Collision's business?

A.    Well, at that time Collision made a decision to essentially stop building the technology and laid off most of the technical team.

Q.    Fast forward a few years from that issue with Nokia.  Did you come to learn that Samsung was infringing Collision's patents?

A.    I did learn that.

Q.    And what was your reaction to that?

A.    Well, I mean, I guess I certainly don't advocate patent infringement for sure, but I had spent a lot of time studying

236

the technology, knowing how much better systems can be using the technology. And so from the perspective of them finding that Samsung was using that technology to improve their products, I mean, that part didn't surprise me.

Q. How do you reconcile the fact that Samsung is using Collision's technology in its cell phones despite not wanting to work with you-all in base stations?

A. Well, the base station market is a little strange where technically if you make a better base station, I can get more data through a base station, then you actually can deploy fewer of them. So a company that is building base stations, if they improve it, may end up actually selling less.

But with cell phones, really everybody wants a better cell phone. Nobody wants to drop calls and nobody wants to watch low quality videos. And so I think as we consumers, we all want the better product.

Q. Now, looking at PX 3 here, did you agree with Mr. Pak's statement in opening that Collision's work with Samsung was only about base stations and never about cell phones?

A. No. In fact, we talked to them many times about how we were starting with base stations and ultimately moving on to handsets. And so this is 2014. We said, you know, handsets today suffer significant interference from adjacent macro cells and we talked about how the performance gains that we showed--that 25 percent, that 165 percent--would be equally

applicable on to the handset side.

Q.   Mr. Farkas, are you proud of the work you did for Collision?

A.   Yeah, absolutely.  I think that, you know, we really showed that multiuser detection is a great technology and can significantly improve a lot of systems.  Sad we didn't quite get there where we were putting this technology in everyone's base stations and phones, but very proud of the work I did.

Q.   If you could go back to 2011, what would be your preference with respect to the relationship between Collision and Samsung?

A.   Well, I was all in this to be working with different companies and improving their products.  I mean, that's the entirety of the conversations that we were having with Samsung.  And so I would way rather be still working with Samsung building I guess the fourth or fifth version of the technology inside of their devices than being here today.

Q.   Thank you, Mr. Farkas.

          MR. STEWART:  Pass the witness.

          THE COURT:  All right.  Cross examination by the Defendants.

          MR. PAK:  Thank you, Your Honor.  If I could hand out the cross binder?

          THE COURT:  You have leave to distribute binders, counsel.

MR. PAK:  Thank you.

(Pause in proceedings.)

THE COURT:  All right.  Mr. Pak, you may proceed with cross examination.

CROSS EXAMINATION

BY MR. PAK:

Q.   Good morning, Mr. Farkas.  How are you?

A.   Good morning.

Q.   My name is Sean Pak.  I represent Samsung.  I'll be asking you some questions today.

A.   Okay.

Q.   Okay.  I think you mentioned this, but you are a paid consultant for Collision.  Is that correct?

A.   That's correct.

Q.   And your consulting agreement means that you get paid for the work you do for Collision, excluding the testimony that you're providing today.  Is that correct?

A.   That's correct.

Q.   And you receive about $325 an hour for that work?

A.   Yes.

Q.   And roughly how much compensation have you received as a consultant?

A.   Well, my work with them for about five years now as a consultant in the 3- to $400,000.

Q.   Now, I think you mentioned that you joined Collision in

early 2005.  Is that correct?

A.    2005?  No, that was --

Q.    That was BAE?

A.    That was BAE.

Q.    Okay.  So when did you join Collision?

A.    Collision in 2012.

Q.    2012.  So early 2012 in February time frame?

A.    Correct.

Q.    Okay.  Now, you understand that the -- going back to the BAE patents that are being asserted here now owned by Collision, that the -- those patents were filed before you joined BAE.  Is that correct?

A.    I thought that wasn't true for the '492 one.

Q.    Okay.  So three out of the four were filed before you joined BAE.  Is that correct?

A.    I think that's correct.

Q.    Okay.  Now, you're not a named inventor in any of the four patents that are being asserted in this case.  Is that correct?

A.    Yes.

Q.    And you did not contribute to the conception of any of the patents that are being asserted in this case.  Correct?

A.    Yes.

        THE COURT:  Try to speak up, please, Mr. Farkas.

Q.    (BY MR. PAK)  But you did mention the named inventors

that you worked with at BAE.  Correct?

A.    Yes.

Q.    And you're not here to dispute any of their testimony that we'll be hearing later in this case.  Correct?

A.    I don't know what their testimony is, but I'm not here to dispute it.

Q.    They know about their inventions.  Correct?

A.    Presumably, yes.

Q.    Okay.  And you mentioned Dr. Learned.  She went to MIT. Correct?

A.    That's correct.

Q.    And she came to BAE with knowledge of other MUD technologies that have been developed prior to her work at BAE.  Correct?

A.    Yes.

Q.    And you would say that she's an expert on MUD technologies generally.  Correct?

A.    Yes.

Q.    And I think we saw a picture of you.  But you were fairly young back then when you were working at BAE?

A.    Yes.

Q.    And when you joined BAE, you had just come out of college.  Is that correct?

A.    Yes.

Q.    So you were a part of a rotation program where you worked

Q.   in different groups?

A.   Yes.

Q.   And so initially you were working on assembling cables for BAE?

A.   For about two weeks, yes.

Q.   Yes.  And you transitioned eventually to working as a junior member of the group that was working on MUD technologies for BAE.  Is that right?

A.   When I joined initially, yes.

Q.   Okay.  And just to make things clear, when you left BAE in 2012, did you still have confidential access to BAE's military projects after that point?

A.   Depends what date you're talking about.

Q.   Do you still have access to BAE's military projects?

A.   Yes.

Q.   Okay.  Have you received confidential information on all of the various programs that are being conducted by BAE at this point?

A.   No.

Q.   Okay.  In particular, were you ever read into the Link 16 product that was being developed by BAE?

A.   No.

Q.   Do you know anything about that product?

A.   The product line?  Not much.  I know a little bit about the underlying Link 16 technology.

Q.   But you don't know the specific way in which the Link 16 technology was applied to the military applications by BAE. Is that fair?

A.   That's fair.

Q.   Now, so you didn't work on the technology that led to the filing of these four asserted patents, but there came a time at BAE when you were asked to market the patent portfolio. Correct?

A.   Yes, from a marketing from a technical perspective.

Q.   And I think we heard a suggestion during the opening from Collision that somehow the military would not find any use of this type of MUD technology that's claimed in the four asserted patents.  You wouldn't agree with that.  Correct?

A.   Can you repeat that one more time?

Q.   Sure.  During Collision's opening, we heard a suggestion that the military customers at BAE would no longer have any use for Collision's patented MUD technology.  You would not agree with that statement.  Correct?

A.   I think the only thing I can say is that it didn't end up in their products.  And so if the inference is therefore it's not useful for the particular BAE products, I don't know.  But I guess -- I'm not sure I would word it that exact way, but I don't fully disagree with it.

Q.   So you left BAE in 2012.  Is that correct?

A.   That's correct.

243

Q.    And so one thing that you didn't mention during your testimony is that BAE actually kept a license to use all of the asserted patents in this case.  Correct?

A.    That's correct.

Q.    Okay.  And so when they sold the patents, they kept a license to use it.  Right?

A.    Yes.

Q.    And you have no personal knowledge of all the different ways that BAE could have used the patented technology after you left in 2012.  Is that fair?

A.    I mean, besides staying just in touch with people, I have no direct awareness of those products.

Q.    Now, you didn't ask BAE on behalf of Collision to see whether the patented MUD technology was ever incorporated into any of their military applications after you left.  Correct?

A.    Correct.

Q.    Going back to the time when you were at BAE and you were trying to market or sell the patent portfolio for commercial uses, you reached out to a number of companies.  Correct?

A.    No.

Q.    Did you reach out to anyone besides the folks at Collision?

A.    I didn't reach out to Collision.

Q.    Are you aware of how many organizations received a proposal from BAE to commercialize the patented MUD

technology?

A.    No.

Q.    You don't have any sense of how many?

A.    I know it was more than two.

Q.    Okay.  So who was in charge of actually figuring out which companies should be targeted for the selling of the BAE's MUD technology?

A.    I don't know.

Q.    So what was your role in that marketing process?

A.    So I came in on the technical side.  Right?  So when they had already engaged with someone who was potentially interested, I was there to talk about just generally the technical benefits of those -- of the patents and really multiuser detection as a whole.

Q.    So you weren't involved in coming up with a list of companies that might be interested in commercializing BAE's MUD portfolio.  Correct?

A.    Correct.

Q.    And you weren't involved in the actual selling process or the marketing process.  Is that fair?  Other than the technical benefits piece.

A.    Correct.

Q.    Okay.  Now, Collision ultimately purchased the MUD patent portfolio from BAE.  Correct?

A.    Correct.

Q.    And that included over 80 patents.  Is that right?

A.    I believe that number is correct.

Q.    I think the records indicate 84 patents.  Does that sound right to you?

A.    Yes.

Q.    And for the entire purchase of 84 MUD patents, Collision paid a total of $3.9 million.  Is that right?

A.    Yes.

Q.    Okay.  And as we indicated, according to that agreement, that transaction, BAE retained a license to use all 84 patents.  Correct?

A.    Yes.

Q.    Also as part of that transaction, BAE has a financial interest in this case.  Isn't that correct?

A.    I suppose so.  I don't -- I've never actually read the agreement, so I'm inferring from that that they have some sort of back end on it.  But I don't really know any details.

Q.    So you've never seen the actual transfer agreement from BAE to Collision?

A.    I don't believe so.

Q.    And you were not involved in negotiating that agreement, I take it?

A.    That's correct.

Q.    Would it surprise you to learn that according to that agreement, BAE has a 15 percent financial interest in the

outcome of this case?

A.   No.

Q.   Okay.  It doesn't surprise you.  Correct?

A.   No.  I knew that they had some sort of back-end on the -- I'm not even sure the details, some sort of back-end.

Q.   Now, to your knowledge, Collision never issued a subpoena to BAE in connection with this case.  Correct?

A.   I have no idea.

Q.   Okay.  To your knowledge, did Collision ever ask BAE to produce documents showing whether their products for the military market used the asserted patents?

A.   I don't know.

Q.   Do you have any knowledge of the specific documents and witnesses that have been produced by BAE in this case?

A.   A little.

Q.   What's your knowledge of that?

A.   I mean, I've been shown some documents that have been produced in the case, and I've met most of the witnesses.

Q.   Okay.  But, again, you're not here as a technical expert in this case.  Correct?

A.   That's correct.  I'm a fact witness.

Q.   You're not a lawyer.  You're not here to tell us about the claim language of the asserted patents.  Correct?

A.   That's all correct, yes.

Q.   And you're not here to testify to us about whether the

confidential BAE documents that were produced in this case show that they do, in fact, use the patents or not.  Correct?

A.    That's correct.

Q.    But you do understand that Collision has the burden to establish that any licensed products under the asserted patents do not practice the asserted patents.  Correct?

A.    Yes, I understand that.

Q.    And that would include -- that burden would include not only BAE who originated the patents but Nokia and Ericsson, the base station companies that also took a license.  Correct?

A.    Yes.

Q.    And, again, you're not here to provide expert testimony about Ericsson or Nokia's products.  Correct?

A.    Correct.

Q.    Now, the testimony you gave about Nokia was based on your personal dealings with them, but you didn't analyze any of the Nokia's confidential documents that were produced in this case.  Correct?

A.    Correct.

Q.    Now, during the period of time that you went through in your chronology when you were dealing with the Samsung's base station group, you never notified Samsung that it was infringing any of the asserted patents.  Correct?

A.    I just personally talked about the portfolio and the technology behind it.  That wasn't my role there.

248

Q.   Right.  So all those meetings that you showed, the purpose of those meetings was not to communicate to Samsung that Samsung was infringing any of these patents.  Correct?

A.   Correct.

Q.   And, in fact, I think you said this.  At this point, you were talking to Samsung's network division.  Correct?

A.   Correct.

Q.   That was a division that makes the base station equipment.  Right?

A.   Yes.

Q.   To your knowledge, Collision never interacted with the handset division of Samsung.  Correct?

A.   I'm not sure if they did directly.  I believe they did indirectly.

Q.   Yeah.  And I don't need speculation, but do you know with certainty, Mr. Farkas, whether BAE -- whether Collision ever communicated with the handset division of Samsung?

A.   I can say I did not.

Q.   Okay.  And to your knowledge, Collision never provided Samsung with any claim charts or any type of analysis to show that any of Samsung's products practice each and every limitation of any of your asserted patents.  Correct?

A.   That's correct.  At least the time I was a Collision employee.

Q.   Now, when BAE sold the MUD patent portfolio to Collision,

it provided a list of companies that BAE thought were utilizing some of the MUD patents.  Do you recall that?

A.    I'm not aware of that.

Q.    You're not aware of that?

A.    No.

Q.    Does it surprise you that Samsung was not identified in any of those documents by BAE?

A.    I don't know.  I just -- you'd have to show me the list.

Q.    Okay.  Let's take a look at PROD 5947.

MR. STEWART:  Objection, Your Honor.  It sounds like this is something outside the scope of this witness' knowledge and he's showing him a BAE document.  He's testified he doesn't know the contents of.

THE COURT:  Do you have a response, Mr. Pak?

MR. PAK:  Yes, Your Honor.  So I believe that there was discussion about BAE's marketing efforts to companies.  He testified regarding his technical support.  I'm just trying to establish that he didn't have any meetings with these other companies and that the Samsung is not one of those companies.

THE COURT:  Well, you can ask him if he met with any particular company, but I don't see any reason to show a document to him that he's testified he doesn't know anything about.

MR. PAK:  Thank you, Your Honor.

THE COURT:  To that extent, I'll sustain the

objection.

Q.   (BY MR. PAK)   For example, when BAE identified Cisco, did you have any meetings with Cisco?

A.   No.

Q.   When they identified Motorola, did you have any meetings with Motorola?

A.   No.

Q.   And you didn't have any meetings with Samsung.   Correct? At BAE?

A.   Correct.

Q.   Now, I think you discussed this briefly, but just to make it clear, MUD technology is a very old technology that goes back to the 1980s.   Correct?

A.   I would say some of the original theory on multiuser detection goes back a long way, yes.

Q.   Right.   There is a textbook that was published by Dr. Verdu, V-E-R-D-U, going back to 1998.   Correct?

A.   Correct.

Q.   And you're familiar with that book?

A.   Yes.

Q.   And that book cites dozens and dozens of articles and publications talking about research and commercialization of that technology.   Correct?

A.   I'm not aware what it says about commercialization of that technology, but I agree with the research part.

Q.   Okay.  Did you review the Verdu textbook to see whether it discusses commercial efforts to use MUD technology?

A.   I've read a lot of portions of it, but I have not reviewed it for this case, no.

Q.   Okay.  And just so we're clear, the asserted patents in this case don't cover MUD technology generally.  Correct?

A.   I'm not sure what you mean by that.

Q.   Sure.  So there are lots of MUD technologies.  For example, everything in Dr. Verdu's 1998 textbook, all the things that the patents say were prior art MUD techniques, anyone could use those techniques and not infringe Collision's patents.  Correct?

A.   Correct.

Q.   So what these four patents cover is a very specific type of MUD technology.  Correct?

A.   Yes.

Q.   So just because somebody says we might have a MUD technology does not mean that it's Collision's MUD technology.  Correct?

A.   Correct.

Q.   And to really figure out what these asserted patents cover and don't cover, we have to look at the claims of each of these asserted patents to see if a product has each and every element of that claim.  Correct?

A.   Correct.

Q.   And you didn't do that analysis.  Correct?  In this case.

A.   I just provided opinions to others.  I didn't do a claim-by-claim mapping.

Q.   That's right.  And you never had access to Samsung's confidential documents?

A.   Correct.

Q.   Now, you testified earlier about some events that took place between Collision and Samsung before you joined Collision.  Correct?

A.   Correct.

Q.   So you're here to tell us and provide testimony on events that happened before you joined Collision as Collision's corporate representative.  Is that correct?

A.   I'm just here to answer questions I know the answers to.

Q.   Okay.  But fair to say that you did review documents predating your arrival at Collision to prepare for today's testimony?

A.   Or had already seen them from my time at being at Collision.

Q.   Okay.  So one of the documents that you mentioned is JX 22.

        MR. PAK:  If we could have that on the screen.

Q.   (BY MR. PAK)  Now, this is one of the documents that you showed us.  Is that correct?

A.   Yes.

Q.   And you understand even though you didn't participate in the meeting, that this was the presentation that Collision gave to Samsung's networking division in April of 2011. Correct?

A.   Correct.

Q.   And to be clear, what Collision was going to Samsung's networking division for at the time was to jointly develop a new base station product that would utilize Collision's form of MUD technology.  Correct?

A.   Yes.

Q.   It was not a conversation about anything that Samsung already had, whether it's handsets or base stations.  Correct?

A.   I think that goes beyond what I know.  I've seen the slides, but I don't know exactly what was discussed in 2011.

Q.   Right.  So you don't know what was being discussed in 2011, but you do know about the conversations that took place after you joined?

A.   Yes.

Q.   Okay.  And the conversations that you were involved in with Samsung was about jointly developing a new base station product using Collision's patented technology.  Correct?

A.   I'm not sure what you mean when you say a new base station product.

Q.   Or adding the Collision's version of MUD technology that's patented into the base station products of Samsung.

254

Correct?

A.    Yes.

Q.    So, again, it wasn't about whether what Samsung had prior to those meetings with Collision used or did not use the asserted patents.  Fair?

A.    Yes.  They talked about Samsung's multiuser detection work, but there was no direct conversation with them about the patents related to that technology.

Q.    And just to be clear, when you saw reference to MUD technology that Samsung may already have developed prior to its meetings with Collision, you're not suggesting to us that that's the patented MUD technology from Collision.  Correct?

A.    Can you say that one more time?

Q.    Sure.  When you mentioned that Samsung had something that it called MUD prior to the meetings with Collision, you're not telling us that that pre-existing MUD technology from Samsung uses Collision's patented MUD technology.  Correct?

A.    Yeah.  I'm not saying either way.  They didn't give us enough details where we could possibly know that.

Q.    You don't know that?

A.    Yeah, I don't know that.

Q.    But you did -- your reaction I think, as we saw in the email from 2012, was that that's not the sophisticated MUD technology that is patented by Collision.  Correct?

A.    I don't think I said anything about that as patented, but

I did say the sophisticated MUD part.

Q.   Right.  And just to be clear, when you say sophisticated MUD, are you talking about Collision's MUD patents?

A.   I think in that email I was -- I -- I think my meeting notes, when I was saying the sophisticated MUD portion was talking about, didn't seem like Samsung was doing what I perceived as a sophisticated MUD.

Q.   But fair to say that you believe what's covered in these asserted Collision patents is a form of a sophisticated MUD technology.  Fair?

A.   Yes.

Q.   Now, if I take a look in this slide to slide 24, in this 2011 presentation, Collision had three options that it was discussing--upgrading within a standard 3G, deploying a new standard 4G, and interference cancellation.  Do you see that?

A.   Yes.

Q.   And if we turn to slide 25, UMTS at the top, is that a form of 3G technology?

A.   Yes.

Q.   So what Collision was telling Samsung in 2011 at this initial meeting was one of the options for a network operator such as T-Mobile or AT&T is to basically go to wider channels, higher modulation schemes, and MIMO, just like LTE and WiFi technology called WiMAX.  Do you see that?

A.   Yes.

Q.    So Collision was not saying to Samsung that they had patents on wider channels.  Correct?

A.    I don't interpret that as saying anything about patents.

Q.    Again -- and you don't interpret this as saying Collision has patents on higher modulation schemes.  Correct?

A.    I don't interpret it talking anything about patents.

Q.    And, again, you don't interpret this as saying that Collision had patents on MIMO technology.  Correct?

A.    Correct.  I don't think that's what they were trying to communicate here.

Q.    And you know, sir, that LTE standard was published in 2008.  Correct?

A.    Correct.

Q.    And that already disclosed using 4 by 4 MIMO technology. Correct?

A.    Correct.

Q.    And you could use 4 by 4 MIMO technology, which had four antennas in a single user device for both uplink and downlink, and that was already published in the LTE standard as of 2008. Correct?

A.    That's correct.

Q.    Okay.  And if we turn to slide 26 of JX 22, it says another thing that Collision noted is operators could just adopt LTE.  Do you see that?

A.    No.  Where is that?

Q.   So do you see at the top, this is one of the options for network operators is deploying a new standard, LTE or WiMAX? Do you see that?

A.   Yes.

Q.   So Collision was communicating to Samsung, network operators had the option of deploying a new standard at the time, which is LTE or 4G technology.  Correct?

A.    I mean, besides interpreting this in real time, I'm not sure.  I don't believe I've ever seen this slide.

Q.   So you presented this presentation, but you had never focused on this particular slide?

A.   Isn't this from 2011?

Q.   Yes.

A.   I did not present this.  That was before I was a Collision employee.

Q.   You didn't talk about the meetings that happened?

A.   Generally, but I don't recall ever seeing this slide.

Q.   Okay.  So going back to your chronology --

MR. PAK:  Could we have Mr. Farkas' demonstrative? And let's put up the chronology that you showed us, which I think is on Farkas 50.

Q.   (BY MR. PAK)  Do you see on the left-hand side, there's a notation there, April 2011, parties begin discussions?

A.   Yes.

Q.   Okay.  So you provided that testimony, but you didn't

actually look at the document JX 22, which was the meeting presentation?

A.   That particular slide I'm not familiar with that you were just showing me.

Q.   Have you seen the presentation before?

A.   I think I've seen other slides from that presentation.

Q.   But you didn't ever look at that particular slide.

A.   I don't recall ever looking at that particular slide.

Q.   And sitting here today, you don't know what that means?

A.   I'm happy to put it back up and try and interpret that in real time.

Q.   Okay.  So that's JX 22, slide 26.

Isn't it true, sir, that one of the things that Collision was telling Samsung was that base station operators like AT&T and T-Mobile could adopt the new standard LTE which was available starting in 2008?  Correct?

A.   Are you saying that's what's on this slide?

Q.   Yes.

A.   Can you repeat that one more time?

Q.   Isn't this slide indicating that Collision was telling Samsung one of the options available for base station companies as of 2011 is to adopt the LTE standard?

A.   I see how it's talking about LTE.  I don't see how Collision was presenting an option to adopt LTE versus something else.  I'm not quite sure what you're getting at.

Q.    You know that Mr. Stanley Fry was at this meeting?

A.    I believe so.

Q.    Did you ask Mr. Fry about what was actually being presented to Samsung in April of 2011?

A.    No.

Q.    Okay.  So if you turn to the next slide, which is slide 27, the title is Interference Cancellation.  Do you see that?

A.    Yes.

Q.    There were lots of ways to do interference cancellation before BAE filed its patents in this case.  Correct?

A.    I'm not sure on the characterization of lots, but I'm familiar with that there were other techniques.

Q.    Right.  For example, successively canceling interference, or SIC, technology was known prior to the filing of these BAE patents.  Correct?

A.    I believe that's true.

Q.    And here it says, "Past efforts focused on improving the signal or interference avoidance but at the cost of reduced capacity."

      Do you see that?

A.    Yes.

Q.    Now, as an engineer, you agree with that statement?

A.    Is your question specific to interference cancellation?

Q.    Yes.

A.    I'm not sure what the cost of reduced capacity, what

argument they're trying to make on this slide.

Q.   Again, you were aware of the meeting, but you didn't study this particular slide before you presented your testimony here today.  Correct?

A.   I believe I've seen this slide, but I certainly didn't study it.

Q.   Okay.  And you don't know what Collision meant by this presentation slide when it presented it to Samsung in 2011. Correct?

A.   Specifically about the cost of reduced capacity, I'm not quite sure what they were trying to communicate with that.

Q.   Okay.  How about the third bullet?  It says, "Currently interference treated as noise."  As an engineer, would you agree that was a true statement as of 2011?

A.   Well, I would say there are certainly some techniques that did not treat interference as noise.

Q.   Prior to 2011.  Correct?

A.   Yes.  This seems to be a general multiuser detection comment.

Q.   Okay.  And, in fact, multiuser technologies or interference cancellation technologies that treated interference as something other than noise existed prior to the filing of the BAE patents.  Correct?

A.   Yes.

Q.   Okay.  And at the top do you see it says, MIMO increases

signal and interference?  Do you see that?

A.   Yes.

Q.   So here Collision was telling Samsung in 2011 that they knew about MIMO technology from LTE, but to them MIMO was actually increasing interference.  Do you see that?

A.   Yes.

Q.   Now, you mentioned something called 3GPP.  Is that the industry standards organization that publishes 3G, 4G, and 5G standards?

A.   Yes.

Q.   To your knowledge, Collision is not a member of 3GPP. Correct?

A.   Correct.

Q.   It did not participate making any of these standards whether it's 3G, 4G, or 5G.  Correct?

A.   Correct.

Q.   And while you were at BAE, you were not aware of BAE being a member of 3GPP.  Correct?

A.   Yeah.  I'm -- it's a big organization, but I'm not aware they were.

Q.   And you're not aware BAE contributing to the development of 3G, 4G, and 5G standards.  Correct?

A.   Correct.

Q.   But you do know that Samsung is a member of 3GPP. Correct?

A.    Correct.

Q.    And you were aware that Samsung does contribute to the development of standards such as 3G, 4G, and 5G.  Correct?

A.    Yes.

Q.    Now, I think you said something interesting during your testimony.  You talked about there are two aspects to Collision's MUD technology.  Do you recall that?  There is the part about making sure that multiple signals that are transmitted at the same time using the same frequency can be decoded or used simultaneously.  Do you recall that testimony?

A.    Yeah, that was one of the aspects.

Q.    And you were to allow that to happen, you may suppress other interference that's not needed for that.  Correct?

A.    Yes.  I think I was talking about that in relation to both Collision's in general multiuser detection technology.

Q.    But the sentence you provided also applied to Collision's sophisticated MUD technology that's claimed in the asserted patents.  Correct?

A.    I believe I was making a statement about the work that we were proposing for Samsung.

Q.    I'm asking you a different question.  You're familiar with these patents generally.  Correct?

A.    Generally.

Q.    And you agree with me that what these patents, the four patents that are asserted in this case cover, is what you

consider to be sophisticated MUD technology that originated out of BAE.  Correct?

A.   Yes.

Q.   And isn't it true that in these asserted patents, when it talks about this form of sophisticated MUD technology, you have two parts to it.  One is preserving and decoding multiple interfering signals that are being transmitted at the same time using the same frequency and also suppressing interference that might occur.  Is that correct?

A.   I agree with you when you talk about multiuser detection in general and the work that Collision was proposing for Samsung.  I think when you start talking about what a particular patent is doing, I don't think I could specifically answer that and certainly in this general way.

Q.   Okay.  So you don't really know, sitting here today, what these patents cover and they don't cover.  Is that correct?

A.   I'm just commenting on breaking things up into these two broad categories and then trying to place the patents across these categories.  We'd probably have to start walking through them one by one.

Q.   So when you were giving us the example of the -- I'm not a very good golfer, but I understand that some golfers throw up some grass to figure out the wind conditions before they start hitting the balls.  Do you recall that testimony?

A.   Yes.

Q.   You were just talking about MUD technology generally; you weren't talking about the specific MUD technology as claimed in these asserted patents.  Is that fair?

A.   Well, at the time I was talking about the golfer analogy, I was just talking about channel estimation.

Q.   Right.

A.   So I didn't -- even unrelated to multiuser detection completely, you can do channel estimation.

Q.   Right.  So let's break that into two parts.  So, first of all, that golf analogy you gave us, you weren't talking specifically about these asserted patents and what these claims require.  Correct?

A.   Correct.

Q.   And even this idea of channel estimation, you can do that, you can do everything you talked about, without using any type of MUD technology.  Correct?

A.   Not everything I talked about.  Some of it, I was talking about multiuser detection.  But the channel estimation part of it, yes, you can do channel estimation without multiuser detection.

Q.   And we established that you could even do multiple user detection MUD technology without using any of these four patents.  Correct?

A.   Correct.

Q.   So even when you were transitioning from channel

estimation to talk about MUD technology generally, everything you presented to us you could do as an engineer without utilizing these four asserted patents.  Is that fair?

A.   Correct.

Q.   So everything you presented to us was not specific to these four asserted patents.  Is that right?

A.   That's correct.

Q.   Okay.  Now, I want to go to something that you said about one of the slides from this 2011 presentation that's JX 22.  That's slide 29.

Do you recall you were asked some questions about this slide?

A.   Yes.

Q.   Again, you weren't at this presentation.  Correct?

A.   Correct.

Q.   And you didn't ask any of the attendees of this meeting about what they intended to convey with this slide.  Correct?

A.   Correct.

Q.   And at the top, it says IP and FPGA code for a non-standard TDD CDMA system.  Do you see that?

A.   Yes.

Q.   Non-standard means that it's not complying with a standard such as 3G?

A.   I don't think that's what that's trying to say.

Q.   Okay.  But you don't know exactly what was conveyed by

10:14

non-standard because you weren't at the meeting.  Correct?

A.   I wasn't at the meeting.  Correct.

Q.   But CDMA is a 3G system.  Correct?

A.   Correct.

Q.   And then at the bottom, it says, what we need to do --
this is Collision talking to Samsung in 2011.

     What we need to do from Collision's perspective is build
a general purpose standards supporting FDD MUD receiver and
MAC IP Core.  Do you see that?

A.   Yes.

10:14

Q.   So what Collision was telling Samsung is we'd like to
build a new standard, not ones that existed such as 3G and 4G,
that would cover Collision's patented technology.  Correct?

A.   No.

Q.   Okay.  But, again, you weren't there at the meeting.
Correct?

A.   I was not there at the meeting.

Q.   But it does say build a general purpose standards
supporting FDD MUD receiver and MAC IP core.  Do you see that?

A.   Yes.

10:15

          THE COURT:  Counsel, approach the bench, please.

          MR. PAK:  Sure.

          (The following was had outside the hearing of the
          jury.)

          THE COURT:  How much additional cross do you think

you have, Mr. Pak?

MR. PAK:  I probably have another 40 minutes or so.

THE COURT:  We're going to take a brief recess, and then we'll pick back up.

MR. PAK:  Thank you, Your Honor.

MR. STEWART:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Ladies and gentlemen, this cross examination has some additional length to it, and there may be redirect after.  So we're going to take this opportunity to have a short recess.

If you'll simply close your notebooks and leave them in your chairs, there's no need to take them back to the jury room with you.  Use this opportunity to stretch your legs, get a drink of water.  Remember all my instructions about your conduct, including not to discuss the case among yourselves, and we'll be back here in a few minutes to continue.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  Be seated, please.

Mr. Pak, I met with counsel this morning in chambers to discuss several issues that developed over the weekend, and you were not there.  I expect lead counsel for both sides to be present whenever we meet in chambers.

MR. PAK:  I apologize for that, Your Honor.  I'll be there.

THE COURT:  All right.

MR. PAK:  Thank you.

THE COURT:  We stand in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Are you prepared to continue with your cross examination, Mr. Pak?

MR. PAK:  Yes, Your Honor.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen.  Please have a seat.  We'll continue with the Defendants' cross examination of Mr. Joseph Farkas.

All right.  Counsel, please continue.

MR. PAK:  Thank you.

Q.   (BY MR. PAK)  So I want to go back to another slide that you had in your opening presentation.  So this is Farkas 5.

Do you recall, sir, that you were telling us about this hard drive work that was being done at BAE at the time you were there?

A.   Yes.

Q.   And so the MUD technology that BAE developed, you

testified was put into these hard drives.  Is that correct?

A.    I don't believe I testified to that.

Q.    Okay.  So to your knowledge, did BAE ever incorporate any MUD technology into these hard drives?

A.    I don't believe so.  I know that there are patents about it.

Q.    Oh, okay.  So this wasn't about any work that BAE was doing?

A.    No.  BAE patents that Collision owns are related to this slide here.

Q.    Are those BAE patents MUD patents?

A.    Yes.

Q.    Okay.  And this hard drive that you were showing us, do you know what kind of BAE products these hard drives went into?

A.    I'm not aware that the actual technology from the patents went into any hard drive products; just that there are patents about it from BAE.

Q.    Okay.  So what you were showing us was not really about any hard drives at BAE; it was just about MUD patents that were sold from BAE to Collision.  Is that correct?

A.    Yeah, just the research they were doing.

Q.    Okay.  Thank you, Mr. Farkas.

      And I take it that you didn't investigate that issue of whether any of that research on the hard drives went into

products at BAE.

A.    Correct.

Q.    Now, going back to the chronology that you presented to us --

MR. PAK:  And if we could turn to DX 36.

Q.    (BY MR. PAK)  I believe this is an email that you showed us.  Just to get the context of this email, this was your trip notes from meeting with Samsung on February 2nd, 2012.  Is that correct?

A.    Yes.

Q.    And the attendees from Collision were yourself and Mr. Barry West.  Is that right?

A.    Yes.

Q.    This was how many days after you joined Collision?

A.    What I was saying earlier, I flew out to this meeting on the second day.  The meeting was a day or two later.

Q.    So the second day of your job at Collision, you flew out to Korea?

A.    Yes.

Q.    Okay.  Great.  Have you been to Korea before or was that your first trip?

A.    That was the first one.

Q.    So you went to this meeting with Mr. Barry West, and the Samsung folks were there and there were Mr. Heewon Kang and Inseok Hwang.  Do you see that?

A.    Yes.

Q.    And you took these notes to memorialize, to document what had happened at that meeting.  Correct?

A.    Yes.

Q.    And this is an accurate historical record of what you heard that -- and your reaction to what you heard at that meeting.  Is that correct?

A.    To the best of my recollection, yes.

Q.    So let's see what it states in these notes.  And by the way, these notes were confidential to Collision until this trial.  Correct?

A.    I think so.

Q.    You never sent these to Samsung.  Correct?

A.    Not that I remember.

Q.    Okay.  So it says, if you go down further, you knew as of this date, 2012, February, that Samsung told you about SU-MIMO technology that they had already developed.  Correct?

A.    Yes.

Q.    And Samsung had already developed SU-MIMO technology for four by four spatial multiplexing.  Do you see that?

A.    Yes.

Q.    That means four antennas on the base station side talking to four antennas on a single user device.  Correct?

A.    Well, as we were talking earlier, this is in reference to the uplink.  So this would be opposite direction.

Q.   But you know that the LTE standard in 2008 allows for SU-MIMO technology to be used in the downlink direction as well.  Correct?

A.   Yes.

Q.   And regardless of whether it was uplink or downlink, you knew at this time in 2012 that Samsung had already developed its SU-MIMO technology for using four antennas on the base station to communicate with four antennas on a single user device.  Correct?

A.   I mean, they were talking about some of their techniques that they were researching, yes.

Q.   And in fact, here it actually says --

          MR. PAK:  If you go down to the top -- actually scroll up, Mr. Sayres.

Q.   (BY MR. PAK)  It says what Samsung claimed to be ML MUD was in hardware.  Do you see that?  HW?

A.   Yes.

Q.   So Samsung was communicating to Collision that they not only at the SU-MIMO, 4 by 4 technology, they already put it into chips.  Correct?

A.   Just to clarify, in chips, are you implying that in products?

Q.   No.  I'm just saying hardware chips whether it's in a product or in prototype?

A.   Right.  I agree with that.

Q.   Okay.  And you also learned that Samsung had a technology called successive interference cancellation, or SIC, as of this date.  Correct?

A.   Can you show me where that is in the notes?

Q.   I'm asking you whether you recall that.

A.   No, I don't recall that.

Q.   So you don't -- but you know at this point, sitting here today, that Samsung did have its own successive interference cancellation technology.  Correct?

A.   Can you repeat that one more time?

Q.   Sitting here today, you know now that Samsung had a technology called successive interference cancellation.  Correct?

A.   I don't know that.

Q.   Okay.  Sitting here today, you don't know one way or the other --

A.   I'm sorry for interrupting.  No, I don't know that.

Q.   But at least you knew that they were using MIMO 4 by 4, and you also note that it was MMSE.  Do you see that reference?

A.   Yes.

Q.   And what does MMSE stand for?

A.   Minimum means square error.

Q.   And what type of technology is that?

A.   Well, in how it's referenced there, that was a form of

multiuser detection that Samsung was researching.

Q.   And that was technology that Samsung already had before any meetings with Collision.  Correct?

A.   At least in their simulation environment.

Q.   Is that correct?  At least in the simulation environment?

A.   Yes.

Q.   All right.  You're not claiming that somehow Samsung obtained that technology through its meetings with Collision. Correct?

A.   Correct.

Q.   Okay.

And if you go down further on, there's a my take.  Do you see that?

A.   Yes.

Q.   It says, "The biggest issue with their story is that they don't have any performance results from SLS."  That's system level simulation.  Is that right?

A.   Yes.

Q.   But Samsung already had it implemented in hardware.  Is that correct?

A.   Yes.

Q.   And you said this doesn't make any sense to you. Correct?

A.   Yes.

Q.   And you guess that what Samsung had that it was calling

275

10:41    MUD is some variant or some version of their existing SU-MIMO receiver technology.  Is that right?

A.    Yes.

Q.    But this is all talking about base stations.  Correct?

A.    Yes.

Q.    This is not talking about SU-MIMO as you used in handsets.  Correct?

A.    Correct.

Q.    In fact, this meeting was not about handsets at all.  Right?  This particular meeting.

A.    Yes.  I don't recall if we talked about our future plans or not at this one, but we were with the infrastructure division, the one they make base stations.

Q.    Okay.  And so then it goes on to say, they probably have both MMSE and an ML SU-MIMO detector.  Do you see that?

A.    Yes.

Q.    Is what's ML?

A.    Maximum likelihood.

Q.    And what type of technology is that?

A.    It's a form of multiuser detection.

Q.    And it says, They probably have MMSE already in an ASIC for release 8.  Do you see that?

A.    Yes.

Q.    So what is ASIC?

A.    ASIC is essentially a chip.

Q.   So at least as of this time, you believed that they had implemented the MMSE-based SU-MIMO detector in a chip. Correct?

A.   Yes.

Q.   And what's Rel8?

A.   Release 8.

Q.   And what is that referring to?

A.   LTE -- or release 8.  That was, I believe, the first release of LTE.

Q.   And that was back in 2008.  Correct?

A.   Yes.  That's the standards release date, not necessarily when somebody has a product for it.

Q.   So what you were saying is this is a chip for the release 8 that had been released back in 2008.  Is that correct?

A.   Correct.

Q.   And then this is the part that we were discussing earlier.  You say, "Another interesting data point that leads me to conclude that they didn't build a sophisticated MUD but rather based it off of their MIMO receiver is that they were fairly naive on MUD."

     Do you see that?

A.   Yes.

Q.   And so, again, sophisticated MUD is the type of MUD that you believe is patented in the asserted patents from Collision.  Correct?

A.    Yes.

Q.    Okay.  So you were saying whatever they were calling multiuser detection is not the type of sophisticated MUD technology that is claimed and described in the Collision patents.  Correct?

A.    At least the version that Samsung had built at that point, no.  Not necessarily inclusive of everything they had done.

Q.    Okay.  Now there comes a time much later when this lawsuit is filed.  Correct?

A.    Correct.

Q.    Now, you didn't use any confidential information that you learned about Samsung's technology as a basis to file that lawsuit, did you?

A.    I didn't file that lawsuit.

Q.    Or Collision, to your knowledge?

A.    To my knowledge, that's correct.

Q.    To your knowledge, Collision used public information about handsets that Samsung makes to file this lawsuit.  Correct?

A.    I believe that's correct.

Q.    And, for example, you were a consultant to Collision, but you have not seen or were given access to any confidential Samsung documents.  Correct?

A.    Yes.

Q.   So public information available in 2012 about handsets, you were generally familiar what was happening with handsets at the time?

A.   Yes.

Q.   Okay.  And there also had been public information in 2023 about Samsung's handsets at the time of the filing of this lawsuit.  Correct?

A.   Yes.

Q.   And it's your belief that Collision always relied on public information to file this lawsuit.  Correct?

A.   To the best of my knowledge.  I'm not really sure exactly what was in the allegation.

Q.   Just to be clear, in 2012 when you had the meeting with the folks from Samsung in Korea, they told you more about what they were working on with SU-MIMO than what was publicly available.  Correct?

A.   At least what they were researching, not necessarily what was in their products.

Q.   Right.  But they had implemented in chips.  Correct?

A.   Correct.

Q.   And they were building those chips for LTE standard. Correct?

A.   Correct.

Q.   Okay.  And you knew all of that in 2012.  Correct?

A.   Correct.

Q.   So let's go to your chronology again.  This is DDX 3.1.
I just replicated your slide.

MR. PAK:  Mr. Sayres, if we could have DDX 3.1.

Q.   (BY MR. PAK)  So do you see a copy of your chronology
that you showed us during your examination?

A.   Yes.

Q.   Okay.  So you talk about the team flying to Korea and
meetings with their engineers.  But if you turn to DDX 3.3, in
your examination you didn't tell us about the specific
sections that we noted from your trip notes.  Correct?  About
the hardware.

A.   Sorry.  What was your question?

Q.   When you were discussing the February 2012 trip notes,
you didn't present testimony in your examination by counsel
for Collision that you knew about the SU-MIMO technology as
implemented in chips.  Correct?  You didn't mention that part.

A.   Yeah, I don't think I mentioned that.  We did bring up
that same meeting notes.

Q.   Right.  So to really understand what happened, we should
read the entire set of notes.  Correct?

A.   I stand by everything in those notes.

Q.   Thank you.

THE COURT:  Gentlemen, you both seem to trail off at
the end of your sentences.  If you could finish as distinctly
the ends as you do the beginnings, it would be helpful.

MR. PAK:  Thank you, Your Honor, Your Honor.  I'll try.

THE COURT:  All right.  Well, let's both try.  Let's continue.

MR. PAK:  Thank you.

MR. PAK:  Now, if we go back to those trip notes, so bring up DX 36.

Q.   (BY MR. PAK)  You mentioned something about the Verdu textbook at the beginning of this notes.

MR. PAK:  So if you turn to, I believe it's -- if you go -- if you keep going, scrolling down, Mr. Sayres.

Q.   (BY MR. PAK)  Another interesting take after the my-take paragraph, this is the language about Samsung being fairly naive on what you consider to be MUD.  Do you see that?

A.   Yes, I do.

Q.   And you wrote that in those notes, "They really didn't understand how to apply an MMSE to solve a CDMA MUD problem."  Right?

A.   Correct.

Q.   And CDMA is referring to 3G technology?

A.   CDMA is part of 3G technology.  I don't think it's exactly what I was referring to here, though.

Q.   Okay.  And you note that there's a chapter in Verdu's textbook.  Do you see that?

A.   Yes.

Q.   Okay.  So in your cross examination binder, if you turn to JX 40.  Do you see that this is a printout of that Verdu textbook titled "Multiuser detection"?

A.   I see that.

Q.   Okay.  And if you turn to JX 40.3, and if you go to the bottom about the author?

          MR. PAK:  If you could blow that up, Mr. Sayres.

Q.   (BY MR. PAK)  By the way, do you have a copy of this textbook personally?

A.   Yes.

Q.   So it states here that, "Sergio Verdu is a professor of electrical engineering at Princeton University.  His contributions to the technology of multiuser detection span his pioneering work in the early 1980s to recent results included in this text"?

     Do you see that?

A.   Yes.

Q.   So just reading the front page of this textbook, we know that work on multiuser detection goes back to the 1980s starting with Dr. Verdu's work.  Correct?

A.   Yes.

Q.   And it notes that Dr. Verdu is a fellow of the IEEE.  Do you see that?

A.   Yes.

Q.   And he served as president of the IEEE Information Theory

Society in 1997.  Do you see that?

A.    Yes.

Q.    Are you familiar with the IEEE?

A.    I am.

Q.    Are you a member?

A.    Not currently.

Q.    Okay.  Do you know what a fellow is?

A.    Roughly, yes.

Q.    Okay.  Just roughly can you explain what a fellow of the IEEE is?

A.    I think you need to be a member for a long time and be influential.

Q.    And what is the IEEE?

A.    It's the Institute for Electronics and Electrical Engineers, I think is what it stands for.

Q.    Okay.  And this is a multihundred-page textbook.  Correct?

A.    Yes.

Q.    And behind each chapter, there's a bibliography that lists various articles and publications that Dr. Verdu discusses in this textbook.  Correct?

A.    Yes.

Q.    Okay.  And I note that there's even problems that students can solve to understand MUD.  Do you recall that?

A.    Yes.

Q.   So this is a textbook that any university professor could use to teach students about MUD technology going back to 1998. Correct?

A.   Yes, that's correct.

Q.   Okay.  And so everything in this book and everything that's cited in this book is what the jurors have heard about as prior art.  Correct?

A.   Correct.

Q.   And so an engineer or a company could utilize the techniques for MUD that's disclosed in this textbook and everything cited in this textbook and not infringe any of the asserted Collision patents.  Correct?

A.   That's correct.

Q.   Okay.  And you mentioned chapter 2.  That's about CDMA channels.  Correct?  I think there's a table of contents, but you can look at that as well.

A.   That's correct.

Q.   Okay.

        MR. PAK:  And, Mr. Sayres, if we can go to JX 40 at page 77 of this textbook.  And if you'd turn to the first full paragraph?

Q.   (BY MR. PAK)  It says, "Accurately modeling the non-Gaussian nature of the background noise in channels with impulsive noise may lead to important performance gains in multiuser channels."  Do you see that?

A.   I do.

Q.   So I think you mentioned this before, but you could model noise or interference in a lot of different ways.  Correct?

A.   Meaning there's multiple multiuser detection techniques?

Q.   Yes.

A.   Yes, I agree with that.

Q.   So you could use it in a Gaussian way?

A.   Yes.

Q.   What is Gaussian to an engineer like yourself?

A.   In this case it's a description of the type of noise. It's like a random noise with a particular description.

Q.   So what would be a non-Gaussian noise?

A.   Typically those created from manmade signals.  Right?  So sending multiple signals.

Q.   So this textbook says you could model noise or interference either as background noise or you could model it as manmade signals.  Correct?

A.   Can you repeat your question one more time?

Q.   Sure.  So this Verdu textbook talks about different ways to model noise or interference.  You can model it as background noise, random noise, or you could also model it as coming from manmade sources using non-Gaussian technologies. Correct?

A.   I --

THE COURT:  We're getting into an area of

speculation about what you could do with a textbook and what you couldn't do with a textbook.

MR. PAK:  Sure.

THE COURT:  Let's get back to what the witness has personal knowledge of.

MR. PAK:  Thank you.

Q.   (BY MR. PAK)  Mr. Farkas, you know that it was known before the filing of the Collision patents that engineers could treat interfering signals as coming from manmade sources for multiuser detection.  Correct?

A.   That's correct.

Q.   And that was known prior to the filing of these particular Collision patents.  Correct?

A.   Certain techniques to do that, yes.

Q.   Okay.  And, again, these patents deal with a very specific type of MUD technology to deal with multiinterference.  Fair?

A.   I mean, when you say very specific, I don't know a particular type.

Q.   And we have to look at the claim language to decide that?

A.   Yes.

Q.   Okay.  Now, I want to go to another chapter in the chronology that you described for us about the test vectors. Do you recall that?

A.   Yes.

MR. PAK:  And if we could have DDX 1 again.

Q.  (BY MR. PAK)  That's your chronology.

MR. PAK:  DDX 3.1.

Q.  (BY MR. PAK)  So you gave testimony about all these test vectors that were provided by Samsung and Collision up to some point in time, provided simulation results using their patented MUD technology running these test vectors.  Correct?

A.  I don't think we specifically said it was patented technology; we were just comparing to the Collision technology.

Q.  Right.  But the -- you mentioned the simulation.  Do you recall that?

A.  Yes.

Q.  It's your belief that the simulation that you showed to Samsung for the joint product development idea utilized these asserted patents, two of them.  Is that --

A.  That's just never based off of work I've done, so -- I understand there's a Collision position on that, but I can't personally speak to it because it's not work I've done myself.

Q.  Do you recall having any conversation with Dr. Kowalski who's Collision's expert about this topic?

A.  Yes.  He asked me some questions, and I responded to them about the simulation.

Q.  Do you recall telling Dr. Kowalski that two of the asserted patents are used in the simulation?

287

A.    I don't think those are the exact words I said.

Q.    What did you tell --

A.    He asked me questions about the general nature of the simulation and the technology and how those relate to patents, and I gave him my opinions.

Q.    But, again, you didn't go and look at the claim language of the four asserted patents to see whether, in fact, the simulation that you showed to Samsung, the results of that simulation, whether they actually have every element?

A.    That's what I was saying.  I did look at the claims, but that's not -- I don't have expertise in that area, so I gave my opinions to Dr. Kowalski, and then he did his report based off of that.

Q.    Okay.  Understanding that you're not a lawyer, but is it your opinion that the simulation that was shared with Samsung as part of this diligence process, does it use any of the asserted patents?

A.    I certainly believe Dr. Kowalski's report.  I just did not -- I do not have the expertise to make that conclusion.

Q.    What did you tell Dr. Kowalski about the asserted patents, if anything, and the simulation that was shown to Samsung?

A.    Well, I talked to him about the different techniques that were done in the simulation, and then we looked at how those are related to the patents.

288

Q.   Do you recall that in around this time period when the test vectors were being exchanged, that Barry West communicated to Samsung, copying you, it was last August, we agree that Collision Communications -- if Collision Communications could show a hundred percent increase in cell edge performance without reduction in average cell throughput, Samsung would execute a commercial agreement?  Do you recall that?

A.   Are you asking about a specific email?  I recall those numbers.

Q.   Okay.

A.   I'm not sure what email you're referring to.

Q.   Let's show Samsung 16641, which is an email that includes your name?

        MR. STEWART:  Objection, Your Honor.  It's not like this is an exhibit in this case and there's not some sort of impeachment attached to this document.

        THE COURT:  What is your objection?

        MR. STEWART:  The objection is using an exhibit that has not been identified to opposing counsel with the witness.

        THE COURT:  So has this been disclosed to the other side either as an exhibit or a demonstrative?

        MR. PAK:  It has not been disclosed as an exhibit, Your Honor.  We have identified 164441 as part of the documents that we will be showing as a demonstrative, Your

289

Honor.

THE COURT:  Are you telling me, Mr. Stewart, you haven't seen this or had notice it might be used?

MR. STEWART:  I believe we received it in a binder maybe this morning that I have in front of me, but prior to walking into the courtroom, we were not aware they wanted to use this document because it was not on their exhibit list.

MR. PAK:  And my understanding, Your Honor, is that we don't disclose cross demonstratives.

THE COURT:  Well, this is not an exhibit in the case.  It can be used as a demonstrative, and you can address it on redirect, Mr. Stewart.

MR. STEWART:  Understood.

THE COURT:  Let's proceed.

MR. PAK:  Thank you, Your Honor.

So if you can publish this document.

Q.   (BY MR. PAK)  Do you see this is an email sent from Barry West to Mr. Jaeho Jeon, J-E-O-N, of Samsung in October of 2012, and you're copied?  Do you see that?

A.   Yes, I do.

Q.   And it says, "It was last August that we agreed that if Collision Communications could show a 100 percent increase in cell edge performance without any reduction in average cell throughput, Samsung would execute a commercial agreement with us to integrate our receiver into your base stations."

Do you see that?

A.    Yes.

Q.    So this was a joint agreement.  Correct?  It says, we agree?

A.    You're saying like did we agree within the hundred percent -- yes.

Q.    So both Collision and Samsung agreed the target is a hundred percent increase in cell edge performance using real-world scenarios.  Correct?

A.    Yes.

Q.    And he also says, "It was also agreed that we would show this improvement by decoding test vector files which your LTE team would provide us."

Do you see that statement?

A.    Yes.

Q.    So Collision also agreed at the time that the way you were going to demonstrate this goal of a hundred percent improvement at the edge of a cell was to use the test vectors that Samsung would provide.  Correct?

A.    Correct.

Q.    So if the test vectors Samsung provided doesn't show this type of performance advantage in a real-world environment, Samsung is free to reject the deal.  Correct?

A.    As long as it's from a real-world environment, yes.

Q.    And what you told us is you actually didn't run the

291

simulations as Samsung didn't share with you the actual results of their simulations.  Is that right?

A.    Correct.  The ones where they took the test vectors and applied that to their simulations, that's correct.

Q.    You knew they were doing that.  You knew the test vectors would be used for that type of simulation at Samsung.  Correct?

A.    They told us that, yes.

Q.    Right.  So we heard some suggestion in the opening from Collision that somehow Samsung was testing or simulating things without Collision's knowledge.  That's not true because Collision agreed that's what Samsung would do to see if Collision's claim of a hundred percent edge performance is actually achievable in a real-world network environment.  Correct?

A.    Sorry.  Can you repeat your question one more time?

Q.    Sure.  There was some suggestion that somehow Samsung was doing all this simulation testing without knowledge of Collision.  That's not true because Collision, as we see here, agreed that Samsung would provide test vectors and be able to simulate your results against the network real-world scenarios to see if, in fact, Collision's patented technology could offer this one hundred percent increase.  You knew that.  Correct?

A.    I knew they were planning to run a simulation based off

of these results, yes.

Q.   Right.  And not only did you know that it was agreed between the two companies that's what would happen, that Samsung would do this in order to see if the claim of a hundred percent improvement is actually achievable or not in a real-world environment.  Correct?

A.   Correct.

Q.   So if we go back to this chronology, DDX 3.1, Samsung was well within its rights to ask for test vectors to be provided, simulations to be run so that they can assess whether there was value in developing a joint product or in addition to its base station using Collision's patented technology.  Correct?

A.   Yes.

Q.   And I think you testified at some point, it was Collision that decided that it no longer wanted to provide test vectors back to Samsung.  Correct?

A.   No.

Q.   Well, I think what you said is they kept on providing test vectors and at some point you decided not to provide any more test vectors.  Is that the testimony?

A.   That I decided not to provide more test vectors?

Q.   Let me ask it this way.  At some point after repeated test vector simulations, you understand that Collision decided not to provide any more test vectors to Samsung.  Is that true?

293

A.    We switched to doing simulations.

          THE COURT:  Mr. Pak, you start off great, and then at the end of your sentence it just goes down to nothing.

          MR. PAK:  Okay.  I'll speak up.

          THE COURT:  If you want us to hear the end as well as the beginning, keep the volume the same.

          MR. PAK:  Thank you.

Q.    (BY MR. PAK)  So let me repeat that again.  Mr. Farkas, at some point it was Collision that decided not to provide any more test vectors and switch to simulations of systems.  Is that correct?

A.    Collision never provided test vectors.

Q.    Okay.  Samsung provided test vectors; Collision was supposed to provide results from those test vectors.  It was Collision at some point that decided it no longer wanted to do that and instead provide system-level simulation data instead. Is that right?

A.    Right.  We agreed with Samsung that we should switch to simulations.

Q.    Well, what we saw is the agreement in that email that I showed you where the agreement, at least in writing, was that it was Samsung and Collision's agreement that these real-world testing or evaluation of Collision's patented technology would be done using test vectors provided by Samsung.  Correct?

A.    On that particular date, yes.

Q.   Okay.  Now, you also talked about in this chronology the June 2013 meeting to discuss further technical collaboration. Do you see that?

A.   Yes.

MR. PAK:  And if you pull up JX 10.1, Mr. Sayres.

Q.   (BY MR. PAK)  Okay.  At the top it's June 25th, 2013.  It says, here are the slides.  Do you see that?

A.   Yes.

Q.   And if you scroll to page 4.  JX 10, we see the presentation that was given by Collision, including yourself, to Samsung on this date; Samsung's base station group. Correct?

A.   Yes.

MR. PAK:  And turn to 10.7.

Q.   (BY MR. PAK)  Just to be clear, there's a recitation or a summary of how Collision came into existence, and at the bottom, it says, "Collision Communications goal:  Develop MUD technology for modern cellular systems and integrate Collision technology into OEM base stations."  Correct?

A.   Correct.

Q.   So, again, all these meetings were about base stations, not handsets as of this meeting.  Correct?

A.   As I was saying earlier, we certainly had mentioned longer term goals of working within the handset market.

Q.   But that was in the 2011 meeting that you didn't

participate in.  Correct?

A.    And other times.

Q.    Okay.  But I'm just focusing on this presentation.  As of this presentation, the focus was on the base stations and your meeting with the networking division of Samsung.  Correct?

A.    I don't recall if we talk about handsets at all in this presentation, but we were meeting with the infrastructure division, yes.

Q.    To your knowledge, Collision never proposed building a joint product as of this time period for a handset to the networking division of Samsung.  Correct?

A.    Correct.

Q.    OEM here is referring to Samsung.  Is that right?

A.    Yes.

Q.    Because Samsung is the original equipment manufacturer, or OEM?

A.    Yes.

Q.    Okay.  So if you turn to JX 10.9, this is a slide from that same presentation, and the colors, the red-colored box and the green-colored box, that was put there by Collision in the original presentation.  Correct?

A.    Correct.

Q.    And if you look here at the bottom, the red box is OEM focus.  Right?

A.    Yes.

Q.    And the green is Collision's focus.  Correct?

A.    Yes.

Q.    So if you look to the chart above, the red box is around the first two rows.  Do you see that?

A.    Yes.

Q.    And the column entitled MUD and MIMO techniques, there are two entries -- linear, successive interference cancellation.  Do you see that?

A.    Yes.

Q.    That was Samsung's focus and Samsung's innovation, according to this presentation.  Correct?

A.    I don't think we were specifically referring to Samsung, but we were generalizing about industry.

Q.    Right.  But the industries' OEMs included Samsung, and you were meeting with Samsung at the time.  Correct?

A.    Yes.

Q.    So Collision was not saying with this presentation that linear techniques, successive interference cancellation techniques are Collision's patented technology.  Correct?

A.    This slide had nothing to do with patents.

Q.    Or even Collision's MUD technology.  What this presentation shows is that Collision told Samsung as of 2013 that linear, successive interference cancellation technologies, the industry already had.  That's not Collision's sophisticated MUD technology.  Fair?

297

A.   Yes.

Q.   Okay.  Instead, what Collision was saying was it's the things in the green box, non-linear, hybrid/turbo.  Do you see that?

A.   Yes.

Q.   So that's what Collision was saying was different and in Collision's view better than what the industry already had for doing MIMO and MUD as of 2013.  Correct?

A.   Correct.

          MR. PAK:  So if we turn to the DDX -- actually -- not this one, Mr. Sayres.  Let's just go back to that slide.  Could we annotate this OEM focus as Samsung?

Q.   (BY MR. PAK)  And we have Collision logo on the right.  Do you see that?

A.   I do.

Q.   And you agree and we have seen evidence that Samsung already had its SU-MIMO technology prior to any meetings with Collision.  Correct?

A.   I believe they have products that supported SU-MIMO, yes.

Q.   And in fact we saw that 2012 email where you said that's not the sophisticated MUD technology that Collision can offer.  Correct?

A.   Yes.

Q.   And I want to point out on the right, there is an arrow

that goes down and it says increasing performance and complexity.  Do you see that?

A.    Yes.

Q.    So one thing that you noted for Samsung is we could offer better performance, but it would come at the cost of added complexity.  Fair?

A.    Can you repeat your question one more time?

Q.    Sure.  You were telling Samsung that compared to industry standard techniques, such as linear, successive interference cancellation, MIMO, Collision could offer increased performance, but it would come at the cost of increased complexity.  Correct?

A.    That's the general idea behind this slide.

Q.    Now I want to turn to the simulation slide that you showed us, JX 10.31.

      This was describing that 15 percent number that was shown in Collision's opening and that you also mentioned based on the simulation.  Correct?

A.    Correct.

Q.    But as of this date, 2013, the industry had MIMO technology.  Correct?

A.    In some forms, yes.

Q.    And industry already had successive interference cancellation.  Correct?

A.    I can't speak to if they were in products, but I know

299

that people had researched successive interference cancellation.

Q. Okay. And I think we already went through this, but if you look at the baseline settings here, this was talking about SIMO. Correct?

A. This would be called multiuser MIMO today.

Q. It says MU-SIMO. Correct?

A. That's what it says.

Q. SI means single antenna per user device. Correct?

A. It stands for single input, but, yes, that's what it means.

Q. And this is talking about multiple user devices where each user device only has one antenna. Correct?

A. Correct.

Q. And so -- and this is simulating only in the uplink direction from each of those multiple user devices up to the base station. Correct?

A. Yes.

Q. Here you were not simulating in the baseline settings a configuration where each user device also had multiple antennas. Correct?

A. Correct.

Q. And that would be a MIMO configuration. Correct?

A. This is a MIMO configuration.

Q. Well, let me make sure my question is clear.

300

A MIMO configuration is one in which each user -- a single user device has multiple antennas. Correct?

A.   That's a particular form of MIMO.

Q.   And that type of technology, a single user MIMO technology, was not being simulated as the baseline in this simulation. Correct?

A.   Correct.

Q.   Okay. And are you aware that single user MIMO is what's being accused in this case in handsets?

A.   I'm aware of single user MIMO as being accused, yes.

Q.   Okay. And this simulation had nothing to do with handsets. Correct?

A.   I mean, the handsets were the transmitters in this case.

Q.   Yeah. So let me be more precise. Thank you.

Mr. Farkas, the receiver that you were simulating here that sits in the base station, not in the handsets. Correct?

A.   Correct.

Q.   And the handsets in this simulation would only have one antenna, not multiple antennas. Correct?

A.   Yes. They have one transmit antenna.

Q.   Okay. And if you look at the equalizer and the detector and all the other settings in the baseline, there's no mention of using successive interference cancellation techniques. Correct?

A.   That's correct.

Q.   You didn't try to compare your Collision MUD technology against MIMO combined with SIC, which is successive interference cancellation.  Correct?

A.   I mean, we did a lot of things at Collision, including comparing to successive interference cancellation.

Q.   But what you presented to Samsung with that 15 percent number did not include simulating anything about successive interference cancellation in the baseline.  Correct?

A.   Correct.

Q.   But SU-MIMO that you agreed would increase capacity for a single user device and successive interference cancellation, they were part of the state-of-the-art technology available to the industry, including Samsung.  Correct?

A.   Can you repeat your question?

Q.   Yes.  Single user MIMO, where you use multiple antennas per single user device and successive interference cancellation, those are technologies that were state of the art, were already known in the industry as of 2013, and was available to Samsung.  Correct?

A.   Correct.

Q.   But you didn't model those technologies specifically in this simulation.  Correct?

A.   In this one we're talking about right now, we did not.

Q.   And to my knowledge, Collision never provided any simulation of its version of MUD technology where it was being

302

compared to SU-MIMO with SIC.  Those results were never shared with Samsung.  Correct?

A.    I think that's correct.

Q.    Okay.  Now, I want to make also something very clear. You understand that the contract between Collision and Samsung says Collision's algorithms and Collision's source code or the computer code that has those algorithms were not to be shared with Samsung during this business evaluation process. Correct?

A.    I know there were a lot of proposals.  It sounds like you're referring to one of them.

Q.    You don't know that the agreement says specifically that the -- Collision's algorithms and source code were to be treated as a black box for Samsung, so Samsung could not see the code and could not see the algorithms?

A.    You're talking about one of the proposals from Collision to Samsung?

Q.    Yes.

A.    Yes, I'm aware that that was our position.

Q.    And, in fact, throughout this entire engagement with Samsung, Collision never shared its source code with Samsung's base station group.  Correct?

A.    Correct.

Q.    And Collision never shared its sophisticated MUD algorithms with Samsung's base station group.  Correct?

A.    Not in the source code, but we talked to them about it for multiple years.

Q.    You talked to them about it, but you didn't actually hand over the detailed algorithms to Samsung.  Correct?

A.    In some level of detail, we certainly did.

Q.    But did you share all the detailed algorithms that are reflected in the source code in written form with anyone at Samsung?

A.    We didn't share all of the details.

Q.    Thank you.

And details matter when it comes to algorithms.  Correct?

A.    I think so.

Q.    And while these simulations were being done, isn't it true that Collision never had a working prototype for this technology?

A.    We had a simulation, but in 2013 we didn't have anything beyond that.

Q.    A simulation is just a software code that simulates what a working product could look like.  Correct?

A.    Yes.  And sometimes you can use some of it in a product, but not necessarily.

Q.    Right.  But in 2013, Collision never had -- up to that point had never developed a working prototype in hardware that would implement the algorithms.  Correct?

A.    Correct.

Q.   Now, you mentioned that there was a change in -- actually before I get to that, there came a time when Samsung shared with you its reasons why it no longer wanted to continue the evaluation process.  Correct?

A.   Correct.

Q.   And Samsung told you during those times that after the simulations were done, after the test vectors were provided, even after the system level tests were provided to Samsung, that Samsung had a technology called C-RAN, C-R-A-N.  Do you recall that?

A.   What date are you talking about?

Q.   This would have been in 2014 time frame.

A.   Yes.

Q.   Okay.  So you know what C-RAN is?

A.   I do.

Q.   That stands for Centralized Radio Access Network?

A.   Correct.

Q.   Centralized Radio Access Network is not Collision's technology that's in these patents.  Correct?

A.   They might be applied to that sort of cellular architecture.

Q.   But if I were to look inside of any of these patents, there's no mention of C-RAN.  Correct?

A.   I believe that's correct.

Q.   And C-RAN was technology that Samsung already had before

305

any meetings with Collision.  Correct?

A.   I'm not sure off the top of my head where they were with their C-RAN development.

Q.   But in C-RAN you have multiple base stations that can talk to each other realtime to share information about signals that were being decoded by each base station.  You understand that?

A.   Yes.

Q.   And then one of the base stations can use the information from the other base station to cancel out the interfering signals.  Correct?

A.   That's not how I would describe C-RAN.

Q.   That's one of the applications of C-RAN.  You know that?

A.   I don't think I can agree with that.

Q.   Okay.  But what Samsung told you after the end of the evaluation process was Samsung's C-RAN technology was outperforming the sophisticated MUD technology from Collision.  Do you recall that?

A.   You'd have to show me.  I don't recall specifically what they said.

        MR. PAK:  Okay.  So if we could put JX 19.  If you can scroll to the top.

Q.   (BY MR. PAK)  January 28, 2014.  Do you see that?

A.   Yes.

Q.   And if you scroll to the bottom, it's from Ms. Serji Oh.

306

Do you see that?

A.   Yes.

Q.   And she worked for the networking division of Samsung?

A.   Yes.

Q.   And so if you go to the top, "Dear Barry J. West, thanks for your patient and understanding our late response.  We have discussed how to use your technology together with our product.  According to our review of your technology, we found that your technology will become efficient for dense urban area where traffic load is high enough to generate collisions. Unfortunately, these days operators look to introduce C-RAN, centralized RAN for dense urban areas where inter-cell interference information among cells can be shared which enables to cancel interference with several methods."

Do you see that?

A.   I do.

Q.   So Samsung was saying, we looked into your technology and your technology could work better for dense urban areas where there is lots of user devices; however, we also have C-RAN which is centralized RAN technology for those urban areas as well where cell interference, inter-cell interference information among cells, can be shared which enables to cancel interference with several methods.  Do you see that?

A.   I see that.

307

Q.   And to your knowledge, Collision never ran a simulation to -- and shared with Samsung any results comparing its sophisticated MUD technology against C-RAN systems where inter-cell interference information among cells would be shared and then canceled out.  Correct?  You never did that simulation to show it was Samsung.  Correct?

A.   We did.

Q.   You did?

A.   Yes.

Q.   Did you share those results?

A.   I believe so.

Q.   Did you show us any of those documents here today?

A.   Those weren't shown earlier.

Q.   Okay.  Now, what this shows is, at least according to Samsung's own simulations and testing, that Samsung believed its C-RAN technology meant that there was no longer a need to use Collision's sophisticated MUD technology.

     That's what Ms. Oh was communicating to you.  Correct?

A.   Yes.

Q.   Okay.  And that's a technical reason.  Correct?  Based on evaluation by Samsung.

A.   That's a technical reason, yes.

Q.   And do you recall any correspondence after this email where Collision told Samsung, We disagree about your comparison of C-RAN to our sophisticated MUD technology?

11:28

A.    I don't recall.

Q.    And if you look at PX 3 --

MR. PAK:    Let's pull up PX 3.  And then go to slide 12.

Q.    (BY MR. PAK)  By the way, let's just show the jurors the beginning of this.

11:29

MR. PAK:    If you go to the first page.

Q.    (BY MR. PAK)  This is April 2014 now.  Do you see that?

A.    Yes.

Q.    And it says, Dear Mr. Song and Ms. Oh.  Please find our overview presentation for your consideration and support with our wish to enter discussions with Samsung Ventures.

Do you see that?

A.    Yes.

Q.    And you're copied on this?

A.    Yes.

11:29

Q.    So you know that Samsung has a separate company, not Samsung network division or electronics, where Samsung invests in start-ups in its venture capital business.  Correct?

A.    Are you saying Samsung Ventures is a separate company from Samsung?

Q.    Let me state it this way, because I'm not asking about corporate form.

A.    That I don't know.

Q.    You know that Samsung has a business that invests in

309

start-ups.  Correct?  It's called Samsung Ventures.

A.   I would have thought it's a division, but yes.

Q.   Okay.  So whether it's a division or a separate company, Samsung has a separate group within Samsung that looks to invest in start-up companies called Samsung Ventures. Correct?

A.   Yes.

Q.   So after we saw that notice from Samsung saying, We'd like to end the business discussions about potentially doing a joint development of a base station group, Collision sends this email with the attached PowerPoint for an introduction to Samsung Ventures.  Do you see that?

A.   Yes.

Q.   And the folks at Samsung's networking division did make that introduction.  Correct?

A.   Yes.

Q.   Did you meet with Samsung Ventures, to your knowledge?

A.   I don't remember.

Q.   Okay.  But you do know that despite that introduction, Collision was not able to secure funding for an investment from Samsung Ventures.  Correct?

A.   Correct.

Q.   But what this presentation is is Collision saying, We'd like an introduction to the part of Samsung's business that invests in start-up companies likes ours.  Here is how we

intend to make money from raising such capital.  Correct?

A.    Correct.

          MR. PAK:  Okay.  So now with that, let's turn to PX 3.12.

Q.    (BY MR. PAK)  And it says "Interference suppression--industry versus Collision approach."

      Do you see that?

A.    Yes.

Q.    "Traditionally industry has treated interference as noise."

      Do you see that?

A.    Yes.

Q.    "Current state of the art techniques, called interference rejection combining (IRC), attempt to suppress interference with no knowledge of the interference."

A.    Yes.

Q.    Okay.  And then at the bottom it says, "Industry's view has been that Collision's approach are unimplementable within the resource constraints of the products."  And it says, "This is no longer true."

      Do you see that?

A.    Yes.

Q.    And now we're in 2014.  Correct?

A.    Yes.

Q.    And, in fact, Collision had tried to license or explore a

311

joint development with other companies besides Samsung.  Is that true?

A.    Yes.

Q.    And so you had heard from other companies that Collision's approaches are unimplementable within the resource constraints of their products.  Correct?

A.    That's not how I would characterize what we heard from different companies.

Q.    But it says here, "Industry's view has been that Collision's approach are unimplementable within the resource constraints of products."

Those are statements in Collision's business plan. Correct?

A.    That's in there, yes.

Q.    Now, as of this time in 2014, you're aware that Samsung had already released the Samsung Galaxy S4.  You're aware of that?

A.    I don't know the timelines of Samsung's phones.

Q.    Okay.  But you were not disputing that Samsung released the Samsung Galaxy S4 in 2013, which employed with LTE and had MIMO with four antennas.  You're not disputing that.

A.    I don't know that's incorrect; I just don't know.

Q.    Well, whatever statements you were making here would have covered any existing technology that was available to the industry, including those that would have been inside handsets

that were being sold by Samsung as of this time.  Correct?

A.   I think we were just making general statements; not about any particular product.

Q.   At this time, even after the business evaluation didn't work out with the base station group, you never told Samsung that any of its handsets that use MIMO and LTE technologies infringed any of Collision's patents.  Correct?

A.   I certainly never did.

Q.   And to your knowledge, Collision never did.  Correct?

A.   Correct.

Q.   And then if you turn to PX 3.20, this is now a discussion about handsets.  Do you see that?

A.   Yes.

Q.   So it says, "Handsets today suffer significant interference."

     Do you see that?

A.   Yes.

Q.   So whatever handsets were available as of 2014, you were talking about that in this business plan.  Correct?

A.   Yes.

Q.   And so if Samsung Galaxy S4 had been released in 2013 in the U.S. market with single user MIMO LTE successive interference cancellation, that would have been covered by the phrase 'handsets today'.  Correct?

A.   Yes.

313

Q.   Okay.  And if you turn to the financing plan, which is slide 27 -- so just remembering the timing, this is 2014. Correct?

A.   Yes.

Q.   You're trying to raise money from Samsung Ventures. Correct?

A.   Yes.

Q.   And one of the uses of proceeds if you got the money, $5 million that you were trying to raise, one of the things that Collision was telling Samsung Ventures would be "Establish R&D team for preliminary handset development."

    Do you see that?

A.   Yes.

Q.   So as of 2014, Collision had not formed an R&D team, research and development team, to do even preliminary handset development.  Correct?

A.   Correct.  The R&D team was focused on other things.

Q.   So there was no finished solution for handsets as of 2014 that utilized sophisticated MUD technology from Collision. Correct?

A.   Correct.

Q.   And then if we turn to another -- now, you didn't mention this in your chronology--correct?--that you presented?  You didn't mention this Samsung Ventures presentation.  In your examination by counsel for Collision.

A.    That's correct.

Q.    Okay.  And then another document that was not presented is June 2015.

MR. PAK:  And let's take a look at 70312; Collision 70312.

THE COURT:  Mr. Pak, it's perfectly fine to call for the document, but to characterize it as another document that was not presented, that's a sidebar comment.

MR. PAK:  Thank you, Your Honor.

THE COURT:  You're here to ask questions and not to make statements.

MR. PAK:  Yes, Your Honor.

Collision 70312.

Q.    (BY MR. PAK)  You didn't present this document to us in your direct examination.  Is that correct?

A.    Correct.

Q.    And you are the author of this document, along with Mr. Jared Fry?

A.    Correct.

Q.    And this is June 1st, 2015.  Is that right?

A.    Yes.

Q.    So it's about a year after the Samsung Ventures presentation that we saw.  Is that right?

A.    Yes.

Q.    And it says, "Collision Communication business plan

315

update overview."

So Collision at this time in 2015 was updating or revising its business plan. Is that correct?

A. I'm not sure what was meant by that statement.

Q. Okay. So if you turn to the third page, 314. Or actually -- yes. It says here, "Summary of the issues from the original strategy."

Do you see that?

A. Yes.

Q. So as of 2015, Collision was saying, These are some of the issues that came from our original business plan strategy and we need to figure out what are the lessons learned. Fair?

A. Yes.

Q. Based on the lessons learned, these specific issues need to be addressed by Collision in 2015. Correct?

A. Yes.

Q. Number one, "company's lack of credibility."

Do you see that?

A. Yes.

Q. Number two, "time to market being too long to convert simulation receiver to product."

Do you see that?

A. Yes.

Q. Three, "Algorithm performance not fully trusted based on simulation data."

316

Correct?

A.   Yes.

Q.   And then in red brackets it says, "In our defense, the vector test, as suggested by SEC, was supposed to establish that trust, and did to the extent that it threw the conversation onto the business side."

Do you see that?

A.   Yes.

Q.   But we've already seen based on the test vector results that Samsung declined politely to engage in further negotiations based on the comparison to C-RAN.  We saw that.  Correct?

A.   I don't think I'd characterize it that way, but you showed me that document.

Q.   Okay.  In any event, one the lessons that Collision took away from its original business strategy is algorithm performance not fully trusted based on simulation data.  Correct?

A.   Correct.

Q.   And also it says, "Algorithm sizing (chip and timing resources required) not trusted based on paper analysis."

Correct?

A.   Correct.

Q.   Those were the lessons that Collision took away from its dealings with companies such as Samsung base station and other

317

base station companies using its original business plan. Fair?

A.    At least in a high level summary of them.

Q.    And show you one more page.

          MR. PAK:  If you'd turn to the next slide.

Q.    (BY MR. PAK)  Do you see a mention of C-RAN there? "Companies are currently investing in emerging architectures"?

A.    Yes.

Q.    "Data showing that Nokia, Ericsson, Huawei, and Samsung are the market leaders in C-RAN."

      Do you see that?

A.    Yes.

Q.    So as of this date you knew that Samsung was a market leader in investing in C-RAN technologies.  Correct?

A.    Yes.  I don't believe I wrote that, but I don't dispute that.

Q.    Well, your name is on this presentation.

A.    Yes; I just don't think I wrote that specific thing.

Q.    But it's in the document.  Correct?  What I read?

A.    Correct.

          MR. PAK:  If you go to the next slide.

Q.    (BY MR. PAK)  It says in the second point, "Completing technologies are often synergistic with Collision's technology and do not solve the capacity problem alone."

      Do you see that?

318

A.    Yes.

Q.    So here, as of 2015 you were saying existing technologies, whether it's more antennas, more spectrum, interference cancellation techniques that the industry were utilizing, you still felt that that was not using Collision's sophisticated MUD technology, and, therefore, there was still opportunity for Collision to do something.  Is that fair?

A.    I don't think this draws any conclusion about if the current technology is using ours; just that we can do better.

Q.    Right.  But one thing this presentation doesn't say is these existing industry standard technologies as of 2015 infringe or use any of Collision's sophisticated MUD technologies.  We don't see that here.  Correct?

A.    I certainly don't see that, no.  I agree.

Q.    Okay.  So I'll end here with DDX 3.12.

     We went through your chronology from your examination by counsel for Collision.  We went through a number of other documents and events that were not covered in the original presentation.  But bottom line is, sir, that during this entire time period Collision, to your knowledge, never told Samsung that the handsets it was making and selling to consumers that use MIMO, OFDM, LTE, successive interference cancellation, was infringing any of the asserted patents in this case, to your knowledge.  Correct?

A.    That's correct.

Q.    Thank you.

MR. PAK:  I pass the witness.

THE COURT:  All right.  Is there redirect by the Plaintiff?

MR. STEWART:  Yes, Your Honor.

THE COURT:  Proceed with redirect, counsel.

REDIRECT EXAMINATION

BY MR. STEWART:

Q.    All right, Mr. Farkas, we have a lot to cover, but I want to start with the document that was an email between Mr. West and Samsung personnel in 2012.  Do you remember being asked about that?

A.    Yes.

Q.    Okay.  I wrote all over my copy so I can't show it to you, but do you recall that the questions being asked of you about that document were about whether Samsung and Collision had agreed that Collision needed to show that 100 percent cell edge performance gain?

A.    Yes.

Q.    Was there ever an agreement, to your understanding, that those performance gains could only be shown in some behind-the-scenes simulations by Samsung in order to meet that threshold?

A.    No.  They never said that.

Q.    In your extensive meetings with Samsung showing them how

Collision's technology could work, did you meet those performance thresholds?

A.    Yes.  So we ran test vectors to do that, and then we also showed simulations, and we showed the simulations with an agreed-upon baseline with them versus Collision's technology and we showed it well exceeding that threshold.

Q.    Do you remember Mr. Pak talking about how they wanted to see those performance benefits in the real world?

A.    Yes.

Q.    What was your simulation designed to simulate and emulate?

A.    The real world.

Q.    Just to be clear, whether or not you actually met those simulation performance benefits that Samsung had set, did you ever give Samsung permission to use Collision's technology for free if they decided you hadn't met those thresholds?

A.    No, of course not.

        MR. STEWART:  Mr. Diaz, could we bring up JX 10.31?

Q.    (BY MR. STEWART)  You were questioned again about this acronym at the top--I won't ask you to repeat a bunch of times--but why, in your view, was the simulation you ran comparable to MIMO, the technology we're talking about today?

A.    Because MIMO, and a particular form of MIMO called spatial multiplexing, is a case where you're sending multiple signals, and that is being received--those are going into

321

multiple antennas--those are being received by multiple receive antennas.  And then we use the multiuser detection to process it.  And so this is a case where there's four separate handsets each sending a signal to multiple receive antennas at the base station, which is by definition MIMO.

Q.   Now, if you have spun this simulation around, and instead of the handsets communicating to the base station, it was a base station communicating to a handset, what would that antenna and signal configuration be like?

A.   So -- and this would be equivalent, in many ways, to if you have four transmit antennas at a base station and then you have four antennas that are at a cell phone receiving those four -- or up to four signals that are all being transmitted from that base station.

Q.   Did you ever tell Samsung that the simulations you showed them in this presentation would also be applicable to handsets?

A.   Yes.

Q.   And did we look at that document earlier at PX 3?

A.   We did.

Q.   Did Samsung agree to the baseline that you used in these simulations when you worked with them for two years?

A.   Yes.  This was an agreed-upon thing between us and Samsung that represent industry state of the art.

Q.   You were asked questions by Mr. Pak about whether or not

it included that successive interference cancellation.  Do you recall that?

A.    Yes.

Q.    Did Samsung ever say, Wait a minute, this baseline's not good enough; it needs to include more, when you were talking to them?

A.    No.  This was what we agreed upon as for the baseline comparison.

Q.    In these conversations you had throughout these two years with Samsung about these simulations, were the technical engineers you were working with excited by and satisfied with the results you were showing?

A.    Oh, yeah.  We were thrilled.  They said, We needed to get to that hundred percent threshold, and we well-exceeded that.

Q.    And what was the reaction of the engineers you were working with to the performance you were showing?

A.    They were excited.  They were all ready to build products with Samsung.

        MR. STEWART:  So I want to go to JX 19, please, Mr. Diaz.

Q.    (BY MR. STEWART)  Do you remember being shown this email?

A.    Yes.

Q.    This was after -- where was this in the chronology relative to all that excitement you were seeing from the engineers at Samsung?

323

A.    This was more than six months later or about six months later after those simulation results.

Q.    You remember being asked about this idea that Samsung's now saying the C-RAN cannot benefit as much from Collision's technology?

A.    Yes.

Q.    And you were asked about whether Collision ever ran simulations of C-RAN with its tech.  Right?

A.    Yes.

Q.    Did Collision ever run simulations of C-RAN using its technology?

A.    Yes.

Q.    What did those performance results show?

A.    They are actually even better performance relative to that baseline.

Q.    So in your mind, based on your understanding of the technology, was this a justifiable excuse for why Samsung was not interested in working with you?

A.    No.  And it didn't even make sense because they weren't talking about the C-RAN at all for that entire time that we were interacting with them, and so suddenly they're saying, Oh, we're not interested because there's this other type of base station that suddenly we want to talk about after two years with talking with them about a different type of base station, particularly when our technology is actually very

well-suited to C-RAN's and we would have tremendous gain over that baseline, even higher than those previous results.  It made no sense.

Q.    All right.  Taking the next step a little --

A.    Sorry.

Q.    -- a little slower.  I want to switch gears --

        MR. STEWART:  If we could take that down, Mr. Diaz.

Q.    (BY MR. STEWART)  Do you remember being asked about that big Verdu textbook?

A.    Yes.

Q.    Did that exist whenever you started working on multiuser detection at BAE?

A.    Yes.

Q.    Do you remember on direct we talked about MUD already existing at that time?

A.    Yes.

Q.    What, despite that textbook existing, is the core of MUD research in the time you've worked on it for 17 or 13 years?

A.    And that's what I was referring to there; it's -- in my direct.  You know, a lot of that work in that book was very theoretical.  Right?  They showed you how to implement or how certain multiuser detection techniques, the math behind them, but there's a difference between I can write down the math and I can actually come up with certain designs that are implementable within real devices, and that's really the focus

of the work at BAE Systems and then Collision Communications after that textbook was published.

Q.   Now, you said in I think direct that one of those combinations you were trying to work on was low complexity versus performance.  Do you recall that?

A.   Yes.

Q.   Can you just explain again to the jury what that means and what the balance you're trying to strike is?  Slowly, please.

A.   Yes.  So with MUD techniques, they do traditionally require more processing power.  That's what that slide with the box is and the arrow is trying to show.  But the entire focus of what we were doing of at, one, BAE Systems, but then also Collision Communications, was how you take these incredibly complicated mathematical techniques and actually map those down into algorithms that really have -- don't have a lot of complexity.  Right?  You can implement with relatively simple processors.  And so although, yes, multiuser detection as a field does traditionally require really high amount of processing power, the techniques that Collision was doing was all about how do we do some things much more simply while getting very high performance.

Q.   Now, technically speaking, what type of devices in a cellular network can most benefit from that lower complexity version of multiuser detection?

A.    Things like a handset.  Right?  So with a handset, since it's battery powered, and we are holding it so it has to be a relatively small chip, handsets are very well-suited to use that sort of lower complexity but very high performance multiuser detection techniques that Collision was working on.

MR. STEWART:  Mr. Diaz, can we have JX 22 at 29?

Q.    (BY MR. STEWART)  You remember being asked about this document?

A.    Yes.

Q.    What time period was this from?

A.    2011.

Q.    And was this describing -- what was this describing, at least as of that time?

A.    So at that time Collision had just bought the technology from BAE, and this is a block diagram of what we were doing at BAE Systems here.  And so what Collision was trying to communicate is they bought something that was not standard, meaning it didn't, you know -- it was military technology, it wasn't 3G or 4G or 5G, and what Collision was attempting to do was take the stuff they bought, it was non-standard, and then actually apply it to a standard, apply it to 3G and 4G, and so adapt existing technology to something that is standards compliant.

MR. STEWART:  And Mr. Diaz, if we could bring up JX 10 at 10.

327

Q.    (BY MR. STEWART)  All right.  Fast forward to 2013 when you're presenting to Samsung your simulations.  If you look at the second line, at this point what were you proposing to incorporate your technology in?

A.    At this point it was -- the second line is the macro base station.

Q.    And what particular type of system?

A.    In the LTE uplink.

Q.    Is LTE a non-standard or a standard system?

A.    A standard system.

Q.    If Samsung is using that LTE standard, how can they still benefit from Collision's technology and techniques?

A.    Well, so by putting a better receiver inside of their products, the network automatically adapts and sends more data because it's not getting errors, and so putting that better receiver the multiuser detection receiver to better handle that interference will improve their products by being able to push more data to and from them.

Q.    Did Samsung's engineers ever say, Oh, no, we don't need your technology; we use LTE, so there's no need for any sort of multiuser detection?

A.    No; completely the opposite.  The whole discussions were about LTE MIMO receivers and how Collision's technology can improve them.

            MR. STEWART:  Could we go one page back, Mr. Diaz,

page 9?

Q.   (BY MR. STEWART)  Do you recall this document?

A.   Yes.

Q.   When you were presenting this document, were you suggesting that if a company is doing successive interference cancellation in the red box, they can't possibly do any of Collision's techniques in the green box?

A.   No.  In fact, that interference cancellation like techniques, a lot of them actually exist in those other boxes. There's just additional things.  So, for instance, that turbo concept very often includes the interference cancellation concept; just a more sophisticated, more complex version of it.

     And, in fact, if you look at the column on the right there, that within that iterative and turbo, both of those often include that interference cancellation concept.  And two of the patents in the case are actually about this block, this parameter estimation.

Q.   Do you remember Mr. Pak talking about the importance of the claims?

A.   Yes.

Q.   And you're not the expert witness who's going to analyze the claims.  Right?

A.   Correct.

Q.   Do you know if there is someone that Collision is

bringing to do that?

A.    I believe that's Dr. Kowalski.

Q.    If analysis of the claims matches Samsung's products, does it matter what label you put it on in these boxes?

A.    No.

Q.    All right.  Do you remember being asked about whether you ever told Samsung that it was infringing Collision's patents during all this process?

A.    Yes.

Q.    Did you show Samsung your patent portfolio?

A.    Yes.

Q.    Did you explain to them what those patents covered?

A.    Yes.

Q.    How long did you talk to Samsung about the details of Collision's technology that was reflected in those patents?

A.    Well, it would be from 2011 to 2014 at least, and then we even had more conversations with them sporadically afterwards.

Q.    Did Samsung know in all of that time that the technology they were working with you on was patented?

A.    Yes.

Q.    So why didn't you just accuse Samsung of infringing at that time in 2011 to 2013 when you were working with them?

A.    Well, we were wanting to partner with them.  Right?  We wanted to improve their systems with our technology, and so, of course, we're not going to go there and say, Hey, work with

us, but you're infringing.  That was never our intention.  We wanted to improve their products using multiuser detection.

Q.  Did they ever actually show you under the hood and show you exactly what they were doing inside their products at that time?

A.  No.  They talked a little bit about their research they were doing but never talked about what was actually in their products.

Q.  And so when we talked about that DX 36 page of notes, was that about Samsung's actual code and the underlying details of their handsets and their base stations?

A.  No.

Q.  Were you talking about what you thought their products did or what their research was about?

A.  It was all about their simulations they were doing and the research they were conducting; nothing about the specific products.  They specifically did not talk to us about what was actually in their products.

Q.  Did the fact that you saw or they told you they were implementing SU-MIMO in chips necessarily mean that they were using Collision's techniques at that time?

A.  No.

Q.  Did they tell you or suggest that they might be able to benefit from Collision's techniques in those same types of systems?

A.   Yes.   That's what the discussions were about from 2011 onward.

Q.   And just to clarify with this notion of LTE and SU-MIMO first being introduced in 2008 -- do you remember that?

A.   Yes.

Q.   How does even that relate to the filing dates of these patents we're talking about today?

A.   Your question is how does the LTE standard relate to the filing date of the patents?

Q.   In terms of dates.

A.   Oh, yes.   I believe all of those or maybe three of those are all pre-existing the LTE standard.

Q.   Now, do you remember being asked toward the end there about whether Collision in 2014 had any fully-developed software code related to handsets at that time?

A.   Yes.

Q.   Just because Collision, after not getting to work with Samsung, didn't have the resources to fully build out a handset product, did that mean you gave Samsung permission to put your technology in their handsets?

A.   No, absolutely not.

MR. STEWART:   Pass the witness, Your Honor.

THE COURT:   All right.   Is there additional cross examination?

MR. PAK:   Yes, Your Honor.

332

THE COURT:  Proceed with additional cross, please.

RECROSS EXAMINATION

11:59    BY MR. PAK:

Q.    Mr. Farkas, if you'd turn to JX 10.41, which is the same document that you were just discussing.

So if you remember, this is the 2013 presentation that was given by you and others to Samsung.  Do you recall that?

A.    This was in the presentation.  I believe this was a back-up slide.

Q.    You see here it says "Collision's gain over current techniques."

Do you see that?

A.    Yes.

12:00    Q.    And it says, "Description:  Standard architecture includes distributed eNodeBs with base stations with minimal information sharing across base stations"?

Do you see that?

A.    Yes.

Q.    You see it says here "today's techniques LTE-A." Correct?

A.    Yes.

Q.    That's the release that comes after release 8 that we talked about in 2008.  Correct?

12:00    A.    I thought it was the 10th release that made it advanced.

Q.    Yep.  And that 10th release that comes in 2011.  Correct?

A.   That seems right to me.

Q.   So here you are telling Samsung in 2013, here's today's technique, LTE-A, that's an even more advanced version of the LTE.  Correct?

A.   Yes.

Q.   And it has intracell--it means within one cell--MIMO spatial multiplexing increases gains within a cell.  Do you see that?

A.   Yes.

Q.   So you're telling Samsung if you use MIMO spatial multiplexing using LTE-A standard, that actually provides performance gains within a single cell.  Correct?

A.   Yes.

Q.   Intercell techniques, that's talking about multiple cells, multiple base stations to increase throughput limited by lack of parameter estimation signals and MUD techniques. Do you see that?

A.   Yes.

Q.   So you're saying today's techniques, whatever people were doing using LTE-A standard for base station products, Collision could provide benefits because Collision's patented MUD technology includes parameter estimation and sophisticated MUD techniques.  Correct?

A.   Yes, among other things.

Q.   Right.  But this was never a conversation here about

handsets that are operating inside of a single cell to receive downlink data from one base station. Correct?

A. This was a base station discussion.

Q. Right. And what you said here is within a single cell if you use MIMO to send data from a base station down to a single user device, it increases gains. It's perfectly fine for that. Correct?

A. I don't think that's what this says.

Q. It says it increases gains within a cell. Correct?

A. Right. But you were talking about the downlink there.

Q. Let's take a look at another portion of the same presentation, JX 10.18.

So at the top, state of the art industry MUD approach is MMSE, IRC, SIC. Do you see that?

A. Yes.

Q. SIC is successive interference cancellation. Correct.

A. Yes.

Q. "Scenario: SU-MIMO with two layers." Correct?

A. Yes.

Q. And it says here if you use single user MIMO, this example with two antennas on a user device, Collision was telling Samsung that it's good for SU-MIMO, single user MIMO. Do you see that second bullet?

A. I do.

Q. Single user MIMO is when a base station is talking to one

335

user device, for example, to send down data.  Correct?

A.    Yes.

Q.    So in this presentation in June of 2013, Collision was saying what the state of the industry techniques are, what the industry is already using with SU-MIMO SIC is good for operations inside of a single cell.  Correct?

A.    Can I explain?

Q.    Just yes or no, please.

A.    Yes.

Q.    And then do you see there is on the right a picture of the cell and one red dot representing a user device?

A.    Yes.

Q.    And then if you turn to the next slide, what Collision was saying is in a multicell environment the story changes. Do you see that?

A.    Yes.

Q.    And here you're talking about the possibility of helping base station equipment deal with intercell interference where you have multiple cells and multiple base stations.  Correct?

A.    Yes.

Q.    Okay.  And again, going back to the simulation, you said it's this SIMO simulation that you did somehow can be used in the downlink direction, but the performance numbers that we saw, it was all in the uplink direction from a user device to a base station.  Correct?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A.   Correct.

Q.   And each of the user devices only had one antenna. Correct?

A.   One transmit antenna.

Q.   And so if you added more antennas to that configuration for every user device, you would gain additional performance. Correct?

A.   Potentially.

Q.   Right.  But you didn't model that.  Correct?

A.   Certainly not in the simulation for Samsung.

Q.   Right.  So in the simulation for Samsung, it did not involve single user MIMO technology which used multiple antennas for performance improvements in a single cell. Correct?

A.   Not in the simulation for Samsung.

Q.   And that simulation was only about uplink direction from multiple user devices up to the base station.  Correct?

A.   Correct.

Q.   Okay.  Samsung was not obligated to do a deal with Collision if it felt that the technology it already had was just as good or better than what Collision was offering.  Is that fair?

A.   Yes.

Q.   And we already saw those lessons learned that Collision put together after the Samsung discussions did not end up in a

337

contract where Collision itself said the industry doesn't trust our simulation. Do you remember that?

A. I wouldn't quite characterize it that way.

Q. Well, you saw the document. It said Collision's lessons learned, and one of those lessons was that the industry is not trusting our simulation data. Correct?

A. That's what it said on the slide.

Q. And that Collision has lack of credibility. Do you recall that?

A. Yes.

Q. And the other thing that Collision took away from the lesson is algorithm sizing--which is number of chips, number of hardware that's required--people aren't believing our statements about how easy it is to implement just based on simulation data. That's one of the lessons learned. Correct?

A. Yes.

Q. That's 2015. And one last thing. Even though you claim that you did the C-RAN simulations, when Samsung told you that they're not going to go with the business deal because their C-RAN technology was better or just as good as what Collision was offering, you never responded back to Samsung with those simulation results using C-RAN as the baseline and said, We disagree. Nothing like that ever happened, to your knowledge. Correct?

A. I don't think we immediately did that.

Q.   You haven't shown us anything in this record and you can't point to a single document sitting here today where that ever occurred.  Correct?

A.   I have no documents that I can show you right now.

Q.   Okay.

MR. PAK:  Thank you, Your Honor.  Pass the witness.

THE COURT:  All right.  Any additional direct?

MR. STEWART:  Yes, please, Your Honor.

THE COURT:  All right.  Proceed with redirect.

MR. STEWART:  Mr. Diaz, can we have JX 10.18?

REDIRECT EXAMINATION

BY MR. STEWART:

Q.   Mr. Farkas, what did you want to explain about this document?

A.   Thank you.

So this was part of a bigger presentation where we were doing what I've said all the time.  We were trying to build better technology for Samsung's equipment.  And so we were talking about the current state of the art, and we did say here is where it performs well, because we then wanted to say here is why ours performs better.  So we literally went through this detailed explanation--I won't go through the math with you why it performs well and what in what situations-- and then we said, Here is why ours does better.

Q.   If Samsung was already using SU-MIMO technology at the

time of these meetings, what could they add to that technology that could make it even better?

A.    That's what we were there to talk about--Collision's multiuser detection technology.

Q.    Do you remember Mr. Pak asking you about lessons learned in the scope of that discussion?

A.    Yes.

Q.    When you were talking with Samsung during all this time, were they telling you anything about what they were doing behind the scenes while working with you?

A.    No.

Q.    Did you learn anything about their efforts to obtain Collision's technology from other people instead of from Collision during those discussions?

A.    Not from those discussions, no.

Q.    The first time you heard about any of that was in opening?

A.    Was opening, yes.

        MR. STEWART:  No further questions, Your Honor. Pass the witness.

        THE COURT:  Any additional cross?

        MR. PAK:  A few quick questions, Your Honor.

                    RECROSS EXAMINATION

BY MR. PAK:

Q.    So Mr. Farkas, June 2013 that you just discussed, you

understand that comes after Samsung already released the Samsung Galaxy S4 that had LTE technology in it with MIMO SU for single user devices.  You understand that?

A.    I don't know the release date of that product.

Q.    Okay.  But you have no reason to dispute that.  Correct?

A.    I don't.

Q.    Okay.  And again, when you talked about in the presentation you could offer something better, the story changes--that was about base station products dealing with multiple cells and multiple base stations.  Correct?

A.    I don't agree that the story changed.

Q.    Well, that's what it said in the presentation--the story changes with multiple cells, and we saw a picture of that. Correct?

A.    Oh, you're taking about the additional details.  Yes, I agree with what that slide said.

Q.    All right.  So just to summarize for the jury, what was actually shown to Samsung in 2013 is SU-MIMO with successive interference cancellation is good, according to Collision, for a single base station talking to user devices.  Where the story changes for Collision, because it was talking to the base station group, is we still think our patented technology can offer benefits for base station products where you have multiple base stations and there is interference across cells. Isn't that correct?

A.   No.

          MR. STEWART:  Objection.

Q.   (BY MR. PAK)  Okay.  The document -- you are not disavowing anything of the things that we saw in the document. Correct?

A.   I am not disavowing the document.

          MR. PAK:  Thank you.

          THE COURT:  You pass the witness, Mr. Pak?

          MR. PAK:  Oh, yes, Your Honor.  I pass the witness.

          THE COURT:  Any additional examination, Mr. Stewart?

          MR. STEWART:  Nothing further, sir.

          THE COURT:  Then you may step down, Mr. Farkas.

          MR. STEWART:  Your Honor, may I approach the podium?

          THE COURT:  You may.

          MR. PAK:  Your Honor, may I do the same?

          THE COURT:  We're about to go to lunch, gentlemen. What is it we need to talk about?

          MR. STEWART:  Sorry for walking all the way around. I wanted to ask if Mr. Farkas could be excused from the Rule now that he is stepping down and finished with his testimony.

          THE COURT:  Any objection, Mr. Pak?

          MR. PAK:  No, Your Honor.

          THE COURT:  Mr. Farkas is excused from the Rule. He's welcome to remain in the courtroom, if he wishes.

          Anything further?

342

MR. STEWART:  That's all, Your Honor.

THE COURT:  Did you have anything, Mr. Pak?

MR. PAK:  No, Your Honor.

THE COURT:  All right.  Then ladies and gentlemen, we'll break for lunch at this point.  If you would, take your notebooks with you to the jury room.  I understand from Ms. Clendening your lunch should be there waiting for you.  We'll take 45 or 50 minutes.

Please remember all my instructions about your conduct, including not to discuss the case among each other.

With that the jury's excused for lunch.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  Be seated, please.

Counsel, for your information, at this juncture the Plaintiff has used an hour and 22 minutes and 28 seconds of designated trial time, and the Defendant has used an hour and 57 minutes and 49 seconds of designated trial time, for a total of 3 hours, 20 minutes, and 17 seconds as of this point in time.

All right.  We'll try to reconvene in 45 minutes, plus or minus, as I told the jury.

With that we stand in recess for lunch.

(Lunch recess.)

THE COURT:  Be seated, please.

Plaintiff, are you prepared to call your next witness?

MR. STEWART:  Yes, Your Honor.

THE COURT:  All right.  Let's bring the jury in, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back from lunch, ladies and gentlemen.  Please have a seat.

All right.  We'll continue with the Plaintiff's case in chief.

Plaintiff, call your next witness, please.

MR. STEWART:  Your Honor, Plaintiff calls Mr. Jared Fry.

THE COURT:  All right.  Mr. Fry, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, sir, have a seat on the witness stand.

MR. STEWART:  And, Your Honor, may my staff or Ms. Fair distribute binders?

THE COURT:  Your colleagues may distribute binders, counsel.

(Pause in proceedings.)

MR. STEWART:  May it please the Court.

THE COURT:  You may proceed, Mr. Stewart.

JARED FRY,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. STEWART:

Q.   Good morning, Mr. Fry.  Would you please introduce yourself?

A.   Hello, everybody.  My name is Jared Fry.

Q.   Would you tell us a little bit about yourself?  Where do you live?

A.   I live in Norwich, Vermont.

Q.   Do you have a family?

A.   I do.

Q.   Any kids?

A.   Yeah.  I have a wife and three children.

Q.   How old are your children?

A.   Nine, 12, and 14.

Q.   What is your job title?

A.   I am the chief operating officer and co-founder of Collision Communications.

Q.   Did you have any involvement in the discussions with Samsung that Mr. Farkas testified about earlier?

A.   I did.  Mr. Farkas generally would handle the technical matters; I was handling more of the business matters.

Q.   Starting at the beginning, when was Collision Communications founded?

A.    In early 2011.

Q.    How did it start out?

A.    We started out by being approached by BAE Systems with a portfolio of technology that they developed in the military space that they were looking to sell.  We took a look at it and saw a lot of potential application in the commercial space.  So we formed Collision Communications to acquire that technology and -- and pursue that opportunity.

Q.    Why were you a good fit for this new venture?

A.    I had a technical background.  I studied engineering undergrad and received a Master's of engineering management from Dartmouth College.  My whole career has been in the tech field as well as in start-ups, and I was excited about this technology and the idea of bringing it to market.

Q.    What was your vision for Collision in those early years?

A.    In those early years, I don't know if you remember, but in 2011 or so, smartphones were becoming much more prevalent.  And with smartphones comes a tremendous amount of increased data usage.  You have a big screen, you're watching videos, you're downloading.  All of that increased usage, increased data, was creating increased interference problems and taxing the networks.

     And so we saw this technology as a way to solve that problem, and so we were excited about trying to build solutions for that.

346

MR. STEWART:  Mr. Diaz, could we have JX 5?

Q.   (BY MR. STEWART)  Mr. Fry, what's this document?

A.   This is the patent purchase agreement between Collision and BAE Systems where we acquired the patent portfolio from BAE.

MR. STEWART:  Your Honor, could I ask my colleague to bring Mr. Fry the four ribbon copies of the patents that are under my chair?

THE COURT:  Yes, you may.

MR. STEWART:  Thank you.

THE COURT:  If you'll hand them to the Court Security Officer, he'll hand them to the witness.

THE WITNESS:  Thank you.

Q.   (BY MR. STEWART)  Sorry about that.  Mr. Fry, what are JX 1 through 4 that you now have in front of you?

A.   These are the four patents that are in suit in this case.

Q.   Were those four patents some of the patents you acquired in this JX 5 agreement with BAE?

A.   They are.

Q.   Why was it important for Collision to obtain these patents as part of this technology transaction with BAE?

A.   Well, these patents embodied a lot of the development that BAE had conducted and so it's part of what we're buying from BAE.  But also as a start-up, as a small company, we needed technology that was protectable.

347

01:12

And so this -- this portfolio of patents allowed us to go into discussions with customers and -- and have some protection for what we were bringing to the table, and so established companies didn't walk all over us.

Q.   Now, looking at the top of JX 5 on the screen, why Collision Technology?

A.   So we needed the company Collision and Collision Technology because we're dealing with interference of signals, and in essence when signals are interfering, you can think of

01:13

them as colliding.  And so we named it Collision Technology. We quickly realized, though, if a potential customer was to goggle search collision technology, they're not going to find us.  They're going to find a bunch of auto repair and collision -- auto collision centers.  So we changed the name to Collision Communications.

MR. STEWART:  Mr. Diaz, could we have JX 23?

Q.   (BY MR. STEWART)  Mr. Fry, what are these documents?

A.   These are the assignment records of the patents from BAE Systems to Collision.

Q.   Through these assignment records, did Collision

01:13

Communications, the Plaintiff, wind up as the owner of the four patents in this case?

A.   Yes.

Q.   Once Collision was up and running --

MR. STEWART:  Mr. Diaz, we can take that down.

Q.    (BY MR. STEWART)  Once the company was up and running, what was your plan for breaking into the cellular market?

A.    Our initial strategy was to work with the existing communication industry's equipment providers and develop software solutions with our technology that improved their products.

Q.    Why not build your own products?

A.    We wanted to focus as a company, especially being a new company and a small company, on our area of technology and the area of expertise that we had.  We didn't want to -- we were focused on primarily on high performance solutions.  We didn't want to build entire systems.  We wanted to develop targeted software solutions to improve other's products.

THE COURT:  Mr. Fry, I don't know if it has anything to do with coming from New Hampshire or not, but please talk a little slower.

THE WITNESS:  My apologies, Your Honor.

THE COURT:  That's all right.

THE WITNESS:  Okay.

THE COURT:  It's important the jury follows your testimony, and they'll follow it better if you can talk slower.

THE WITNESS:  Understood.

THE COURT:  All right.  Let's continue.

Q.    (BY MR. STEWART)  Mr. Fry, who were a couple of

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

Collision's first prospective customers?

A.    Samsung and Nokia to name two.  Our initial customers that we were focused on were base station manufacturers in that side of the cellular industry.

Q.    Why did Collision want to focus on base stations, at least in the beginning?

A.    In the beginning, we saw base stations as a more advantageous initial market for our technology because we felt we could develop solutions and deploy our technology into customers' products and, you know, and eventually into the marketplace more quickly and more efficiently.  So it was the fastest path to proving ourselves as a company.

      And then the other factor was you heard Mr. Farkas refer to Mr. Barry West as our CEO and his history at Sprint.  He brought also to the table a lot of contacts to that side of -- from that side of the industry that we could leverage.

Q.    Now, when did Collision's interactions with Samsung begin?

A.    In spring of 2011.

Q.    Looking at JX 22, what is this first set of slides?

A.    This is a set of slides that we sent to Samsung in April of 2011.

Q.    And if we look at the page 8 that's shown here on the screen, what were you proposing to provide to Samsung in this first interaction?

A.    We were proposing our advanced receiver technology that utilizes MUD for both base stations and mobile devices.

Q.    Looking at this next page on page 12, what were you conveying to Samsung here?

A.    We were sharing with Samsung here a listing of our patent portfolio that we'd acquired from BAE Systems.

Q.    Why did you include this in that first presentation?

A.    We included this slide because, again, we were a young company, a brand new company, and we wanted to make it known to Samsung that we were coming to the table with real technology; that we had something already.  You know, in a sense, it was -- it was validating who we were as a company.

Q.    Did you just give them a list of patents, undifferentiated numbers?

A.    No.  This is a -- we had categorized this list of patents to different functional areas of technology.

Q.    Did Samsung show interest in Collision's patents?

A.    They did.  They later asked for more -- you know, more information on our patents, and then invited us to Korea to speak with them and discuss in November of 2011.

Q.    So looking at JX 6, what is this document?

A.    This is a set of slides that Samsung produced relative to that November 2011 meeting in Korea.

Q.    And so what did the fourth slide here of that presentation from Samsung contain?

A.    This slide contained an analysis that Samsung had conducted on our patent portfolio in reference to this meeting.

Q.    And what did that tell you about their analysis of the patent portfolio?

A.    It told us that they had reviewed all of our patents and analyzed them in depth.

Q.    All right.  Based on slide 6 of that same presentation, what did you understand to be the next step that Samsung wanted from you?

A.    They naturally wanted to understand what performance our technology would bring to their products, and so they were asking for simulation and test -- you know, test measurements, test results of our -- our technology so that they could understand its applicability to their products.

Q.    Did Collision feel like it could provide what Samsung was asking for here?

A.    We did.  We were confident that our technology was applicable to their products and could improve the performance of their products.  And so we worked hard for the next number of months or even over a year to provide information that showed Samsung how our technology performed.

Q.    We heard a lot about that technical work from Mr. Farkas, but how was Collision supposed to be paid for that work?

A.    We were proposing pretty early on to Samsung that our

352

relationship be put to what we're calling a framework agreement.

Q.   What is a framework agreement?

A.   This is an agreement that -- that laid out all the details of the relationship, the steps to develop our product, and what the relationship looked like once Samsung was selling a product that included our technology, and in that, included how we would be paid.  Collision would be paid at each milestone as well as when Samsung was selling product that included Collision's technology in it.

Q.   Looking at JX 58, was Samsung on board with this idea of setting out that framework agreement right here at the beginning?

A.   They did.  This is from Mr. Jaeho Jeon, who was the vice president.  And he wrote, "I understand why you'd like to establish a framework including all the stage.  I am okay for this proposal."

Q.   Why was it important for Collision to set out each step of the collaboration right at the beginning like this?

A.   It was critical for Collision because we were a young company, limited resources, small, and we would be devoting almost all of our resources to this project.  And so we needed to understand what that looked like after we did all the work to make sure we would be adequately compensated for -- for what we did.  We needed that assurance.

Q.   Just as a preview, did Collision ever get paid a cent by Samsung for its work?

A.   We never have.

Q.   Now let's walk through that.  Besides Mr. Jeon here on this email, who else were you interacting with on a regular basis at Samsung?

A.   Ms. Serji Oh was, I would say, I guess my counterpart at Samsung.  She was represented to us as the -- the Samsung representative in charge of the business side of our relationship with Samsung.  So any agreements or terms of that relationship were -- she was in -- responsible for.

Q.   Turning to JX 33, did Collision prepare a framework agreement like Mr. Jeon had agreed to talk about for them to review?

A.   We did.  We produced a draft agreement to them in August of 2012 that laid out both how we were compensated for some early testing as well as compensation for development of a solution for Samsung, and then ultimate compensation for a sales royalty fee that would be paid to Collision for each unit of product that Samsung sold with our technology.

Q.   And so now that you've put pen to paper and presented this draft, did Samsung agree to sign it?

A.   They did not.  I think the response I got from Ms. Oh was that we needed to go through further testing before we could start negotiating commercial terms.

Q.    Did you agree to do those additional tests even without an agreement in place?

A.    We did.  Those were the vector file tests and simulations that Mr. Farkas spoke of.

Q.    So fast forward a year.  What happened after those tests were all completed?

A.    We met with Samsung again in Korea in June of 2013 and presented those results.

Q.    How did Samsung respond?

A.    They seemed very enthusiastic.  We -- as Mr. Farkas had showed, we far exceeded their goal of a hundred percent gain in cell edge, and they seemed like they wanted to move forward quickly with getting a contract in place between our companies.

Q.    So looking at July of 2013, after that June 2013 meeting, what did Samsung tell you in PX 1?

A.    They wrote to us and said, "The contract can be signed after checking the processing power."

Q.    Now, we heard about this from Mr. Farkas, but did Collision show the processing power and complexity in its receiver?

A.    We did, and Samsung seemed quite impressed with the results.

Q.    All right.  So then did you propose new royalty terms in JX 11?

355

A.    We did.  We updated our proposal as a result of going through this evaluation phase for the prior year and proposed, again, development fees to develop the custom solution for Samsung and then a sales royalty fee for the sale of our technology that was -- that would be included in Samsung's products.  And here we were proposing a 3.5 percent royalty on that revenue.

Q.    So starting at the top right with that development fee, why did Collision feel it was fair to ask for those up-front fees?

A.    We felt it was fair to ask for these up-front fees because we were -- we were coming to the table in these discussions with Samsung with already proven technology.  We had -- between BAE's work, BAE Systems' work and Collision's work, we had already validated this technology could provide great performance.  And there's over $30 million of investment between the companies that had been put into it at this point that Samsung would be getting the benefit of.  And so we felt that was a fair proposal.

Q.    And then what was the three-and-a-half percent royalty fee for?

A.    That was for the use of our technology.  So each time Samsung sold a product that included our technology in it, we were proposing that we should be paid a small fee as a result of that so that they could use the technology that was in the

product.

Q.   At this point in the negotiation, did Samsung balk at the royalty fees you proposed at all?

A.   They did not.

Q.   So now that you put pen to paper again a second time, did Samsung agree to sign this version?

A.   They did not.  They came back to us after this with a new plan, and this was adding an additional evaluation step to the process.

Q.   What is JX 56 here in September of 2013?

A.   This is a new proposal that we had submitted to Samsung upon their request for a contract that covered just an evaluation phase, and that evaluation phase would be further covered under an evaluation license.

Q.   Did Samsung agree to sign this version?

A.   No.  After submitting it, Ms. Oh had seemed to reverse and was -- was disappointed we had not included the commercial terms in this.  And so I met with her to understand that confusion.

Q.   And did you have another phone call or meeting with Ms. Oh?

A.   Yeah.  It was a phone call where she had in effect asked us to now repropose our commercial terms as well.  And in that she wanted us to include, separate from a royalty license fee, to also give the option of a lump sum license fee.

357

Q.   All right.  So JX 9, did you propose that new set of terms according to her guidance?

A.   I did.  As you see here, we provided two options, a percent-based royalty license fee of 3.5 percent as we had previously proposed as well as a one-time lump sum license fee of $30 million, which I note this was not our favored approach, but...

Q.   You predicted my question.  Why was this lump sum fee not your favorite approach at this time?

A.   This was not our favored approach because we didn't have a good understanding of how many units Samsung was going to sell.  The nice -- a nice inherent attribute of a percent-based royalty fee is for each unit they sell, Samsung would pay us a more fee, not more not less.  And so it scales with the success of Samsung selling that product, whereas a lump-sum fee it's just not clear because we can't predict the future here what -- if that's a fair -- you know, a fair fee or not.

Q.   Did Samsung agree now to these terms?

A.   They did not.  In fact, I think they came back and suggested that they shouldn't need to pay a license fee at all.

Q.   How did you react to that?

A.   I was getting a little frustrated at this point because it seemed like at each step, the plan would take a new turn or

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

358

a new hurdle would get in the way or it just didn't seem like this process was making progress.

Q.    Did you meet with Ms. Oh yet again to talk through that confusion?

A.    In December of 2013, I met again with Ms. Oh in San Francisco.

Q.    And what is PX 5?

A.    This is a set of notes from that meeting.

Q.    What did --

A.    Sorry.  That I took.

Q.    As reflected in your notes, what did Ms. Oh propose at that December 2013 meeting?

A.    Ms. Oh, her first name was Serji.  So you can see that reference is there.  So she proposed that Samsung would pay for 2 percent for macro base stations as a royalty fee.

Q.    Did Samsung agree with a deal consistent with that proposal?

A.    They did not.  About three or four weeks later they submitted to us a new written proposal.

Q.    What was the problem that they introduced with that new written proposal?

A.    They introduced the concept of the royalty fee not being based off of the price of a base station, the product that they're selling, but off of a chip that the base station uses.  So a small subcomponent of that -- of that base station.

Q.   Why was that an issue for Collision?

A.   It was an issue for I think a couple of reasons.  One, what our technology was doing was adding value to their product.  It was improving their product and increasing the value of that product brought to their customers.  And so we felt that the royalty should reflect the value that we were bringing to their product.

The second concern was this chip was a tiny fraction of the cost of the entire base station.  And so by saying a royalty fee is paid off of the chip cost dramatically eroded the compensation we would receive as a result.

Q.   So what did you do about that issue?

A.   We brought up this concern with them in the weeks that followed this, and Samsung agreed that it was unreasonable to base a royalty off of a chip price and indicated that basing it off of the base station price was -- was reasonable.

Q.   And so what did they propose in JX 21?

A.   So a month later, they resubmitted a proposal to us where the royalty rate issue was largely resolved here and it looked like we were starting to get closer to an agreeable agreement between the companies.  But then they introduced a new scenario to this agreement that they had the option to take.

Q.   And so in that new scenario 2 shown up here on the left, what were some of those new terms they introduced here in February?

A.   So they had the option to elect scenario 2 as part of this agreement which would have -- which included Collision giving Samsung our source code as well as it gave Samsung the right to term terminate the agreement for any reason at their will and not Collision that right.  And then also it was asking Collision to acknowledge that Samsung may be developing their own competing technology to what Collision would be providing.  And then, lastly, it was making Collision agree that we would not sue or assert any claims for patent infringement against Samsung.

Q.   So what was your reaction of the combination of all these new terms?

A.   These new terms made me a bit suspicious.  It seemed like this was a recipe for them to get our source code and it would give them the right to terminate any time they wanted, and so they could just take it and do what they wanted with it.  And we felt like we'd be left without necessarily being able to be compensated for it and without any recourse.

Q.   Now, did you explain your issues with this agreement to Samsung?

A.   We did.  And that's what we see here.  We again reiterated that we felt our technology had the ability to improve Samsung's base stations and handsets.  The reference here to UEs is UEs is another term for handsets.  But we also said we're unable to enter into an agreement with Samsung can

unilaterally decide the terminate the development effort.  And then, lastly, we raised concern that Samsung had continued to change direction on us numerous times throughout this effort.

MR. STEWART:  For the record, that was PX 9.

Q.   (By MR. STEWART)  What happened in March of 2014, later that year?

A.   So just a few weeks later, Samsung wrote us and declined the opportunity to work with us further.

Q.   How did that make you feel?

A.   I was pretty discouraged at this point.  We had been, you know, working with Samsung for over two years now at this point, and trying to get to a point where we would be good partners and where Collision would be improving Samsung's products with our technology.  And so to have put all this effort into that relationship and to be left where we were left here was -- was discouraging.

Q.   Did that lead you to wonder whether technology or Collision's technology was valuable at all?

A.   No, not at all.  And, in fact, Samsung agreed to that point and wrote here that our technology has merits and value.

Q.   Do you remember in Mr. Farkas' direct the discussion of Samsung saying they wanted to focus on C-RAN?

A.   I do.

Q.   And that Samsung was saying that was the reason they were declining to work with Collision was because it wasn't as good

362

for C-RAN?

A.    I recall that.

Q.    Did you ever at some point after this present results for your technology in C-RAN to Samsung?

A.    We did, yes.

MR. STEWART:  Mr. Diaz, can I have the doc cam?

Q.    (BY MR. STEWART)  Mr. Fry, who was this email to?

A.    I think this was a -- I'm not sure it's to a person.  I think it was to a mailbox.  But we had been -- we had talked with Samsung in this time frame, and they had invited us --

MS. SMITH:  Your Honor, may we approach briefly?

THE COURT:  Approach the bench, please, counsel.

(The following was had outside the hearing of the jury.)

THE COURT:  What's the issue, Ms. Smith?

MS. SMITH:  I don't think I received this in my binder.  I don't think it's been disclosed to me.  I've never seen it before.

MR. STEWART:  Your Honor, this is a document we are using as a demonstrative directly in response to the direct of Mr. Farkas where they suggested that there weren't results related to this C-RAN technique.

This is a document that was produced to Samsung in the case, but that we only just got to use as a demonstrative in response to that testimony.

MS. SMITH:  And, Your Honor, that's not how this works.  They have to disclose their demonstratives to me that they're going to use on direct, and they've known probably through lunch and even before that and they withheld it and ambushed me just now.  I've never seen it before.

THE COURT:  Any reason why after Mr. Farkas stepped down, this couldn't have been disclosed to opposing counsel over the lunch break?

MR. STEWART:  Your Honor, we were researching over the lunch break just to find this particular document to be able to make this point.

MS. SMITH:  Your Honor, I got here about 10 minutes before Your Honor came in.  I was standing around the table, and anyone could have given it to me.  So I respectfully think this was intentional.

MR. STEWART:  Your Honor, we have an extra copy if she wants to see a copy of it now.

THE COURT:  Well, it's not a matter of getting a copy, Mr. Stewart; it's a matter of timing.  And I understand there was a demonstrative used with Mr. Farkas that you weren't prepared for.  But the Defendants don't have to -- neither party has to disclose their demonstratives and exhibits for cross examination.  But you do have to disclose what you're going to use on direct examination.

I think you're going to have to pull this down and move

on.  I mean, if you had supplied it over the lunch break or even if you'd supplied it 10 minutes before we started this examination, in light of the fact that it was more or less sprung on you in the Farkas testimony, I would have probably permitted it.

But having not given it to opposing counsel over lunch, having not given it to opposing counsel before we started this witness, and the first time opposing counsel sees it is when you put it up in front of the jury and the witness and start asking questions about it, even with it having been sprung on you during the Farkas cross examination, I don't think that's right.  You -- you know, the researching answer doesn't really cut it.  There's no reason why Ms. Smith should not have seen this before this examination started.

MR. STEWART:  I understand Your Honor.

THE COURT:  I think we need to move on.  Okay?

MS. SMITH:  But, Your Honor, just briefly tell the jury that they can ignore this document, please.  He got pretty far down the road before I got on my feet because I was trying to figure out what it was.  He spent some time on it already, and it would be helpful, Your Honor.

MR. STEWART:  If I can respond, Your Honor?

THE COURT:  Please respond.

MR. STEWART:  Mr. Fry could have testified to everything I asked him so far with the document on the screen,

the fact they sent email with additional results about C-RAN, not that there was anything super prejudicial.  I didn't even get to show the actual results of the simulations in the document itself.

THE COURT:  I'm not going to order the jury to disregard it.  I am going to order counsel for the Plaintiff to move on in front of the jury.

MS. SMITH:  Thank you.

THE COURT:  And, you know, I can't imagine there's a circumstance by which the door could be opened to you going back into this, but there are always circumstances I can't imagine.  So at this point we're just going to leave it there.  Okay?

MR. STEWART:  Just to clarify, Your Honor, you mean the testimony as well?  Can I continue asking questions?  I just don't want to violate your order.

THE COURT:  You can ask him questions, but you can't examine on the document you haven't disclosed to the other side.

MR. STEWART:  Understood.  Understood.

THE COURT:  All right.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right, counsel.  You need to pull this document down.  Continue your examination, but not

vis-a-vis this document.

MR. STEWART:  Thank you, Your Honor.

Q.   (BY MR. STEWART)  Mr. Fry, did you present results to Samsung of simulations done by Collision about the use of its technology in C-RAN?

A.   We certainly did.

Q.   Were the results better or worse than the results that were presented to Samsung about products other than C-RAN?

A.   I -- they were quite compelling results.  I don't have the technical expertise to do a comparison, but I am comfortable saying the results were so compelling that I think they were greater.

Q.   All right.  Was that the end of your interactions with Samsung, the emails we saw about -- just now on the screen where Samsung declined to work with Collision?

A.   It was not.  Pretty quickly as a result of the discussions in that March of 2014, we started interacting with Samsung Ventures.

Q.   What was Samsung Ventures' interest in Collision?

A.   They were an investment group of Samsung that would look to make an investment in innovative companies that were relevant to Samsung's interests.

Q.   Were the same base station folks that you've been talking to involved in that Samsung Ventures deal?

A.   They were part of that discussion.  But also in working

with Samsung Ventures, we were -- we were communicating to Samsung Ventures that we have a lot of value in applying our technology to handsets as well.  And so Samsung's handset division was also involved in that discussion.

Q.    Did Samsung ultimately invest in Collision through that process?

A.    They did not.

Q.    Now, was that because Samsung Ventures didn't see value in Collision's technology?

A.    That was not my impression, no.

Q.    What did they say to other companies that they introduced you to?

A.    They had introduced us to a number of other investment groups, and they presented us as a company that Samsung did studies and validated our technology already with.

Q.    And looking at the middle email here, who was that to?

A.    That was to Verizon Ventures.

Q.    And how did Samsung describe you to Verizon Ventures?

A.    They described us as an advanced multiuser detection MIMO and parameter estimation company.

Q.    Now, after the deal with Samsung and Samsung Ventures fell through, what did Collision do next with its business?

A.    Though we were very disappointed that fell through, we also had a lot of enthusiasm and excitement about our technology and frankly felt our technology was only becoming

more and more relevant as mobile communication use continued to increase.  And so we started talking to other potential customers.

Q.   Who are some of those other potential customers you talked to?

A.   Well, Ericsson and Nokia to name two.

Q.   We talked about that with Mr. Farkas a little bit, but from your perspective why did the deal with Nokia not work out?

A.   We had a very successful proof of concept with Nokia and had been engaged with them for a good period of time and entered into a product development and commercial relationship with them.  They ultimately, because of a number of reasons including budget issues related to LTE, canceled our project on us.

Q.   What did that mean for Collision at that point?

A.   Well, at that point we were pretty devastated because we had invested our company into this relationship with Nokia at this point, and as a result of that, we were in a precarious position.  We had 20 employees, I think, or over 20 employees at that time.  And we had to let that whole team go and shut down our research and development operations.

Q.   Now, speaking of Nokia and Ericsson, did you end up reaching agreements with them?

A.   We did end up licensing our technology to Nokia and

Ericsson.

Q.    Is what year was that in?

A.    In 2023.

Q.    When you were in discussions with Nokia and Ericsson about those licenses, were you talking about the exact same patents and products that are at issue in this case?

A.    No.  Those licenses -- the discussions for those licenses were focused on a different set of patents and base stations, not handsets, with the exception of the -- we had talked about the '492 Patent with them in this case.  But with regards to Ericsson, that wasn't relevant to their products in the U.S.; and for Nokia, that was only relevant to 3G base stations that they were no longer selling.

Q.    So when the dust finally settled in 2023 from those license discussions with Nokia and Ericsson, did you have a chance to look back at Samsung?

A.    We did.  We looked at Samsung again and, sure enough, we found that they were infringing our technology with their handsets.

Q.    So it's 2023 now.  How were you able to determine that Samsung was infringing after all that time you'd work with them?

A.    We -- again, in a lot of that time we had worked with them, we didn't have visibility into what they were doing.  But we came across a document in 2023 that Verizon had put out

that suggested that Samsung may be infringing our technology with their handsets.

Q.   And where did it go from there?

A.   From there, we engaged with our attorneys.

Q.   Now, do you recall this slide from Mr. Farkas' direct?

A.   I do.

Q.   Does this slide reflect the additional interactions and conversations you had with Samsung in that time period?

A.   It does.  I'm not sure it captures all the effort that was put into that relationship over that time frame, and then also we talked with Samsung almost every year after this until into 2019.

Q.   So after all those interactions and all that time, how did it feel when you learned that Samsung was using Collision's technology without permission?

A.   It felt like a bit of betrayal.  We had worked really hard to make a productive and a good partnership with Samsung for all those years.  We truly believed our technology was going to make them have -- sell better products and relevant to the industry, both in handsets and in base stations.  And for them to then use our technology behind our back, it was -- it felt like a betrayal.

Q.   So what did you do about it?  Did you just sit back and take it?

A.   No.  We ended up filing the lawsuit that we're here today

for.

Q.   Did you want to have to file this lawsuit?

A.   We did not want to file this lawsuit.  We wanted to be making products with Samsung.

Q.   Why have you -- has it been an easy process?

A.   It has not.  A lawsuit is -- is very difficult, stressful, taxing, and, you know, as I said, we'd rather be building products --

Q.   Why did you continue -- I apologize.  Why have you continued to pursue Samsung in this case?

A.   I think it's the right thing to do.  We needed to -- we need to protect our property, and we feel this is the only way to do it at this point.

Q.   Thank you, Mr. Fry.

          MR. STEWART:  Pass the witness.

          THE COURT:  All right.  Cross examination by the Defendants.

     Do you have binders to distribute, Ms. Smith?

          MS. SMITH:  I do, Your Honor.

          THE COURT:  Let's proceed to do that.

          MS. SMITH:  Thank you.

                    (Pause in proceedings.)

          THE COURT:  All right.  Ms. Smith, you may proceed with cross examination.

          MS. SMITH:  May it please the Court, Your Honor.

372

CROSS EXAMINATION

BY MS. SMITH:

Q.   Good afternoon, Mr. Fry.  I don't believe we've met yet. My name is Melissa Smith, and I represent Samsung.  It's a pleasure to meet you, sir.

A.   Likewise.

Q.   Now, Mr. Fry, you've told the ladies and gentlemen of the jury that you're not an inventor of the patents in this case. Correct?

A.   That's correct.

Q.   And nobody at Collision is an inventor of the patents in this case.  Correct?

A.   That's correct.

Q.   So we heard that Collision purchased these patents from a company called BAE.  Correct?

A.   That's correct.

Q.   And Collision didn't just purchase the four patents in this suit from BAE, did they?

A.   We did not.

Q.   They actually purchased the four patents in the suit plus 79 other patents.  Correct, sir?

A.   I can't confirm the exact number, but that sounds about right.

Q.   About 83, 84 patents.  Correct?

A.   Again, I can't confirm the actual number, but that's in

the right ballpark.

Q.   All right.  Well, you were here in opening statement when your counsel put up a picture from BAE's website.  Correct?

A.   I recall that, yes.

Q.   Okay.  And BAE is -- is a sophisticated company.  Fair?

A.   That's fair.

Q.   They have over 100,000 employees.  Does that sound right?

A.   I don't know how many employees they have.

Q.   Well, what you understand that BAE is is certainly a global company.  Correct?

A.   I understand that, yes.

Q.   They sell tanks and jets and all kinds of arms all over the world.  Correct?

A.   That's my understanding, yes.

Q.   And as a sophisticated company, it's also fair to say that BAE, they might know something, they might know a little bit of something about how to value both inventions and technologies.  Correct, sir?

A.   They may.

Q.   Okay.  So BAE sold 83, not 84, 83 patents to Collision, including all the patents in the suit, for $3.9 million.  Is that correct, sir?

A.   That was one element of the purchase agreement, yes.

Q.   Okay.  Well, the $3.9 million is the amount of money that Collision agreed to pay BAE to purchase the patent portfolio.

374

Correct?

A.    I don't fully agree with that, no.

Q.    All right.  If you will do me a favor, there is a notebook in front of you, and it has your prior sworn testimony in it.  I'd like you to take a look at that notebook.  There is a deposition from August of '22 in that notebook.  Are you there with me?

A.    Yes.

Q.    All right, sir.  If you could go to page 60, lines 17 through 20.  And I don't want you to read it out loud; I just want you to kind of refresh your recollection, if you would?

A.    Do you mind repeating the line numbers?

Q.    Of course.  It's line 17 through 20.

A.    I see that.

Q.    Okay.

THE COURT:  Is this the right binder, Ms. Smith?

MS. SMITH:  It is the August 22nd deposition that I'm looking at.

Your Honor, I'm being told it is the green one.  I apologize.

THE COURT:  All right.  I have August 10th, '22 and April 1st, '25.

MS. SMITH:  It's the August 10th of 22.  I apologize.

THE COURT:  All right.  Page and line again, please.

MS. SMITH:  Page 60, line 17 through 20.

THE COURT:  All right.

Q.   (BY MS. SMITH)  Have you had an opportunity to take a look at your sworn prior testimony, sir?

A.   I have.

Q.   And so my question to you is that 3.9 million is the amount of money Collision agreed to pay BAE to purchase the patent portfolio.  Is that correct?

A.   I see that there, yes.

Q.   That's correct?

A.   Yes.

Q.   Thank you, sir.

So the sale took place in 2010.  That's about 15 years ago.  Correct, sir?

A.   That's correct.

Q.   Okay.  And fair to say there were back and forth, a good deal of back and forth between Collision and BAE during that time?

A.   I recall there being a fair amount of back and forth.

Q.   Okay.

A.   Yes.

Q.   And during the course of that fair amount of back and forth, Collision's discussions with BAE in regards to the purchase of the patents, you don't recall Samsung ever being mentioned.  Correct, sir?

A.   I don't have that recollection, no.

Q.   Okay.  If you will pull out your other sworn testimony, which is April of '25.  And I'm going to ask you to look at page 70, at line 19 through 24.  Are you there, sir?

A.   I see that.

Q.   All right.  My question to you is, you don't recall any discussion of Samsung in the course of your discussions with BAE with regards to the purchase of the patents.  Correct, sir?

A.   That's correct.

Q.   Thank you, sir.

All right.  So Collision had discussions, I believe I heard you say, with Samsung starting about 14 years back in 2011.  Correct?

A.   Yes.

Q.   And you personally had five or six face-to-face discussions with Samsung.  Right?

A.   That sounds about right, yeah.

Q.   And each of these meetings between the years of 2011 and 2014, they were with Samsung's network division.  Correct?

A.   That was my understanding, yes.

Q.   Well, you were at the meetings and it was with the network division.  Correct, sir?

A.   That was my understanding, yes.

Q.   All right.  And your understanding is also that Samsung's

377

network division is a department that sells base station products. Correct?

A. That was also my understanding, yes.

Q. Okay. So for the discussions with Samsung's network group, at a high level, if you will, the focus was on partnering--partnering--to develop Collision's technology in such a way that it could be installed on Samsung's base stations, potentially. Correct?

A. Yeah, that was our initial strategy.

Q. Okay. And then, more specifically, if we drill down a little bit, Collision hoped to develop a receiver module for Samsung base stations. Correct?

A. I think that's fair, yes.

Q. Okay.

MS. SMITH: Now, if we could pull up JX 6, please.

Q. (BY MS. SMITH) And you recognize that document, sir?

A. I do.

Q. And this has a Collision's Bates number on the bottom of it. So Collision certainly received this document from Samsung. Correct?

A. That's correct.

Q. And this document includes Samsung's response to that first meeting that you discussed with the ladies and gentlemen on your direct examination. Correct?

A. Yes.

Q.   Okay.

MS. SMITH:  If we could, Mr. Sayres, if we could go to JX 6.4.  It should look like appendix 1.  Thank you, sir.

Q.   (BY MS. SMITH)  Do you see that, Mr. Fry?

A.   I see that.

Q.   All right.

MS. SMITH:  And if we go one slide deeper at 6.5.

Q.   (BY MS. SMITH)  Here we see Samsung, again this is from Samsung to Collision, indicating that most of Collision's key patents, and I am on this third line right here, are related to turbo MUD for developing a new base station.  Correct, sir?

A.   I see that.  That's what they wrote here, yeah.

Q.   All right.  Thank you, sir.

And, again, Collision is not accusing base station products in this case.  Correct?

A.   That's correct.

Q.   All right.  We heard some testimony from Mr. Farkas earlier about source code, and I just want to -- I want to be clear.

Collision never, never disclosed source code to Samsung.  Correct?

A.   That's my understanding, correct.

Q.   Okay.  Well, you'd know if someone was giving your source code away, wouldn't you, sir?

A.   I would hope so.

379

Q.   All right.  On direct, you testified about a proposal that a Samsung sent to you back in February of 2014.  Do you remember that conversation with your counsel?

A.   I do.

Q.   What we didn't hear about or hear much about is that Collision actually sent a counterproposal back about a week later.  Do you recall that?

A.   I do.

Q.   All right.

     MS. SMITH:  If we could take, Mr. Sayres, at PX 9, 9.1.  Thank you.  Thank you, sir.

Q.   (BY MS. SMITH)  All right, Mr. Fry.  What we see here is an email from Barry West who was with Collision.  Correct?

A.   He was at the time, yes.

Q.   Okay.  And it's to Samsung.  Correct?

A.   That's correct.

Q.   Okay.  And you're CCed on this, so you received it.  Correct?

A.   That's correct.

Q.   Okay.  And in this email, if we scroll down just a little bit to where it says, "The following."  There we go.  In this email, Mr. West is sharing an amended term sheet which is -- which is his attempt, as he says here, to explain Collision's positions in response to Samsung's proposal.  Correct?

A.   That's correct.

380

Q.   All right.

MS. SMITH:  So if we could flip -- flip to PX 9 at 9.5.

Q.   (BY MS. SMITH)  And at the top we see an example -- we all know what a red line is.  You know what a red line is. Correct, Mr. Fry?

A.   I do.

Q.   Okay.  When we see Collision's response in red line.  Do you see that at the top?

A.   I see that.

Q.   Okay.  And then we see, you know, we see Samsung's proposal in black.  Do you see that?

A.   Yes.

Q.   And then you see Collision's response in red.  Correct?

A.   Correct.

Q.   Okay.  And if we look down at the third paragraph at 3.3 --

MS. SMITH:  I think it's going to be on the next page, Mr. Sayres.  3.3.  Thank you, sir.

Q.   (BY MS. SMITH)  We see here that Collision is -- is acknowledging and agreeing that Samsung -- this is Samsung's proposed language, sir.  "Collision acknowledges and agrees that Samsung is engaging in and will be engaging in," currently engaging in and will be engaging in, "in the development of the same or similar software function and/or

purpose with those of Collision's software."

Do you see that?

A.   I see that.

Q.   Okay.  And we see a lot of red on this document, but I think your words moments ago were you balked at some of the proposals from Samsung.  Correct?

A.   That's fair, yes.

Q.   Okay.  But this specific section was not one that you balked at.  There's no red line here.  Correct, sir?

A.   There's not.

Q.   Okay.  And you were here again in opening statements when Mr. Caldwell, your lawyer, addressed the ladies and gentlemen of the jury?

A.   I was.

Q.   And at that time, Mr. Caldwell talked about some kind of overseas research or Samsung doing something behind the scenes.  Do you remember that suggestion?

A.   I remember that.

Q.   And what we see right here is Samsung telling Collision right up front, "we're currently engaging in the development of software and we're going to keep doing it."  Not exactly behind the scenes, sir, is it?

A.   I don't recall how I viewed that at the time, but I don't think it was clear to us what they were doing.  I think it was clear to us, though, that we -- that this wasn't a negotiable

382

term because we can't control what Samsung is doing.

Q.    Is there in any--any--doubt in your mind about what Samsung is doing by this language?  They are engaging in and will be engaging in the development of software.  Is that anything less than crystal clear, sir?

A.    I don't think it's super clear what -- what they're doing here besides what's written here.

Q.    Okay.  Thank you, sir.

Now, Samsung's network division eventually ended discussions with Collision shortly after this.  Correct?

A.    Correct.

Q.    And Collision at that time had owned -- that was about 2014.  So Collision had owned its patents for about four years now.  Correct?  Bought them in 2010?

A.    Yeah, I'd say three years.  The assignment didn't occur until 2011.

Q.    Okay.  They had them a little over three years, sir.  Correct?

A.    Sure.

Q.    Okay.  And nobody at Collision said anything to Samsung about patent infringement.  Correct?

A.    That's correct.

Q.    And nobody filed a lawsuit against Samsung.  Correct?

A.    That's correct.

Q.    And you weren't talking to Samsung's network division

about using Collision's technology in phones and tablets at the time, were you?

A.   I think we would bring up the use of our technology in handsets to Samsung often, but that was not the main -- that was not the focus of the discussion at the time.

Q.   That wasn't the main focus of the discussion because those were future plans and hopes of Collision at the time. Correct?

A.   That's correct.

Q.   Okay.  And make no mistake, make no mistake, that Samsung at the time during those three years, they're out there selling smartphones, they're selling LTE-A smartphones and tablets during this time.  Correct?

A.   That's correct.

Q.   Okay.  All right.  So after the discussions with Samsung's network division ended, Samsung actually--and I think we heard this on your direct--they actually suggested that you talk to Samsung Ventures.  Correct?

A.   That's correct.

Q.   And you understood that this second division of Samsung was an investment arm of Samsung.  Correct?

A.   Yes.

Q.   They'd invest in start-ups and small companies and things like that.  Correct?

A.   Correct.

Q.   Okay.  And what you wanted from Samsung Ventures was about $5 million.  I think I saw that in a document.  Correct?

A.   I think that's where the discussion started, yes.

Q.   All right.  And the discussion started there, and it went on till about 2015.  Correct?

A.   That's correct.

Q.   Okay.  And ultimately Samsung Ventures did not invest in Collision.  Correct?

A.   That's correct.

Q.   Okay.  And you mentioned another group on your direct, Verizon Ventures?  Did I hear that properly?

A.   You did.

Q.   And is that like Verizon, the carrier?

A.   It's an investment group within Verizon, the carrier, yes.

Q.   And Verizon Ventures had some discussions, but they, too, chose to opt out of investing in Collision.  Correct, sir?

A.   That's correct.

Q.   Okay.  Now, by that time we've moved up to 2015, and Collision's had their patents for four or five years at that point?

A.   Yeah, four years.

Q.   Nobody said anything to Samsung about patent infringement.  Correct?

A.   That's correct.

385

Q.    Nobody's filed a lawsuit.  Correct?

A.    That's correct.

Q.    Samsung still out there selling, you know, many, many, many -- can't give you a number -- many, many, many smartphones with MIMO.  Correct?

A.    Yeah.  Again, I can't answer to the MIMO portion of that because that's not my area of expertise, but they were selling many phones, yes.

Q.    Okay.  Another year goes by, and then you actually reached back out to the network division.  Correct?

A.    Is there a time frame you're referring to?

Q.    Maybe September of 2016?  Let me actually help you with this.

        MS. SMITH:  If I could see Collision 127388, please.  Thank you, sir.

Q.    (BY MS. SMITH)  Does that look familiar, Mr. Fry?  It's from you?

A.    It does.

Q.    Okay.  So here, again, you're corresponding with the network division about collaborating.  Correct?

A.    Yeah.  There is more detail to that, but yeah.

Q.    Well, you're not telling them that they're using your patents.  Correct?

A.    That's not what I'm doing here, no.

Q.    And you are not telling them you're going to file a

386

lawsuit.  Correct?

A.   Correct.

Q.   And you're trying to do business with them again. Correct?

A.   Correct.

Q.   So if we go down to about the fourth paragraph, it says a lot of time has passed.  Fair?

A.   Yes.

02:06  Q.   Okay.  And then, again, during that time, Samsung is still selling those LTE-A smartphones.  Correct?

A.   Do you mind repeating that question?

Q.   During all this time that has passed, Samsung -- it's no secret that Samsung is still selling LTE-A smartphones. They're on TV.  They're out in the open.  There's no secret, sir.  Correct?

A.   That's correct.

02:06  Q.   All right.  Now, you say in this second bullet that in earlier discussions, Collision was focused on macro cell interference suppression technology.  Do you see that, sir?

A.   I see that.

Q.   Okay.  And then you go on to say, at this point in time Collision has expanded, your word.  Correct?  Expanded.

A.   That's correct.

Q.   To solutions including C-RAN.  Correct?

A.   Correct.

Q.   So it's fair to say that C-RAN wasn't a part of Collision's solutions before that.  Correct?

A.   I know we were doing work many years prior.  You know, when -- I don't know when we started labeling it as a solution that we were providing.  But in terms of our development -- research and development work, it was something that had been in our efforts for years at that point.

Q.   Well, when you tell somebody that you've expanded into something, that's a change.  Fair?  You made a change, you've expanded into something, something different.

A.   Is that a question?

Q.   Yes, sir.

A.   I think it could mean anything in the context of how it's used here.  Here I am -- I am saying that we're -- we are marketing new offerings related to our technology.

Q.   And one of those new offerings is C-RAN.  Correct?

A.   That's correct.

Q.   All right.

        MS. SMITH:  Thank you, Mr. Sayres.

Q.   (BY MS. SMITH)  Another couple of years go by, and then you present to Samsung Research America in about 2018.  Do you recall that?

A.   I do.

Q.   And Samsung Research America is a research and development -- an R&D company.  Correct?

A.    I'm not sure I'm able to qualify what Samsung Research America does overall, but I had interaction with them at that time frame and it was related to the prior exhibit that you just put up.

Q.    Okay.

MS. SMITH:  Mr. Sayres, if I could see the SRA website, please, the front page.  It says "our mission" on the front of it.  Thank you, sir.

Q.    (BY MS. SMITH)  All right.  You see that, Mr. Fry?

A.    I see that.

Q.    This is from SRA's website, and it talks about their mission and it talks about searching for the best -- or the brightest talent from around the world and giving them resources that they need to be the best at what they do.

Any reason to dispute that that's what SRA is all about?

A.    It's what's on their website so I don't have reason to dispute that.

Q.    Okay.  And when they talk about resources, that could include money.  Correct?

A.    I assume so, but again I don't know.

Q.    Oh, when you were talking to Collision -- when Collision was talking to SRA, were you looking for some investment?

A.    I think those discussions were related to Samsung and maybe SRA.  Again, I'm not -- wasn't fully clear of the corporate structure.  They were inviting us to submit material

to them for an event that they would hold.

Q.    And then if you are -- if Samsung likes your technology at the event that they hold, they ultimately invest in your company or your product.  Correct?

A.    It wasn't clear to me if it was an investment like a venture investment or if it was maybe a development deal of some sort or some study or -- it wasn't clear to me the results of that -- or at least from where I am today.

Q.    Okay.  But what is clear from where you are today is that a Samsung Research did not invest or collaborate or do any of the other things with Collision that you just mentioned.  Correct?

A.    That's correct.

Q.    All right.  And at this point Collision had had the patents -- the BAE patents for about eight years.  Is that right?

A.    I think seven, but...

Q.    I'll go with your math; seven years, sir.  Is that correct?

A.    Yeah.

Q.    Okay.  So in the communications that we've talked about, you know, Collision's had the patents for seven years, no one has accused Samsung of using the patents.  Correct?

A.    That's correct.

Q.    Okay.  And a point of clarification.  Collision's

390

technology, it was never actually integrated into Samsung base stations. Correct?

A. That's correct.

Q. Okay.

A. But technology I was referring to in my answer, software that Collision developed, that would be integrated into Samsung's base stations.

Q. Collision's technology was never integrated into Samsung base stations. Correct?

A. Our software, yes.

Q. It was only after all of these conversations, whether it be with Ventures or SRA and the various divisions with Samsung, when Samsung opted out of investing in Collision, that Collision filed a lawsuit. Correct?

A. We filed the lawsuit after a long history of dealings with Samsung.

Q. Okay. And during that long history, Samsung was out selling phones for about 14 years before you filed your lawsuit. Correct?

A. Sure. That sounds right. I don't know when they started selling phones, but --

Q. If we look at the Galaxy S4 to the Galaxy S23, any reason to dispute that's about a 14-year span, sir?

A. Again, I'm not knowledgeable about Samsung's product releases and...

391

Q.    All right.  Mr. Stan Fry founded Collision.  Correct, sir?

A.    He and I together did, yes.

Q.    And he's your father.  Right?

A.    He is.

Q.    Okay.  He, while you say you founded it together, it was Mr. Fry that actually contributed the money to purchase the BAE patents.  Correct?

A.    He as well as other investors made investment in Collision.

Q.    And the other investors did not include you.  You didn't contribute the money to buy the BAE patents.  Correct, sir?

A.    That's correct.

Q.    And you told the jury in your direct examination that you were a good fit for your position at Collision because you're an engineer.  Did I hear that correctly?

A.    You did hear that correctly.

Q.    And you're also a good fit to hold your position at Collision because your dad is the founder.  Correct?

A.    I'm not sure what you're -- I'm not sure if that determines the fit or not.

Q.    Well, you're not telling these ladies and gentlemen under oath that it's a coincidence that your dad founded Collision and purchased the BAE patents, are you, sir, and you just happened to work at the company?

A.    Do you mind clarifying that question?

Q.    It's not a coincidence, sir, that you are a good fit to work at Collision because your dad's the founder and purchased the BAE patents.  Correct, sir?

A.    I don't think our relationship to my father was what determined if this was a good fit for me or not.

Q.    It has nothing with you being a part of this company the fact that your dad founded it?

A.    Again, I would say he and I founded it together, so I don't think that's coincidental.

Q.    Okay.  And you are -- your dad -- or you are the COO of Collision.  Correct?

A.    That's correct.

Q.    You are also a co-chairman of Collision.  Correct?

A.    That's correct.

Q.    Your father, Mr. Stan Fry, is also a co-chairman. Correct?

A.    That's correct.

Q.    Your dad has a little more equity interest in the company than you do.  Correct?

A.    Yes.

Q.    You serve on the board of Collision.  Fair?

A.    That's correct.

Q.    And you actually have a brother that also serves on the board.  Correct?

393

A.    That's also correct.

Q.    Now, you are a part owner of Collision.  Correct?

A.    I have some ownership interest, yes.

Q.    Okay.  And you said previously that Collision had about 20 employees.  Is that correct?

A.    I don't know the exact number, but when we were at our largest, we were around 20, maybe more, yeah.

Q.    And now you have about three employees.  Correct?

A.    That's correct.

Q.    And no plans to hire more any time soon.  Fair?

A.    We don't have plans at the moment to hire for the near term.

Q.    Okay.  And you're not making any products and you've never made products in the past.  Fair?

A.    I would characterize it differently.

Q.    Well, you're not currently making products, are you, sir?

A.    That's accurate.

Q.    Collision.  I apologize.

A.    That's accurate.

Q.    Okay.  All right.  In addition to having an ownership interest, you get a salary from Collision.  Correct?

A.    I do.

Q.    But since about 2019, you'd characterize your work as more part-time work at Collision.  Correct?

A.    Since I would say 2020, it's varied over a number of

years.  I'm full time now.

Q.  Okay.  There was a time between 2019 and April of '25 when you gave your deposition that you would have called your involvement in Collision as a part-time job.  Correct?

A.  Yeah.  I would say it varied over those years based on needs.

Q.  Okay.  Being in court obviously all day every day is a full-time job, isn't it, sir?

A.  It is.

Q.  All right.  Now, you're not familiar with the infringement allegations in this case.  Correct?  The spec claims.  I'm not sorry, sir?

A.  I'm not -- well, I don't have detailed familiarity with the detailed claim allegation.

Q.  You haven't reviewed, for instance, claim charts.  Correct?

A.  I have.

Q.  That's new.  Have you done that recently, sir?

A.  Yes.

Q.  Okay.  Because previously you swore under oath in April of '25 that you hadn't reviewed the claim charts.  Do you recall that?

A.  I do.

Q.  Okay.  So you decided to take a closer look, just kind of as you came to court to trial for this case, take a closer

395

look at the case?

A.   I took a closer look at that and that element of the case, yes.

Q.   But you didn't look at anything before you filed this suit.  Correct?  You hadn't looked at any claim charts before you filed this suit?

A.   I personally did not, no.

Q.   All right.  Never read the file histories of the asserted patents?

A.   I don't believe I did.

Q.   Okay.  Never reviewed any of the prior art in this case?

A.   I did not, no.

Q.   Okay.  However, if Collision recovers money from Samsung, you would certainly receive a portion of that money due to your ownership interest in Collision.  Correct?

A.   There's a chance of that, yes.

Q.   Fair to say there's a chance of making a significant amount of money.  Correct?

A.   Potentially.

Q.   Okay.  I believe that you're not exactly sure about what percentage interest in Collision you own.  Is that correct?

A.   I don't have the exact number, but I have a sense.

Q.   Something less than 20 percent.  Fair?

A.   I think it's closer to probably 7 percent.

Q.   Okay.

396

A.   But that's not exact, yeah.

Q.   Well, let's talk about this a little bit.  You were here on Friday when His Honor told the jurors that they get to consider if a witness has a personal interest in a case in judging a witness' credibility.  Did you hear His Honor give that instruction?

A.   I did.

Q.   All right.  So the damages that Collision has asked for in this case are right around $445 million, about a half billion dollars.  Does that sound right?

A.   That sounds about right.

Q.   Five percent of that even would be over $20 million.  Is my math right on that, sir?

A.   It is.

Q.   And up until recently, you hadn't really looked at claim charts, and this was more of a part-time job for you. Correct, sir?

A.   As I testified, my work with Collision because of our hardships back in 2018, 2019 became part-time for a number of years, yes.

Q.   And fair to say, $20 million is a good amount of money whether you're in Vermont or Texas for a part-time job. Correct, sir?

A.   $20 million is a lot of money.  Yes, you're correct.

Q.   Now, Collision has licensed -- we heard a little bit

about this on your direct.  Collision has licensed the asserted patents before.  Correct?

A.    That's correct.

Q.    Got a license with Nokia.  Right?

A.    Correct.  That's correct.

Q.    And a license with Ericsson.  Correct?

A.    That's correct.

Q.    And you know these are two of the largest network companies in the world.  Correct?

A.    They are the -- they make -- they're one of the largest players for making base stations, if that's what you mean.

Q.    Exactly.  They are two of the largest players in the base station industry.  Correct, sir?

A.    That's correct.

Q.    All right.

MS. SMITH:  Your Honor, I may need to seal the courtroom just briefly while I discuss the numbers in those licenses.

THE COURT:  All right.  Based on counsel's representation and to protect confidential information, I'll order the courtroom sealed at this point.

That means those persons present who are not subject to the protective order that's been entered in this case should exit the courtroom and remain outside until it's reopened and unsealed.

398

(Courtroom sealed.)

02:22

Q.

A.

Q.

02:23

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

02:23  Q.



(Courtroom unsealed.)

THE COURT:  All right, counsel.  The courtroom is reopened and unsealed.  Please continue.

MS. SMITH:  Thank you, Your Honor.

Q.   (BY MS. SMITH)  Now, you said these were base station manufacturers, so obviously the agreement with Nokia was to work on technology for their base stations.  Correct?

A.   That's correct.

Q.   Okay.  Collision's business from, say, 2019 to this day, it's mainly licensing its intellectual property.  Correct?

A.   Yeah, I would say after Nokia canceled our project with them, we were exploring what we do as a company, and licensing our technology is one of those activities that we've been engaged in since.

Q.   Okay.  And we heard a little bit about marking in this trial.  You're not aware, just to be clear, you're not aware

400

of any product sold by anyone that has ever marked with the patents asserted against Samsung in this case.  Correct?

A.    That's correct.

Q.    Okay.  Now, Mr. Fry, you don't dispute that Samsung is an innovative company.  Fair?

A.    Yeah, I guess I can't speak to, you know, how they're innovative.  I'm sure they're innovative in certain ways.  I just -- I don't know.

Q.    Have you seen the TVs and the flip phones and the vacuum cleaners and all kinds of things?  Fair to say, they're innovative in some respects?

A.    Sure.

Q.    All right.  But you're claiming today that Samsung does not respect Collision's IP.  Correct?

A.    I claim today that they're infringing our IP.

Q.    Do you know that Samsung actually had the largest number of patent filings in the U.S. just last year?

A.    I was not aware of their patent filings.

Q.    Do you know that Samsung actually has thousands, thousands, of patents on both 4G and 5G technology?

A.    I didn't have an idea of how many patents Samsung has with relation to those -- those areas of technology.

Q.    Okay.  Now, we've heard a good bit about the correspondence between Samsung and Collision and base station collaborations.  But you understand that His Honor, His Honor

is going to tell the jurors that their job is to compare

claims in the patents to Samsung's consumer mobile products.

Correct?

A.   That's correct.

Q.   Okay.  Been in court for many hours now and we haven't

heard anyone from Collision speak to that yet, have we?

A.   Not yet, no.

Q.   Okay.  Now, sir, stepping aside from this lawsuit and

this courtroom, you and I have both been on the receiving end

of a sales pitch where we had to say no.  Fair?

A.   Yeah, that's fair.

Q.   Sometimes you have to say no more than once when people

are persistent.  Fair?

A.   Sure.

Q.   And there's no reason that a company also shouldn't be

able to say no.  Correct, sir?

A.   I agree with that.

Q.   Okay.  In 2013, as early as 2013, Mr. Fry, you knew there

were shortcomings in the performance of Collision's

technology, did you not?

A.   I'm not sure what you're referring to.  I don't recall

anything in particular, but...

MS. SMITH:  Mr. Sayres, if we could have Collision

102487, please.  Thank you, sir.

Q.   (BY MS. SMITH)  Now, up here on the screen, I have an

email, an email from you to your dad.  Fair?

A.    Yes.

Q.    And it's dated January of 2013.  Quite early in 2013.
Correct?

A.    Correct.

Q.    Okay.  And if we look down at the first line, we see
Barry and Joe -- and that's Mr. Barry West and Mr. Joe Farkas.
Correct?

A.    That's correct.

Q.    They're having a sinking feeling that they're not going
to reach their numbers for Samsung.  Correct?

A.    Correct.

Q.    Okay.  And then you go on to write that Mr. West and Mr.
Farkas felt that Collision's algorithms had shortcomings for
two reasons.  Do you see that?

A.    I see that.

Q.    Okay.  The first reason was that the algorithms weren't
working as strongly as Collision expected them to.  Do you see
that, sir?

A.    I see that's written there.

Q.    And the second reason, the second reason was because
Samsung's technology was just better than Collision initially
understood.  Do you see that, sir?

A.    I see that.  I think it's in reference to the -- to the
baseline.  I don't think it's saying it's better than what we

were doing.  I think it's saying the baseline was better than what we were expecting.

Q.   All right.  Samsung was doing better than expected. Fair?

A.   That's fair.

Q.   All right.  You also wrote that Collision was hoping to replace Samsung's technology.

MS. SMITH:  If we can highlight that.

THE WITNESS:  Yes.  That's what it says.

Q.   (BY MS. SMITH)  So if you're hoping to replace Samsung's technology, that means that Collision's technology and Samsung's technology, they aren't the same.  Fair?

A.   I think -- yeah, I think that's fair, and I think we were proposing to Samsung that our receiver is -- is better than theirs.

Q.   Because of these concerns, because of these concerns, you -- you thought Mr. West and your father should begin talking -- or taking the company into a new direction.  Fair?

A.   I don't recall --

Q.   Let me help you out, Mr. Fry.

A.   Okay.

Q.   I'm sorry.

MS. SMITH:  I think, Mr. Sayres, if we could go down a little further.  There you go.

Q.   (BY MS. SMITH)  I didn't mean to hide that from you, sir.

I apologize.  Do you see that line, Mr. Barry West, myself, and you--Dad--need to begin thinking about different directions we could take our company.  Do you see that, sir?

A.   I see that.

Q.   And one of those new directions that you list is to --

MS. SMITH:  If we could go down a little further, there it is.

Q.   (BY MS. SMITH)  The 2, to investigate patent assertion. Correct?

A.   I see that.

Q.   And that means filing this lawsuit, doesn't it, sir?

A.   I don't think that's in reference to this lawsuit here. I think I was brainstorming what are some other plans for the company in anticipation of a discussion that we were maybe going to have.

Q.   Well, patent assertion doesn't mean making products, does it, sir?

A.   It does not.

Q.   And it doesn't mean going into collaborations, does it, sir?

A.   It -- my guess it's not -- it's not mutually exclusive of those, but it does not.

Q.   All right.  Thank you, sir.

MS. SMITH:  Your Honor, I'll pass the witness.

THE COURT:  All right.  Is there redirect?

MR. STEWART: Yes, Your Honor.

THE COURT: Let's proceed with redirect.

REDIRECT EXAMINATION

BY MR. STEWART:

Q.   Mr. Fry, hi, again.

MR. STEWART: Can I please have the document camera?

Q.   (BY MR. STEWART) So I'll start where Ms. Smith ended. Mr. Fry, what date was this email?

A.   This was January 10th, 2013.

Q.   Do you recall Ms. Smith suggesting that you were looking into patent assertion at this point in January of 2013?

A.   I do.

Q.   How many more years of trying to work with Samsung to actually develop products for them and with them did you proceed with before you ever thought of having to bring a lawsuit?

A.   Many years, yeah.

Q.   Now, she also pointed you to a portion at the top of this email where there were expressions of shortcomings in the performance and the algorithms not working as strongly as expected. Do you see that?

A.   I see that.

Q.   When was that meeting with Samsung where Mr. Farkas testified about showing simulation results to Samsung?

A.   Five months later.

406

Q.    Was there a lot of work being done in those five months?

A.    There sure was.

Q.    Was Collision able to demonstrate the performance that Samsung was expecting to see at that meeting after all that work?

A.    We did.  We were able to show that we far exceeded Samsung's goals and also show them that we could do it with low complexity.

Q.    Now, taking a look at another document that was shown, do you recall this one?

A.    I do.

Q.    We've talked about C-RAN a couple of times now.  Can you explain to the jury at a high level what C-RAN is?

A.    This is a non-technical explanation of what C-RAN is, but you're familiar with seeing cell towers along the highway, big towers.  They usually sit pretty independent of each other and operate independently.  In C-RAN, the one I guess -- C-RANs can be a broad term, but one implementation of a C-RAN architecture is where you have a centralized base station that has antennas in lots of distributed locations bringing the signals back.

So rather than having a tower with a base station and a set of antennas that are all co-located, you have a base station that is a much bigger base station because it's getting signals from a bunch of distributed locations, and

407

then the base station processes all that data.

Q.   Just to clarify, as a very shortened version, it's a base station architecture.  Right?

A.   Correct.

Q.   Do you recall that in Mr. Farkas' direct, there was this discussion about Samsung using as an excuse for not collaborating with Collision that they didn't think Collision's technology was going to work well in C-RAN?

A.   I recall that, yes.

Q.   In this very email that you sent to Samsung a few years later, what sort of performance were you showing in C-RAN architectures with your technology?

A.   We could show massive performance in C-RAN.

Q.   What are the numbers here, that 300 and 400 percent really mean?

A.   Yeah, 300 and 400 percent, that's 3X the amount of data, 4X the amount of data you could put through the network.

Q.   When you saw those results after you ran them even a couple of years later, did that call into question in your mind Samsung's reason why they didn't want to work with you back in 2014?

A.   It did, yes.

Q.   Now, I want to switch gears a little bit.  Do you recall being asked about the BAE purchase?

A.   Yes.

Q.   You were shown your deposition transcript.  Do you recall that?

A.   I was.

Q.   And the testimony that you said in that transcript that Ms. Smith confronted you with just said that the amount of money paid by BAE or to BAE was $3.9 million.  Is that fair?

A.   That's -- that's what I was asked, yes.

Q.   Was the $3.9 million in cash or in money that was sent to BAE the only thing they received as part of that license?

A.   It is not.

Q.   What else did BAE get as part of that collaborative deal?

A.   As part of that agreement, they received access to some of our developments, so some of the technology that as Collision we were developing, they had access to.

They received a license to our technology back, to the patents back, that is, and then they have a profit participation in Collision's profits.  So as we're profitable in some of our activities, they get a percentage of that profit.

Q.   Did you understand that $3.9 million payment back in 2010 to reflect the expectation of all of the potential uses going forward into the future of this technology?

A.   No.

Q.   What was the state of MUD technology at the time that Collision was purchasing it in the commercial sector?

A.    I recall at that point in time, the technology was -- was -- even though the theories around MUD had been around, the commercial use of MUD is -- was newer.  And I felt like as starting this company, we needed to make the market for what we were doing in terms of technology development, meaning we needed to go out and we needed to be proving ourselves, proving this technology to industry.

Q.    When Collision and BAE came to that number as that partial payment for this deal, would they have been able to know how much individual companies were going to infringe on those patents all the way up to 2025?

A.    No.

Q.    Now, you were also asked about the Nokia and Ericsson licenses.  Do you remember that?

A.    Yes.

Q.    I don't want to talk about the numbers so we don't have to seal the courtroom again, but why do you believe the numbers paid by Nokia and Ericsson were appropriate for those particular licenses?

A.    I believe those amounts were reflective of their use of our technology.

Q.    You know that Ericsson and Nokia, they used to make cell phones a long time ago.  Right?

A.    That's correct.

Q.    When you were doing this license with them, was there any

understanding that they were making 250 million phones that might use this technology?

A.   No, not at all.  They don't make phones anymore.

Q.   Do you remember being asked whether you ever gave Samsung notice of infringement in all that time you talked to them?

A.   I do.

Q.   What was Collision's product at the time that they were focusing on in those initial discussions with Samsung?

A.   We were -- those discussions were around Samsung's base stations.

Q.   What was next in the pipeline for Collision?

A.   Handsets.

Q.   Did Samsung know that?  Did you tell them that?

A.   They did.

Q.   Had it got in your mind that Samsung knew handsets was on the radar for Collision's technology?

A.   There is no doubt in my mind.

Q.   Did you tell Samsung that if they just wanted to use our tech and handsets, they didn't need a license?

A.   We didn't tell them that.

Q.   Now, in all of these interactions with Samsung, even after that email we looked at in 2013, what were you trying to do with Samsung?  What was the relationship you wanted to build?

A.   That whole time we were trying to build a relationship

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

with Samsung and be partners where Collision was developing solutions that would go into Samsung's products.

Q.   Was it part of your business model at that time to accuse your potential customers of patent infringement?

A.   No.

Q.   Was it part of your business model to investigate them for potential infringement while trying to work with them on products?

A.   No.

Q.   Was it part of your business model to assume that they might be operating in bad faith and using your technology without permission?

A.   No.

MR. STEWART:  Can we bring up PX 9, Mr. Diaz, and paragraph 3.3?

Q.   (BY MR. STEWART)  You recall being asked about this acknowledgement?

A.   Yes.

Q.   In the red line you sent back to Samsung, you did not red line out that agreement or that portion of the agreement. Right?

A.   That's correct.

Q.   Did you say that in acknowledging that Samsung might be engaging in its own development they won't have to respect our intellectual property?

A.   I never said that, no.

Q.   Did Samsung tell you exactly what they were developing?

A.   They did not.

Q.   Did you think they were just going to go and try to get someone to code the same type of techniques that Collision was proposing?

A.   I would hope not.

Q.   Did you learn about that for the first time in opening?

A.   In opening on Friday, that was the first time I learned about that.

Q.   If they had told you back then that they were going to ask someone to code the exact same technology that you were proposing, would that have been okay with you?

A.   No.

Q.   Now, one last thing.  Do you recall Ms. Smith kind of insinuating that you might be not telling the truth because you have a financial interest in this case?

         MS. SMITH:  Objection to the sidebar, Your Honor.

         THE COURT:  It's not a sidebar; it's a question.
He can ask the question.

         MS. SMITH:  Thank you, Your Honor.

         THE WITNESS:  I remember that insinuation.

Q.   (BY MR. STEWART)  How did that make you feel when she asked you those questions?

A.   It doesn't make you feel good when someone insinuates

things like that against you.

Q.    She also talked about the fact that your father was one of the investors in the company that you worked for.  Right?

A.    She did.

Q.    Is there anything wrong with a family-owned business?

A.    I would hope not.

Q.    Do you feel that Collision has been anything more than forthright and truthful in this case?

A.    I do.

Q.    Do you stand by all the testimony you gave in your direct examination?

A.    I do.

Q.    Knowing that you might be accused of having this sort of biased interest in the outcome of this case or that you might be accused of, I don't know, being untruthful because your father's also involved in the company, why did you still want to come to court and tell your story today?

A.    Because I think it's important to have the facts presented here, and this has been a company that I've been involved with for almost 15 years now, I poured myself into this company, and this is important to us.

          MR. STEWART:  Pass the witness.

          THE COURT:  Redirect?

          MS. SMITH:  Please, Your Honor.

          THE COURT:  I'm sorry.  Additional cross; not

redirect.

MS. SMITH:  That, too, Your Honor.  Thanks.

THE COURT:  Go ahead.

RECROSS EXAMINATION

BY MS. SMITH:

Q.   Sir, you said you're not here giving technical expert testimony.  Correct?

A.   That's correct.

Q.   Do you know anything about something called blind MUD?

A.   Very loosely.

Q.   Do you know whether these patents cover blind MUD?

A.   It's not clear to me if they do or not.  It's outside my technical expertise.

Q.   And do you know that when -- do you know that MUD, when used with C-RAN, is not a blind MUD?

A.   Again, this is probably beyond my technical expertise, but that sounds about right.

Q.   And you never gave Samsung code or algorithms for your MUD technology, did you, sir?

A.   I don't believe we did.  I guess I'd defer to Mr. Farkas' testimony that we did share a lot of technical information.  I don't believe we shared code, but we may have shared detailed information, technical information about algorithms, but I'm not able to testify to that.

Q.   All right.  And to the extent, sir, that you felt at all

that I was insinuating that you were less than truthful, please accept my apology. I meant no such thing.

Do you accept my apology?

A.    Sure. Thank you.

Q.    Thank you, sir.

MS. SMITH:  I'll pass the witness, Your Honor.

THE COURT:  All right. Any further direct?

MR. STEWART:  No, Your Honor.

THE COURT:  Then you may step down, Mr. Fry.

THE WITNESS:  Thank you.

THE COURT:  Ladies and gentlemen, the next witness is probably going to be on the witness stand between four and five hours, so we're going to take a recess before we start with the next witness.

If you'll simply close your notebooks and leave them in your chairs, follow all my instructions about your conduct, including not to discuss the case with each other, use this opportunity to stretch your legs, get a drink of water, and we'll be back shortly to continue with the next Plaintiff's witness.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right, counsel. The Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Is there an issue about use of demonstratives, Ms. Fair, or somebody else on the Plaintiff's side?

MR. NEMUNAITIS:  Yes, Your Honor.

THE COURT:  Tell me what you have in mind.

MR. NEMUNAITIS:  I would like for him to be able to step down from the witness stand to use a magnetic board that he can write on and put some magnets on.

THE COURT:  And where do you propose to put this magic magnetic board?

MR. NEMUNAITIS:  If we -- I believe if he could just stand here, we could put the board here.  I believe he could do it there.  I expect it to take around eight minutes.

THE COURT:  And where is the board now?

MR. NEMUNAITIS:  It's right over here.

THE COURT:  All right.  Why don't you move it and put it behind the railing here so that when that time comes all, you've got to do is set it up.  Is it on its own easel?

MR. NEMUNAITIS:  The easel is right over there so I can put that here.

THE COURT:  Put the whole mechanism behind the railing there so all you have to got to do is lift it up.

And you say he's going to write on it as well as attach some magnets?

MR. NEMUNAITIS:  Yes.

THE COURT:  All those markers and magnets are --

MR. NEMUNAITIS:  I can set them there as well.

THE COURT:  Put everything there.  Let's do it right now.

Mr. Pak, you're on your feet.

MR. PAK:  Yes, Your Honor.  When that happens, can I have permission to take a look --

THE COURT:  Absolutely.

MR. PAK:  Thank you.

THE COURT:  You can reposition so you can see everything.

Yes, sir?

MR. NEMUNAITIS:  Your Honor, may I also move some claim boards behind the lectern?

THE COURT:  Let's do it all right now.

Mr. Barnett, we're going to use a handheld microphone when that happens.  If you'll make sure the witness holds the handheld microphone.

THE COURT SECURITY OFFICER:  Yes, sir.

THE COURT:  Now, when you're ready to use these fixed boards near the podium, you can bring the easel with the pad on it up to the front of the elmo and position the boards on them there.  That should give the jury a straightforward view of them.

MR. NEMUNAITIS:  Thank you, Your Honor.

THE COURT:  And whether it's the magnetic board or the charts, opposing counsel can certainly have leave to reposition as needed so they can see everything.

MR. PAK:  Thank you, Your Honor.

THE COURT:  Anything else, counsel?

MR. NEMUNAITIS:  No, Your Honor.

THE COURT:  Okay.  And is it Mr. Nemunaitis?

MR. NEMUNAITIS:  Yes, Your Honor.

THE COURT:  I'll try to get it right.

MR. NEMUNAITIS:  Well, that's pretty good.

THE COURT:  Okay.  All right.  If there's not anything further, let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, members of the jury.  Please have a seat.

All right.  Plaintiff, call your next witness.

MR. NEMUNAITIS:  Plaintiffs call Dr. John Kowalski.

THE COURT:  All right.  Dr. Kowalski, if you'll come forward and be sworn, sir.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please have a seat on the witness stand.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Nemunaitis, you may proceed with direct examination.

MR. NEMUNAITIS:  Thank you, Your Honor.  May it

please the Court.

                    JOHN KOWALSKI, Ph.D.,

having been first duly sworn, testified under oath as follows:

                    DIRECT EXAMINATION

BY MR. NEMUNAITIS:

Q.   Will you please introduce yourself and tell the jury a little bit about your family?

A.   Yes.  My name is John Kowalski.  I am a researcher in wireless communications, cellular in particular.  I have a wife of over 24 years and a son who recently graduated college.

Q.   And where do you live?

A.   I live in Vancouver, Washington, which is right across the Columbia River from Portland, Oregon.

Q.   What's your role in this case?

A.   My role is to demonstrate the infringement of the patents-in-suit; to assess the technical benefits; to identify what the accused products are; and, finally, to address issues of marking.

Q.   Did you have some slides prepared to assist in your testimony today?

A.   Yes.

Q.   Could you please tell the jury about your education?

A.   Yes.  I graduated from Polytechnic University, now the NYU Tandon School of Engineering, Bachelor's of Science in

electrical engineering, highest honors, '79; Master's of Science in '82; and Ph.D. in 1993.

Q.   Do you also have in-the-field experience?

A.   I do.

Q.   And can you tell the jury about that?

A.   Yes.  Over 35 years of work experience in wireless, in particular.  I started work at defense contractors.  In 1992 I started my career at InterDigital working on 3G technology.  '97, I went to Sharp Labs of America working on 4G, 5G, and also 3G technology.  And I've been consulting in wireless since 2022.

Q.   During your time in the wireless industry, have you personally participated in the development of 4G and 5G standards?

A.   Yes.

Q.   Are you a named inventor on any patents?

A.   Over 135 with about 100 pending.

Q.   Do any of those patents relate to MUD, or multiuser detection?

A.   Several do.

Q.   Any of them relate to interference cancellation?

A.   Yes, including interference cancellation for headphones.

Q.   Have you been retained by Collision Communications to be an independent expert in this case?

A.   I have.

Q.   Have you previously testified as an expert in wireless communication cases?

A.   Yes.

Q.   Are you charging for your work?

A.   I am.

Q.   How much do you charge?

A.   My firm is charging $850 an hour.

Q.   Does the outcome of this case affect your compensation in any way?

A.   Not at all.

Q.   Have you been paid for your work in this case to date?

A.   I have.

MR. NEMUNAITIS:  Your Honor, at this time Collision Communications tenders Dr. Kowalski as an expert in the field of wireless communications.

THE COURT:  Is there objection?

MR. PAK:  No objection, Your Honor.

THE COURT:  Without objection, the Court will recognize this witness as an expert in those fields.

Please continue.

Q.   (BY MR. NEMUNAITIS)  What technical background does someone need to have to understand Collision's patents?

A.   Well, the person of ordinary skill in the art, that's what POSITA stands for, is a person with at least a Bachelor's in electrical engineering, computer engineering, computer

science, physics, or equivalent, and two years of experience with cellular telecommunications, radio network access architectures, protocols, and signal propagation in wireless networks.

Q.   If that is the level of skill required to understand the patents in this case, how are the jury or myself, people like that, supposed to understand the issues in this case?

A.   Well, that's why I'm here.  My job, in addition to explaining about the patents, et cetera, is to try to explain it as simply as I can.

Q.   Can you give us a roadmap of the issues you're going to be discussing today?

A.   Yes.  First, we will discuss the patents-in-suit.  Then we will discuss the accused products.  I will provide an infringement analysis, and then, finally, we will get to discuss marking and technical benefits.

Q.   Before we get into the details, can you provide a summary of your conclusions on infringement?

A.   Yes.  Samsung infringes all of the claims that you see here of the patents-in-suit.

Q.   Did you prepare a report of your opinions in this case?

A.   I did.

Q.   About how long was your report?

A.   It's about a thousand pages, including appendices.

Q.   And was that report provided to Samsung?

A.    It was.

Q.    And how long do you expect your direct testimony to last today?

A.    Two-and-a-half hours.

Q.    Can we begin with the section in your roadmap on the first set of Collision patents?

A.    Yes.

Q.    And can we use one of the patents--and I believe the jury has a copy of these in the notebooks--to walk us through the main parts of the patent?

A.    Sure.

Q.    What is this patent that's been marked JX 1?

A.    This is the -- we have excerpts here from the '651 Patent.  And we see at the top that there's the patent number, there's the date the patent was issued--April 5th, 2011--the title, "Joint Symbol Amplitude and Rate Estimator."  We see the invention, Mr. Thomas McElwain.  We see the assignee, original assignee, BAE Systems Information and Electronics Systems Integration.  And we see the date the provisional application was filed, April 14th, 2003.

Q.    Now, there's two dates shown on this slide.  And on the front page of the patent, if it turns out that there's a fight over who invented one of these patents first, what is the date that matters?

A.    It would be the provisional application date.

424

Q.    And so for the '651 Patent in particular, is that 2003?

A.    Yes.

Q.    Now, if we look at the part of the patent on the right-hand side where there's some references cited, can you explain what those are?

A.    Those are patent applications or granted patents that the patent examiner found relevant when he was determining whether or not the '651 Patent application should be issued as a patent.

Q.    And now if we continue flipping through the patent, there are some figures and images, and then we get to a long section of text.  Can you explain what that part of the patent is?

A.    Yes.  This is -- on the left, you see it says field of invention.  And that is just generally setting what the area of the invention is.

The next section is the background of the invention, more specifically identifying the set of technologies that this patent is seeking to be able to be used for.

Finally, there is on the right the detailed description of the invention.  This is called the invention specification, which is actually the description of the invention itself.

Q.    Now, at the end on the final page, there's a section that says what is claimed and some numbered paragraphs.  What is that?

A.    That is the claims.

Q.   When we get to your infringement analysis portion, what part of the patent is it appropriate to compare the accused products to?

A.   We have to look at the claims and every element in the claims of the particular claim that is in suit.

Q.   Were you here on Friday for opening statements?

A.   I was.

Q.   Do you remember when Samsung's counsel said that Collision's technology is supposed to keep interference to use it, not to cancel it?

A.   I remember that.

Q.   Is that right?

A.   No.

Q.   What's shown here?

A.   This is showing that one of the things that the '651 Patent is claiming is that there are processing modules that calculate interference cancellation values.

Q.   Can this patent be used for what Mr. Farkas referred to as channel estimation?

A.   Yes.

Q.   And briefly can you remind us again what channel estimation is?

A.   Yes.  Well, Mr. Farkas made the analogy about golfer dropping grass and the wind blowing and, therefore, the golfer can aim his shot appropriately.  Likewise, a transmitter sends

426

a signal of known structure to a receiver.  The receiver knowing that structure of the signal and knowing how the signal is received distorted can use that to estimate the channel.

Q.   Can you walk us through an example of a system that could use the '651 Patent for channel estimation?

A.   Yes.

Q.   What's shown on this slide?

A.   We see on the top in the red stuff, we see a serving transmitter represented by a cell tower in the red rectangle, and there is a signal in the time frequency grid that you've already seen that is being transmitted.

In another cell, there is another interference -- there is an interfering transmitter which is transmitting a signal in the exact same time frequency resource.

Q.   What happens when those two transmitters send their signals to the receiver?

A.   They interfere with each other or collide.

Q.   Do you have a demonstration that can help explain how these signals and arrows are related to each other?

A.   I do.

MR. NEMUNAITIS:  Your Honor, may Dr. Kowalski step down from the witness stand to use a demonstrative board?

THE COURT:  He may.

THE WITNESS:  Thank you.

427

THE COURT:  And, Mr. Pak, you may reposition yourself so you can observe accurately.

MR. PAK:  Thank you, Your Honor.

MR. NEMUNAITIS:  Your Honor, may I step away to use the microphone as well?

THE COURT:  Yes.  All right, counsel.  Go ahead.

MR. NEMUNAITIS:  Should I use a microphone, Your Honor, or I can just --

THE COURT:  You can speak loud enough.

MR. NEMUNAITIS:  Understood.  Thank you, Your Honor.

THE COURT:  Just use your full voice.

Q.   (BY MR. NEMUNAITIS)  All right.  Starting off, Dr. Kowalski, could you use that black marker to show the jury how phase and amplitude are plotted on this graph?

A.   Sure.  So signal can be represented thuswise where the length of the signal represents the amplitude and the angle from this part of the horizontal axis to the line represents the phase.

Q.   What do each of those different colored arrows represent?

A.   All right.  These will represent, from the left, this is going to represent the signal received at the handset.  This red arrow is going to represent the signal that was transmitted from the desired target base station.

The blue arrow is going to represent the signal from the interfering base station.  The blue hashed arrow is going to

428

be representing the effects of the channel on the blue arrow.

And just I want to say we're going to demonstrate it as additive, but you'll see later it's really multiplicative. But multiplication is a form of addition, so -- and, finally, the red hashed arrow at the effect of the channel on the desired target signal.

Q.   Can you show us how the red arrow is plotted?

A.   Yes.  So, for example, the red arrow might be transmitted this way.  There.

Q.   And can you plot the red hashed arrow?

A.   The red hashed arrow might be transmitted this way.

Q.   And can you plot the blue arrows?

A.   Yes.  The blue arrow might be transmitted this way, and the blue hashed arrow again might be transmitted that way. And we add them by taking the end of one and adding it to the tip of the other.

Q.   And now, finally, can you plot the purple arrow that's the arrow actually received at the receiver?

A.   Yes.  So the purple arrow would represent -- again, it would interfere, and so they'd add up with their effects.  So, therefore, we know the received signal would look like that.

Q.   Do all of those arrows plotted on the graph, do they all contain phase and amplitude information?

A.   Yes, they do.

Q.   Given that relationship between the signals representing

429

those arrows, can you write this up as a mathematical equation?

A.   Yes, I can, and that's why we have two sets of arrows.

So the received signal is going to be equal to the target signal times the effect on its channel, plus the interfering signal times the effect of its channel, plus a noise component.

Q.   When you say noise, is that referring to some type of sound or what is that?

A.   This is basically like noise like you hear on the radio when there's no station present.  It's an inherent property of the physics of both electromagnetic radio wave propagation and the receive amplifier in the cell phone.

THE COURT:  Counsel, speak up a little bit, please.

THE WITNESS:  I'm sorry.

THE COURT:  No.  Counsel, speak up.

MR. NEMUNAITIS:  Sorry about that, Your Honor.

Q.   (BY MR. NEMUNAITIS)  Now, in this example if the receiver is trying to receive information from the red transmitter, what is it trying to calculate at this point for channel estimation?

A.   It wants to calculate that.

Q.   Does the '651 Patent help it do that?

A.   Yes, it does.

Q.   How so?

A.    Well, it does it because it knows that the '651 takes advantage of the fact that this signal being transmitted has a structure known to the handset.  And so it's able to say estimate this, to get this, and then subtract this from the total received signal.

Q.    Now, you mentioned that subtraction.  Is that a form of interference cancellation?

A.    Precisely.

Q.    Now, if we were talking about a different system, a system that does not use the '651 Patent or any interference cancellation at all, what would it do about those blue arrows?

A.    It would not use the structure of the blue arrow and, therefore, get knowledge of the channel that the blue signal uses to be able to estimate the channel for the red arrow.

Q.    Okay.  Can we remove the blue arrows from the board?

A.    Yes.

Q.    Now, in this system we're talking about a system that does not use any interference cancellation, no '651 Patent, how would it go about trying to do channel estimation?

A.    It would assume that the channel that the target signal goes through is going to look like this.

Q.    And what's wrong with that?

A.    Well, first of all, it's not the red hashed arrow, and that means that it's going to make a very poor estimate for the channel that the target signal is distorting the

transmitted signal by.

MR. NEMUNAITIS:  Your Honor, may we take the demonstrative down and have Dr. Kowalski return to the witness stand?

THE COURT:  Yes, you may.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  Counsel, continue with your examination, please.

Q.    (BY MR. NEMUNAITIS)  Dr. Kowalski, is the '651 Patent the only way to do channel estimation when you have two interfering signals?

A.    No, it is not.

Q.    What then is the significance of the '651 Patent?

A.    It's both mathematically and computationally efficient to do so.

Q.    Can we move on to talk about the next patent?

A.    Yes.

Q.    What patent is shown here?

A.    This is the '505 Patent.

Q.    And what does it relate to?

A.    It relates to a parameter estimation unit used with a signal separation unit.

Q.    A moment ago you showed this slide, but are there additional channel effects that affect a received signal?

A.    Yes.

432

Q.    What are you showing here?

A.    This is showing some of the effects of what happens to the total received signal.  And, in particular, that's going to be multipath effects, timing offsets, frequency offsets and so on, and they are going to basically smear both the target and interfering signals in this time frequency grid we've been talking about.

Q.    And what does the '505 Patent say to do about that?

A.    It says to account for them, so the multipath timing and frequency offsets.

Q.    All right.  Dr. Kowalski, are we ready to turn to an explanation of how the accused Samsung devices work?

A.    Yes.

Q.    What types of products are accused of infringement in this case?

A.    Samsung phones and tablets.

Q.    And what cellular standards are at issue?

A.    4G and 5G cellular standards.

Q.    As part of your investigation in this case, did you have access to a database with all the documents produced by the parties and third parties in this case?

A.    I did.

Q.    What evidence did you review to determine whether Samsung's mobile devices infringe?

A.    It involved analyzing the cellular standards, looking at

433

discovery responses, documents produced from Samsung in regard to this matter, public information about Samsung's products, confidential Samsung documents, deposition testimony, chipset source code, and product testing.

Q.   Do you remember in opening when Samsung's counsel said that the accused products just do the standards?

A.   I remember that.

Q.   If that were right, why did you feel the need to look at all this different type of evidence, like source code and depositions and discovery responses?

A.   Well, the standards only tell you what to transmit over the air.  As far as the technology involved for these patents, the standards are silent on how you should receive it.  So you need to rely on more information than just what's in the cellular standards in order to determine infringement.

Q.   What is a chipset?

A.   A chipset is like the brains of the cell phone.  It controls how the cell phone works.

Q.   What is source code?

A.   Source code is computer programs that programmers write that get put on the chipset into the phone that tell the phone how it should work.

Q.   Is chipset source code important to your analysis?

A.   It's very important.

Q.   And why is that?

A.    Because if you analyze the source code, that tells you whether or not the phone is infringing.

Q.    Does Samsung write the source code for all of its products?

A.    They do not.

Q.    What other companies' chipsets does Samsung put in its phones?

A.    Qualcomm and MediaTek.

Q.    What is shown on this slide?

A.    This is showing a request for production from Collision to Samsung saying for each of your LTE and/or 5G products from December 2017 to present, it's a request for the source code related to CRS interference cancellation and MIMO interference cancellation.

Q.    Was Qualcomm served with a subpoena in this case?

A.    Yes.

Q.    And did you have access to the information provided by Qualcomm in response to the subpoena?

A.    I did.

Q.    Can you explain what PX 14 is?

A.    This is a list of accused products as originally provided by Samsung.

Q.    How many products are included in PX 14?

A.    Hundreds.

Q.    Did you have to separately review the source code for

each of these products?

A.    I did not.

Q.    How did you handle accused products that contain Samsung chips?

A.    Well, Samsung identified a representative chipset, and the source code for that they said is how we should think of how the phones work in the accused products with Samsung chipsets.

Q.    How did you handle accused products containing Qualcomm chipsets?

A.    Qualcomm identified a number of chipsets and a number of versions of software also called builds that run on the chips. And so I had to go to a secure place, review multiple builds of Qualcomm code to see if the functionality was there amongst the builds that they identified.

Q.    How did you handle accused products containing MediaTek chips?

A.    I examined the source code produced by MediaTek in response to the subpoena to see if the accused functionality was present.

Q.    Does your conclusion of infringement change for the accused products in PX 14 based on differences in the chipsets of the products?

A.    It does not.

Q.    Could you explain the time period you were asked to

investigate infringement?

A.    Yes.    So in December 2023, the case was filed, and my understanding of the law from what I've been told is that the damages period only goes back six years from when the case was filed.    So that's why the start of damages is December 2017.

Q.    When did Samsung release its representative chip, the S5123?

A.    That would be October 2019.

Q.    When did Samsung release the first chip that is represented by the representative chip -- I'm sorry, the first product represented by the representative chip?

A.    That would have been April 2015.

Q.    Because Samsung's representation indicates that all of the phones sold in the damages period operate the same way, does your infringement conclusion change based on the date when an accused product was sold?

A.    No.

Q.    What about for products containing MediaTek and Qualcomm chips?    Did your review of the evidence show that their chips also work in substantially the same way?

A.    Yes.

Q.    And that's for the entire damages period?

A.    Yes.

Q.    What is JX 55?

A.    This is the front page of the particular 3GPP 4G standard

437

that deals with how CRSs, the reference signal we've been talking, about are transmitted.

Q.   Is this an example of one of the cellular standards that we've been talking about as related to this case?

A.   Yes.

Q.   Can you explain at a high level what the infringing features are that you analyzed for infringement?

A.   There's two of them.  First, and we'll talk about this first, is this colliding CRS channel estimation, and then, secondly, advanced SU-MIMO reception.

Q.   What is CRS?

A.   CRS stands for cell specific reference signals.  They are these reference signals that are transmitted by the cell throughout the cell that a handset, when they receive that CRS, they know which base station is sending it.

Q.   What about the word 'colliding' in there?  What does that mean?

A.   That means interfering, as we demonstrated before.

Q.   How often are CRS signals sent?

A.   They're sent a thousand times a second.

Q.   Why so frequently?

A.   Well, if you're driving down the highway at 70 miles an hour, the radio channel could be changing very fast and so it's transmitted that fast, so your cell phone keeps up with the changing channel.

Q.   Why should an ordinary customer care about whether their phone has colliding CRS channel estimation functionality?

A.   Because with this functionality, it involves things like reducing dropped calls, ensuring better quality video, and even, for most networks in the United States, being able to connect from a 4G network to a 5G network.  So all of these functionalities are improved if you have this technology.

Q.   What's shown on this slide?

A.   This is an aerial view of Austin, Texas, with base station tower locations that have been identified on it.

Q.   Is this an example of a place where CRS signals could collide?

A.   It's a place where they do collide.

Q.   Now, is this problem of CRS collisions only a problem in bigger cities like Austin?

A.   No.

Q.   What's on this slide?

A.   This is a map of the cell towers around Marshall, Texas.

Q.   Does CRS collisions happen here?

A.   Yes.

Q.   How do you know that?

A.   I had tests done to see whether or not CRS collisions happen here.

Q.   All right.  Can you now walk us through an example to show what the accused products do when they're in range of

colliding CRS signals?

A.    Yes.

Q.    What are you showing on this slide?

A.    I am showing that the -- based on what we've been discussing with the '651 and '505 Patent, you are transmitting cell-specific reference signals along with other transmissions and they're being received as on the right.

Q.    Where are the CRS signals represented in this slide?

A.    Those yellow boxes that you are showing.

Q.    And what are the other arrows?

A.    The other arrows are information that's transmitted along those CRSs that provide, you know, the applications that I've been just been talking about.

Q.    Do the accused devices do anything to make sure that the CRS signals are in the right spot in the time frequency grid?

A.    Yes.

Q.    What is this document that's been marked as JX 8?

A.    This is the -- showing the front page of the system design document for the chipset that was identified to us as a representative of the functionality for the accused products with Samsung chips.

Q.    Does this explain how the Samsung products handle channel estimation?

A.    Yes.

Q.    If we look at page 132 of JX 8, what is this equation,

starting with the Y equals XEs?

A.    This equation is showing with -- and it says it right at the top, NI interferers with colliding CRSs colliding with the CRS of the serving cell.  So that's what this equation is showing.

Q.    Does this equation apply whether we're talking about one cell phone tower or two or three or four that are colliding?

A.    It applies to an arbitrary number of cell towers interfering with the desired signal which is represented by the X sub S there.

Q.    What's that squiggly symbol in the middle there?

A.    That's called a Sigma symbol, and it basically with the I=1 and Ni, it's saying sum everything to the right with an I in it.

Q.    Now, if we want to focus on the example you showed before of one serving base station and one interfering base station, can we remove that Sigma?

A.    Yes.

Q.    Now, that lower case N, what is that?

A.    That's the noise that I spoke about earlier.

Q.    And if we want to focus on the signals and the channel estimates, can we remove that for now?

A.    Yes.

Q.    How does this equation compare to the one you drew on the demonstrative board a moment ago?

A.   It -- you can basically identify each term here with the arrows that I have on the board.  So the total received signal, Y, is the purple arrow; X sub S, the serving reference signal is the red arrow.  The unknown serving channel, H sub S, is the hashed red arrow.  X sub I, the interfering reference signal, is the blue arrow.  And H sub I, the unknown interfering channel, is the blue hashed arrow.

Q.   Given this model of the signal, how do the accused devices start to prepare channel estimates?

A.   Well, first, it takes the received signal and it passes it through a filter.

Q.   I'm sorry, sir?

A.   I'm sorry.  I was done.

Q.   What does the filter produce?

A.   The filter produces an initial channel estimate.

Q.   What's that little triangle above the hashed blue arrow there?

A.   That we call typically hat or circumflex, usually hat.  It means that it's an estimate -- a good guess of what the channel is.

Q.   What do the accused devices do next?

A.   They then take that signal, channel estimate, reconstruct the interfering signal, and subtract that from the received signal.

Q.   Is that a form of interference cancellation?

A.    Yes.

Q.    What do the accused devices do next?

A.    They then take that resulting signal and put it through another filter, and then they get an estimate for the serving channel.

Q.    At this point did the accused devices have a channel estimate for the serving cell and the interfering cell?

A.    They do.

Q.    Are they done now?

A.    No.

Q.    What do they do next?

A.    They repeat the process.

Q.    And is that what's referred to as iteration?

A.    Yes.

Q.    Once the accused products finish up that iteration process, what happens next?

A.    Then they store the unknown interfering channel estimate and the serving channel estimate in a special memory called an IIR buffer.

Q.    Is that step shown in the figure to the right -- the left, I'm sorry, from JX 8 where it says update IIR buffer?

A.    Yes.

Q.    All right.  What happens at that point?  Are they done handling this particular CRS signal?

A.    Well, they store it and update the estimate based on

what's in the IIR buffer.

Q.   And once that's completed, what happens next?

A.   Then that is used as the channel estimate.

Q.   What happens when the next CRS arrives?

A.   That channel estimate is then used as the IIR is updated and that's used as the new channel estimate.

Q.   Why do the accused products have this IIR buffer that reuses the channel estimates?

A.   Well, one of the things the IIR buffer does is it sort of averages the new channel estimate with old channel estimates. So if the channel's not changing too much, it's actually providing a better channel estimate because, remember, we ignored that noise term?  Well, it kind of smooths out that noise.

Q.   Now, in this example we just walked through, we were talking about one serving cell tower and one interfering cell tower.  How would the accused devices handle three or four more interfering CRS signals?

A.   It would basically do this process but with an interference cancellation calculation for each interferer, and then there would be an IIR buffer for each interferer, and you'd have basically this process for multiple interferers.

Q.   This process that we just described, is this required by a cellular standard?

A.   No.

Q.   What evidence did you rely on to make sure that the accused products perform this process?

A.   I reviewed both the Samsung system design document as well as code that was produced in this matter.

Q.   Do you have some examples of source code to show to the jury?

A.   I do.

Q.   How much total code did you review in this case?

A.   Thousands of pages.

Q.   And do you have a subset of those pages to show to the jury now?

A.   Yes.

          MR. NEMUNAITIS:  Your Honor, I plan to get into some source code, and Samsung has asked me to request that we seal the courtroom to allow only authorized persons and Samsung employees in the courtroom.

          THE COURT:  Are you prepared to do that at this time?

          MR. NEMUNAITIS:  Yes.

          THE COURT:  Then I'll order the courtroom sealed.

     I'll direct that all persons who are present and not subject to the protective order in this case should excuse themselves until it's -- until the courtroom is reopened and unsealed unless you are Samsung personnel or you're otherwise permitted to remain in the courtroom while it's sealed.

445

03:41    (Courtroom sealed.)

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████?

A.   ███.

Q.   ██████████████████████████████████

████████████████████████████████████████

████████████████?

A.   ███.

Q.   ██████████████████████████████████

████?

A.   ████████.

Q.   ████████████████████████████?

A.   ████████████.

Q.   ██████████████████████████████████

██████████████████?

A.   ██████████████████████████████████

████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████.

Q.   ████████████████████████

████████████████████████████████████████

A.   ████████████████████████████████

████████████████████████████████████████

447

Q. ██████████████████████████████████████

████████████████████████████?

A. ████.

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████.

████████████████████████████████████

████████████████████████████████████

████████

████████████████████████

████████████████████████████████

███████████████████████████████████████████

██████

████████████████████

██████████████████████████████████████

█████████████

████████████████

Q. ██████████████████████████████████

████████████████████████████████████████

████████████████████████?

A. ███████████████.

Q. ██████████████████████████████?

A. ████████████████████████████████████

03:48

03:48

Q. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████?

A. ██████████████.

Q. ██████████████████████████?

A. █████.

Q. ███████████████████████████████████████

███?

A. ███████

Q. ██████████████████████?

03:49   A. ███████████████████████████████████████

███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

03:49   ███████████████████████████████████████

██████████████████.

Q. ███████████████████████████████████████

03:49   ███████████████████████████████████████

████████?

A. ███████████████████████████████████

██████████████████████.

Q. ██████████████████████████████████████?

A. ██████

Q. ████████████████████████████████████
████████████?

A. ████.

Q. ████████████████████████████████████
████████████?

A. ████████████████████████████████████
████.

Q. ████████████████████████████████████████
████?

A. ████████████.

Q. ██████████████████████████████████?

A. ████████████████████████████████████████
████████████████.

Q. ██████████████████████████████████
████████████████████████████████████
██████████████████████████████████?

A. ██████████████████████████████████
████████████████████████████████████
██████████████████████████████████████
██████████████████████████████.

Q. ████████████████████████████████████████
██████████████████████████████████?

A. ██████



(Courtroom unsealed.)

THE COURT:  All right, counsel.  The courtroom is reopened.  You may proceed.

MR. NEMUNAITIS:  Your Honor, may I set up a claim board?

THE COURT:  You may use the easel to exhibit demonstratives.

MR. NEMUNAITIS:  Thank you, Your Honor.

Q.   (BY MR. NEMUNAITIS)  Dr. Kowalski, does this claim board include the same language that's in the claims in the patent of the '651 Patent?

A.   It does.

Q.   And are you ready to go through your infringement analysis for this patent?

A.   Yes.

Q.   Claim 1 starts off, "A joint amplitude estimator for a data stream from multiple users comprising".  Do the accused products include a joint amplitude estimator?

451

A.    They do.

Q.    And what is that?

A.    That's the channel estimator that we've been speaking of.

Q.    How can a channel estimator be an amplitude estimator?

A.    Because like I showed you with the board and in the demonstratives here, the channel estimates have to have a magnitude or an amplitude.

Q.    And is that the length of the arrow you showed before?

A.    Exactly.

Q.    What makes the channel estimator in the accused products a joint estimator?

A.    Well, you are estimating the amplitudes for the channel for the target signal as well as all of the interferers that may be present.

Q.    Could you explain what the data stream from multiple users is in the accused products using your slides from before?

A.    Yes.  So as I mentioned, there is data that's transmitted on the CRSs that identify the cell, so it -- therefore, there is a data stream corresponding to each cell tower transmitting CRSs.

Q.    All right.  Now, for this term multiple users, did the Court provide a construction for that term?

A.    Yes, they did.

Q.    What does multiple users mean?

A.    Multiple sources of digital data streams for transmission.

Q.    How was that met in the accused products?

A.    Well, there are multiple base stations transmitting digital data streams for transmission here.

Q.    How do you know that these CRS signals are for transmission?

A.    First of all, they are specified as to how they're going to be transmitted in the 4G specifications.  Secondly, they are going to be assigned to frequency resources and transmitted.  Finally, they're received by the handset, so clearly they fit multiple sources of digital data streams for transmission.

Q.    Now, the last word there is the word 'comprising'.  Can you explain what that means?

A.    That means including but not limited to.

Q.    So if the claim requires amplitude estimation but the accused products do amplitude and phase estimation, would that still infringe?

A.    It would.

Q.    All right.  Could we check off that limitation?

A.    Yes.

Q.    The next limitation starts off, "A data stream for multiple users divided into a plurality of observation intervals."  Can you explain how that limitation is met?

A.    Yes.  Well, as I mentioned, these CRSs are transmitted thousands of times -- a thousand times a second.  In one observation interval, which in the 4G lingo is called a subframe, you're going to get multiple of these CRSs.  So you get the CRS transmission happening every single subframe.

So, therefore, there is a data streams from multiple users divided into a plurality of observation intervals.

Q.    Could we check off that limitation?

A.    Yes.

Q.    Now, the next limitation starts off, "A plurality of processing modules."  How do you know that that portion is met?

A.    Because we have seen that there are modulation -- modules computing interference cancellation values for the interferers and for the target reference signal.  And there are things like that IIR buffer in there, too.

Q.    Is there a construction for this term?

A.    Yes.

Q.    And did you apply the Court's construction?

A.    I did.

Q.    How do you know that the plurality of processing modules are coupled to the plurality of observation intervals?

A.    Because they are operating on a subframe-by-subframe basis, as we can see from the code.

Q.    Now, the claim goes on to say that the processing modules

calculate interference cancellation values for each of said users.  Is that met?

A.    Yes.

Q.    What are the interference cancellation values?

A.    The interference -- they would be the computed channel estimates and the interfering reference signals that would be subtracted from the received signal.

Q.    And are they represent represented in JX 8 as the minus sign Hi Hi?

A.    Yes.

Q.    The claim also says computes a filter for each of said observation intervals.  How is that met?

A.    Well, the filter is the channel estimator for both the interferers as well as for the serving reference signal to get these channel estimates.

Q.    Is that depicted in JX 8 as the CE function?

A.    Yes.

Q.    How do you know that's a filter?

A.    Because it is taking an input and it is producing an output, namely the channel estimate.

Q.    The claim goes on to say, "Said filter being applied to said data within said observation interval to compute individual amplitude estimates."  Is that met?

A.    Yes.

Q.    What are the individual amplitude estimates?

A.   The channel estimates for each interferer and the serving

reference signal.

Q.   Is there an individual amplitude estimate for the serving

signal and all interferers?

A.   Yes.

Q.   And are they represented as Hi and Hs in JX 8?

A.   Yes.

Q.   Can we check off this limitation?

A.   Yes.

Q.   The final limitation of this claim says, "An amplitude

estimation unit which processes said individual amplitude

estimates and calculates new amplitude estimates."

     Is that part of the claim met?

A.   Yes.

Q.   And without sealing the courtroom again, did you show

some of the source code for that?

A.   I did.

Q.   What are the new amplitude estimates?

A.   The new amplitude estimates would be the updated

interference cancellation values that would be computed from

the end iterations of this interference cancellation

processing that's done in the figure above.

Q.   The claim goes on to say, "Wherein said new amplitude

estimates are iteratively passed back to said processing

modules."  Is that met?

A.    Yes, it is.

Q.    Can you explain that?

A.    Yes.  So this process of interference cancellation passes back interference channel estimate values for interference cancellation for up to N iterations times.

Q.    And was there a Court construction for this part of the claim?

A.    Yes.

Q.    Is that shown on the screen here?

A.    Yes.

Q.    And did you apply that in your analysis?

A.    I did.

Q.    In addition to the passing back during the iteration step, is there an additional way that there's a passback that happens?

A.    Yes.

Q.    Can you explain that?

A.    Well, as I mentioned before, there is this -- in the Samsung chip, there is this IIR buffer and there is equivalence in the MediaTek and Qualcomm chips for counting something, and those are updating the -- taking the channel estimates from this interference cancellation process and updating this IIR buffer so that it gets an improved channel estimate.

Q.    And is that shown in JX 8 in the table shown on the

screen here where it's describing estimating the H values using the updated buffer information?

A.    That's correct.

Q.    Is there a maximum number of iterations performed at this step?

A.    Yes.

Q.    And how do you know that?

A.    In the Samsung chips, as we showed, there is a channel estimation reset which stops this procedure, if it's signaled to do so.  In the Qualcomm and MediaTek chips, they are -- this process stops if the chip detects that the channel is changing too fast.

Q.    And was that shown in the code when you mentioned the stabilizing counter, for example?

A.    Yeah.

Q.    All right.  Can we check off this limitation?

A.    Yes.

Q.    We've checked all the boxes for '651 claim 1.  What does that mean?

A.    That means that claim 1 is infringed.

Q.    All right.  Now, for claim 3, that claim starts off the "joint amplitude estimator according to claim 1."  What does that mean?

A.    It means that when you see that text, you have to insert the entirety of claim 1 before the 'wherein'.  So basically

458

it's adding in another condition after that 'wherein' to claim 1.

Q.   And that 'wherein' portion says, "said amplitude estimation unit sums and weighs said individual estimates," is that portion met?

A.   Yes.

Q.   Can you explain that?

A.   Yes.  So for clarity we've highlighted that the IIR buffer -- and again, there's equivalent functionality in the Qualcomm and MediaTek chips, but there is a summing, which you see by the plus sign in the green boxes, and then there is a weighting of the new -- there's a weighting of the old amplitude estimate with the new amplitude estimate to update the channel estimate.

Q.   And did you refer to that as the smoothing operation?

A.   Yes.

Q.   Can this also be referred to as a weighted average?

A.   It is.

Q.   Can we check off this box and move on to the next patent?

A.   Yes.

Q.   Does this have the language for claim 1 of the '505 Patent?

A.   Yes.

Q.   Did the Court provide a construction for the first part of this claim?

459

A.    Yes.

Q.    And what is the Court's construction shown on the screen here?

A.    It's -- if you see the text in bold italics, "a parameter estimation unit for use in conjunction with a signal separation unit, in which each received signal has associated channel transfer functions," that means that this patent claim has to apply to that type of a system.

Q.    How is that part of the claim met?

A.    Well, the parameter estimation unit that we've been speaking of is the channel estimation unit, and it is used in conjunction with the signal separation unit which is canceling out those interfering CRSes, and each of them has an associated channel transfer function--and channel transfer function is the fancy name for channel--so it's met.

Q.    We can check this one off?

A.    Yes.

Q.    The next limitation requires, "a signal predecessor for determining said channel transfer functions for each received signal."  Is that met?

A.    Yes.

Q.    And can you explain that?

A.    Well, there is a signal processor done for each of the interferers to calculate its channel estimate as well as the channel estimate for the desired target CRS.

Q.   And did you show some of the code for that?

A.   Yes.

Q.   Can we check that off?

A.   Yes.

Q.   Now, the final limitation begins with this phrase, "means coupled to."  Is there a construction for this term?

A.   Yes.

Q.   All right.  For Collision to prove that this part of the claim is met, does it need to show that the claimed function is performed by the corresponding structure in the Court's construction?

A.   Yes.  A parameter tracking unit as discussed at these various places.

Q.   And is it shown in figure 3 of the '505 Patent?

A.   Yes.

Q.   All right.  I want to focus first on these boxes on the bottom right here where it says 'track power', 'track timing', 'offset track frequency'.  What are those things?

A.   Those are entities within the parameter tracking unit that are going to account for power, timing offset, frequency offset, phase, and multipath structure, like I was talking about when we introduced this patent.

Q.   Are those examples of parameters?

A.   Yes.

Q.   Do the accused products track power?

A.    They do.

Q.    And is that shown in this example from JX 8?

A.    Yes.  AGC stands for automatic gain control.  FD is frequency domain.  And it's basically saying in the Samsung design document that it measures the average power of the CRSes.

Q.    Do the accused products track timing offset?

A.    Yes, they do, as, again, the same system design document shows.

Q.    Do the accused products track frequency?

A.    Yes.

Q.    Do the accused products track phase?

A.    Yes, they do.

Q.    Do the accused products -- I'm sorry.  This next term, multipath structure, can you explain how that's described in Samsung's documents?

A.    Yes.  So Samsung's document talks about large-scale multipath properties consisting of some or all of delay spread, Doppler spread, frequency shift, average received power, and received timing.

Q.    What are delay spread and Doppler spread?

A.    Delay spread is a measure of how the received signal is smeared in time over the channel.  Doppler spread is a measure of how the received signal is smeared in frequency over the channel.

Q.   Do the accused products track delay and Doppler spread?

A.   They do.

Q.   Is that shown in JX 8 as well?

A.   Yes.  And this is, again, showing from the Samsung design document that delay spread values are calculated and Doppler estimator is present as well.

Q.   Does that mean the accused products track all the parameters required in figure 3?

A.   Yes.

Q.   All right.  Moving on to the next portion, which is box 60, where it talks about recreate training sequence, does the '505 provide some explanation as to what that is?

A.   Yes.  And it says, "The training sequence, as used herein, refers to any known bit or symbol sequence that the handset receiver knows about in advance."

Q.   What are the training sequences in the accused products?

A.   Those are the CRSes.

Q.   And why are they training sequences?

A.   Because they contain this known structure that the receiver knows in advance.

Q.   Do the accused products recreate the training sequences or the CRS signals as shown in figure 3?

A.   Yes, they do.

Q.   And did you explain that in the context of this equation?

A.   Yes.

Q.    Could you just explain that again real quick?

A.    Yes.  So the total received signal has a known serving reference signal, a serving channel that was -- you have to estimate an interference reference signal that you know the structure and an unknown interfering channel that you have to estimate.  And so in order to do that, you have to put the signal through a filter, get the -- an estimate of the unknown serving channel, then recreate the training sequence, the unknown reference signal times that channel, subtract it from the received signal, and go through that whole process.  So it's being done.

Q.    What's this next box here 74 that says 'training sequence window'?

A.    That is showing that this computation is being done on a select group of CRS samples.  And as you see, there's a window function in the Samsung design document.

Q.    Moving onto that little plus sign numbered 72 --

        THE COURT:  Counsel, slow down a little bit, please.

        MR. NEMUNAITIS:  Sorry about that, Your Honor.

Q.    (BY MR. NEMUNAITIS)  What is that little plus sign?

A.    That's a summing junction.

Q.    And what's the purpose of the summing junction?

A.    It is going to take the interference cancellation values, and if you see just to the left of the plus sign there's a minus sign, so it's going to take the interference

cancellation values and subtract them from the received signal.

Q.   And did you show that before as the subtraction step?

A.   That's right.

Q.   Now, finally there is some text in figure 3 that says, "estimate of signal due to newcomer," is that explained in the '505 Patent?

A.   That's right.  And it is showing that the estimates are averaged with older parameter estimates for each of the users.

Q.   And is that met in the accused products?

A.   Yes.

Q.   Is that referring to the weighted average, for example?

A.   That's right; or the Kalman filter in the other chipsets.

Q.   If we look back at the Court's construction for this term, do the accused products contain the corresponding structure?

A.   Yes.

Q.   Do they perform the claimed function using that structure?

A.   They do.

Q.   And can you explain that?

A.   Yes.  So they have the parameter tracking unit with all of the elements of tracking power, timing offset, frequency offset, phase, multipath structure, it's got a recreating the training sequence window, it's got subtraction of that times

the channel from the received signal, and it has the estimate

averaging with the newcomer.  So all of these functions --

functional elements are present.

Q.   Can we check off this limitation?

A.   Yes.

Q.   Is '505 claim 1 infringed?

A.   Yes.

Q.   Can we move on to talk about the other two patents?

A.   Yes.

Q.   Which patent is shown here at JX 2?

A.   This is the '703 Patent where we will discuss a joint

symbol amplitude and rate estimator.

Q.   And did Mr. Farkas explain what the symbol estimator and

the decoders are?

A.   Yes.

Q.   Can we take a look at the next patent that's marked JX 4?

A.   Yes.

Q.   And which one is this?

A.   This is the '492 Patent.

Q.   And what is this claim about?

A.   This is talking about a multiuser detector decision unit

that contains multiple multiuser detectors and a bank of

decoders.

Q.   All right.  Can we move on to talk about how the accused

products use the accused advanced SU-MIMO reception?

A.    Yes.

Q.    What cellular standards use SU-MIMO?

A.    4G and 5G standards use SU-MIMO.

Q.    And can you walk us through what the products do when they receive an SU-MIMO signal?

A.    Yes.

Q.    What are you showing on this slide?

A.    So this is showing that there are what's called MIMO layers.  You can think of them as dimensions in space, sort of.  And there are two MIMO layers that are used to be transmitting over a single cell tower.  And then again, because of all the effects that we've been talking about with the '505 Patent, they are received at the receiver interfering with each other.

Q.    How does this MIMO example compare to the CRS example we were looking at before?

A.    In the CRS example we were talking about multiple base stations, multiple cell towers.  Here we have a single cell tower, but it is transmitting these multiple layers of data.

Q.    In the CRS example we were focused on reference signals. What are we focused on for this one, mainly?

A.    Here we are focused on the information that is transmitted in this manner.

Q.    And is that shown in yellow highlighting here?

A.    Yes.

Q.   Did you prepare a diagram to help explain how the different components in the accused receivers process SU-MIMO signals?

A.   I did.

Q.   And is that shown here?

A.   Yes.

Q.   Now, do the cellular standards specify how a transmitter should format SU-MIMO signals for transmission?

A.   Yes.

Q.   Do the cellular standards specify how the receiver needs to be built to receive that signal?

A.   No.

Q.   What happens when the accused Samsung devices receive an SU-MIMO data stream?

A.   They first go to the channel estimator, such as we've been speaking about earlier, and then that channel estimate will be formed which will then be with the symbol detector sent to an appropriate MUD, or as it's called here, rank detector.

Q.   What do the rank detectors do?

A.   They are taking the received signals and they are creating symbol estimates, the data symbol estimates that Mr. Farkas was talking about, and amplitude and phase estimates associated with them.

Q.   Now, this word 'rank' here, what does that refer to?

A.    It refers to the number of layers that were transmitted.

Q.    So in the example from before there were two signals transmitted.  Does that mean rank 2?

A.    Yes.

Q.    Do these detectors use a mathematical model to do this estimation?

A.    They do.

Q.    And how does that compare to the equation we looked at before?

A.    Well, it's the same equation, oddly enough.  And as you see, we can use the arrow notation.  I think it is the third time the jury has seen this.

Q.    What is this table that's from JX 8, table 524-13?

A.    This is a description of what's called the dimension reduced maximum likelihood algorithm for computing the symbol estimates.

Q.    And what's the high-level strategy that's used here?

A.    Well, first you are going to look and see -- again, if it's rank 2, there's two symbols we're trying to figure out which were most likely transmitted.  And there could be anywhere between 4 and 1024 possible values of symbols that the handset would know in advance that were transmitted.  But we're going to try to loop over the first symbol, which we're calling X0 here, then we're going to find the best X1.  Assuming that X0 was transmitted, we're going to see how close

that comes to the signal that was actually transmitted.  And then by the time we've looped over all of the X0 possible symbols, we will have found the one that was most likely transmitted.

Q.   Can you show how this works graphically?

A.   Yes.

Q.   And is that purple arrow the received signal?

A.   Yes.

Q.   Now, if we look back at the information in the table, what does that K=1 portion mean?

A.   Yes.  So the C0 with the bars around it means go -- try from K=1 to the number of possible symbol values that X0 can take on, which is 16.

Q.   All right.  What does the next portion of this table do?

A.   It starts with the first one, and let's say the first one is 0010.

Q.   So this has a guess for the red arrow.  What does it do about the blue signal?

A.   It's going to try to find the blue signal that came closest to when you consider the effect of the channel which blue signal comes closest to the purple arrow.

Q.   And is it going to test out a number of these different dots on the screen?

A.   It's going to test all of them.

Q.   HOW does it know which one is the best one?

A.    It's using the -- that thing to the right says Argmin, and under it it says basically all X1s that it can take on. And the stuff in the argmin function, that expression squared H1 Hermitian times Y versus H0 X hat 0 minus H1 Hermitian H1 X1, that's a measure of how close the X1 and X0 hat come to Y.

Q.    And that final portion there, what does that refer to?

A.    That refers to the distance between the best guess represented by the black arrow and the received signal represented by the purple arrow.

Q.    Do the detectors continue to try out different combinations of guesses for the red and blue symbol estimates?

A.    Yes.  They do this for all possible values.

Q.    Once that process is done, what do the accused devices do at that point?

A.    At that point the symbol detector outputs a sequence of bits and something called a log likelihood ratio associated with that.

Q.    Is that also referred to as an LLR?

A.    Yes.

Q.    What do those black numbers mean in the LLRs?

A.    Those are a measure of how likely the bit that was assigned to it was actually the one that was transmitted.  So the higher the value in the LLR, the more likely it is transmitted.  The closer to zero it is means the more uncertain it was.  The detector doesn't have a good idea

whether a 0 is transmitted or a 1.

Q.   All right.  If we look back at the flowchart for accused products, what do the detectors do once they've created those LLRs?

A.   Once they've done that, they send them to the bank of decoders where the bank of decoders tries to decode the signal.  As Mr. Farkas explained earlier, there is error correction coding done.  It's doing the opposite of that.

Q.   It's checking for errors?

A.   Yes.

Q.   And what happens after the bank of decoders are done with that?

A.   It is fed back to the symbol detector to try to get an improved symbol estimate.

Q.   And then what happens?

A.   A new symbol estimate is produced.  This process can continue until a decision is reached, and then an output data stream, which might be video, which might be a webpage, it might be a map, comes out of the decoder.

Q.   Is that the end of the process?

A.   Then the next code word comes in.

Q.   What is shown here on page 335 from JX 8?

A.   Yes.  So you saw that symbol diagram.  Both I showed it and Mr. Farkas showed it.  These are called constellations because they kind of look like stars.  So these are some of

the signal constellations that 4G and 5G systems must be capable of receiving.  So 16 QAM refers to 16 possible values, 64 refers to 64 possible values, and it goes up to 1024.

Q.   Do the accused products support all the different modulation schemes shown on the screen?

A.   Yes.

Q.   When they are processing the larger ones, like 256 QAM, do they check every single constellation point?

A.   They don't.

Q.   Even if they don't check every one, do they still calculate amplitude estimates and symbol estimates?

A.   Yes, they do.

Q.   Now, in this example we walked through there were two MIMO layers.  If there were three or four MIMO layers, would the accused products still calculate amplitude and symbol estimates?

A.   Yes.  They might be a little different in the -- they are a little different in the calculation, but they're essentially doing the same process.

Q.   And do they still calculate and pass back LLRs from the bank of decoders?

A.   They do.

Q.   What is JX 54?

A.   This is the 5G version of the system design document that, again, is of the representative chip.  And you see a

comparison of the 4G--again that's LTE--and the 5G NR stands for new radio of the different MIMO symbol detectors and how they compare in the 4G versus 5G.

Q.    Do the accused products perform these processes you just explained for 4G and 5G?

A.    Yes.  And they're very similar.

Q.    Are we ready to move on to your infringement analysis for the '703 and '492 Patents?

A.    Yes.

THE COURT:  Counsel, approach the bench, please.

(The following was had outside the hearing of the jury.)

THE COURT:  I know these are complicated questions and you're referring to your notes I'm sure to read them correctly, but as you read, you're getting faster and faster. You need to slow down.

MR. NEMUNAITIS:  Okay.  Sorry, Your Honor.

THE COURT:  All right?

Let's continue.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's continue.

Q.    (BY MR. NEMUNAITIS)  Claim 1 starts off, "an apparatus for processing a digital data stream from multiple users."

Do we look to the Court's construction for that term?

A.    Yes.

Q.    And did you apply that here?

A.    Yes.

Q.    What is the data stream for multiple users?

A.    That would be the data stream that arrives from each of the MIMO layers.

Q.    What are the multiple sources of digital data streams for transmission?

A.    Those would be the MIMO layers.

Q.    How do you know those MIMO layers are for transmission?

A.    Again, they are specified in the 4G and 5G standards, they are specified for transmission, they are transmitted by a base station tower, and they are received by a handset or tablet, so they're multiple layers for transmission.

Q.    Dr. Kowalski, if the name of this functionality is SU or single user MIMO, how can it be met by a claim that requires multiple users?

A.    Single user in this case means a single user device is transmitting -- is receiving, rather.  And the single user device is a cell phone or a tablet.  So user in this sense, which is a term defined by the standards body, is not the Court's construction, but we have to use the Court's construction here.

Q.    Could we check off this first limitation?

A.    Yes.

Q.    The next limitation requires "an initial amplitude estimation unit processing said data stream and producing initial amplitude estimates on a first iteration."

Where is that in the accused products?

A.    That is the amplitude estimation unit in the channel estimator.

Q.    And what are the initial amplitude estimates?

A.    They would be the channel estimates that we showed before.

Q.    And are they depicted as H0 H1?

A.    Yes.

Q.    Can we check off this limitation?

A.    Yes.

Q.    The next limitation starts offer with "a joint amplitude estimator" and ends with "updated amplitude estimates."

Where is that in the accused products?

A.    The amplitude and phase estimators that are associated with the rank 2 and rank 3 and 4 detectors.

Q.    What are the updated amplitude estimates?

A.    Those would be the updated values from the symbol estimator as we iterate through them.  And again, there are similar processes for rank 2 and rank 3 and 4.

Q.    And that's shown in JX 8 as what's inside the argmin function?

A.    Correct.

476

Q.    Does the joint amplitude estimator include multiple updated amplitude estimates?

A.    Yes.

Q.    And did you show before that this occurs many times for all these different constellation points?

A.    Correct.

Q.    Is the joint amplitude estimator coupled to the data stream and the channel estimator?

A.    Yes.  And it's coupled through this -- that argument -- the stuff inside the argmin function, it's coupled to the channel estimate--the H--it's coupled to the observed data, which is in the Y, and it is coupled to the symbol estimates.

Q.    Could we check off this limitation?

A.    Yes.

Q.    The next limitation starts off with "the symbol estimator coupled to said data stream said initial amplitude estimator," and it goes on to say that it "produces a plurality of symbol estimates for each user."

Is that met?

A.    Yes.

Q.    Where is the symbol estimator?

A.    The symbol estimator, it's in the rank 2 and rank 3 and 4 detectors.  And again, symbol estimates in their log likelihood ratios are output from them.

Q.    And what the symbol estimates?

477

A.    These are the estimates that we have been showing with this -- for the rank 2 example was DR-MLM algorithm.

Q.    And are the symbol estimates depicted as X0 and X1?

A.    Yes.

Q.    The claim also has these coupling requirements?

A.    Yes.

Q.    How do you know that's met?

A.    The coupling requirements, again, you can see that in the argmin function, and -- because they are coupled to the observation interval, the channel estimates, and so forth.

Q.    Can we check off that limitation?

A.    Yes.

Q.    The final limitation requires a bank of decoders.  Where is that in the accused products?

A.    That is in the box that says bank decoders.

Q.    Did you identify evidence that the accused products use a bank of decoders as opposed to just one?

A.    Yes.

Q.    What's shown here on page 382 of JX 8?

A.    So this is showing iterative detection and decoding as applied in the Samsung chipset.

Q.    And where it says turbo CW-0 for example, can you explain what that means?

A.    Yes.  So CW-0 means code word 0, CW-1 means code word 1, and these code words have to be decoded together.  Often

there's different code -- there's different decoders, in fact, associated with them, and so this is showing that multiple decoders are present.

Q.    And if look at the next page, is this additional evidence of using multiple decoders?

A.    Yes.  You see a reference to DEC-0 and DEC-1.  So they're multiple decoders.

Q.    In addition to using multiple decoders for multiple code words, do the accused products use multiple types of decoders?

A.    Yes.  The 4G and 5G standards specify that there is a different types of codes -- different types of error correcting codes must be able to be used simultaneously.  So that's another way in which this claim element is met.

Q.    Now, the claim also requires that the bank of decoders produce symbol likelihood estimates that are iteratively fed back.  Can you explain what the symbol likelihood estimates are?

A.    Yes.  So those are the log likelihood ratios that we've been speaking about earlier, and they are fed back to the rank 2 and rank 3 and 4 detectors to get improved symbol estimates.

Q.    And do you have some testimony from a Samsung engineer about this?

A.    I do.  This is an exchange with Dr. Yang of Samsung, and it is showing that the detector transfers a log likelihood ratio to the decoder and the decoder transfers information

that is a higher probability to the detector.

Q.   And what does Dr. Yang say here?

A.   He says, "In a modem based on S5123, one feedback takes place from the decoder to the detector.  The IDD needs to be used."

Q.   And did you also show source code for this for the Qualcomm and MediaTek chips?

A.   Yes.

Q.   Can we check off this limitation?

A.   Yes.

Q.   Is '703 claim 1 infringed?

A.   Yes.

Q.   For claim 5, it requires the use of one of the group of decoders.  Which one of those is used?

A.   The maximum a posteriori decoder is used.

Q.   Does that mean we can check off claim 5?

A.   Yes.

Q.   Can we talk about the '492 Patent?

A.   Yes.

Q.   The preamble here says, "a hybrid multiuser detector system."

     Can you explain what that is?

A.   That is a multiuser detector system that includes multiple multiuser detectors and a bank of decoders.

Q.   Do the accused products containing Samsung chips use

different detectors based on the rank of the received signal?

A.    Yes.

Q.    What detector do they use for rank 2?

A.    They use this DR-MLM algorithm.

Q.    What detector do they use for rank 3 or 4?

A.    They use decision feedback minimum means square error algorithms.

Q.    Do the accused product use different detectors for different modulation schemes?

A.    They do.

Q.    Can we check off this limitation?

A.    Yes.

Q.    For the next limitation beginning with "a parameter estimator," where is that in the accused products?

A.    That's the channel estimator that we've been speaking of.

Q.    And can we check that one off for the same reasons you explained before?

A.    Yes.

Q.    The next limitation requires "a multiuser detector decision unit."

      Is there a construction for this term?

A.    Yes.

Q.    Does this construction also require a claimed function in structure?

A.    Yes.

481

Q.   And now it says here -- it's referring to one or more algorithms.  Does Collision need to prove that each of the algorithms shown in the specification are met for this term?

A.   We only need to show one.

Q.   What's shown in the '492 Patent at column 13, line 39?

A.   It's showing that one way to make a decision on which MUD to use is based on the number of symbols that are being detected in a specific MUD window.

Q.   Is that an algorithm covered by the Court's construction?

A.   It is.

Q.   Do the accused products do that?

A.   They do.

Q.   How so?

A.   Well, they decide which -- they decide which MUD to use based on the number of symbols that is signaled to the handset to use based on what's called downlink control information.  Based on knowing the rank and knowing the coding scheme, it knows how many data symbols it expects to get.  So it's meeting this term.

Q.   So if a transmitter sends two MIMO layers in a box in the time frequency grid, will the device choose a particular detector for that?

A.   Yes.

Q.   And is that true for the accused products containing Samsung chipsets?

A.    As well as Qualcomm and MediaTek.

Q.    Can we check off this box?

A.    Yes.

Q.    Before we do that, I wanted to point to one other portion of the '492 Patent at column 14, line 33.

Can you explain this.

A.    Yes.  So another criteria can include computational complexity and the number of bits to detect.

Q.    How does this relate to what the accused products do?

A.    Well, for example, before we discuss that for different data modulation schemes, different types of detectors are used.  So the type of detector used, which means the type of MUD decoder used, is based on the computational complexity involved with the data modulation scheme.  And also the number of bits to detect is -- you can also get from the number of data symbols to detect.  So this condition is met, too.

Q.    And does this slide show examples of the different types of modulation schemes and levels of complexity?

A.    Yes.  For 64 and 16, they would have one algorithm used for complexity.  For 256 and higher they have other methods to reduce complexity.

Q.    Is that true for accused products containing Samsung, Qualcomm, and MediaTek chipsets?

A.    Yes.

Q.    Can we check off this limitation?

A.    Yes.

Q.    The next limitation requires "at least two multiuser detectors" and ends with "received signals."

       Do the accused devices have at least two detectors, as you've been explaining?

A.    Yes.

Q.    And does that include the different rank detectors and modulation detectors?

A.    Yes.

Q.    Are the at least two detectors coupled to the parameter estimator?

A.    Yes.

Q.    And did the detectors output a plurality of information streams?

A.    One for each layer.

Q.    And do those streams correspond to the received signals?

A.    Yes.

Q.    Can we check off this limitation?

A.    Yes.

Q.    For the final limitation requiring a bank of decoders, is that met?

A.    Yes.

Q.    Is that met for the same reasons you explained before for the '703 Patent?

A.    Yes.

Q.   All right.  Can we check that one off and be done with the infringement analysis?

A.   Yes.

THE COURT:  Counsel, before you move on, I want everybody to take 30 seconds, stand up, stretch, and then we'll sit back down.

(Pause in proceedings.)

THE COURT:  All right.  Have a seat.

Please continue, counsel.

Q.   (BY MR. NEMUNAITIS)  Can we talk about Samsung's acts of direct infringement?

A.   Yes.

Q.   What does Collision need to show to prove direct infringement?

A.   We have to show that the accused products perform each step of the claim and that Samsung has sold, offered for sale, imported, made, or used the accused products.

Q.   What are we looking at here?

A.   We're looking at screenshots from two webpages--one from Samsung showing a Galaxy S23 offered for sale on their website, and we see on the right a screenshot from the Best Buy website showing tablets and phones offered for sale.

Q.   Are these examples of sales and offers for sale?

A.   Yes.

Q.   At the beginning of your direct, did you show PX 14, the

list of accused products?

A.   Yes.

Q.   Where did you get the information in this exhibit?

A.   This was supplied by Samsung.

Q.   What's shown here?

A.   This is a -- if you see at the top, it says 'interrogatory'.  That means request from Collision for information about products made, used, sold, offered for sale, or imported into the U.S. that includes 4G and 5G functionality.  And below is Samsung's response that shows that they have sent an exhibit that identifies each product made, used, sold, offered for sale, or imported into the United States by Samsung, including 4G and 5G functionality.

Q.   Are the products listed in PX 14 taken from Exhibit A to Samsung's interrogatory response?

A.   Yes.

Q.   Now, there's two Samsung Defendants in this case.  Do they both infringe?

A.   Yes.

Q.   Why do you say that?

A.   Because there's been no distinction made between them.

Q.   For direct infringement, does Samsung have to know about the asserted patents or intend to infringe?

A.   No.

Q.   What did you conclude about Samsung's direct

infringement?

A.    They directly infringe.

Q.    What is induced infringement?

A.    It means that, first of all, the products must meet -- perform each step of the claim, and then they have to -- the party has to intentionally act to encourage or influence someone else to infringe.

Q.    Now, you're not going to be opining on anyone else's state of mind, are you?

A.    No.

Q.    Can you, nonetheless, help us understand some of the technical issues associated with whether Samsung received notice of the patents and infringement?

A.    Yes.

Q.    What's shown here as from JX 22?

A.    This is an excerpt from a document that you've seen already that Collision provided to Samsung outlining their patents related to wireless communication.

Q.    Does it identify the '505 '703 Patents, and two pending patents?

A.    Yes.

Q.    Was the '651 Patent pending around the time this presentation was provided to Samsung?

A.    Yes.

Q.    Is it possible to locate patents even if they have not

yet issued?

A.    Yes.

Q.    How so?

A.    Well, you can go to the USPTO website, which I've done it many times in my career.  You can also use Google patents, which nowadays is substantially easier to use.

Q.    Do you remember seeing this timeline earlier today?

A.    Yes.

Q.    Can we make some room on here and add JX 22?

A.    Yes.

Q.    What is this document that is JX 6?

A.    This is a document from Samsung to Collision discussing Collision's technologies.  It mentions that they have a -- they know there's a list of 50 patents shared; 46 of them they reviewed, 4 of which weren't published.

Q.    If we look at the next page, does it contain information related to MIMO and channel estimation, like the accused functionality you've been discussing today?

A.    Yes.  They were talking about, regarding Collision's MUD technology for MIMO OFDM, that there was a gain over ML--maximum likelihood--MIMO OFDM receivers as well as gains with pilot structure and channel estimation.

Q.    Would a person of skill in the art understand that MIMO functionality and channel estimation functionality that can be used in a base station could also be used in a phone?

A.   Yes.

Q.   Could we add this to the timeline?

A.   Yes.

Q.   Now, because you're an expert in this case, were you also able to see some of Samsung's confidential emails?

A.   I was.

Q.   What is PX 20?

A.   This is an email from Mr. Meong Hee Park at Samsung System Innovation Lab at the time, to assistant manager Bo Hee Kim, where he asked "If Collision successfully builds the board and demonstrates actual gains, shouldn't we then proceed with a license agreement for technology adoption?"

Q.   When was this email sent?

A.   October 10th, 2013.

Q.   And if we look further down, what response did he receive?

A.   He received a response from corporate development group leader Ms. Serji Oh that told Mr. Park, You're absolutely right.  However, if we adopt C Company's technology, we will have to pay for it.

Q.   Can we add this one to the timeline?

A.   Yes.

Q.   Do you remember in opening on Friday Samsung's counsel talking about the Collision simulation?

A.   Yes.

MR. NEMUNAITIS:  Mr. Diaz, can you bring up Friday's trial transcript on page 184, lines 11 to 15?

Q.   (BY MR. NEMUNAITIS)  Do you remember when he said, "Samsung tested, simulated, you know, those performance numbers and they compared it to what Samsung already had for base stations, and it didn't perform as well as Collision was claiming.  Samsung's internal products outperformed Collision's"?

Do you remember that?

A.   I do.

Q.   Did your investigation turn up evidence inconsistent with that?

A.   It did.

MR. NEMUNAITIS:  Can you return to my slides, Mr. Diaz?

Q.   (BY MR. NEMUNAITIS)  What is PX 22?

A.   This was an email from Mr. Meong Hee Park to executive director Jaeho Jeon that prepared responses -- that included responses to comments regarding Collision's technology.

Q.   If we look further down, what is highlighted here from PX 22?

A.   It shows that Mr. Park concluded the technology provided meaningful capacity gains.

Q.   And if we look further down on this document, there is this blue table with a bullet point above it.  Can you explain

490

what's shown here?

A.    It showed that Samsung's evaluation of this technology would result in a 35 percent increase in average capacity.

Q.    And is that shown for C Company's technology?

A.    Yes.

Q.    What does that bullet point 2 say?

A.    Bullet point 2 says that they get an increase in 35 percent average capacity and 65 percent in cell edge capacity.

Q.    I'm sorry.  I meant the title of this.  Does it say --

A.    Oh, "How Does it Differ From our Smart Technology."

Q.    What did Samsung measure as the performance of its internal technology?

A.    That was a performance of 10 percent on the average and 30 percent at the edge.

Q.    Can we add this one to the timeline?

A.    Yes.

Q.    Based on the presentations that Collision made to Samsung and the patents identified to Samsung, could a person of skill in the art understand how the functionality you identified as infringing in this case actually infringes the patents-in-suit?

A.    Absolutely.

Q.    Do you remember in opening when Samsung's counsel said that Collision's technology was just related to base stations?

A.    I remember that.

Q.   Would a person of skill in the art understand that these patents could be used in phones and tablets?

A.   Absolutely.

Q.   All right.  Are you ready to move on to your final topic?

A.   Yes.

Q.   And what's that?

A.   Marking and technical benefits.

Q.   What is your understanding of the patent marking statute?

A.   My layman's understanding is if a patent owner or licensee makes, uses, sells, offers for sale, or imports a patent practicing product, damages begin when the patentee either notifies the infringer of infringement or notifies the public by marking patent practicing products.

Q.   If the jury concludes that Samsung received notice of the infringement based on Collision's dealing with Samsung, what would that mean for Samsung's marking defense?

A.   They would not have one.

Q.   Even so, did you analyze Samsung's theory based on the lack of patent numbers?

A.   I did.

Q.   What was your starting point for evaluating Samsung's marking theory?

A.   It was a letter that Samsung sent -- a marking letter that based on Collision's infringement contentions they claimed the following products practice at least one of the

asserted claims of the patents, including Nokia base stations, Ericsson base stations, and BAE Systems software and technology developed under their DARPA research contracts.

Q.   Did Samsung identify specific functionality or features in these products to start you on your investigation?

A.   No, they did not.

Q.   Did you, nonetheless, investigate these products?

A.   Yes.

Q.   And what was your conclusion?

A.   My conclusion is that there was no justification to assert that either Nokia base stations, Ericsson base stations, or BAE Systems and Electronics Systems Integrations Systems practiced the products -- have products that patent--excuse me--products that practice the patents.

Q.   Was BAE served with a subpoena in this case from Samsung?

A.   Yes.

Q.   And what were they asked to provide?

A.   Documents sufficient to identify all products sold by BAE that practice the asserted patents, and the date and location of each sale.

Q.   And are you also aware of testimony from BAE in connection with this case?

A.   I was.

Q.   Based on the documents you were able to review and the testimony that you reviewed, did BAE claim that it was

practicing the patents at issue in this case?

A.    They did not.

Q.    Now, these patents were invented by engineers at BAE. Right?

A.    Correct.

Q.    Were you able to review testimony from those inventors?

A.    Yes.

Q.    And did they indicate that BAE sold products that practiced their patents?

A.    They indicated that it was unlikely at best.

Q.    Now, are the BAE devices identified by Samsung mobile devices, like phones and tablets?

A.    No.  They don't make such things at all.

Q.    And do you remember Samsung's counsel referring to something called Link 16?

A.    I do.

Q.    And I believe he referred to it as something for communicating with fighter jets?

A.    That's correct.

Q.    Did you investigate that product?

A.    I did.

Q.    Can you explain what frequency hopping is?

A.    That is where military systems--which, by the way, aren't cellular systems--use -- between a transmitter and receiver they send a series of frequencies that they know they will

494

communicate on, which are frequencies over a wide set of frequencies, and this is to make it harder for an enemy to jam the communication.

Q.   Does BAE Link 16 use frequency hopping?

A.   Yes.

Q.   What does that tell you about whether or not it would use the patents at issue in this case?

A.   Based on that and the other characteristics, it's highly -- it just isn't appropriate to use the patents in this case.

Q.   If the BAE products identified by Samsung did not actually practice the patents in this case, did BAE or Collision do anything wrong by not putting the patent numbers on those products?

A.   No.

Q.   Can we move on to talk about Nokia and Ericsson?

A.   Yes.

Q.   Were they served with subpoenas?

A.   Yes.

Q.   And what were they asked to provide?

A.   "Documents sufficient to identify all products sold by you that practice the asserted patents and the date and location of each sale," as well as, "Documents sufficient to show whether you, pursuant to your license agreement with Collision, practice one or more of the patents-in-suit."

Q.   Based on your review of the evidence, did Nokia or

Ericsson claim to practice the specific patents at issue in this case?

A.    They not only did not claim, but I was not able to identify the functionality corresponding to the patents-in-suit.

Q.    If Nokia and Ericsson licensed Collision's patent portfolio, why doesn't that mean that they practice the patents?

A.    Simply because you license a patent portfolio doesn't mean -- certainly doesn't obligate you to practice every patent in the portfolio, and it's -- I don't really know of a case where that is, in fact, the case.

Q.    Do the Nokia and Ericsson base station products receive CRS signals?

A.    No.

Q.    Do they use something called DMRS?

A.    Yes, they do.

Q.    How does DMRS handle colliding DMRS signals?

A.    Well, there's two basic ways.  First of all, they transmit them in such a way that they don't interfere with each other, or -- well, actually -- yes, they don't interfere with each other, or they structure them so that any interference is completely minimized.

Q.    So if the Nokia and Ericsson base stations are able to use that, what does that tell you about whether or not they

496

Q.   use the patents at issue in this case?

A.   They certainly wouldn't be using them.

Q.   What is shown here on page 5 of PX 24?

A.   This is an excerpt from a document produced from Nokia.

Q.   And what does it tell you about whether or not the Nokia and Ericsson -- or Nokia products use Collision's patents-in-suit?

A.   I do not -- on this document you do not see the structures necessary to practice the Collision patents, in particular -- any of the four.

Q.   What's shown on this slide?

A.   This was a document describing some interference suppression techniques from Ericsson.

Q.   And what does it tell you about whether or not the Ericsson products use the patents-in-suit?

A.   It is using a method called interference rejection combining or G-Rake plus, which does not practice the patents-in-suit.

Q.   Do the Nokia and Ericsson products identified by Samsung feed back symbol likelihood estimates from the decoder to the joint amplitude estimator, as required by the '703 Patent?

A.   No.

Q.   Do the Nokia and Ericsson products identified by Samsung iteratively pass back amplitude estimates, as required by the '651 Patent?

497

A.   No.

Q.   Do the Nokia and Ericsson products identified by Samsung perform the training sequence recreation and parameter estimation of the '505 Patent?

A.   No.

Q.   So if the base station -- I'm sorry.  If the Nokia and Ericsson products identified by Samsung didn't actually practice the patents in this case, did Nokia or Ericsson or Collision do anything wrong by not putting the patent numbers on those products?

A.   No.

Q.   Could we talk about non-infringing alternatives?

A.   Yes.

Q.   Is this one of the non-infringing alternatives identified by Samsung in this case?

A.   It's one of the ones they claimed, yes.

Q.   Is Samsung here arguing that it would be able to use Nokia's base station approach described here as a way to avoid infringement in this case?

A.   It seems to be what they're saying.

Q.   Would this proposal actually stop Samsung from using -- or receiving CRS signals in the phones and tablets?

A.   No.

Q.   So would this do anything to avoid infringement of the '651 or '505 Patents?

A.    Not at all.

Q.    Could Samsung replace the SU-MIMO in its phones using the technology described here?

A.    No.

Q.    And do you have some testimony from a Samsung engineer on this?

A.    Yes.

Q.    What did Dr. Yang say?

A.    Dr. Yang said, "It is impossible to remove SU-MIMO detection because receiving is necessary in terms of standards."

      And I might add that it's not only the standards, but the phone operators, the carriers, the AT&Ts and T-Mobiles, that specify that such things must be used.

Q.    In your opinion, did Samsung identify any non-infringing alternatives that would have allowed it to receive the same technical benefits provided by Collision's patents?

A.    No.

Q.    Now, did you review all of the non-infringing alternatives identified by Samsung in this case?

A.    Yes.

Q.    Did they ever identify C-RAN as a non-infringing alternative for their phones or tablets?

A.    No.

Q.    Can we move on to your final topic talking about

499

Collision's simulation?

A.    Yes.

Q.    And what's shown here from PX 1?

A.    This is an email from Mr. Farkas sent August 22nd, 2013, to Mr. Meong Hee Park showing that there were similar level simulations with blind detection, and Mr. Farkas showed that the Collision algorithms with blind detection have a 15.4 percent average gain and 132 percent gain for cell edge users.

Q.    How does that correspond to things like download speed or battery life?

A.    It directly translates into, because these are -- download speed is directly proportional to spectral efficiency, it translates to a 15.4 percent increase in spectral efficiency.

Q.    Did you investigate which Collision patents potentially contributed to that increase in speed?

A.    Yes.

Q.    What is shown on the screen here?

A.    These are the 50 or so patents that are related to Collision's technology.

Q.    Were you able to exclude some of these patents because they are unrelated to the simulation?

A.    That's right.

Q.    So, for example, some of these things talk about cable modems and storage drives.  Would those have been related to

500

the simulation?

A.    No, not at all.

Q.    What about some of these more technical descriptions for patents like frequency hopping?  How did you evaluate those?

A.    Again, they would not be applicable to the -- an LTE OFDM MIMO level simulation.

Q.    So did you identify a set of Collision patents that likely did contribute to the gain in spectral efficiency?

A.    Yes.

Q.    And are they shown in yellow here?

A.    That's right.

Q.    Did you also identify patents that may not have contributed to this simulation but could provide benefits to Samsung?

A.    That's right.

Q.    And are they shown in orange here?

A.    Yes.  They would include the '505, the '492 that we've been talking about, and the '071.

Q.    What is this list of patents?

A.    This is a list of patents that were granted or issued after the simulation was done that could provide potentially additional benefits to Samsung.

Q.    Did you review the source code for Collision's simulation?

A.    Yes.

501

Q.    And what did that tell you about whether or not that source code simulated the '651 and '703 Patents?

A.    It told me that it did simulate those two patents.

Q.    Now, did the simulation actually practice those patents?

A.    No.

Q.    If it didn't practice the patents, how can you measure the benefits if it's just a simulation?

A.    Well, this is a very common thing that communication systems engineers do in developing new systems.  It turns out that the type of the physics of cellular radio channels is very highly predictable, and, in fact, based on my discussions with Mr. Farkas, the system level simulations that he did were actually more accurate than what the standards body uses to evaluate its technologies, and so it's very predictive of the benefits you're going to see in the field.

Q.    All right.  Can we briefly walk through the claim charts one last time to show how the simulation relates to that claim language?

A.    Yes.

Q.    Did Collision's simulation simulate the first limitation of the '651 Patent claim 1?

A.    Yes.

Q.    And does it show in the source code here from JX 64 simulating a number of users?

A.    That's right; and a showing that 10 users are put in a

sector, which is an area that is served by a base station.

Q.   And does this mean that it also simulated the next limitation starting with the data stream?

A.   That's right.

Q.   For the next limitation, a plurality of processing modules, is that shown in the simulation code?

A.   Yes.  And it's shown that these interference--rather--individual amplitude estimates are computed with this tmpHest object and interference cancellation values ue.signals_sic.

Q.   And did the simulation simulate the final limitation and amplitude estimation unit?

A.   Yes.  And we see the new amplitude estimate tmpHest, that object being evaluated as well.

Q.   Can we move on to the '703 Patent?

A.   Yes.

Q.   For the same reasons you explained before, did the Collision simulations simulate the first part of claim 1 of the '703 Patent?

A.   Correct.

Q.   Did it simulate the initial amplitude estimation unit limitation?

A.   Yes.

Q.   And is that shown in the code here?

A.   Right.  Yeah, yes.

Q.   And are the initial amplitude estimates shown as the

Htemp1 and Htemp2?

A.    Yes.

Q.    Did the Collision simulations simulate the next limitation about a joint amplitude estimator?

A.    Yes.  And it's showing that this is setting the joint amplitude estimator to be reestimating the channel to be true.

Q.    Did the Collision simulation code simulate the next limitation requiring a symbol estimator?

A.    Yes.

Q.    And is that shown here in the code referring to the Tsyms?

A.    Yes.  This is showing the loop in which the symbol estimates are computed.

Q.    And finally, did the Collision simulation code simulate the bank of decoders?

A.    Yes, showing a decoder for each of the users, and below that is the LLRs being computed.

Q.    All right.  Dr. Kowalski, can you conclude by telling the jury your final conclusion on infringement?

A.    Yes.  '703, claims 1 and 5 infringe; '651, claims 1 and 3 infringe; '505 and '492, each of their first claims infringe.

          MR. NEMUNAITIS:  Pass the witness.

          THE COURT:  All right.  Cross examination by the Defendants.

          MR. PAK:  Your Honor, may I pass out the cross

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

binders?

THE COURT:  You may.

And Plaintiff's counsel, you need to move the easel back to where it was.

MR. NEMUNAITIS:  Sorry, Your Honor.

MR. PAK:  May I proceed, Your Honor?

THE COURT:  You may start.  I doubt we'll finish this cross examination today, but we'll start it.

Go ahead, counsel.

MR. PAK:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. PAK:

Q.   Good afternoon, Dr. Kowalski.  It's good to see you again.

A.   Good afternoon, Mr. Pak.

Q.   Yes.  You know me.  I deposed you in this case.

A.   Yes, I remember.

Q.   Right.  So I'm going to start by some of the -- one of the topics that you addressed toward the end of your examination, and that relates to what Samsung -- internally how they viewed the joint proposal to develop a base station product using Collision's patents.  Do you recall that testimony?

A.   I recall a lot of that today.

Q.   Yes.  And you were shown some commentary I made to the

jury about what I believed the evidence will show from my opening statement.  Do you remember that?

A.    I'm sorry.  I didn't hear the whole thing.

Q.    Sure.  I'll speak up a little bit louder and I'll be closer to the mic.

So Doctor, do you remember counsel for Collision showed you some statements I made in my opening statement to the jury?

A.    Yes.

Q.    And you were here for the opening.  Correct?

A.    I was.

Q.    And do you recall that I told the jury that what I say and what Mr. Caldwell says is not evidence; it's just a roadmap of the evidence?

A.    That's right.

Q.    And the evidence is actually in the documents and the witness testimony in this case?

A.    That's right.

Q.    Okay.  So now, your opinions are to be evaluated against the actual evidence in this case.  Would you agree?

A.    I would say that should be the case, although my opinions are sworn testimony.

Q.    Well, of course.  But you're here to provide your opinions as a technical expert looking at the actual evidence in this case.  Correct?

506

A.    Correct.

Q.    You were not there when these events occurred between Samsung and Collision.  Correct?

A.    That's true.

Q.    And you didn't participate in the invention process of these patents.  Correct?

A.    Correct.

Q.    Okay.  So we are to take a look at whether your opinions are, in fact, to be supported by the actual evidence in this case.  That's one of the things that the jury will be asked to decide.  Correct?

A.    That's right.

Q.    So I believe what I said in the opening statement was that evidence -- actual evidence, when viewed in totality, will show that Samsung determined in the end that the claimed performance of Collision did not meet the goal of the 100 percent performance gain at the edge of a cell, and also that when compared to what Samsung already had in terms of their technology, that in the end Samsung's internal technology outperformed what Collision was offering for the joint development.  Do you recall that in my opening?

A.    I recall you said that, yes.

Q.    Okay.  So now, as I understand your testimony and as you stated in your report that you prepared, your conclusion in looking at some of the evidence in this case was that Samsung

was consistent in praising Collision's patented MUD technology. Do you recall making that statement?

A. Based on what I've seen, yes.

Q. Right. But there are a number of things that you did not consider in forming your opinions in this case. Correct?

A. Many things.

Q. Right. And I think I covered some of that in your deposition. For example, the 2012 email from Mr. Farkas where it was a historical summary of the meetings that took place in Korea where Samsung shared its SU-MIMO technology and Mr. Farkas had a reaction to that, that that was not the sophisticated MUD technology in Collision's patents, until your deposition you had never seen that document. Correct?

A. That's correct.

Q. And so that document was not something that you had considered in forming your expert opinions in this case, which were included in all of your reports. Correct?

A. That's right.

Q. So there are many pieces of evidence in this case that's been produced by both parties that you did not consider in actually forming opinions in this case. Correct?

A. I suppose so.

Q. Right. You're not testifying to the jury that you reviewed all of the evidence in terms of the interactions between Samsung and Collision and all of the internal evidence

within Samsung's files that were produced in this case relating to those interactions.  Correct?

A.   I think that's fair.

MR. PAK:  Okay.  So let's take a look at PX 16.  And if we turn to PX 16 on page 26.

Q.   (BY MR. PAK)  You realize that when the jury gets these exhibits, they will be the original document in Korean and then later there's an English translation that's been certified.  Do you understand that?

A.   I understand that.

Q.   Yes.  And so for this exhibit, for example, we have the translated version of the Korean emails, and it starts on page 26.  Do you see that?

A.   I don't see where it says page 26.

MR. PAK:  Yeah.  If you scroll here --

THE WITNESS:  Okay.  Now I see it.  Thank you.

Q.   (BY MR. PAK)  So at the top of PX 16.26, we have an email from Ms. Sunja Oh, or Serji Oh that we've seen in this case.  Correct?

A.   Yes.

Q.   And this is dated January of 2014.  Do you see that?

A.   I see that.

Q.   And this is related to Collision technology value assessment.  You can see that in one of the attachments to this email?

A.    I see that.

Q.    Okay.  All right.  So then if we turn to 16.36, so slide -- page 36 of this document, I think that you discussed this briefly or a similar document.

MR. PAK:  But if you could blow up the box under 2, Mr. Sayres.

Q.    (BY MR. PAK)  So, first of all, do you see that this is MUD SIC technology?

A.    I see that.

Q.    And successive interference cancellation, as I established with Mr. Farkas, that was already in possession of Samsung as a standard technology that the industry knew about.  Correct?

A.    Absolutely.

Q.    Okay.  And here what we see in the fourth bullet is performance edge capacity plus 100 percent without loss of average capacity.  Do you see that?

A.    I see that.

Q.    And plus 100 percent means that -- as you can see here, this is Company C's assertions.  So Collision was claiming to Samsung as part of this joint development process that its technology, its patented MUD technology, would offer a performance gain of over 100 percent at the edge of a cell.  Do you see that?

A.    I see that.

Q.   And we saw that in some of the evidence that we've seen where that was the basis for the agreement between Mr. Barry West and folks at Samsung where Collision was trying to demonstrate this plus 100 percent gain at the cell edge in order to convince the base station group at Samsung to jointly develop this new technology capability.  Do you recall that?

A.   Yes.

Q.   And then below this is the part you pointed out.  You said, Our company -- this is Samsung's predicted performance. And so you know it's predicted because, as Mr. Farkas and Mr. Fry testified, Collision never actually provided the detailed algorithms or the source code, the computer code that contained their patented MUD technology to Samsung.  Correct?

A.   That's been the testimony.

Q.   And you've seen no evidence to the contrary based on your investigation.  Correct?

A.   No, I have not.

Q.   So just to be clear, when Samsung's doing its own simulations, it doesn't actually have the detailed algorithms or the simulation code in Collision's possession.  Correct?

A.   I assume that is the case, based on the testimony that we've heard.

Q.   So prediction here means Samsung doesn't know actually what Collision is doing under the hood, but they're trying to make some guesses about what may be happening.  But Samsung

could be wrong about that because they don't that have the source code and they don't have the detailed algorithms. Correct?

A.   Among other reasons.

Q.   Right.  There could be many reasons why this predicted performance may not be realistic or at all comparable to what's actually achievable with the patented MUD technology from collision.  Correct?

A.   It's fair.

Q.   All right.  And -- but we've seen over and over again--counsel for Collision has cited to this in his opening; you cited to it--and you focused on the average capacity of plus 35 percent based on this prediction, which may or may not be the actual performance of Collision's patented technology. That's average capacity of 35 percent.  Do you see that?

A.   That's right.

Q.   But the edge capacity is 65 percent based on Samsung's?

A.   I do.

Q.   Sixty-five percent is less than 100 percent claimed by Collision.  True?

A.   That's right.

Q.   Okay.  So remember this conversation and the specific proposal was to develop a base station product for Samsung's base station customers.  Correct?

A.   That's right.

Q.   This was not about trying to incorporate any of Collision's MUD technology into handsets that were LTE compatible.  Correct?

A.   Not at the time, no.

Q.   Right.  And we saw later some evidence in this case where long after this meeting Collision was trying to raise money to even start a research and development team to look into having a handset design.  Do you remember that?

A.   I remember that that was a point in a narrative about developing the handset technology.

Q.   Right.  We saw that in the 2015 business plan.  We saw that in the 2014 Samsung Ventures presentation when they were trying to raise money from the venture capital arm of Samsung. Do you recall that?

A.   Among other places, yes.

Q.   So just to be clear, as of this date 2013, Collision was not claiming that it had a working solution for LTE handsets. Correct?

A.   Fair.

Q.   Okay.  But what we do see here is that even for the base station proposal that was being evaluated by Samsung, Samsung actually predicted that, based on a guess, Collision's MUD technology would only achieve edge capacity improvement of 65 percent, which is 35 percent lower than the 100 percent claim made by Collision.  Correct?

513

A.   That's right.

Q.   Okay.  Now, smart technology that was being compared here on this slide, that's not the only technology that Samsung has for base stations.  Correct?

A.   I haven't really evaluated the entirety of Samsung's technology portfolio for base stations, so I don't -- I can't answer that.

Q.   Right.  And we heard about -- and you know this because you've filed a lot of patents.  You know that Samsung has thousands of patents that cover 4G and 5G standards.  Correct?

A.   I know very well, yes.

Q.   Okay.  And you know that many of those patented technologies make their way into base station products. Correct?

A.   Yes.

Q.   And so here looking at -- so this one smart technology comparison we have the reported numbers.

        MR. PAK:  But if we turn to PX 16. -- actually I think we have to go to another document for this, so -- we have 16.36.  We may come back to this document later, because there's a long series of emails going back and forth on this. But if you'd turn to JX 7.

Q.   (BY MR. PAK)  Do you recall this document, sir?  Do you remember seeing this document when you were forming opinions?

A.   I do not -- I don't recall whether I saw it or not.

Q.    But you didn't present this one to us today.  Correct?

A.    I'm sorry?

Q.    You did not present this document to us today when you formed the opinion that Samsung consistently praised Collision's patented technology.

A.    That's right.

Q.    Okay.  And let's take a look at what it actually says.

So this is an email at the top from Serji Oh.

MR. PAK:  You can see the name at the very bottom, Mr. Sayres.  Or actually if you go up one more.  Yep.

Q.    (BY MR. PAK)  Serji Oh.  Do you see that?

A.    Uh-huh.

Q.    So she is a business lady who works at the Samsung networking division and she's writing to Mr. Barry West who was the CEO of Collision at the time.  Do you see that?

A.    Yes.

Q.    And this is on March 12th, 2014?

A.    Uh-huh.

Q.    Is that correct?

A.    That's what it says.

Q.    Okay.

THE COURT:  You're going to need to give verbalized responses, Dr. Kowalski.  'Uh-huh' doesn't translate into the transcript very well.

THE WITNESS:  I'm sorry.

THE COURT:  That's okay.

Let's proceed.

Q.    (BY MR. PAK)  It says, "Dear Mr. West."  And she's writing on behalf of Mr. Youngky Kim, who was one of the vice presidents at Samsung.  Do you recall that?

A.    I do.

Q.    And she says, We sincerely appreciate your honest exchange with us of your vision for collaboration possibilities with Samsung.  Regarding your suggestions on a potential collaboration, this has been a difficult consideration for Samsung.  Regretfully, we would like to politely decline the opportunity to work together at the time.

Do you see that?

A.    Yes.

Q.    And do you remember there were a number of things that Samsung needed to evaluate for this joint development proposal for a new product or a new addition to the Samsung base station product line?

A.    It's kind of late in the day.  Can you refresh my memory?

Q.    Sure.  We saw that from the 'lessons learned' document from 2015 that I covered with Mr. Farkas.  Do you remember where one of the lessons learned was companies like Samsung had a hard time trusting simulation data when there's been no hardware product or prototype?  Do you remember one of those points?

A.   I disagree with that characterization.

Q.   But you did see the testimony and you did see the document that I used with Mr. Farkas?

A.   I saw that document.

Q.   Right.  But that was not a document that you considered in forming your opinions in this case.  Correct?

A.   That's correct.

Q.   Okay.  Another thing that we saw in that document, as we heard from Mr. Farkas, in 2015 was the sizing issue--how much additional hardware costs would there have to be incurred by Samsung to account for the additional complexity of Collision's MUD technology.  Do you recall that?

A.   I recall that.

Q.   And it was stated as a lessons learned in 2015 that not just Samsung but the industry view was the patented MUD technology that Collision was offering to base station customers wasn't practical on existing hardware.  Do you recall that?

A.   I recall that was in a document.

Q.   Okay.  And so here -- I'm just making a point that Samsung in evaluating a joint proposal to do something would have to look at not just the performance benefits, but what's the extra costs we would have to charge our customers, is it possible to fit this technology in with what we have or would we have to build new hardware.  Those are fair business

517

considerations for a company thinking about a proposal from a different company. Correct?

A. Can you restate the question?

Q. Sure. I'll simplify it.

It's fair for a company who's receiving a business proposal from another company to look at not just the claimed performance benefit but what is the cost to my customers, added cost to my customers if I add this new functionality to my products. That's a fair consideration. Correct?

A. Among many associated with the business plans related to the particular product line, yes.

Q. Right. Another consideration is to my existing products and even have the hardware necessary to be able to run this functionality, that's another fair consideration for a company receiving a proposal from another company? Fair?

A. Among others, yes.

Q. There could be many considerations that a company could consider before deciding to do business and actually charge more to their customers for something new. You would agree?

A. Yes. You have to look at the whole business.

Q. That's right. So you can't -- and also if a company comes in and says, We don't have the hardware, we're just giving you some simulation, we're not going to give you the source code, we're not going to give the details about our algorithms, it's fair for a company to be somewhat skeptical

of those claims and ask for more data to confirm whether those claims are actually achievable or not.  Would you agree?

A.    Depends on what the ask is.

Q.    Right.  But that would be generally fair to ask for more data if a company comes to you and says, I have some simulations, I'm not going to tell you what I'm doing, I'm not going to show you my code, I don't even have the hardware built, but here are my claims that it can do a hundred percent better, it would be fair for you to ask for more information, it would be fair for you to suggest that you build an evaluation board, build something in hardware to see if it works.  You would agree?

A.    It depends on, again, the specifics.

Q.    And you're aware that Samsung did ask Collision to put their algorithm in an evaluation board in hardware and test it in Samsung's actual networking environment.  Do you recall those discussions?

A.    I recall that came up in the deposition, yes.

Q.    And Collision, because they didn't want to take on additional costs to prove up their technology, said, We don't want to do that at this time.  Do you recall that?

A.    I'm sorry.  Again, it's late in the day.  Can you restate the question?

Q.    Sure.  Do you remember as part of those discussions that it was Collision that decided that they didn't want to take on

the extra costs of building a physical hardware version of their algorithms in an evaluation board that they could deliver to Samsung to actually prove that their technology worked?

A.    Yeah.  I'm sorry.  I don't remember the details right here right now.

Q.    Okay.  So perhaps tomorrow we'll have an opportunity to show you those documents.

Well, you do recall there was a discussion about that?

A.    I recall a discussion, but I don't recall the details.

Q.    Right.  And you do know that Collision never built an evaluation board in hardware to run their algorithms to prove to Samsung this actually works in a real network.  You do know that.  Correct?

A.    Again, I'm not sure I remember any details pro or con regarding that.

Q.    Okay.  Well, certainly in this trial we have not heard any testimony to that effect from any Collision witnesses. Correct?

A.    I don't think so, no.

Q.    Mr. Farkas actually testified that they never built any hardware version of their algorithms when they were talking to Samsung.  Do you recall that?

A.    Okay.

Q.    And what Samsung here stated in this letter politely

520

declining the opportunity to work with Collision on their

joint development proposal was the following.

MR. PAK:  If you'll scroll down Mr. Sayres.

Q.   (BY MR. PAK)  Samsung's agreeing that Collision's

technology has merits and value from a perspective of

technical innovation.  "However, our development team has

concluded that the commercialized performance and benefits may

fall short of our expectations, bearing in mind Collision's

proposed terms."

Do you see that?

A.   I see that.

Q.   So, first of all, Samsung was politely telling Collision

the commercial performance and value of their technology may

not be what you had claimed, which was a hundred percent at

the edge--our numbers show something different; number two, we

have to keep in mind what you're proposing in terms of the

additional cost to our customers.  That's fair?

A.   I'm not sure I would exactly characterize what you've

just highlighted with what you've just --

Q.   Sure.  Let me just ask it this way.  It is fair for

Samsung to tell Collision, We don't -- we respect your

technology, but we ultimately decide that we're not going to

do a commercial deal because Samsung's development team has

concluded that the commercialized performance and benefits may

fall short of our expectation, bearing in mind Collision's

proposed terms.  That's a fair decision by Samsung.  Correct?

A.    On its face, yes.

Q.    And recall that Collision's proposed terms included Samsung having to pay significant royalties to Collision if Collision's patented technology was added to their line of base station products.  Do you recall that?

A.    I recall there was a royalty structure discussed.

Q.    And I think Mr. Fry testified to this, that Samsung said, We think your royalties are too high, this might not be something that we could commercially accept if we're going to be charging our customers for this new functionality.  Do you recall that testimony?

A.    I recall there was testimony about it, but I'm not focused on the details, to be honest.

Q.    Right.  So, again, it's fair for a company that's receiving a proposal to also consider, in addition to whether the technical gains can actually be achieved and whether the hardware can be made to do that, but also what's it going to cost me and my customers to add this new functionality. That's a fair consideration for Samsung.  Correct?

A.    Among others.

Q.    Among others.

And what Samsung tells Collision is this is the principal reason why we have decided not to adopt Collision's technology at the present.  Do you see that?

A.    I see that that is what was the -- what was communicated, yes.

Q.    And I want to show you now Samsung's -- one of Samsung's documents that was produced in this case.

MR. PAK:  Mr. Sayres, if we can have Samsung-Collision 897879.

THE COURT:  While that's coming up, approach the bench, counsel.

(The following was had outside the hearing of the jury.)

THE COURT:  I know you've got a lot of additional cross.  I'm look for a good place to break for the day.  Do you have any suggestions?

MR. PAK:  If I can have five minutes.

THE COURT:  That's perfect.  You just wink at me when you're ready.

MR. PAK:  Thank you.

THE COURT:  All right.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  Let's continue.

MR. PAK:  So Mr. Sayres, if we can have that document on the screen.

Q.    (BY MR. PAK)  So this is a document that was produced by Samsung in this case.

MR. PAK: And if you scroll down to the bottom.

Q. (BY MR. PAK) It's Samsung-Collision 897879. Do you see that?

A. I see that.

Q. And the title of this document is "Samsung-Collision Collaboration for the Effectiveness of Collision's Technology." Do you see that?

A. Yep. That's what it says.

Q. And this is February 4th, 2014. Is that right?

A. That's the date.

Q. And if you look at slide -- or the next three pages later at 882, the top, this is Samsung's own internal test results that were doing a system-level evaluation based on test vectors. Do you see that?

A. Yes.

Q. And so this isn't looking at just individual links; it was saying we're doing a system-level evaluation based on test vectors. Samsung generated test vectors, delivered them to Collision. Do you see that?

A. I see that.

Q. Collision applied its own MUD technology to the test vectors, checked CRS success, in addition Collision provided link performance curve to Samsung. Do you see that?

A. That's right.

Q. And I want to -- in the interest of time, I want to go

just to 897885, which is six pages later.

You recall testimony in this case about C-RAN?

A.    I do.

Q.    And I think that Mr. Fry indicated that C-RAN is not a blind MUD system.  Correct?

A.    I believe that was conveyed.

Q.    And you would agree with that.  Right?

A.    It depends on how the C-RAN is developed.

Q.    Okay.  Well, what we know is that Samsung had a C-RAN technology, and it says SIC -- that's successive interference cancellation.  Correct?

A.    That's correct.

Q.    And it says here "both C-RAN D-RAN based SIC directly exploit interference information shared by cells."

Do you see that?

A.    I see that.

Q.    And if that was happening, you would agree that's not a blind system.  Correct?

A.    That's right.

Q.    Right.  So this is a non-blind C-RAN system running successive interference cancellation technology already in the possession of Samsung.

And let's look at the edge throughput document on the right.  Are you with me?

A.    Yes.

Q.   So if you look at the green plot, it says "C-RAN based successive interference cancellation."

Do you see that?

A.   Yes.

Q.   And those are the green plotted dots with the lines?

A.   Yes.

Q.   And the red is the Collision MUD technology system level performance based on test vectors that Samsung provided and Collision provided the simulation results.  Do you see that?

A.   I see that.

Q.   And do you see that the cell load at the bottom, that means what percentage of the total user device capacity is happening on the network?

A.   Yes.

Q.   And if you look at a hundred percent loading where Collision is saying this is the best utilization of our technology, C-RAN based SIC is at 40 percent.  Do you see that?

A.   I see that.

Q.   Whereas, Collision's MUD technology based on their own test results at the system level is only at 30 percent.  Do you see that?

A.   I see that.  It says that.

Q.   Right.  These are Samsung's own internal simulations. And as you go down all the way to the left, going through

526

every point in the analysis from are virtually no users to maximum users, isn't it true that according to this Samsung historical simulation, Samsung's C-RAN based SIC outperformed Collision's MUD technology at every operating point of the network?  Correct?

A.   I'd have to look at this in more detail to be able to answer yes or no, because I would need to examine what the details of this is beyond what is on this slide.

Q.   Well, in the interest of time I'm going to only ask you two questions.

Number one, visually you can see that when you look at the percentage or the performance gain, the C-RAN based SIC is higher than the Collision MUD performance gain chart at every point in the operating load of the network.  Correct?

A.   For whatever conditions, which, again, I am not going to opine on sitting here now under which this was done.

Q.   Now, Doctor, you didn't consider this document even though it was produced by Samsung in this case before you formed your opinion that Samsung consistently praised Collision's technology and before you suggested to us that Collision's technology is better than anything that Samsung had.  Isn't that true?

A.   That's true.

Q.   Okay.

MR. PAK:  Your Honor, I think we can break for the

527

day.

THE COURT:  All right.  Ladies and gentlemen, this cross examination has some considerable length to it and we're not going to finish it today, but this is as good a place as any to break.

If you would, when you leave the courtroom in a few minutes, take the juror notebooks you have with you.  Leave them closed on the table in the jury room.

Thank you for being ready to go on time at 8:30 this morning.  Please replicate that exactly the same tomorrow.

Let me remind you, as you would expect, to continue to follow all my instructions about your conduct, including not to discuss the case with anyone in any way.  Have a good evening, travel safely to your homes, and we'll see you tomorrow morning at 8:30.

The jury's excused at this time.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  Be seated, please.

You can step down, Dr. Kowalski.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  And let me remind everyone, Dr. Kowalski is sequestered from any further discussions with counsel since he's in the middle of his testimony.

Counsel, for your benefit, we have used 7 hours, 38 minutes, and 45 seconds of designated trial time today.  The

Plaintiff has used 4 hours, 20 minutes, and 12 seconds, and the Defendant has used 3 hours, 18 minutes, and 33 seconds.

All right.  Are there any issues that counsel need to raise with the Court before we recess for the evening?

MR. PAK:  Not for the Defendants, Your Honor.

MR. CALDWELL:  Not for the Plaintiff.

THE COURT:  All right.  I will look to see what comes in overnight.  Less is more.  Continue to meet and confer.  We talked about that this morning in chambers.  I expect you'll take my guidance and put it into play this evening.  If there are matters we need to resolve before the jury comes in tomorrow, I'll be available in chambers at 7:30 to meet with you.

Also, be prepared tomorrow morning before I bring the jury in to have a representative from each side recite into the record those items from the list of pre-admitted exhibits that have been used during the trial today.

All right.  Counsel, if there's nothing further, we stand in recess until tomorrow morning.

(The proceedings were concluded at 5:51 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts                10/06/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER