IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

COLLISION COMMUNICATIONS, INC.,(  CAUSE NO. 2:23-CV-587-JRG
                                 )
          Plaintiff,             (
                                 )
vs.                              (
                                 )
SAMSUNG ELECTRONICS CO., LTD., (
et al.,                          )  MARSHALL, TEXAS
                                 (  OCTOBER 9, 2025
          Defendants.            )  8:00 A.M.
_____

VOLUME 5

_____

TRIAL ON THE MERITS


BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE
and a jury

_____


SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:       CALDWELL CASSADY & CURRY, PC
                         2121 N. PEARL ST., SUITE 1200
                         DALLAS, TEXAS  75201
                         (214) 888-4848
                         BY: MR. BRADLEY CALDWELL
                             MR. CHRISTOPHER STEWART
                             MS. AISHA HALEY
                             MR. JUSTIN NEMUNAITIS
                             MR. JOHN SUMMERS

                         MILLER FAIR HENRY, PLLC
                         1507 BILL OWENS PARKWAY
                         LONGVIEW, TEXAS  75604
                         (903) 757-6400
                         BY; MS. ANDREA FAIR

FOR THE DEFENDANTS:      QUINN EMANUEL URQUHART &
                         SULLIVAN
                         555 TWIN DOLPHIN DR.
                         5Th FLOOR
                         REDWOOD SHORES, CA 94065
                         (650) 801-5094
                         BY:  MR. BRADY HUYNH
                              MR. BRICE LYNCH
                              MR. JOHN REED
                              MS. VICTORIA MAROULIS

                         QUINN, EMANUEL, URQUHART &
                         SULLIVAN, LLP - WASHINGTON
                         1300 I STREET NW., SUITE 900
                         WASHINGTON, DC 20005
                         (202) 538-8188
                         BY:  MR. KEVIN HARDY

                         QUINN EMANUEL URQUHART &
                         SULLIVAN, LLP - SAN FRANCISCO
                         50 CALIFORNIA ST., 22ND FLOOR
                         SAN FRANCISCO, CA 94111
                         (415) 875-6600
                         BY:  MR. SEAN PAK

                         GILLAM & SMITH, LLP
                         303 SOUTH WASHINGTON AVENUE
                         MARSHALL, TEXAS  75670
                         (903) 934-8450
                         BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:        SHAWN M. McROBERTS, RMR, CRR
                          100 E. HOUSTON STREET
                          MARSHALL, TEXAS  75670
                          (903) 923-8546

THE COURT:  Be seated, please.

All right, counsel.  Having completed the presentation of the evidence at the end of the day yesterday, the Court will now turn to practice under Rule 50(a) of the Federal Rules of Civil Procedure.

What I would like to do to begin with is I'd like each party that seeks to move for relief under the rule to identify subject matter-wise or topically, if you will, what you seek relief on, and then once I've had a recitation from both sides, the Court's then better able to structure the following argument.

As I mentioned yesterday, it's very common that there are at least some motions for relief under Rule 50(a) that are diametrically opposed and common argument at the same time is often more efficient.

So with that, let me ask, what matters, if any, does Plaintiff seek relief under pursuant to Rule 50(a)?

If you don't mind, counsel, go to the podium.

MR. SUMMERS:  Yes, sir.

Your Honor, John Summers for Collision Communications. Before we get started, would you like us to read into the record exhibits used at trial yesterday.

THE COURT:  We've got to do that at some point.  If you're prepared to do that now, let's get it out of the way.

MR. SUMMERS:  Plaintiff identifies used at trial

yesterday by the Plaintiff DX 240 and PX 33.

THE COURT:  All right.  Any objection from Defendants?

MS. SMITH:  No, Your Honor.

THE COURT:  All right.  Do Defendants have any items from the list of pre-admitted exhibits used yesterday to read into the record?

MS. SMITH:  We do not, Your Honor.

THE COURT:  All right.

Then, Mr. Summers, that brings us back to Rule 50(a).  What matters, if any, does Plaintiff seek relief under the rule?

MR. SUMMERS:  Plaintiff will seek relief on two issues, one of no invalidity -- no invalidity on the '651 and '703 Patents because the only invalidity theory was the written description and enablement issue for which there was insufficient evidence to return a verdict of invalidity; also, no invalidity of the '505 and '492 Patents.  And then Rule 50(a) on two sub-issues related to marking; one concerning the burden of production issue, just for preservation of error purposes to the extent it's not already preserved from the Court's grant of summary judgment, and then also JMOL 50(a) that the DIMA prototypes were confidential as a matter of law.

THE COURT:  All right.  Let me ask Defendants what matters, if any, they seek relief on pursuant to Rule 50(a).

1136

MR. LYNCH:  Yes, Your Honor.  Brice Lynch for Defendant Samsung.

May I proceed?

THE COURT:  Yes, please.

MR. LYNCH:  So under Rule 50(a), Samsung moves for non-infringement based on the following categories:

First is an overall failure of burden of proof for all patents.

Second for all patents is non-infringement based on the lack of evidence for the channel estimation and parameter estimation and amplitude estimation issues that have been raised.

Then there is for the '703 Patent non-infringement due to the source of data as used in the multiple user term.

Then for the '651 Patent it is non-infringement based on the datastream -- digital data part of the datastream term.

And for the '505 and '492 Patents, it is non-infringement.  It's a separate issue for each one, but both involve the means-plus-function limitations not being shown.

Then Samsung also moves for summary judgment of invalidity of the '703 and '651 Patents based on 35 U.S.C. § 112, and invalidity of the '492 and '505 Patents based on prior art obviousness.

And then on issues of more damages, Samsung moves under Rule 50(a) for summary judgment of failure to apportion,

summary judgment--sorry--under Rule 50(a) for failure to use the hypothetical negotiation date appropriately, then an indirect infringement motion, no pre-suit damages based on marking, both for actual notice and as well as the practicing of the patents by licensees BAE, Nokia, and Ericsson, and then lastly, a Rule 50(a) motion of no willfulness.

THE COURT:  All right.  Thank you.

Well, it's clear we have overlapping motions with regard to the general topic of invalidity, but let's start with the non-infringement motions from Defendant as to the various theories leading to a potential finding of non-infringement as recited by Defendant.

Let me hear Defendants' argument on those matters first, followed by Plaintiff.

MR. LYNCH:  Thank you, Your Honor.  Brice Lynch again for Defendant Samsung.

Before I start, the non-infringement arguments are just going to be divided up between myself and my colleague Mr. Huynh.

THE COURT:  I'm happy for you-all to split the arguments however works for you.

MR. LYNCH:  So I'm going to --

THE COURT:  Just as long as they're succinct and get to the point.

MR. LYNCH:  Yes, Your Honor.

1138

So to start with, Samsung moves under Rule 50(a) for judgment as a matter of law that Samsung does not infringe any of the asserted -- any asserted claim of any asserted patent based on an overall failure of proof.

For each asserted claim, Dr. Kowalski's analysis consisted of conclusory testimony that merely recited the claim limitations without sufficient analysis or specific citations to evidence in the record.

Samsung moves on all evidence adduced at trial, but will cite a few examples:  For the '651 Patent, the trial transcript page 450, line 16, through page 458, line 20; for the '505 Patent, page 458, line 21 to page 465, line 7; for the '703 Patent, page 465, line 10 through line 15, and page 473, line 23 through page 479, line 17; and for the '492 Patent, page 479, line 18, through page 484, line 3.

Going through those examples just provided, the evidence is clear in many if not all instances that Dr. Kowalski merely says that the claim limitation is met without adequate cites in the record.  And as the Federal Circuit has held in a few cases, most notably the *Dominion Energy* case at 725 F.Appx 980, at pin cite 986, "Just saying that something is so does not make it true, especially when there was no record support."  And then the other Federal Circuit case is *Kim v. Conagra Foods*, and that's at 465 F.3d 1312 at pin cite 1320, and again the same citation.

THE COURT: All right.

MR. LYNCH: And for the sake of not bouncing around, Your Honor, I'm going to move to the '703 specific argument.

THE COURT: Go ahead.

MR. LYNCH: Samsung moves for judgment as a matter of law under Rule 50(a) that Samsung does not infringe any asserted claim of the '703 Patent.

For the '703 Patent, the Court construed the term 'multiple users' as 'multiple sources of digital datastreams for transmission'. However, Collision has failed to show the presence of multiple sources in the accused MIMO functionality, and there's no legally sufficient evidentiary basis from which a reasonable jury could find that Samsung infringes.

Defendants again move based on all evidence adduced at trial, but Defendants will cite a few examples for the Court. Most notably, Dr. Kowalski clearly testified that there is only one source, not multiple, from what Dr. Kowalski referred to as the "core network." And again quoting Dr. Kowalski, "The source of the data may be one or more datastreams that are transmitted from some source that, as far as what we're talking about here, comes from the core network to the base station, which -- when the base station, again, we're talking abstractly here." And that was at trial transcript page 639, line 16, through page 640, line 11.

And then later on in the exchange, or actually earlier in the exchange, Dr. Kowalski also testified that MIMO layers are merely, "a spatial dimension."  And that is at trial transcript page 637, line 16 through 22.

And in conclusion, Dr. Kowalski, therefore, has admitted that there's only one source, which is the core network, and that layers are not a source; they are just a spatial dimension used for data transmission.

THE COURT:  All right.

MR. LYNCH:  Moving to the '651 Patent-specific argument, Samsung moves for summary judgment as a matter of law under Rule 50(a) that Samsung does not infringe any asserted claim of the '651 Patent.  Again, the '651 Patent had the term 'multiple users' construed in the same way it was for the '703 Patent.

For this patent Collision has failed to show that the accused CRS signals are digital datastreams in the accused CRS interference cancellation functionality, and, thus, there is no legally sufficient evidentiary basis from which a reasonable jury could find that Samsung infringes.

Defendants move based on all the evidence adduced, but will provide examples for the Court here.  So there was testimony at trial that a CRS signal is a reference signal. That was at page 557, lines 21 through 23.  And further, there was testimony that the job of the channel estimator is to

1141

account for the effects of the channel on the CRS so that you can apply that knowledge to get the information that is transmitted with the reference signal, i.e., the data.  In other words, the channel estimator is not acting on the data itself.  And that testimony is at trial transcript 558:23 through 559, line 4.

And putting that together, Dr. Kowalski, according to him, the CRS signal is analogous to the golfer's tossing grass up into the air and to check the wind speed and other environmental characteristics.  In that example, then, the golf ball represents the actual transmitted data in that environment, and so what he points to as the multiple users is the grass floating in the air which contains no data--the golf ball--and so has, thus, under his own analogy shown that he has failed to provide sufficient evidence for infringement.

And lastly, by estimating the channel you recover what was actually transmitted, which represents the bits that are trying to be communicated.  And that was at trial transcript 203, line 14 through 24.

And again, these bits are the digital datastream for transmission, which are not what Mr. Kowalski has opined meets the multiple user limitation.

With that, Mr. Huynh is going to handle the next three.

MR. HUYNH:  Good morning, Your Honor.  Brady Huynh for Samsung.

May I proceed?

THE COURT:  You may proceed.

MR. HUYNH:  So first Samsung moves for judgment as a matter of law under 50(a) that Samsung does not infringe any asserted claim of the '505 Patent.  For the '505 Patent, the Court construed 'means coupled to said channel transfer function, determining signal processor for providing uninterrupted estimates of the channel transfer function parameters on a real time basis' as governed by § 112 of the United States Code 35, ¶ 6.  Specifically, the Court construed the function and structure as follows:  "The claimed function is providing uninterrupted estimates of the channel transfer function parameters on a realtime basis by first deriving the estimated channel transfer function for each of said interfering signals."

The corresponding structure is a parameter tracking unit and equivalence thereof, as discussed at figure 1; page 5, line 20 through 40; page 6, line 9 through 23; figure 3; figure 4 item 90, 90 prime, 90 double prime; page 7, line 45 through page 8 line 40.

Dr. Kowalski's analysis of this claim term was cursory at best.  For example, as shown in page 460, line 5, through 465, line 5 of the trial transcript, there is no legally sufficient evidentiary basis from which a reasonable jury could find that Samsung infringes the function and structure required by the

Court's claim construction.

More critically, Dr. Kowalski failed to address the required function at all.  The law is well-settled that literal infringement of a § 112, ¶ 6 limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification.  Functional identity and either structural identity or equivalence are both necessary.  And this is from the Federal Circuit case *Odetics Inc. vs. Storage Technology Corporation*, and the reporter information is 185 F.3d 1259.

So here the Court construed the function as providing uninterrupted estimates of the channel transfer function parameters on a realtime basis by first deriving the estimated channel transfer function for each of said interfering signals.  And this claim function was not covered in Dr. Kowalski's infringement analysis for the means-plus-function claim limitation at all.  And this in his analysis can be found at page 460, line 5, through 465, line 5.  None of the words are present, nor is the concept covered at all.  And accordingly, Dr. Kowalski failed to meet his burden to show means-plus-function infringement as a matter of law.

And moving on to non-infringement of the '492 Patent, Samsung moves for summary judgment -- for judgement as a matter of law under Rule 50 for similar reasoning as the '505

Patent.

For the '492 Patent, the Court construed 'multiuser detection decision unit using decision criteria to determine a selected multiuser detector' as governed by § 112, ¶ 6.  The Court construed the function and structure as follows.

THE COURT:  Low down a little bit, please.

MR. HUYNH:  Yes, Your Honor.

The claimed function is using decision criteria to determine a selected multiuser detector and the corresponding structure is MUD decision unit 220 or decision logic unit 520 configured to perform one or more of the algorithms described at page 8, line 12 through 18; page 13, line 35 through page 14, line 40; page 15, line 3 through 21; page 19, line 43 to 48; page 19, line 56 through 62; and page 20, line 41 through 49, and equivalent thereof.

THE COURT:  Counsel, I really don't want to interfere with your presentation, and I understand you're reciting all these lines and pages from the trial transcript for purposes of clarity on review, but for purposes of meeting your 50(a) threshold, it seems to me that you don't have to recite every line and every page that you think supports your position.  Give me your argument, and I'm not going to tell you how to practice appellate law, but I think if your arguments are succinct and on point, then without citing every line and page that might support it you still have preserved

1145

it for 50(b) purposes and ultimately for appeal.

If you feel compelled to recite every line and every page, I'm not going to stop you, but obviously I'm not here looking at those cites as you rattle them off, so for purposes of me deciding whether with your motion under 50(a) has merit or not, all that supporting information in granular detail is really not helping me at all.  If you think you need to do it for preservation purposes, I won't stop you.  That's not what my reading of the rule would require, but I'm not the person that will pass on whether or not you properly preserved something, so I'll just say that and let you continue.

MR. HUYNH:  Understood, Your Honor.

I'll cut to the chase here, which is that the claim function wasn't covered in Dr. Kowalski's infringement analysis for the means-plus-function claim limitation at all. He does not even mention the phrase 'decision criteria', and does not even provide a cursory analysis of his concept.

And I can move onto the next argument.

So Samsung also moves for judgment as a matter of law under Rule 50(a) that Samsung does not infringe any asserted claim of the '651, '505, '703, and '492 Patents.

Here Collision failed to show that each limitation of the asserted claims are met because for multiple limitations in the same claim, it maps to the same channel estimator and the channel estimate in the accused products.

For limitations that require a plurality, Collision maps only to the one CRS signal and channel estimate.  Additionally amplitude estimates and parameter estimates are not channel estimates, and amplitude estimators and parameter estimators are not channel estimators.  There is no legally sufficient evidentiary basis from which a reasonable jury could find that Samsung infringes.

Samsung moves, based on all the evidence adduced at trial, for example, Dr. Kowalski and Dr. Mahon both agree that the channel estimator cancels out all the interference signals and outputs the one CRS for the serving cell and channel estimate.  And the testimony that supports this can be found at page 560, line 2 through 10, page 559, line 18 through 22; line -- page 898, line 18, through 899, line 6; and page 929, line 15 through 25.

Dr. Mahon also explained that channel estimation is very different from parameter estimation and amplitude estimation.  Thus, when Dr. Kowalski maps the primary estimation unit -- or parameter estimation and amplitude estimation limitations to the channel estimation functionality in the accused products, there's a failure of proof because the channel estimation functionality simply does not perform the claim limitations.

Accordingly, Collision has failed to adduce evidence to show these have been met.

THE COURT:  What else?

MR. HUYNH:  I think that's all for non-infringement, Your Honor.

THE COURT:  Let me hear a response from Plaintiff.

MR. SUMMERS:  Thank you, Your Honor.

May I proceed?

THE COURT:  Please do.

MR. SUMMERS:  Your Honor, the jury heard extensive testimony from Dr. Kowalski spanning more than 60 pages of trial transcript just on direct mapping each and every limitation to the claims of the asserted claims of the '703, '651, '505, and '492 Patents.  His analysis relied on evidence, including source code from Samsung, MediaTek, and Qualcomm, and documentary evidence that Samsung represented as representative in JX 54 as -- it's a general point the non-infringement arguments on which Samsung has moved under Rule 50(a) are misinterpretations of the claim scope, which are either inconsistent with the Court's constructions or incorrect as a matter of claim interpretation and were also addressed by Dr. Kowalski in his extensive and thorough testimony.  Dr. Kowalski's testimony as to each of the issues addressed is more than sufficient evidence for the jury to return a verdict of non-infringement.

On the specific issues addressed, Samsung raised a non-infringement position about CRSes not being digital datastreams, but Dr. Kowalski testified--and this is for the

'651 Patent--testified that CRSes contain data to identify the transmitting cell.

As to the '505 Patent and the argument that Dr. Kowalski failed to cite evidence for means-plus-function, he walked through the required portions of the Court's claim construction by reference to figure 3, and this is pages 460 to 465, and also explained the structures used to practice the function. On the means-plus-function as to the '492, Dr. Kowalski specifically referred to the criteria used for decisions at page 482.

And going back to the -- and as to the -- this issue of users in the '703 Patent, which the Court's very familiar with, Dr. Kowalski fully explained how his analysis met the Court's construction in his direct testimony, and his direct testimony on that issue is sufficient for the jury to return a verdict of infringement on that issue.

THE COURT:  All right.  Anything else with regard to responding to Defendants' non-infringement motions?

MR. SUMMERS:  No, Your Honor.

THE COURT:  All right.  Let's move on to the competing motions regarding the issue of validity or invalidity.

Plaintiff has moved for findings of no invalidity; Defendant has moved for findings affirmatively of invalidity as to the four patents-in-suit.

Defendants have the burden here, so let me hear from Defendants on their invalidity motions at this time.

MR. LYNCH:  Thank you, Your Honor.  Brice Lynch again for Samsung.

THE COURT:  Go ahead.

MR. LYNCH:  I will start with the '505 and '492 Patents.  Samsung moves for judgment as a matter of law under Rule 50(a) that the asserted claims of the '505 and '492 Patents are invalid as obvious.  Samsung has met its burden for both of these patents on this issue and is entitled to judgment as a matter of law.

We -- Samsung moves on all evidence adduced at trial, but a few examples will be discussed here.  Specifically, the asserted claim of the '505 Patent is obvious in view of JX 48, which was referred to in court as Hottinen, and JX 47, which has been referred to as Lilleberg.  And the trial transcript of most importance is page 960, line 22, through page 967, line 6.  In there Samsung's expert Dr. Mahon presented what became unrebutted testimony on this issue as Collision did not call any witness in its rebuttal, and so having no rebuttal to Dr. Mahon's opinion on invalidity for the '505 claim, Samsung's entitled to judgment there.

And then moving to the '492 Patent, which the argument there was that it is obvious in view of JX 45, which was referred to as Texas Instruments, and JX 44, which has been

referred to as Egnor, and the cite there is page 967, line 12 through 972, line 20. And again, just like the previous ground, Samsung's expert presented what became unrebutted testimony on the issue. And so the only evidence in front of the jury in the -- our expert that was presented at trial is that the patents and these claims are invalid. And so Samsung has met its burden on the obvious/invalidity ground for both of these patents and is entitled to a judgment as a matter of law.

With regard to the '703 and '651 Patents, I'll be as brief as possible here, Your Honor, but Samsung moves for judgment as a matter of law under Rule 50 that the asserted claims of those two patents are invalid for lack of written description and enablement under 35 U.S.C. § 112. Again, Samsung has met its burden on both of these issues.

While understanding the Court's ruling from the bench yesterday, Samsung's expert still presented sufficient unrebutted testimony on both issues such that there is enough evidence for the jury to not only find invalidity but, again, that was unrebutted testimony. As just two short examples. So it's clear on the record, even though we move on all evidence adduced, Samsung wants to note that trial transcript page 951, line 22, through page 954:12, and then page 960, line 12 through 19. And Samsung has met its burden on both issues.

THE COURT:  All right.  Thank you.

Let me hear a response from Plaintiff and opposition to Defendants' affirmative motion, and, of course, Plaintiff's affirmative arguments on its motions; all the arguments.

Go ahead.

MR. SUMMERS:  Thank you, Your Honor.

Plaintiff moves under Rule 50(a) for no invalidity of the '651 and '703 Patents because the only theory presented on those two patents was written description and enablement, and there was clearly insufficient evidence from which a reasonable juror could find that Samsung's clear and convince evidence burden was met.

As to enablement, Dr. Mahon provided no testimony.  The only question and answer as to enablement reads as follows: "And what is enablement?  What does that mean in addition to written description?"  And he explains what enablement is.  Beyond that, there was no testimony, no opinion, no explanation whatsoever about how under the claims asserted that a person of ordinary skill would find that these claims are not enabled.

As to written description, the evidence is hardly any more fulsome.  The only affirmative opinion that was given was stricken from the record on a sustained objection, and that's on page 958.

And then on page 960, Dr. Mahon said -- I'll just go

1152

through the question and answer because I think it's important to see what was actually said.

"Dr. Mahon, if we think about the claim language and we think about what's being described in the patent specification, what's your view on whether one of ordinary skill in the art would have found that there's sufficient written description to enable the full scope of the claims as written without considering the accusations in this case?"

And he just states, "Well, my opinion is that they lack written description."

But Mr. Pak then asked, "For the reasons that we just described?

"That we just went through, yes."

And he hadn't described any reasons other than the reasons that the Court struck from the record, which was the improper comparison between the accused product and the specification as opposed to the claims and the written description in the specification.

So there's a clear and convincing evidence burden here. There is one line of at best wholly conclusory testimony on written description, zero lines on enablement, and we think this is clearly the rare circumstance in which a Rule 50(a) is plainly appropriate.

And I'll -- would you like me to stop there or move on to the obvious issues on the '505 and '492?

THE COURT: Go ahead and move on, if you will.

MR. SUMMERS: On the '505 and '492 Patents, Collision moves for judgment as a matter of law of no invalidity as well. The only theory presented for each of these patents was obviousness. The references were Hottinen and Lilleberg for '505 and Ogosunasi and Egnor for the '492.

Again, at trial Dr. Mahon expressly indicated that his invalidity theories were not based on his own understanding of the claims but, instead, based on Dr. Kowalski's claim scope. And as provided in the *TiVo vs. EchoStar* case, that is an insufficient opinion to sustain a clear and convincing evidence of invalidity. An expert cannot present an obviousness opinion based on claim scope with which he affirmatively disagrees, and Dr. Mahon disagreed with Dr. Kowalski's claim scope on that issue.

There's -- Dr. Mahon also did not address any secondary considerations even though he was aware of secondary considerations in the record, and there are facts at trial from which a jury could find evidence of secondary considerations, including the extensive evidence of Samsung's in-house development of Collision's technology. But Dr. Mahon did not opine about secondary considerations at all, even though the law is that secondary considerations must be considered in every case in which they exist.

Beyond that, Dr. Mahon's testimony on obviousness was

conclusory as to any motivation to combine the asserted references.  I believe at most he said these are in the same technological field, and that is insufficient evidence to sustain a clear and convincing burden.  And the Federal Circuit demands more than an explanation that a skilled artisan could have combined the references.  He must show they would have combined the references, and conclusory testimony about the references being in the same technological field is insufficient to sustain that burden.  And Collision moves on 50(a) on that basis as well.

THE COURT:  All right.  Thank you.

Let's go on to the issue of damages as raised by the Defendants, particularly their argument regarding the failure or lack of apportionment.

Let me hear from the moving Defendants on that, please.

MR. REED:  Good morning, Your Honor.  Joe Reed for Samsung.

THE COURT:  Please proceed.

MR. REED:  Thank you, Your Honor.

Samsung respectfully moves under Rule 50(a) that Collision is not entitled to damages because it's failed to prove up apportionment.

Collision's damages case is based on the simulation that we've all heard a lot about this week that purported to show a 15 percent increase in download speeds from Collision's

technology.  Dr. Kowalski told Mr. Franklyn about that supposed increase, Mr. Franklyn did a survey claiming to measure what people are willing to pay for that increase, and Mr. Bergman used that willingness to pay as the basis for his damages analysis.  That could only be permissible as apportionment if the simulation reflected the benefits of the patented technology and nothing else.  And there is just no evidence in the record that that's the case, and, in fact, the evidence has shown that it's not.

I'll start with the '703 and the '651 Patents. Dr. Kowalski testified that in his opinion the simulation does not practice the '703 and the '651 Patents.  And that's at trial transcript 501:4 through 5 and 767:15 through 19.  So if the simulation doesn't practice the patents, then, as a matter of logic, there must be some difference, some delta between what the simulation does and what the patents do.

As a matter of law, that difference can't just be the fact that it's a simulation, and that's because, as the Federal Circuit has held, a simulation that meets every claim element, every claim limitation, practices even though it's a simulation.  And that's from *Carnegie Mellon versus Marvell*, 807 F.3d 1283 at 1297.

And so if the simulation doesn't practice, then there must be some difference between the simulation and the patent. And, in fact, Dr. Kowalski admitted that there are things in

the simulation that are not part of Collision's patented technology that's at issue in this case; specifically, turbo MUD and decoding. And that's at transcript 620:6 through 13.

And the Court and the jury heard no evidence that Dr. Kowalski or Mr. Franklyn or Mr. Bergman, or anybody, did anything to separate out, to apportion out the value of the things in the simulation that are not part of Collision's patented technology.

Now, as for the '492 and the '505 Patents, I think the analysis is in some ways even more straightforward. The simulation does not affect the practice of the '505 and '492 Patents. Dr. Kowalski testified to that clearly and admitted that he never quantified the technical benefits of the '505 and the '492 Patents. And that's at trial transcript 619:22 through 620:5. And so there is no basis for any apportionment to the value of the '505 and '492 Patents, even accepting Dr. Kowalski's testimony about the simulation in general.

And lastly and relatedly, the simulation could only be a basis for apportionment if it reflected the incremental benefit of the asserted patents over the next best commercially acceptable alternative. That was Mr. Bergman's suitcase analogy about a suitcase with four wheels versus two versus none. And so for it to be acceptable apportionment, the baseline for the simulation would have needed to be a current as of 2013 LTE base station.

1157

But Mr. Farkas testified that single user MIMO with multiple antennas per single user device and successive interference calculation were known in the industry, part of what would have been a current LTE base station in 2013, but were not modeled as part of a simulation.  And that's transcript 301:15 through 23.

So given that the simulation is the entire basis for Collision's damages case and its efforts to apportion and that it does not provide a basis for a reasonable jury to do that, Samsung moves for judgment under Rule 50(a) that Collision is not entitled to damages because it can't prove up apportionment.

THE COURT:  All right.  Thank you, Mr. Reed.

MR. REED:  Thank you, Your Honor.

THE COURT:  Let me hear Plaintiff's response, please.

MR. SUMMERS:  Thank you, Your Honor.

THE COURT:  Go ahead, Mr. Summers.

MR. SUMMERS:  Collision opposes Samsung's Rule 50(a) motion.  Dr. Kowalski explained in detail his analysis of the simulations and how they reflect technical benefits attributable to the patents-in-suit.  The analysis for what is relevant for a damages data point does not require the practice of the patents, and Dr. Kowalski was very clear that the simulations contained the techniques that are patented in

a simulated form.  And while it is true that simulations can practice claims, it depends on the language of the claims.

And as Your Honor may recall from the pretrial conference, it's the specific claims that indicate why there are technical benefits that are simulated, but that the claims themselves require real-world implementation.  And that's why Dr. Kowalski's testimony is a relevant and reliable data point as to the technological benefits of the '703 and '651 Patents that Mr. Bergman reliably uses to begin his analysis, which then extensively uses that analysis alongside the parties' negotiation history to apportion down to just the value of the four patents-in-suit.

To address the point about Dr. Kowalski not opining about the technical benefits of the '492 and the '505 Patent, Mr. Bergman did that, and the way Mr. Bergman did that is he relied on Dr. Kowalski's analysis about Collision's total patent portfolio.  And he used Dr. Kowalski's analysis, which Dr. Kowalski testified to at trial about what other unasserted patents may have been in the simulation and which ones were not, and then Mr. Bergman uses that analysis to derive relative value between the patents in Collision's portfolio, and that is the way that Mr. Bergman ultimately is able to quantify the '492 and the '505 Patents.  It's by reference to the 2 percent negotiation history and then removing the value of the simulation patents.  And so the benefits of the '492

and the '505 are quantified, but they are quantified from Dr. Kowalski's analysis in a different manner.

Most of the grounds on which Samsung moves on 50(a) are evidentiary issues, reliability issues. The Court denied *Daubert* motions related to that, and Mr. Bergman and Dr. Kowalski adequately apportioned using the simulations.

I -- the -- I'll leave it at that, Your Honor.

THE COURT: All right. Thank you.

Let's move on next to the issue of pre-suit damages.

I'll hear Defendants' motion under § 287 regarding marking.

When Plaintiff responds, I'd like to hear their arguments regarding these DIMA prototypes as part of that as well so that we can cover all issues related to the issue of marking.

Let me hear from Defendants on their affirmative motion.

MS. MAROULIS: Good morning, Your Honor. Victoria Maroulis for Samsung.

May I proceed?

THE COURT: Yes, you may, counsel.

MS. MAROULIS: Samsung moves for judgment as a matter of law under Rule 50(a) that Collision is not entitled to pre-suit damages, both because there's no actual notice and also because there's no constructive notice in the form of marking.

With respect to the actual notice, the Court heard

extensive evidence from Mr. Stan Fry, Mr. Jared Fry, and Mr. Joe Farkas that none of them have given a specific notice of infringement to Samsung of specific products or specific patents.  There's no question that under the governing federal law of *Amsted versus Buckeye Steel Casting* there was no actual notice in this case.  The only item that Collision pointed to was the JX 22 slide deck from 2011 that listed some patents.

There are two of the asserted patents, '505 and '703, on that list.  The other two asserted patents do not even appear on the list.  But more importantly, it is not sufficient to just simply list patents; you have to for the purposes of pre-suit damages inform the other side, inform the accused infringer that they are potentially infringing and that -- they are infringing, and provide both the patents and the products at issue.  I will not give specific transcript cites, but all three fact witnesses appearing live and by deposition admitted they did not.

Because Collision cannot satisfy the actual notice, we'll move onto the constructive notice or marking.

Here we're starting out with the burden shifting, because as part of the summary judgment the Court found that the burden shifted to Collision.  At trial Collision did not satisfy this burden.  It has been established beyond a dispute that Collision had three licensees--BAE, Nokia, and Ericsson. It also has been established that none of those licensees

1161

marked the products.  So the only issue in dispute coming into trial was whether these licensee products practiced the asserted patents, and Collision bore the burden on that which they did not meet.

With respect to '492 Patent, the Court will remember that Dr. Kowalski did not have an opinion, and admitted so at trial, and no other evidence by any other witness came in as to the marking of the '492 Patent.

With respect to the other three patents, '703, '651, and '505, Dr. Kowalski did present very conclusory testimony, he did not go into the specifics of the products that Samsung identified, and he did not consider confidential documents produced by BAE or Nokia, and there's not sufficient evidence for Collision to meet its burden with respect to those three patents as well.

There was -- besides Dr. Kowalski, there was some fact testimony of BAE witnesses, but that does not support or -- does not support Collision's position and did not provide any detailed analysis of his practicing products.

Your Honor, the record is complete as to both Nokia and Ericsson as well that the products were under the license, they were not marked, and Dr. Kowalski did not go through the detailed analysis that is required under Collision's burden to show that these products did not practice.

Would Your Honor like me to address the two points that

1162

Plaintiff raised with respect to marking?

THE COURT:  I'd like to hear your complete argument.

MS. MAROULIS:  Thank you, Your Honor.

That is the summary of arguments, and I can provide cites, but I understand the Court's guidance that the Court does not need specific transcript cites at this time.

THE COURT:  All right.

MS. MAROULIS:  Thank you, Your Honor.

THE COURT:  Let me hear a response from the Plaintiff.

MR. SUMMERS:  Thank you, Your Honor.

On the two specific issues that Plaintiff moves under Rule 50(a), first, that Samsung failed to meet its *Arctic Cat* burden in its notice that it did not identify specific products or specific patents, I understand the Court granted summary judgment, but we are moving under Rule 50(a) in an abundance of caution to preserve that for appeal.

On the second issue on which we are moving on 50(a), one product that had been identified is the DIMA prototype from BAE, and Mr. Farkas provided unrebutted testimony that the DIMA prototype was confidential and -- confidential.  Even if a product practices the patent if it is not available publicly, that is not a product that gives rise to a marking obligation.  And that is in the *Staton Techiya* case the Court wrote, "The Court is unconvinced that the marking requirements

of § 287 attach to non-public prototypes that are neither sold nor intended for sale."

And as to the responsive issues, I'll start with the issue of constructive notice.

As to the -- or as to the marking obligation and whether it attached to any patent practicing product, Dr. Kowalski gave detailed opinions about non-use of the identified products of the '505, '703, and '651 Patents. The jury is entitled to credit that evidence under a preponderance burden and the lack of any real contrary evidence.

The jury also heard evidence from BAE witnesses, including Mr. Mindler who was BAE's designated corporate representative, who testified unequivocally at page 685 that he was familiar with multiuser detection and that he confirmed that he wasn't aware of any BAE product that used those techniques.

Mr. Jared Fry also testified that Ericsson and Nokia were not accused of infringing any, but the '492 Patent -- and as to the '492 Patent, Mr. Fry testified that Ericsson wasn't selling the products accused by the '492 Patent in the U.S. at any point after Ericsson took a license, and that Nokia base stations were only 3G, not 4G and 5G, and those base stations were not sold after Nokia took a license.

As to the issue of actual notice, there was significant evidence that Collision made affirmative representations to

Samsung identifying the patents-in-suit.  That is beyond just the one document with the list because there is additional documentary evidence that Collision provided all 50 patents, that Samsung reviewed those, there's -- I believe it's JX 6 where Samsung says that the 50 patents were provided, and that's certainly sufficient evidence from a jury, in the context of everything else they've heard at trial, that all 50 patents were provided to Samsung and identified.

The jury's heard significant evidence about Samsung's -- about the amount of information that Collision shared with Samsung about its technology.  Mr. Farkas specifically testified that he showed Samsung his patent portfolio, he explained to them what the patents covered, and he told them the type of products that the patents covered.  He said, We told them about multiuser detection, of course, how it relates to MIMO, and then also we talked to them about the parameter estimation, which is that channel estimation component.

And then the jury's also seen significant evidence on Samsung's side of things that Samsung was aware of the infringement risk based on those communications from Collision, including seeking to license with Collision, which we see in the negotiation histories and also -- and the contractual provisions we've seen that Samsung was seeking to have Collision contract away its right to sue for patent infringement, which is evidence on which the jury can rely

that Collision's communications put Samsung on notice that Collision -- of what Collision believed would infringe its patents, as well as the documentary evidence the jury saw about Samsung contemplating whether Collision would sue it, as well as the risk of its own in-house development.

THE COURT: All right. Thank you, Mr. Summers.

Let's go next to the motion under Rule 50(a) raised by Defendants concerning the issue of willfulness.

Let me hear from Defendant on this.

MR. REED: Joe Reed for Samsung, Your Honor.

THE COURT: Please proceed, Mr. Reed.

MR. REED: Thank you, Your Honor.

Willfulness requires proof of knowledge of an issued patent and the Defendant engaged in conduct that is willful, wanton, and a list of adjectives that the Supreme Court provided in *Halo*, meaning that knowledge of the asserted patent and evidence of infringement is necessary but not sufficient to find willfulness.

So on the knowledge point, I think this argument largely tracks what Ms. Maroulis discussed in the actual notice portion of the pre-suit damages motion. I won't go through the transcript cites, but so the record is clear, Collision's witnesses, Mr. Farkas, Jared Fry, and Stan Fry all gave very clear admissions that they never provided notice to Samsung of any alleged infringement, so the first component of the

willfulness prong is lacking here.

And for the same reasons that Ms. Maroulis identified, the slides that Collision provided in 2011 don't solve that problem because, one, they don't include any reference to alleged infringement or any suggestion that anything Samsung was doing or might do would infringe; and two, even if that document could count as notice or create knowledge for the patents it lists, it does not list the '492 or the '651 Patents.

And on the second component, the deliberate or intentional willful, wanton, malicious, and so on, conduct that *Halo* requires, there's no evidence of that either. Collision's willfulness story, broadly speaking, is that during and after these negotiations that the parties had between 2011 and '14, Samsung effectively snuck behind Collision's back to develop similar technology. The evidence was very clear that Samsung told Collision that it would try to develop its own similar software. And that's PX 9.9 at section 3.3, which was a draft agreement between Collision and Samsung in which Collision wrote that it acknowledges and agrees that Samsung is engaging in and will be engaging in the development of the same and/or similar software function and/or purpose with those of Collision's.

And so in addition to the lack of pre-suit knowledge of the patents and alleged infringement, the evidence has shown

that there was no deliberate or intentional conduct that would

meet the *Halo* standard.

THE COURT:  All right.  Thank you, Mr. Reed.

Let me hear from Plaintiff in response.

MR. SUMMERS:  Thank you, Your Honor.

The Court has sat through the trial and is aware of the

significant evidence that a reasonable juror could rely on to

return a verdict of willfulness.  The jury has seen evidence

that Samsung was notified of the patents, it has seen evidence

that Samsung reviewed the patents, it has seen evidence from

Samsung that after reviewing Collision's technology Samsung

began to develop the technology in-house, it began to seek to

hire research institutes to try to reach Collision, Inc.'s

level, and many, many other documents and testimony that's

been presented throughout the case.

And as to willfulness, that depends on Samsung's intent

and Samsung's conduct, and Samsung knew about the patents and

the jury's heard significant evidence that Samsung's conduct

in light of that knowledge was deliberate and intentional, or

at least subjectively reckless, which is all that is needed to

return a verdict of willfulness.

THE COURT:  Thank you.

Counsel, have either party not been heard on any matter

they care to raise under Rule 50(a)?

MR. REED:  Yes, Your Honor.  Samsung has two

additional damage-related motions, one regarding the hypothetical negotiation date and one regarding indirect infringement.

THE COURT:  All right.  Let me hear from you on those at this time.

MR. REED:  Thank you, Your Honor.

Samsung respectfully moves under Rule 50(a) that Collision has failed to prove up entitlement to damages because of its damages expert's use of the wrong hypothetical negotiation date.  And the issue here is that it's undisputed, based on the evidence that came in at trial, that the accused functionality was already in Samsung's products as of Collision's and Mr. Bergman's hypothetical negotiation date.

Mr. Bergman opines that the hypothetical negotiation would have taken place in April of 2015 because that's when Dr. Kowalski said was the date of first infringement.  But Mr. Kang from Samsung provided undisputed testimony that the accused MIMO and IRC technologies work the same now as they did all the way back to the first LTE-A compliant phone, which was the S4 that was first sold in the U.S. in April of 2013.  And that first sale date is also undisputed in the record.

So there is undisputed testimony that the infringing functionality was in Samsung's products going back to April of 2013.  No one from Collision has said that that's not true.  And Dr. Kowalski can't say that that's not true because he

didn't look at code or technical documents for any products with dates of first sale before December of 2017. So again, undisputed record evidence that the infringing functionality was in Samsung's products and worked the same way going back to April 2013, which is two years before Dr. Kowalski's and Mr. Bergman's hypothetical negotiation date.

Now, as for how Collision derived that hypothetical negotiation date, Dr. Kowalski relied on a representation that we made that phones with Samsung chips function the same for purposes of infringement. And that's true, they do, and because the S6 was the first relevant product with a Samsung chip and came out in April of 2015, that's the date that Dr. Kowalski picked for the date of first infringement. But Samsung never represented anything one way or the other about products with other chipsets. And the S4 which came out in 2013 and the S5 which came out in 2014 had Qualcomm chips, and those function the same for purposes of infringement, too. We know that because Mr. Kang said so, as I mentioned. And we also know that because Dr. Kowalski said so.

THE COURT: Let me ask you just a real simple question here, Mr. Reed.

MR. REED: Sure.

THE COURT: How does this argument that you're making now that there was no dispute that the accused functionality were in your client's products back to 2013, how

1170

does that square with your first argument this morning that you don't infringe because you don't practice the asserted claims in any way?  I mean, the functionality's either in your products or it's not in your products.

MR. REED:  Right, Your Honor, and our position is the functionality doesn't infringe.  For the purposes of this motion, the point is that if the functionality does infringe, it's been in the products in the same way since before the hypothetical negotiation date.

THE COURT:  All right.  Go ahead with your argument.

MR. REED:  Thank you, Your Honor.

Now, Mr. Bergman -- sorry.  So for Mr. Bergman's opinion to make sense in this case, that April 2015 date really has to be right.  This is not a case where Mr. Bergman can say, Well, fine, maybe that's not exactly the right date, but nothing would have changed in the hypothetical negotiation if it had been two years before; the way he set up his opinion in this case, that date is critical because his view is that the parties had their real-world negotiations, Collision presented the simulation to Samsung, Samsung went out and developed the technology, and then there's the hypothetical negotiation.  If that hadn't happened, if Samsung had not seen the simulation at the time of the hypothetical negotiation, those things could not have been taken into account and Mr. Bergman has offered no opinion as to how they could have.

And, of course, even more fundamentally, if the allegedly infringing technology was already in Samsung's phones at the time of the hypothetical negotiation, the whole framework falls apart because the parties couldn't have been negotiating over technology that Samsung already had.

And so we would ask for a judgment under Rule 50(a) on that as well, Your Honor.

THE COURT:  Let me hear from the Plaintiff in response.

MR. SUMMERS:  Thank you, Your Honor.

On the specific issue of the legal appropriateness of the hypothetical negotiation date, the Federal Circuit law is pretty clear that the hypothetical negotiation date is based on the products accused of infringement in the case.  The only -- the first product accused by Collision of infringement in the case is April 2015.

As to the issue of whether the products have changed or not and the unrebutted testimony of Mr. Kang, I think the Court may recall his testimony and the cross examination of Mr. Kang.  And I think in view of that testimony, a reasonable jury could clearly reject Mr. Kang's testimony, in part because he was impeached with a document showing that the functionality had changed, and also because he admitted that he was not an algorithm person so he would not know whether the products had changed or not.

1172

THE COURT:  All right.  Thank you.

Is there anything else regarding relief under Rule 50(a) that either party has not been heard on?

MR. REED:  One more, Your Honor.  Joe Reed for Samsung.

THE COURT:  Do you have anything beyond this, Mr. Reed?

MR. REED:  This will be the last one, Your Honor.

THE COURT:  All right.  What is it?

MR. REED:  Samsung moves under Rule 50(a) for judgment as a matter of law that Collision has not -- that Collision cannot show indirect infringement of the asserted patents.

This argument, again, largely is co-extensive with what we talked about in terms of lack of knowledge before the suit, lack of knowledge of the patent and the alleged infringement in the pre-suit damages and willfulness motions.  I won't belabor the evidence on that further except to again say that Collision witnesses all admitted they never provided notice of any alleged infringement before the suit.

And just so the record is clear for purposes of this motion, induced infringement requires knowledge that the induced acts constitute patent infringement.  That's from Global-Tech Appliances vs. SEB, 563 U.S. 754.  And from the same case, contributory infringement requires the Defendant to

know that the combination for which the component was especially designed was both patented and infringing.

And so for those reasons, we think that the admissions from Mr. Farkas and both Frys regarding the failure to provide pre-suit notice of alleged infringement also preclude a finding of indirect infringement here.

THE COURT:  And you say 'both Frys', you mean Stan Fry and Jared Fry?

MR. REED:  I do, Your Honor, yes.

THE COURT:  All right.  Thank you.

MR. REED:  Thank you.

THE COURT:  Plaintiff's response?

MR. SUMMERS:  Thank you, Your Honor.

I'll just reference back to my argument of -- in response to the 50(a) motion of no willfulness, which I discussed all of the evidence that indicates that Samsung knew about the patents and continued infringing anyway.

THE COURT:  All right.

Then with regard to the various matters presented for relief by either party under Rule 50(a), the Court, having considered your arguments, having heard the totality of the evidence over the course of the trial, rules as follows:

With regard to Defendants's motions for non-infringement on all grounds, that's denied.

In regard to both parties' competing motions on the issue

1174

of validity or invalidity under either or any of the theories presented, those are denied on all grounds.

With regard to the Defendants' motion concerning non-apportionment and damages, that is denied.

Considering the Defendants' motion regarding pre-suit damages, the marking statute, including Plaintiff's arguments concerning the DIMA prototype and the Court's prior summary judgment ruling on the burden here, those motions and all aspects of the same are denied.

Concerning the Defendants' motion for a finding as a matter of law of no willful infringement, that is denied.

Regarding Defendants' motion for no damages based on an improper or wrong hypothetical negotiation date, that is denied.

And with regard to Defendants' motion for JMOL concerning no indirect infringement, that is denied as well.

In short, counsel, all matters presented by either party for relief under Rule 50(a) are denied.

Ms. Smith, you have something?

MS. SMITH:  I do, Your Honor.

With apologies, I believe Samsung used three exhibits yesterday that have not yet been read in, and I'd move for leave to read those in at this time.

THE COURT:  You have leave to do that, and if you will announce those into the record now.

MS. SMITH:  Thank you, Your Honor.

Defendant used DX 114, JX 47, and JX 48.

And I've met and conferred with opposing, and I do not believe they oppose.

MS. FAIR:  We do not.

MS. SMITH:  Thank you.

THE COURT:  Thank you, counsel.

MS. SMITH:  Thank you.

THE COURT:  All right.  It's 9:30, counsel.  I need a few more minutes in advance of us meeting in an informal charge conference in chambers.  Let's take about 20 minutes, and somewhere in the neighborhood of 10 minutes until 10:00 if you'll come to chambers, I'll meet with you there and we'll informally take up the current proposed version of the final jury instruction and verdict form, and you'll be in a position to afford the Court direct input on all those issues, after which hopefully the Court will be in a position to generate what it believes to be the appropriate final jury instruction and verdict form for use in this case before this jury.

All right.  That's about 20 minutes from now.  We'll stand in recess until then.

(Recess.)

THE COURT:  Be seated, please.

Counsel, are you prepared for the Court to hold a formal charge conference at this time reviewing both the charge and

1176

the verdict form as I've supplied it to you?

MR. SUMMERS:  Yes, Your Honor.

THE COURT:  Defendants?

MS. SMITH:  Yes, Your Honor.

THE COURT:  All right.  Then whoever's going to speak for the Plaintiff and whoever's going to speak for the Defendants, please go to the podium.  If you'll stay there together, that will save us the time of going back and forth from table to podium.  And we'll begin with the final jury instructions.

As is the Court's practice, we will walk through these documents one page at a time sequentially, and if at any point page-by-page you believe some matter has been included which should not have been and rises to the level of an objection, then you may make that objection.  Likewise, if you believe some matter has been omitted and it's objectionable to omit that matter and you care to make that objection for the record, then you may at that point also make that objection.

But by going through these page-by-page, the Court believes it minimizes any risk that any issue will be overlooked and not otherwise preserved.

Let me get announcements from you two, counsel, for the record, and then we'll start with the final jury instructions.

MR. SUMMERS:  Thank you, Your Honor.  John Summers on behalf of the Plaintiff.

1177

MS. MAROULIS:  Thank you, Your Honor.  Victoria Maroulis on behalf of Samsung.

THE COURT:  All right.  Let's look at the first page or the cover page of the final jury instructions.  Is there any objection here from either party?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Turning then to page 2, are there any objections here from either party?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 3.  Are there any objections here?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 4.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 5.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 6.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 7.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 8.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 9.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 10.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 11.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 12.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 13.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 14.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  Your Honor, there is an underlining. There's no objection, but we wanted to make sure it's intentional.

THE COURT:  The underlining is intentional.

MS. MAROULIS:  Thank you, Your Honor.  No objection.

THE COURT:  Then we'll turn to page 15.  Are there any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 16.  Are there any objections here?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 17.  Are there any objections here?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  Your Honor, Samsung objects that the

equivalence should not be referenced here due to the lack of evidence at trial and presentation of equivalence for means-plus-function limitations.

THE COURT:  Would you repeat that objection, counsel?  I didn't follow you.

MS. MAROULIS:  Yes, Your Honor.

As previously stated in our written submissions, Samsung objects to reference to equivalence in the means-plus-function limitations.

THE COURT:  All right.  That objection is overruled. Anything else from either party on page 17?

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Nothing from Samsung on this page, Your Honor.

THE COURT:  We'll turn to page 18.  Any objections here?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 19.  Any objections here?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 20.  Any objections here?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 21.  Any objections here?

MS. MAROULIS:  No objection --

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 22.  Any objections here?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Turning to page 23, any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 24.  Any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 25.  Any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 26.  Any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 27.  Any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 28.  Any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 29.  Any objections?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Samsung.

THE COURT:  Next is page 30.  Any objections?

MR. SUMMERS:  Yes, Your Honor.

Plaintiff objects to the marking instruction on a variety of grounds which begins at the bottom of page 30.  The most principal objection is that the instruction now currently does not instruct at all on the requirement that the marking obligation attaches only for patent practicing products.

The parties had proposed agreed language on this topic. And so without inclusion of that topic, which the Court denied JMOL on this morning, that would deprive the jury of the ability to resolve this live issue of fact that has been hotly disputed in the trial.

And, Your Honor, we have proposed language for how to do that if I could read that at this time.

THE COURT:  Before you do, counsel, let me inquire of Samsung's counsel.  Is there any objection here from Samsung?

MS. MAROULIS:  Your Honor, there are two or three objections on this page.  If I may ask the Court's permission, the top of page 30 with the continued discussion of enablement, Samsung objects because it proposed in our written submissions the following phrase after the undue amount of experimentation, it says, "The more one claims, the more one

1183

must enable.  In other words, if a patent claims a broad scope but enables only a narrow part of the full scope, the public does not receive its benefit of the bargain and the patent is invalid.  Though the specification need not always describe with particularity how to make and use every single embodiment, it must nevertheless enable the full scope of the invention as defined by its claims."

THE COURT:  That was suggested language from Samsung that's not been included here, and your objection in that regard is overruled.

MS. MAROULIS:  Thank you, Your Honor.

Going further into the notice, Samsung objects to the -- I'm sorry.  That's next page Your Honor.

Your Honor, Samsung believes that marking is a live issue unless the 50(a) JMOL is granted.  So to the extent the 50(a) motion is not granted, we do need an instruction on marking.

THE COURT:  Well, we discussed the marking issue at length in the informal charge conference.  And under the evidence in this case, there is no evidence, though I did not grant 50(a) on it because it was embedded within a larger issue, there is no evidence before this jury of any constructive notice of pre-suit damages.  There is a very live issue about actual notice with regard to pre-suit damages.

Now, the Plaintiff argued before the Court in the informal charge conference that if its licensees produced

products and placed those products in the stream of commerce but it could show that those products did not embody the accused functionality, then there was no marking defense and they were entitled to a full six-year look-back.

The Court disagrees with that.  The Court believes that regardless of whether the Plaintiff's licensees produce and place in the stream of commerce products that do not embody the accused functionality, there is still separately and independently a notice requirement that the Plaintiff must show in order to get pre-suit damages, and it must show that the Defendant had pre-suit knowledge of its infringement claims either by actual notice or constructive notice.

The fact that its licensees sell a product that doesn't embody the accused functionality does not in and of itself entitle the Plaintiff to pre-suit damages looking back six years.  That leaves us with the actual notice dispute because there is no constructive notice here.

Nobody says that any produced products were marked with the patent numbers of these four patents.  Nobody says any of the produced products by anybody, licensee or otherwise, are marked with a website and the website includes the patents at issue here.  There is no constructive notice.

And, again, while that's abundantly clear from the body of the evidence during this trial, because it was embodied in and part and parcel of a larger and more broadly presented

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

50(a) motion, I did not grant it. That does not mean that the Court believes that there's any evidence to support a constructive notice finding here.

So if the products produced by the Plaintiff's patentees do or do not include accused functionality, that doesn't obviate the requirement to show pre-suit notice. And so that brings us at the end of the day in the Court's view back to the issue of is there pre-suit notice from the Plaintiff to Samsung or is there not. And we have a very live factual dispute in that regard.

And we had lengthy discussions about how the Court could properly and fairly instruct the jury as to what type of communication was necessary to either achieve or not achieve that actual notice requirement. And I put what the Court believes to be fair and accurate instructions in this charge as to what type and scope of communication is necessary to reach and achieve the pre-suit notice requirement and what falls short of that.

So at the end of the day, what we are left with in this case is whether the Plaintiff can show it gave pre-suit notice to Samsung, and if so, when did that pre-suit notice attach. And that is what I believe these instructions fairly advise and instruct the jury on.

So to the extent, Mr. Summers, the Plaintiff wants to object that I have left out your proposed instructions that if

you can show your licensees produce a product that does not embody the accused functionality that that ends the inquiry and you're entitled to a six-year look-back without anything further, the Court disagrees with that and the Court's denying that objection.

Nobody's proposed that there be -- that there is constructive notice here, and the Court sees no reason to instruct the jury on something there's no evidence on, even though I didn't grant 50(a) on it.

The Court often is confronted with issues that are raised at the 50(a) stage under which the statute clearly says the Court may grant JMOL but the Court's not required to grant JMOL, and issues for which there is no evidence.  And the Court is fully within its rights to not charge the jury on an issue where there is no supporting evidence in the record, and that is my finding as to constructive notice and that's why there is no instruction in here as to constructive notice.

Again, at the end of the day, what the parties have between them with regard to pre-suit damages is a very live dispute about whether a multi-year communications between Samsung and Collision rise to the level of providing actual notice or whether they don't, and that's an issue the jury's going to have to decide.  And I'm persuaded that these instructions fairly instruct the jury on that issue.

Now, with regard to pre-suit damages and the notice

1187

requirements, are there other objections from either of you as to what's in the charge?

MS. MAROULIS:  Yes, Your Honor.  Samsung has objection to the actual notice language.  And as submitted previously in writing, Samsung believes that the actual --

THE COURT:  Just a moment.  Before you rattle off what you wanted me to include and I didn't, tell me what's in here that you object to.

MS. MAROULIS:  Thank you, Your Honor.

The language we're objecting to is as follows.

THE COURT:  What page and what paragraph?

MS. MAROULIS:  Page 31.  I apologize, Your Honor, if I'm ahead of you.  I thought you said you wanted to hear about notice.

THE COURT:  That's fine.  We're going to all catch up here in a minute.  I knew this discussion was coming based on the way we discussed it in the informal charge conference.

So I'm ready just to stop and let me hear from everybody on every issue related to this topic, and then we'll pick back up and catch up.  But at this point if Samsung has a specific objection to the instruction I've given on pre-suit damages and actual notice, let me hear from you on that.

MS. MAROULIS:  Yes, Your Honor.  The following language on the top of page 31 is what Samsung is objecting to.  The language reads, "Actual notice means that Collision

has communicated or brought home to Samsung in a reasonable way an assertion that Samsung's accused products use Collision's patented technology such that Samsung would be infringing Collision's patents if they did not obtain a license from Collision to practice the asserted patents."

THE COURT:  Okay.  Your objection to that language is overruled.

MS. MAROULIS:  Thank you, Your Honor.

Would you like me to state the specific language Samsung requested?

THE COURT:  For purposes of completeness, I think that's appropriate.

MS. MAROULIS:  Thank you very much.

The language Samsung proposed in its written submissions is:  "Actual notice means that Collision communicated to Samsung a specific charge of infringement of Collision's asserted patents by a specific accused product or device."

THE COURT:  That objection's overruled.

MR. SUMMERS:  Your Honor --

THE COURT:  I'm happy to hear from Plaintiff on this topic now.

MR. SUMMERS:  Thank you, Your Honor.

And before I proceed, may Mr. Caldwell have leave to seek clarification on one issue?

THE COURT:  Do you have a question, Mr. Caldwell?

MR. CALDWELL:  Yes, sir.

So I want to make sure that -- I'm not trying to reargue something, and I understand the Court's sensitivity to that, but I want to make sure I understand something.

There is a live issue separate from the actual notice. It's been an issue that there's been testimony and dispute about as to whether, for example, Ericsson, BAE, or Nokia products practiced.  If their products don't practice the patents in this case --

THE COURT:  Let me stop you.  The Ericsson, Nokia, et cetera, products don't go to the issue of actual notice; they could potentially go to the issue of constructive notice.

MR. CALDWELL:  Yes, sir.  Yes, sir.  Absolutely correct.  If they don't practice the patents in this case, it would actually be false marking if they were marked with the patents.  So by default, if they don't practice, if no licensee has actually implemented a product that practices the claims -- the patents that are in this lawsuit, by default you get -- you are eligible for the six years look-back.

So I'm worried we might be talking past each other.  As I understand it--and Mr. Summers is far smarter than I am at this sort of thing--but as I understand it, the fundamental issue that I think we need to be able to argue--and I think it would be a tremendous, tremendous problem on appeal if we cannot argue--is if Ericsson, BAE, or Nokia products do not

practice, there was not a need for them to mark in order for the six-year period to be eligible. And that's I think fundamentally what we are concerned about here.

We're not trying to say that we are automatically entitled to six years damages, or what have you; it's just that there's not a marking requirement -- there's not a requirement that they put these four patents on their products if those products don't use these four patents, and, in fact, it would be contrary to the false marking law if they did.

THE COURT: Well, I have thoughts, Mr. Caldwell, about what you've just raised, but I am reluctant to advise counsel on either or both sides as to how to argue closing arguments to the jury. That's what you're effectively asking me to do is tell you what's okay and not okay to argue in closing. At this juncture, the Court is concerned with giving accurate and fair instructions to the jury vis-a-vis its charge, and I'm happy to hear from you on that. From the resulting final charge that the Court uses in this case and gives the jury orally later today, you can make appropriate closing arguments. But one drives the other --

MR. CALDWELL: Yes, sir.

THE COURT: -- not the other way around.

MR. CALDWELL: Understood.

THE COURT: And to the extent you're asking me to tell you what you can and can't say in closing, I'm going to

decline the invitation.

MR. CALDWELL:  Fair enough.  I understand that, Your Honor.

I guess I'm saying that's how it processes in my head. And I think Mr. Summers has proposed language that I -- if you don't mind, I would like to have him offer, because I really do think this is a tremendous problem if there is a suggestion that our licensees' products have to be marked because they are a licensee, without regard to whether or not they actually do the patents.  That is -- and so we would like to propose --

THE COURT:  I do not think there is anything in this charge that imposes a marking requirement on your licensees' products if they do not practice the accused technology.

MR. CALDWELL:  So Ms. Fair, what she's pointing to actually relates in the actual notice portion, but I think it bleeds over to the constructive notice portion, because it says, "With respect to Collision's asserted patents, damages, if any, commence on December 12th, 2017.  However, if Samsung did not have actual notice of Collision's claims of infringement by or before December 12th, 2017, then damages only begin when Samsung had actual notice."  And so I think we're kind of steering --

THE COURT:  To obtain pre-suit damages, you have to put the Defendant on notice of your claims, and if you don't, then your notice is embodied in your complaint when it's filed

and your damages are limited to post-complaint damages.  So regardless of what your licensees did or didn't do, you have to show notice, either actually or constructively, to get pre-suit damages, and there is no constructive notice here.  Nothing has been marked.  There can't be constructive notice without some marking of some type.  So we're left with whether over the many decades, or many years, anyway, that the parties communicated about this technology whether those communications rose to the level of directness and specificity to reach the point of actual notice of Collision's assertions of infringement.

MR. CALDWELL:  Yes, sir.  I -- I'm sorry.

THE COURT:  And I think these instructions fairly address that, notwithstanding objections from everybody.

MR. CALDWELL:  Yes, sir.  I think, though, that the place where I -- or a place where I would disagree is you actually just by default can get six years past damages unless somebody is producing a licensed product that practices the patent and does not marking -- is not marking.

These are apparatus claims, for example.  The default is that you can get six years.  And so that's -- what we've done is we have -- in the instructions as they are drafted now is we have gotten away from the default construct that you get six years, essentially, assuming that there is a marking problem, and then said this can only be remedied which actual

notice. But the reality is if there is not a marking problem because the licensees have not practiced, then we are still back in the original default realm that by default you could get six years. So that's the problem that I was trying to articulate with the way the actual notice thing is phrased to.

And Mr. Summers can propose something more intelligent, but I hope I've at least articulated that I think it's very, very serious concern.

MR. SUMMERS: And Your Honor, just to close the loop on that, this issue about the licensees and whether they practice or not is the *Arctic Cat* burden-shifting framework. They identify products that they think should have been marked, and the Plaintiff is allowed the opportunity to prove by a preponderance of the evidence that the products identified did not practice the patents, and that is the evidence that was presented throughout the trial to meet that burden of proof. That part of the marking instruction was agreed as an accurate statement of the law between the parties.

And so based on the Court's ruling, if the Court is going to not include an instruction on this issue, Collision would propose the following to begin at the bottom of page 30, "With respect to Collision's asserted patents, damages, if any, commence on December 12th, 2017, if Collision complied with the marking statute. One way Collision can show compliance is

by showing by a preponderance of the evidence that the licensed products that Samsung identified as practicing a specific patent did not practice that patent."  And just for the record, that is language that Samsung and Collision agreed to as to this issue.  And then we could continue, "Otherwise, Collision must show actual notice before that time.  However, if Samsung did not have actual notice of Collision's claims of infringement by or before December 12th, then damages only begin when Samsung had actual notice," and the instruction could continue as the Court has currently drafted it.

MS. MAROULIS:  Your Honor, there was a dispute within the constructive notice instruction, so if Plaintiff is going to read that in, may I read in the language that Samsung proposed for the constructive notice?

THE COURT:  You may.

MS. MAROULIS:  Samsung's language stated as follows: "Constructive notice requires Collision or its licensees to mark products practicing the asserted patents with the asserted patent numbers.  The parties do not dispute that Collision's licensees never marked any products with the asserted patent numbers, but dispute whether those products practiced the asserted patents and, thus, dispute whether the marking was required"

THE COURT:  Counsel, as much as I would prefer not to, and out of an abundance of caution and to evidence the

Court's focus and desire to make sure that its duty to properly instruct the jury is complied with pursuant to the law, I'm going to recess the formal charge conference and I'll be happy to meet with the appropriate counsel in chambers and we will discuss this at length; then I will come back on the record, I'll reconvene where we left off, and we'll finish any discussion of the marking statute issue and then go through the rest of the final jury instructions.  All right?

MR. CALDWELL:  Yes.

MS. MAROULIS:  Thank you, Your Honor.

THE COURT:  All right.  The Court stands in recess.

Those of you that are on point with regard to this issue, please meet me in chambers.

(Brief recess.)

THE COURT:  Be seated, please.

All right, counsel.  I'm reconvening the formal charge conference in the Collision versus Samsung matter.

Before we return to the proposed final jury instructions, I am going to grant JMOL under Rule 50(a) with regard to only the issue of constructive notice brought about by marking patents numbers on products either directly or indirectly. And the grant under 50(a) is that there is no evidence and no reasonable jury could find to the contrary that there is no constructive marking in this case -- constructive notice, I'm sorry.  Constructive notice.  That leaves open the issue of

actual notice.

Now, let's return to the formal charge conference, and for the record I have rewritten in light of the discussions with counsel on the record and the discussions with counsel off the record during the period of the recent recess to the formal charge conference. I have replaced pages 30 through the end of the final jury instructions. We have already covered issues up to page 30. We are going to begin again with page 30 and go forward to the end of the charge.

With regard to revised page 30, are there objections from either party? And if both Mr. Summers and Samsung's counsel will go to the podium where they were.

MR. SUMMERS: Thank you, Your Honor.

THE COURT: Any objections as to page 30, counsel?

MR. SUMMERS: Nothing from the Plaintiff.

THE COURT: Any objections as to page 30 from Samsung?

MS. MAROULIS: Not to page 30, Your Honor.

THE COURT: Then let's turn to page 31. Are there objections here from either party?

MR. SUMMERS: Your Honor, one objection that Collision would raise on the actual notice question. "Actual notice means that Collision has communicated or brought home to Samsung in a reasonable way an assertion that Samsung's accused products use Collision's technology."

We would propose an insertion of "use or would use", consistent with the *Minks* case which holds that a patentee can provide actual notice without knowing of the infringement if it provides sufficient information from -- to communicate a belief as to what would infringe.

THE COURT:  I'm going to grant that objection, and I'll add "or would use" at that juncture.  So that the sentence will read "Actual notice means that Collision has communicated or brought home to Samsung in a reasonable way an assertion that Samsung's accused products use or would use Collision's patented technology."

Anything else on page 31 from Plaintiff?

MR. SUMMERS:  Nothing from the Plaintiff.

THE COURT:  Anything from Defendant on page 31?

MS. MAROULIS:  Yes, Your Honor.  With respect to actual notice, we object to the language of actual notice and we already stated on the record the language that Samsung proposed regarding specific charge of specific patent to a specific product.  We also object to the addition of "or would use" language separately.

With respect to the marking, Your Honor, we understood the Court grant of the constructive notice of JMOL that marking would not be included to the jury, and we're just seeking to --

THE COURT:  Constructive notice.  The only thing

I've granted JMOL under 50(a) is constructive notice.

MS. MAROULIS:  Your Honor, in that event, if the Court is -- we believe that constructive notice means that the marking has been resolved and should not be included in the jury instructions.  We object on that basis.

But, further, to the extent the Court is going to include the marking, further, we need to add that it's Collision's burden to show that the products do not implement or embody the functionality at issue in this case.

THE COURT:  I think the burden is clearly established in these instructions.  I'm going to overrule your objection.

Anything else on page 31?  If not, let's turn to page 32. Are there objections here from either party?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  No objection from Defendants.

THE COURT:  Next is page 33.  Are there any objections here?

MR. SUMMERS:  No objection from the Plaintiff.

MS. MAROULIS:  Yes, Your Honor.

At the top of the page with the respect to the apportionment of unpatented features of the accused products, Samsung would like the language I previously requested in the written papers "and the apportionment cannot be based on unasserted patents or technology outside the footprint of the

1199

asserted claims".

THE COURT:  That objection's overruled.  I considered that request, I felt it was redundant and previously covered adequately.

MS. MAROULIS:  Thank you, Your Honor.

THE COURT:  Anything further from Defendant on page 33?

MS. MAROULIS:  No, Your Honor.

THE COURT:  Then let's turn to page 34.  Any objections here from either party?

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Nothing from Defendant.

THE COURT:  Next is page 35.  Any objections here?

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Nothing from Defendants.

THE COURT:  Next is page 36 which covers all 15 of the *Georgia-Pacific* factors, and I assume, counsel, both sides agree that it is appropriate under these facts in this case to charge this jury with all 15 factors.

MR. SUMMERS:  That's correct from the Plaintiff, Your Honor.

MS. MAROULIS:  No objection to this page, Your Honor.

THE COURT:  Does Samsung agree that charging the jury in this case with all 15 *Georgia-Pacific* factors is --

MS. MAROULIS:  Yes, Your Honor.

THE COURT:  -- appropriate?

MS. MAROULIS:  Yes, Your Honor.

THE COURT:  All right.  Then let's turn to page 37.  Are there any objections here from either party?

MR. SUMMERS:  Nothing from the Plaintiff, Your Honor.

MS. MAROULIS:  Your Honor, Defendant objects to not including the smallest saleable unit instruction.  And if I may read quickly into the record, the instruction that Samsung proposed was as follows:  "A multicomponent product like the Samsung devices at issue in this case may have both infringing and non-infringing components.  In such products royalties should be based not on the entire product but instead on the smallest saleable unit that practices the patented invention and has close relation to the claimed invention.  If the smallest saleable unit is a multicomponent product containing one or more non-infringing features with no relation to the patented features, damages must only be based on the portion of the value of that smallest saleable unit product attributable to the patented technology.  This may involve estimating the value of a feature that may not have ever been individually sold."

THE COURT:  All right.  That objection is overruled.  Turn to page 38.  Any objections here, counsel?

03:11          MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Nothing from Defendant.

THE COURT:  Next is page 39.  Any objection here?

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Nothing from Defendant.

THE COURT:  Next is page 40.  Any objection here?

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Nothing from Defendant.

THE COURT:  Next is page 41, the final page of the final jury instructions.  Are there objections here?

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Nothing from Defendant.

THE COURT:  All right, counsel.  Let's turn to the verdict form which has been prepared and furnished to counsel
03:12 with an opportunity to review the same.  We'll follow the same approach regarding the cover page or page 1 of the verdict form.  Is there any objection from either party?

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Nothing from Defendant.

THE COURT:  Turning to page 2, is there any objection here?

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Nothing from Defendant.

THE COURT:  Page 3, any objections here?

MR. SUMMERS:  Nothing from the Plaintiff.

1202

MS. MAROULIS:  Nothing from Defendant.

THE COURT:  Page 4 where Question 1 regarding infringement is situated, are there any objections here?

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Your Honor, the Defendants object to lack of delineation between direct and indirect infringement in Question 1.

THE COURT:  That's overruled.

Let's turn to page 5 where there are additional instructions.  Any objections here?

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Defendants object to the instruction that the jury does not need to decide invalidity and requests that the jury be directed to also decide invalidity.

THE COURT:  Had Defendants brought counterclaims for invalidity, the Court would require the jury to answer the question.

MS. MAROULIS:  Your Honor, we did not.

THE COURT:  And that's clear to the Court.  Given that you only asserted them as an affirmative defense, I don't believe it's necessary that the jury answer the invalidity question, and I'm going to overrule your objection.

Turning then to page 6 where Question 2 is found, is there objection here?

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Yes, Your Honor.  Defendants object to trying the invalidity issues together.  We request respectfully to break out the written description and prior art theories of the case.

THE COURT:  That's overruled.

In light of the Court's instructions, we'll turn next to page 7.  Any objections here?  These are additional instructions to the jury.

MR. SUMMERS:  Nothing from the Plaintiff.

MS. MAROULIS:  Nothing from Defendant.

THE COURT:  Turning next to page 8 where Question 3 and Question 4 are found, are there objections here?

MR. SUMMERS:  Your Honor, Collision would object to Question No. 4 and asking that our running royalty or lump-sum royalty based on the Court's lack of authority to extinguish Collision's patent rights into the future for actions that have not occurred for the better part of the case.

THE COURT:  That objection's overruled.

MS. MAROULIS:  Your Honor, Defendants object to questions on page 8 because it does not break out questions on pre-suit damages, specifically on the actual notice and on the marking.

To the extent that marking remains in the jury charge, Defendants respectfully request several questions asking the jury to determine if there was an actual notice and if there

was marking.  And that is the objection to Question 3.

THE COURT:  That objection's overruled.

03:15     We'll turn to page 9 of the verdict form where Question 5 is located.  This is the willfulness question.  Is there objection here?

MR. SUMMERS:  No objection from the Plaintiff, but there --

THE COURT:  We did not put the heading Question No. 5, and I'm going to add that.

MR. SUMMERS:  That was what I was hoping to point out.  Thank you, Your Honor.

THE COURT:  Any objection on page 9 as to Question 5 from the Defendant?

MS. MAROULIS:  No, Your Honor.

THE COURT:  Then we'll turn to page 10, which is the final page of the verdict form.  Is there any objection here 03:15 from either party?

MR. SUMMERS:  Nothing from the Plaintiff, Your Honor.

MS. MAROULIS:  Nothing from Defendant, Your Honor.

THE COURT:  All right.  That completes the formal charge conference, counsel.

I'm going to reproduce these documents so that each member of the jury can have their own printed copy of the Court's final jury instruction, and one clean copy of the

verdict form to send back to the jury when they deliberate.

As soon as that is complete, I expect to return to the bench, bring in the jury, and begin my final jury instructions.

With that, the Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

All right, counsel.  I'm about to bring out the jury and proceed to give them my final instructions on the law followed by your closing arguments.  Is there anything I need to hear from on either party before I proceed to do that?

MR. PAK:  Not for the Defendants, Your Honor.

MR. STEWART:  Nothing from the Plaintiff.

THE COURT:  All right.  Tell me who I can expect to present what order of closing arguments.  What should I expect from the plaintiff?

MR. STEWART:  I will present the first part of Plaintiff's closing argument.  I expect to try to aim for around 23 minutes, thereabouts, and then Mr. Caldwell will present the second part.

THE COURT:  All right.  Do you want a warning on your time of any kind, Mr. Stewart?

MR. STEWART:  Yes.  At 15 minutes total spent, and at 20 minutes.

THE COURT:  15 and 20.  All right.

Mr. Pak, you're going to present Defendants' closing argument?

MR. PAK:  Yes, Your Honor.

THE COURT:  Do you want any kind of warning on your time, sir?

MR. PAK:  Yes, Your Honor.  If I could have 10 minutes left and 2 minutes left.

THE COURT:  All right.  That means 30 minutes used and 38 minutes used.

MR. PAK:  Yes, Your Honor.

THE COURT:  All right.  And, Mr. Caldwell, I'll get yours once we see what Mr. Stewart's left you.

MR. CALDWELL:  Yes, sir.

THE COURT:  All right.  Let me just say this before I bring the jury in.  Those of you that are in the courtroom, particularly those of you that are in the gallery, the Court views its final instructions to the jury and counsels' closing arguments to be the most serious part of an inherently serious process.

Consequently, I do not want any disruptions of any kind. I don't want people coming and going out of the courtroom.  I trust there's not going to be some paralegal with two banker's boxes on their hip walking in the door in the middle of closing arguments.  If you have somebody coming up here, stop them now.  If you have a device that's capable of making a

noise, disable it or remove it.  If you have anything else in mind that might cause a disruption, take care of it now before I bring in the jury.  I hope everybody's clear on that.

All right.  Let's bring in the jury, Mr. Barnett.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good afternoon, ladies and gentlemen. Please have a seat.

Thank you, members of the jury, for your patience and your cooperation.  It's now 3:30, give or take.  I told you yesterday evening I expected to be ready to give you my final instructions on the law at hopefully 1:00 this afternoon.  I'm only two-and-a-half hours late.

There are reasons I could give you by way of an explanation, but they involve things you don't need to know about and probably don't want to know about.  Just let me say that the time prior to now has been used and there's been no wasting of it, but it's just taken longer than we anticipated. But I'm now prepared to give you my final instructions on the law.

Also, ladies and gentlemen, I want to remind you, each one of you are going to have your own printed copy of this document that I'm about to give you orally.  Therefore, unless you particularly want to, there's no reason to take notes. And you can and if you have any inclination, you should refer to it in writing during your deliberations if you have any

questions about the instructions I'm giving you.  But I would much rather you watch and listen and pay particularly close attention as I give you these orally on the record rather than try to take notes.

You've now heard all the evidence in the case, and I'm now going to instruct you on the law that you must apply.  As I've told you, you'll each have your own written copy of these final jury instructions, and there's need for you to take notes unless you particularly want to do so.

Now, it is your duty to follow the law as I give it to you.  On the other hand and as I've said, you, the jury, are the sole judges of the facts in this case.  Do not consider any statement that I have made over the course of the trial or may make in the course of these instructions as an indication that I have any opinion about the facts in this case.

Now, you're about to hear closing arguments from the attorneys for the competing parties.  Statements and arguments of the attorneys are not evidence, and they are not instructions on the law.  They are intended only to assist you, the jury, in understanding the evidence and the parties' contentions.

A verdict form has been prepared for you, and you will take this verdict form with you to the jury room.  And when you've reached a unanimous agreement as to the questions in your verdict form, you will have your foreperson fill in the

answers to those questions reflecting your unanimous agreement, then date and sign the verdict form on the final page, and then advise the Court Security Officer that the jury has reached a verdict.

Answer the questions as directed in the verdict form from the facts as you find them to be.  Do not decide who you think should win this case and then answer the questions to reach that result.  Again, your answers to those questions and your verdict in its entirety must be unanimous.

Now, in determining whether any fact has been proven in this case you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them.  You may consider the stipulations of the parties, and you may consider all the exhibits received and admitted into evidence, regardless of who may have introduced them.

You, the jury, are the sole judges of the credibility of all the witnesses and the weight and effect to apply to all of the evidence.  Now, in deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You alone are to determine the questions of credibility or truthfulness of the witnesses.

In weighing the testimony of the witnesses, you may consider the witness' manner and demeanor on the witness stand, any feelings or interests that they may have in the

outcome of the case, any bias or prejudice about the case that the witness may have, and the consistency or inconsistency of their testimony, considered in the light of the circumstances. Has the witness been contradicted by other evidence? Has he or she made statements at other times and other places contrary to what they said on the witness stand?

You, ladies and gentlemen, must give the testimony of each witness the amount of credibility and weight that you think it deserves. You must also keep in mind that a simple mistake does not mean that a witness is not telling the truth. You must consider whether any misstatement was an intentional falsehood or a simple lapse in memory and what significance, if any, should be attached to that testimony.

Now, as I've told you previously, the attorneys in this case are acting as advocates for their competing clients, and they have a duty to object when they believe evidence is offered that should not be admitted under the rules of the Court. When the Court sustained an objection to a question addressed to a witness, you must disregard that question entirely, you may draw no inference from its wording, or speculate about what the witness would have said if they had been permitted to answer the question.

On the other hand, if the objection was overruled, then you must treat the answer to the question just as you would treat any other answer to any other question, that is, as if

1211

no objection had been made.  Now, by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court, in so doing, did not indicate any opinion as to the weight or the effect of that evidence.

Now, at various times during the trial it's been necessary for the Court to talk with the lawyers outside of your hearing, either here at the bench or by calling a recess and talking to them while you were outside the courtroom.  This happens because during trials things come up that do not involve the jury.  You should not speculate or guess about what was said during such discussions that took place outside of your presence and hearing.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect or circumstantial evidence, that is, the proof of a chain of circumstances that indicates the existence or the non-existence of certain other facts.  As a general rule, ladies and gentlemen, the law makes no distinction between direct or circumstantial evidence, but simply requires that you find the facts based on all the evidence presented, both direct and circumstantial.

Now, the parties may have agreed or stipulated to some facts in this case, and when the lawyers for both sides stipulate as to the existence of a fact, then you must, unless

otherwise instructed, accept the stipulation as evidence and regard the fact as proven.

Now, certain testimony in this case has been presented to you through depositions. A deposition is the sworn, recorded answers to questions asked to a witness in advance of the trial. If the witness cannot be present to testify in person, or if the rules of procedure otherwise allow, then the witness' testimony may be presented under oath in the form of a deposition.

Before the trial began, the attorneys representing the parties in this case questioned these deposition witnesses under oath. At that time, a court reporter was present and recorded their sworn testimony. Deposition testimony is entitled to the same consideration by you as testimony given by a witness in person from the witness stand in open court. As a result, you should judge the credibility and the importance of deposition testimony to the best of your ability, just as if the witness had testified before you in person in open court.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. Said another way, ladies and gentlemen, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that

have been established by the testimony and evidence in this case.  However, you should not base your decision on any evidence not presented by the parties during the trial of this case, including your own personal experience with any of the products that might be at issue in this case.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if, after considering all the evidence, you believe that single witness.

Also, when knowledge of a technical subject may be helpful to the jury, a person who has special training or experience in that technical field--called an expert witness--is permitted to state his or her opinions on those technical matters to the jury.  However, you're not required to accept those opinions.  As with any other witness, it is solely up to you to decide whether or not to rely upon it.

Certain exhibits have been shown to you during the trial that were simply illustrations.  We call these types of exhibits demonstrative exhibits.  Sometimes they're referred to simply as demonstratives.  Demonstrative exhibits are a party's depiction, picture, model to describe something involved in the trial.  If your recollection of the evidence differs from the demonstratives, you should rely on your recollection of the evidence.

Demonstrative exhibits are sometimes called jury aids, and demonstrative exhibits, ladies and gentlemen, themselves are not evidence, but a witness' testimony given with the use and aid of a demonstrative exhibit is evidence.  Let me be clear, demonstrative exhibits will not be available for you to review during your deliberations.

Now, in any legal action, the facts must be proven by a required amount of evidence known as the burden of proof.  The burden of proof in this case is on the Plaintiff for some issues and on the Defendants for other issues.  And there are two burdens of proof that will apply in this case.  They are the preponderance of the evidence and clear and convincing evidence.

The Plaintiff in this case, Collision Communications, Inc., which you've heard referred to throughout the trial either as the Plaintiff or as Collision, has the burden of proving patent infringement by a preponderance of the evidence.  Collision also has the burden of proving willful patent infringement by a preponderance of the evidence.  Collision has the burden as well of proving damages for any patent infringement by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

Now, the Defendants in this case are Samsung Electronics Company, Ltd., and Samsung Electronics America, Inc., which you've heard referred to throughout the trial together as the Defendants or simply as Samsung. And Samsung has the burden of proving invalidity of Collision's patent claims by clear and convincing evidence.

Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable. Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard. If proof establishes in your mind an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, as I've previously told you, these two burdens of proof are not to be confused with a different and altogether unrelated burden of proof known as beyond a reasonable doubt, which is the burden of proof applied in a criminal case and not a civil case such as this. Beyond a reasonable doubt is a higher standard than both the preponderance of the evidence and clear and convincing evidence.

Now, as I did at the beginning of the case, I'll first give you a summary of each side's contentions, and I'll then provide you with detailed instructions on what each side must

1216

prove to win on each of its contentions. As I have previously told you, this is an action for patent infringement. Collision contends that Samsung infringes certain claims of the four patents-in-suit.

Those four patents-in-suit are: U.S. Patent No. 7,463,703, which you've heard referred to consistently as the '703 Patent; U.S. Patent No. 7,920,651, which you've heard referred to consistently as the '651 Patent; U.S. Patent No. 6,947,505, which you've heard referred to as the '505 Patent; and U.S. Patent No. 7,593,492, which you've heard referred to as the '492 Patent.

You've also heard these four patents referred to collectively as the asserted patents or as the patent-in-suit.

Now, the Plaintiff Collision contends that the Defendant Samsung infringes the following claims of the patents-in-suit: Claims 1 and 5 of the '703 Patent, claims 1 and 3 of the '651 Patent, claim 1 of the '505 Patent, and claim 1 of the '492 Patent. And these are the asserted claims.

Collision contends that Samsung has infringed these asserted claims by making, using, selling, importing, or offering for sale 4G and 5G products that include the accused single user MIMO and CRS interference cancellation technology. I'll refer to these products as the accused products.

Collision further alleges that Samsung's infringement of the asserted patents was willful. Collision contends that

it's entitled to money damages in the form of a reasonable royalty for Samsung's alleged infringement.  Collision has the burden to prove these issues by a preponderance of the evidence.

Samsung, on the other hand, denies that it infringes any of the asserted claims of the four patents-in-suit.  Samsung denies that it makes, uses, offers for sale, sells, or imports any accused product that infringes any of the asserted claims. Samsung also denies that any alleged infringement was willful, and Samsung also denies that it owes Collision any money damages.

Samsung further contends that the asserted claims of the patents-in-suit are invalid as being obvious in the light of prior art, and that the asserted claims are invalid for lack of an adequate written description and/or a lack of enablement.  Samsung has the burden to prove these invalidity theories by clear and convincing evidence.

Now, invalidity and infringement are separate and distinct issues, and your job is to decide whether or not Samsung has infringed any of the asserted claims and whether those claims are invalid.  If you decide that any asserted claim has been infringed and that claim is not invalid, you'll then need to decide what amount of money damages, if any, to be awarded to Collision to compensate it for the infringement you have found.

If you decide that there was any infringement and that it was -- that infringement was willful, that decision as to willfulness should not affect any damages award that you might make.  The Court will take willfulness into account later if you find it.  A finding of willfulness should play no role in the amount of damages that you might award.

Now, before you can decide many of the issues in this case, you'll need to understand the role of the patent claims. The patent claims are those numbered sentences at the end of each patent.  The claims are important because it's the words of the claims that define what a patent covers.  The figures and the text in the rest of the patent provide a description and/or examples of the invention and they provide a context for the claims.  But, ladies and gentlemen, it is the claims themselves that define the breadth of the patent's coverage.

Each claim is effectively treated as if it were a separate patent, and each claim may cover more or may cover less than any other claim.  Therefore, what a patent covers depends, in turn, upon what each of its claims covers.

Now, you will first need to understand what each claim covers in order to decide whether or not there is infringement of that claim, and to decide whether or not that claim is invalid.  Now, the law says that it's my role to define the terms of the claims and it is your role to apply my definitions to the issues that you are asked to decide.

1219

Therefore, as I explained to you at the beginning of the case, I've already determined the meaning of certain language from the asserted claims, and I've provided you with those definitions, sometimes called constructions, in your juror notebooks, and you must accept these definitions or constructions of the words in the claims as being correct. And it's your job to take these definitions that I have given you and apply them to the issues that you are deciding, including the issues of infringement and invalidity.

Now, you should disregard any evidence presented during the trial that contradicts or is inconsistent with the constructions and definitions that the Court has given you. Now, for claim language or limitations that I have not construed--that is, limitations I have not interpreted or defined--you are to use and apply the plain and ordinary meaning of that language and those limitations as understood by one of ordinary skill in the art, which is to say, in the field of the technology of the patent, at the time of the alleged invention.

The meaning of the words of the patent claims must be the same when deciding both infringement and when deciding invalidity. And as I say, you've been provided with copies of all four of the asserted patents in your juror notebooks, and you may refer to them and everything else in your notebooks during your deliberations.

1220

Now, several times during these instructions I have referred or will refer to a person of ordinary skill in the field of the invention, or a person of ordinary skill in the art. In deciding the level of ordinary skill in the field, you should consider all the evidence introduced at trial, including but not limited to (1) the levels of education and experience of the inventor and other persons actively working in the field; (2) the types of problems encountered in the field; (3) previous solutions to those problems, and (4) the rapidity with which innovations are made; and also (5) the sophistication of the technology.

Now, the claims are intended to define in words the boundaries of the inventor's rights. Only the claims of a patent can be infringed. Neither the written description nor the drawings in the patent can be infringed. And each claim must be considered for infringement individually and on a claim-by-claim basis.

I'll now explain how a claim defines what it covers.

A claim sets forth in words a set of requirements. Each claim sets forth its requirements in a single sentence. If a product satisfies each of these requirements, then it is covered by the claim. And there can be several claims in a patent, and each claim may be narrower or broader than another claim by setting forth more or fewer requirements. The coverage of a patent is assessed on a claim-by-claim basis.

And in patent law, the requirements of a claim are often referred to as the claim elements or the claim limitations. And you've heard them referred to that that during the course of this trial. Now, when a product meets all the requirements of a claim, the claim is said to cover that product, and that product is said to fall within the scope of that claim.

In other words, a claim covers a product where each of the claim limitations or requirements is present in that product. If a product is missing even one limitation or element of a claim, then the product is not covered by the claim. And if the product is not covered by the claim, ladies and gentlemen, that product cannot infringe that claim.

Now, the beginning portion, or preamble, of a claim often uses the word 'comprising'. The word 'comprising' when used in the preamble means including but not limited to or containing but not limited to. When comprising is used in the preamble, if you decide that an accused product includes all of the requirements of the claim, the claim is infringed. And this is true even if the accused product contains additional elements or features.

For example, a claim to a table comprising a tabletop, legs, and glue, would be infringed by any table that includes a tabletop, legs, and glue, even if the table also contains additional structures, such as leaves to expand the size of the tabletop or wheels to go on the ends of the legs.

1222

Now, claim 1 of the '505 Patent and claim 1 of the '492 Patent are in a special form called means-plus-function format. These claims do not cover all of the structures that could perform the function set forth in the claim. Instead, they cover a structure or a set of structures that perform that function and that is either identical or equivalent to the structures described in the patent for performing the function.

The issue of whether the two structures are identical or equivalent is for you to decide. And I'll explain to you later how to determine whether two structures or two sets of structures are equivalent to one another.

This case involves two types of patent claims--independent claims and dependent claims. In this case, claim 1 of the '703 Patent and claim 1 of the '651 Patent, and claim 1 of the '505 Patent, and claim 1 of the '492 Patent are independent patent claims. Claim 5 of the '703 Patent and claim 3 of the '651 Patent are dependent claims.

As we've discussed, an independent claim sets forth all of the requirements that must be met in order to be covered by that claim. It is not necessary to look at any other claim to determine what an independent claim covers.

On the other hand, a dependent claim does not itself recite all the requirements of the claim, but refers to

another claim for some of its requirements.  In this way, the claim depends from another claim.  A dependent claim incorporates all the requirements of the claim to which it refers or as sometimes said from which it depends, as well as its own additional requirements.

So to determine what a dependent claim covers, it's necessary to look at both the dependent claim and any other claim to which it refers, or from which it depends.  A product that meets all the requirements of both the dependent claim and the claim to which that dependent claim refers is covered by that dependent claim.

Now, if a person or a corporation makes, uses, sells, or offers to sell within the United States, or imports into the United States what is covered by a patent claim without the patent owner's permission, that person or corporation is said to infringe the patent.

In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed.  You must compare the asserted patent claims, as I may have construed them for you, to the accused products, and determine whether or not there is infringement.  This, ladies and gentlemen, is the only correct comparison.

You should not compare the accused products with any specific examples set out in the patent, with the prior art, or with Collision's own products in reaching your own decision

on infringement.  Again, in deciding infringement, the only correct comparison is between the accused products and the limitations of the claims as the Court may have construed or interpreted them.  And you must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by both of the parties over the course of the trial.

I'll now instruct you on the specific rules that you must follow to determine whether or not Collision has proven that Samsung has directly infringed one or more of the patent claims involved in this case.

A patent can be directly infringed even if the alleged infringer did not have knowledge of the patent and without the direct infringer knowing that what it did was infringement of the claim.  A patent may also be directly infringed even though the accused direct infringer believed in good faith that what it did was not infringement of the patent. Infringement does not require proof that any party copied its product from the asserted claims.

You must determine separately for each of the asserted claims whether or not there is infringement.  However, if you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers to, directly or indirectly, that independent

claim.

On the other hand, if you find that an independent claim has been infringed, then you must still decide separately whether the product meets the additional requirements of any claims that depend from that independent claim--that is, whether those claims have been infringed.  A dependent claim includes all the requirements of any of the claims to which it refers plus the additional requirements of its own, as we've discussed.

Now, in order to prove direct infringement of a patent claim, Collision must show by a preponderance of the evidence that the accused product includes each and every limitation of the claim, either literally or under the doctrine of equivalents.

In determining whether the accused products directly infringe a patent claim in this case, you must compare the accused product with each and every one of the requirements or limitations of that claim to determine whether the accused products contain each and every requirement or limitation recited in that claim.  An accused product infringes a claim if it is reasonably capable of satisfying the claim elements, even though it may also be capable of non-infringing modes of operation.

A claim requirement is literally present if it exists in an accused product just as it is described in the claim

language, either as I have explained or interpreted that language for you, or if I did not construe or explain it, as would be understood by its plain and ordinary meaning to one of ordinary skill in the art.  If an accused product omits any element recited in a claim, then you must find that the product in question does not literally infringe that claim.

So long as an accused product has each and every one of the claim elements, infringement of that claim is shown, even if the product includes or contains additional features or elements not required by the claims.

Now, as I have previously explained, claim 1 of the '505 Patent and claim 1 of the '492 Patent include the requirements that are in means-plus-function format.

A product meets a means-plus-function requirement of a claim if:  (1) it includes a structure or set of structures that perform the identical function recited in the claim, and (2) the structure or set of structures is either identical or equivalent to the described structures in the patent that I have defined in your juror notebooks as performing the functions set out in the asserted claims of the patent.

If the accused products do not perform the specific function recited in the claim, the means-plus-function requirement is not met and the products do not literally infringe the claim.  Alternatively, even if the accused products have a structure that performs the function recited

in the claim but the structure is neither identical nor equivalent to that structure that I defined for you as being described in the relevant patent and performing this function, the products do not literally infringe the claim.

A structure or set of structures may be found to be equivalent to one of the structures or sets of structures I have defined as being described in the '505 Patent and the '492 Patent if a person of ordinary skill in the field of the technology of the '505 Patent and the '492 Patent would have found the structures performed the identical function and are otherwise insubstantially different.  In order to prove direct infringement of a means-plus-function limitation, Collision must prove the above requirements are met by a preponderance of the evidence.

I'll now instruct you on indirect infringement.

In this case, Collision has accused Samsung of indirect infringement by actively inducing its customers to directly infringe the asserted claims of the asserted patents.  As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.  Samsung is liable for induced infringement of a claim only if Collision proves by a preponderance of the evidence that:

1.  Acts have been carried out by Samsung's end users, distributors, resellers, and retail partners that directly infringe that claim;

1228

2.  Samsung has taken action during the time the asserted patents were in force, intending to cause the infringe infringing acts by its end users, distributors, resellers and retail partners; and

3.  Samsung has been aware of the asserted patents and has known that the acts of its end users, distributors, resellers, and retail partners constitute infringement of the asserted patents, or Samsung was willfully blind to that infringement.

Willful blindness, ladies and gentlemen, is established if Samsung believed there was a high probability that the acts, if taken, would constitute infringement of the asserted claims, but deliberately avoided confirming that belief.  But belief that a patent is invalid is not a defense to induced infringement.

Now, by establishing or to establish, rather, induced infringement, it's not sufficient that someone else directly infringes a claim.  Nor is it sufficient that the company accused of inducing another's direct infringement merely had knowledge or notice of an asserted patent or had been aware that the acts of another allegedly constitute direct infringement.

And the mere fact that the company accused of inducing another's direct -- excuse me.  Inducing another's direct infringement had known or should have known that there was a

1229

substantial risk that someone else's act would infringe is not sufficient.  Rather, in order to find inducement, you must find that Samsung specifically intended or was willfully blind to that infringement.

Collision also intends [sic] that Samsung has willfully infringed the patents-in-suit.  If you decide that Samsung has infringed, then you must go on to address the additional issue of whether or not that infringement was willful.  Collision has the burden of proving willful infringement by a preponderance of the evidence.  You may not determine that the infringement was willful just because Samsung knew of the asserted patents and infringed them.  Willful infringement is deliberate or intentional infringement.

You may find that Samsung's actions were willful if Samsung acted in a reckless or callous disregard of, or with indifference to, the rights of Collision.  A defendant is indifferent to the rights of another when it proceeds in disregard of a high or excessive danger of infringement that is known to it or was apparent to a reasonable person in its position.

To determine whether Samsung acted willfully, consider all the facts and assess Samsung's knowledge at the time of the challenged conduct.  Facts that may be considered include whether or not Samsung reasonably believed that it did not infringe or that the asserted patents were invalid.  You may

1230

find that Samsung's actions were deliberate or intentional if Samsung was willfully blind to Collision's patent rights.

Your determination of willfulness should incorporate the totality of the circumstances based on the evidence presented during this trial. Willfulness can be established by circumstantial evidence. If you decide that any infringement was willful, that decision should not affect the amount of any money damages that you might award. As I've told you, the Court will take willfulness into account later, if you find it.

I'll now instruct you on the rules that you must follow in deciding whether or not Samsung has proven that any asserted claims of the asserted patents are invalid. An issued United States patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard called the PTO or the Patent Office, acted correctly in issuing the patent. This presumption of validity extends to all issued United States patents.

To overcome this presumption, Samsung must establish by clear and convincing evidence that a claim is invalid. Like infringement, ladies and gentlemen, invalidity is determined on a claim-by-claim basis. And you must determine separately for each claim whether that claim is invalid. If one claim of a patent is invalid, this does not mean that any other claim

is necessarily invalid.

Now, claims are construed in the same way for determining infringement as for determining invalidity, and you must apply the claim language consistently and in the same manner for the issues of infringement as well as for the issues of invalidity.  In making your determination as to invalidity, you should consider each claim separately.

As I explained to you earlier, a previous device, system, method, publication, or patent that predates the claimed invention is generally called prior art and may include items that were publicly known or that have been used or offered for sale, or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention.

Prior art may be authored or created by anyone.  In evaluating the prior art to determine whether an invalidity defense has been proven by clear and convincing evidence, you may consider whether that prior art was or was not before the Patent Office.

In this case Samsung contends that claim 1 of the '505 Patent is obvious in light of U.S. Patent No. 5,995,499, which you've heard referred to as the Hottinen and in view of U.S. Patent No. 5,905,946, which you've heard referred to as the Lilleberg reference.

Samsung also contends that claim 1 of the '492 Patent is

obvious in light of U.S. Patent Application No. 2006/0018410, which you've heard referred to as the Texas Instruments reference, in view of U.S. Patent Application No. 2005/0053173, which you've heard referred to as the Egnor reference.

I'll now instruct you on how to determine whether claim 1 of the '505 Patent or claim 1 of the '492 Patent is invalid as being obvious.

Even though an invention may not have been identically disclosed or identically described in a single prior art reference before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

Samsung has the burden of establishing obviousness by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of the technology of the patent.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field that someone would have had at the time the invention was made, the scope and the content of the prior art, and any differences between the prior art and the claimed invention.

Keep in mind, ladies and gentlemen, that the existence of

each and every element of the claimed invention in the prior art does not necessarily prove obviousness.  Most, if not all, inventions rely on the building blocks of prior art.  The skill of the actual inventor is not necessarily relevant because inventors may possess something that distinguishes them from persons having ordinary skill in the art.

In considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art.  The scope and content of the prior art for deciding whether the invention was obvious includes at least prior art in the same field as the claimed invention.  It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention.

Further, teachings, suggestions, and motivations may also be found within the knowledge of a person of ordinary skill in the art, including inferences and creative steps that a person of ordinary skill in the art would employ.  A person of ordinary skill may be able to fit the teachings of multiple pieces of prior art together like pieces of a jigsaw puzzle.  The person of ordinary skill in the art would have the capability of understanding the scientific and engineering principles applicable to the pertinent art.

In considering whether a claimed invention is obvious, you may, but you are not required, to find obviousness if you

find that at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field to combine the known elements in the way the claimed invention does, taking into account such factors as:

1.  Whether the claimed invention was merely the predictable result of using prior art elements according to their known function;

2.  Whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3.  Whether the prior art teaches or suggests the desirability of combining elements in the claimed invention;

4.  Whether the prior art teaches away from combining elements in the claimed invention;

5.  Whether it would have been obvious to try the combination of elements in the claimed invention, such as when there is a design need or market pressure to solve a problem, and there are a finite number of identified, predictable solutions; and

6.  Whether the change resulted more from design incentives or other market forces.

To find the invention obvious, you must find that the prior art provided a person having ordinary skill in the field a reasonable expectation of success.  Obvious to try is not sufficient in unpredictable technologies.

Now, in determining whether the claimed invention was

obvious, consider each claim separately.  Do not use hindsight; consider only what was known at the time of the invention.  In other words, you should not consider what a person of ordinary skill in the art would know now or what has been learned from the teachings of the '505 or the '492 Patent.

In making these assessments, you should take into account any objective evidence, sometimes called secondary considerations, that may have existed at the time of the invention and afterwards that may shed light on the obviousness or not of the claimed invention.  The following are possible secondary considerations, but it is up to you, ladies and gentlemen, to decide whether secondary considerations of non-obviousness exist at all.  These are:

1.  Whether the invention was commercially successful as the result of the merits of the claimed invention, rather than the result of design needs or market pressure, advertising, or similar activities;

2.  Whether the invention satisfied a long-felt need;

3.  Whether the inventor proceeded contrary to accepted wisdom in the field;

4.  Whether others tried but failed to solve the problem solved by the claimed invention;

5.  Whether others invented the invention at roughly the same time;

6.   Whether others copied the claimed invention;

7.   Whether others accepted licenses under the patents-in-suit because of the merits of the claimed invention;

8.   Whether the claimed invention achieved unexpected results;

9.   Whether others in the field praised the claimed invention;

10.   Whether there were changes or related technologies or market needs contemporaneous with the invention; and

11.   Whether persons having ordinary skill in the art at the time of the invention expressed surprise or disbelief regarding the invention.

These factors are relevant only if there is a connection or nexus between the factors and what differentiates the claimed invention from the prior art.  Collision, the Plaintiff, has the burden of establishing this connection or nexus.  Moreover, even if you conclude that some of the above indicators of objective evidence have been established, those factors should be considered along with all the other evidence in this case in determining whether Samsung has proven that the claimed invention would have been obvious.

In support of obviousness, you may also consider whether others independently invented the claimed invention before or about at the same time as the named inventor thought of it.

In making these determinations, a person of ordinary skill uses simple common sense, and can rely upon the inferences and creative steps that a person of ordinary skill in the art would employ.

Also, Samsung does not need to show that one of ordinary skill would actually have combined the physical structures of two references; one need only combine the teachings. Remember and as stated earlier, prior art is not limited to patents and published materials, but includes the general knowledge that would have been available at the time to one of ordinary skill in the field of the invention. If you find that Samsung has proven the obviousness of a claim by clear and convincing evidence, then you must find that that claim is invalid.

Now, the law requires that the specification section of a patent contain an adequate written description of the invention set forth in the patent claims. Samsung contends that the asserted claims of all four of the patents-in-suit are invalid for failure to satisfy the written description requirement.

As I previously explained, to obtain a patent, one must first file an application with the U.S. Patent and Trademark Office. This process of obtaining a patent is called patent prosecution. The application submitted to the Patent Office includes within it what is called a specification. The specification is required to contain a written description of

the claimed invention telling what the invention is, how it works, how to make it, and how to use it.  The written description requirement is designed to ensure that the inventor was in possession of the full scope of the claimed invention as of the patent's priority date.

To succeed on its claims of a lack of an adequate written description as to the four patents-in-suit, Samsung must show by clear and convincing evidence that a person having ordinary skill in the field reading the patent specification as of the priority date of the patent would not have understood that the specification describes the full scope of the invention as it is claimed in the claims of the patent.  If a patent claim lacks adequate written description, it is invalid.

In deciding whether the patents-in-suit satisfy this written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of the technology of the patent as of the filing date of the patents-in-suit.  The specification must describe the full scope of the claimed invention, including each element thereof, either expressly or inherently.  A claimed element is disclosed inherently if a person having ordinary skill in the field as of the priority date would have understood that the element is necessarily present in what the specification discloses.

Now, the written description does not have to be in the

1239

same exact words as the claim.  The requirement may be satisfied by any combination of words, structures, figures, diagrams, formulas, et cetera, contained in the patent specification.  Adequate written description does not require either examples or an actual reduction to practice of the claimed invention.

However, a mere wish or plan for obtaining the claimed invention is not adequate and is not an adequate written description.  Rather, the level of disclosure required depends on a variety of factors, such as the existing knowledge in the particular field, the scope and content of the prior art, the maturity of the science or technology, and other considerations appropriate to the subject matter.  The issue of written description is decided on a claim-by-claim basis, ladies and gentlemen, not as to the entire patent or groups of claims.

Now, another way that a patent can be invalid is if it fails to disclose sufficient information to enable or teach persons of ordinary skill in the field of the invention, as of the effective filing date, to make and use the full scope of the claimed invention without undue experimentation.  This requirement is known as the enablement requirement.  Samsung contends that the asserted claims of the '703 and the '651 Patents are invalid as having a lack of enablement.  If a patent claim is not enabled, it is invalid.

In considering whether a patent complies with the enablement requirement, you must keep in mind that the patents are written for persons of ordinary skill in the field of the invention.  Thus, a patent need not expressly state information that persons of ordinary skill would likely know or could obtain without undue experimentation.

Factors that you may consider in determining whether persons of ordinary skill in the field of the invention would require undue experimentation to make and use the full scope of the claimed invention include:

1.  The quantity of experimentation necessary, and whether that experimentation involves only known or commonly used techniques.  The question of undue experimentation is a matter of degree.  Even extensive experimentation does not necessarily make the experiments unduly extensive where the experiments are routine, such as repetition of known or commonly used techniques.  But permissible experimentation is not without bounds;

2.  The amount of direction or guidance disclosed in the patent;

3.  The presence or absence of working examples in the patent;

4.  The nature of the invention;

5.  The state of the prior art;

6.  The relative skill of those in the art;

7.   The predictability of the art; and

8.   The breadth of the claims?

No one of these factors alone is dispositive.  Rather, you must make your decision about whether or not the degree of experimentation required is undue based on all of the evidence presented to you.  You should weigh these factors and determine whether or not, in the context of this invention and the state of the art at the time of the effective filing date, that a person having ordinary skill would need to experiment unduly to make and use the full scope of the claimed invention.

The question of enablement does not turn on whether the accused product is enabled.  To show a lack of enablement, Samsung must show that all disclosed alternative modes are insufficient to enable the full scope of the claims.  The law requires that the specification section of the patent contain enough information to enable a person of ordinary skill in the field of the invention to make and use the full scope of the invention without an undue amount of experimentation.

If you find that Samsung has infringed any valid claim of the patents-in-suit, then you must consider what amount of money damages, if any, to award to Collision.

I'll now instruct you about the measure of damages, but by instructing you on damages, ladies and gentlemen, I am not suggesting which party should win this case on any issue.  If

you find that Samsung has not infringed any valid claim of the patents-in-suit, then Collision is not entitled to any patent damages.

Collision has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that Collision establishes that it more likely than not suffered as a result of Samsung's infringement.  Now, while Collision is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.  Collision is not entitled to damages that are remote or that are only speculative.

The damages that you award, if any, must be adequate to compensate Collision for any infringement that you may find.  You must not award Collision more damages than are adequate to compensate it for the infringement.  You must also not include any additional amount for the purpose of punishing Samsung or for the purpose of setting an example.

With respect to Collision's asserted damages, damages shall not be had for infringement committed more than six years prior to the filing of the complaint in this case.  The complaint in this case was filed on December the 12th, 2003.  However, if Collision's licensees, such as Nokia and Ericsson, produced and sold in the market products that implement and practice the patented functionality at issue in this case, and

those licensees failed to mark their products with the patent numbers of the asserted patents (which is the case here), then Collision is only entitled to damages from and after the time that Collision gave Samsung actual notice of its infringement claims.

However, if the products of Collision's licensees did not implement or embody the functionality at issue in this case, then Collision remains entitled to damages going back six years from when the complaint was filed, which would be December the 12th, 2017.  Actual notice means that Collision has communicated or brought home to Samsung in a reasonable way an assertion that Samsung's accused products use or would use Collision's patented technology such that Samsung would be infringing Collision's patents if they did not obtain a license from Collision to practice the asserted patents.

Regardless of any pre-suit communications between Collision and Samsung, the filing of the complaint in this case qualifies as actual notice, so in any event, the damages period begins no later than the date the complaint was filed, which was December the 12th, 2023.

I'll now instruct you, ladies and gentlemen, on how to calculate reasonable royalty damages.

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of royalty

1244

payment that the patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.  In determining this, you must assume both parties believed the patent was valid and infringed, and that both parties were willing to enter into an agreement.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred. Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

Although evidence of the actual profits an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

Now, the law requires that any royalty awarded to Collision correspond to the value of the alleged inventions within the accused products, as distinct from other unpatented

features of the accused products.  This is particularly true where an accused product has multiple features and multiple components not covered by the patents or where the accused product work in conjunction with other non-patented items.

This process of separating the value of the allegedly infringing features from the value of all other features is called apportionment.  If unpatented features contribute to the accused products, you must apportion that value to exclude any value attributable to unpatented features.  You must determine the appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.

A reasonable royalty is the amount of royalty payment that the patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time immediately prior to when infringement first began.

You've heard references throughout this trial to whether Collision should be entitled to a running royalty or to a lump-sum royalty.  If you find that Collision is entitled to damages, you must decide whether the parties would have agreed to a running royalty or to a fully paid-up lump-sum royalty at the time of the hypothetical negotiation.

A running royalty is a fee paid for the right to use the patent that is paid for each unit of the infringing products that have been sold.  If you decide that a running royalty is

appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate Collision for Samsung's past infringement.  If there are additional units sold in the future, any damages for these sales will not be addressed by you, but will be addressed by the Court later.

A lump-sum royalty, however, is when the infringer pays a single price for a license covering both past and future infringing sales.  If you decide that a lump sum is appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate Collision for Samsung's past and future infringement.

In considering the hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.  In determining this, you must assume that both parties believed the asserted claims were valid and infringed and that both parties were willing to enter into an agreement.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty that either party would have preferred.  In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time infringement began.

The parties disagree on the date of the hypothetical

negotiation for the asserted patents, which is the date of first infringement. Collision alleges that the date of first infringement is April 2015, when Samsung first sold an accused smartphone which uses Collision's patented technology. Samsung contends that the hypothetical negotiation occurred in April 2013.

Now, some of the kinds of factors that you may consider in making your determination are:

1. The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty;

2. The rates paid by the licensee for the use of other patents comparable to the patents-in-suit. Comparable license agreements include those covering the use of the claimed invention or similar technology;

3. The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4. The licensor's established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

5. The commercial relationship between the licensor and licensee, such as whether they are competitors in the same

territory in the same line of business;

6.    The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales;

7.    The duration of the patent and the term of the license;

8.    The established profitability of the product made under the patents, its commercial success, and its current popularity;

9.    The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

10.    The nature of the patented invention, the character of its commercial embodiment as owned and produced by the licensor, and the benefits to those who have used the invention;

11.    The extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

12.    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13. The portion of the recently realizable profits that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

14. The opinion and testimony of qualified experts; and

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time infringement began) if both had been trying reasonably and voluntarily to reach an agreement, that is, the amount which a prudent licensee--who desired as a business proposition to obtain a license to the patented invention--would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license.

You may have heard these factors referred to during the trial as the *Georgia-Pacific* factors. No one of these factors is dispositive, and you should and you can consider the evidence that's been presented to you in this case on each of these factors.

You may also consider, ladies and gentlemen, any other factors which, in your mind, would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept,

1250

acting as normally prudent business people.

Comparable license agreements are one factor that may inform your decision as to the proper amount and form of the reasonable royalty payment, similar to the way in which the value of a house is determined relative to comparable houses sold in the same neighborhood.

Whether a license agreement is comparable to the license under the hypothetical license scenario depends on many factors, such as whether they involve comparable technologies, comparable economic circumstances, comparable structure, and comparable scope.  If there are differences between a license agreement and the hypothetical license, you must take those into account when you make your reasonable royalty determination.

In determining a reasonable royalty, you may also consider whether Samsung had commercially-acceptable non-infringing alternatives to taking a license from Collision that were available at the time of the hypothetical negotiation and whether that would have affected the reasonable royalty the parties would have agreed upon.

A non-infringing alternative is a way of providing the same or comparable functionality or achieving the same or comparable result that does not require using the asserted claims.  You may compare the patented invention to non-infringing alternatives to determine the value of the

patented invention, including the utility and advantages of the patent over the old modes or devices, if any, that had been used to achieve similar results.

Now, with those instructions, ladies and gentlemen, we'll proceed at this time to hear closing arguments from the attorneys in this case.

The Plaintiff may now present its first closing argument to the jury.

You may proceed with the Plaintiff's first closing argument when you're ready, Mr. Stewart.

MR. STEWART:  Thank you, Your Honor.

May it please the Court.

Members of the jury, as a reminder, my name is Chris Stewart.  I hope you remember me from Monday.  It's only been a few days, but I'm sure you agree with me it's been a lot of information over those few days and so it feels like a long time.

I want to first start off by thanking you on behalf of myself and my team and especially on behalf of Collision, Mr. Fry, and Mr. Farkas, for the attention that you've given to this case over this week, for your jury service, for coming in early and staying later than you may be expected to some days. We really appreciate it.  We are extremely grateful for the opportunity to present our case to you in front of a jury of Collision's peers and to have our day in court to be heard on

1252

this issue.  So, again, thank you very much.

Now, to start off with, I have a few minutes to spend with you, and then after Samsung presents its arguments, Mr. Caldwell will get up and have some more time to talk at the end.  So I'm going to try to be as efficient as I can with my time, but I want to start with something Mr. Caldwell said at the beginning of this trial.  He said that in this case you were going to see what happens when there's an idea, a technology that Samsung desperately wants, and what happens when you go to them and try to negotiate for that technology.

You may have heard the phrase, I'm sure you have, nice guys finish last.  Well, you met a couple of pretty nice guys on Monday, Mr. Farkas and Mr. Fry, and you heard about their attempt to start a company, build it from the ground up using this groundbreaking cutting-edge military technology that they got from BAE Systems, and bring that military technology to commercial systems to make our phones, our base stations more efficient, more effective, increase our download speeds.

But you also saw what happened when they tried to bring that patented technology to Samsung to actually collaborate with them on a business relationship.  And it's a lot of information, but I want to walk through a timeline of what you've seen so far this week.

So the very beginning you saw that these patents were filed back in the early 2000s by Dr. Learned, by Mark Landy,

by Tom McElwain, brilliant scientists and engineers at BAE Systems working on this new approach to interference in military communications.

You heard about Mr. Farkas, 17 years ago, a younger version, working on these DIMA prototypes to try to prove that this was a concept that could really be applied to communication systems in the real world.

Now, you fast forward to 2010, BAE Systems sells their technology to Collision Communications, and Collision hits the ground running.  Within that first year, they were already approaching Samsung and having these lengthy detailed conversations about collaborating because they know Samsung can use this technology in their base stations and their phones to make their products better.

And so you saw that Mr. Farkas spent a year-and-a-half working on detailed tests that Samsung asked them to run, telling them all about their patents, what those patents covered, what technology they had to offer, and how that technology worked, and running extremely sophisticated simulations for Samsung to show how much better their products could get from this tech.

Now, the results that Collision was able to show in those simulations were off the charts.  You know, I think Samsung's goal was a hundred percent edge of cell with only 0 percent average spectral efficiency, and that's that download speed,

that gain in data that Mr. Farkas talked about.  And Collision was showing 25 percent average with 165 edge of cell.  Even when they ran a harder version of that test, they still got 15 percent gains on average, and you also heard numbers like 40 percent, 35 percent.  This technology was really improving Samsung's products or had the potential to based on these simulations.

Now, you heard a little bit in portions of this trial about the baseline that Collision ran these simulations against, whether they used the right inputs and whether the baseline should have used different acronyms or what have you. But what you didn't hear is any Samsung engineer complain about the baseline that Collision used or the simulations they ran.  The actual engineers working with Mr. Farkas and the Collision team on these simulations thought they were doing everything right and were eager to see more and more results from these simulations.

Now, the one person you heard in this trial who did seem to disagree with the baseline and disagree with that simulation was Samsung's expert, Dr. Mahon, in this case.  But on cross examination, he acknowledged that while those opinions were based on him reviewing the source code for those simulations, he maybe hadn't actually reviewed it and that that part of his report might have just been slipped in, maybe by the attorneys in the drafting process.

1255

So back to 2013.  Mr. Farkas and Collision are running all these simulations, and Samsung's engineers are thrilled. They say, we're really impressed with the low complexity that you're showing with this new technology.  And as you may recall from some of the witnesses, low complexity means low processing power and that's going to be really useful in a cell phone.  If you can do this advanced technique with low complexity, you can put it into a smaller device in addition to a base station.

So then something weird happens.  Around the time that they completed those simulations and were showing those great results, Mr. Fry got involved in trying to do a commercial contract with Samsung.  And you saw this slide in his direct where time and time again Collision would propose some contract terms to Samsung, and they'd find some reason to pivot, some reason to not commit to actually signing a deal.

Mr. Fry and Mr. Farkas were both pretty confused as to why they were getting that cold treatment.  But Mr. Fry and Mr. Farkas, sitting in this courtroom, got to learn in this trial at the same time you did exactly what was going on behind the scenes, why Samsung was showing so much reluctance.

You'll remember this October 2nd, 2013, was one of the dates where Mr. Farkas proposed one of the many failed attempts at a contract to Samsung?  Well, on that same day you saw testimony that Ms. Oh was asking for how much it would

cost for Samsung to develop that same technology on their own, the very same day that she rejected Mr. Farkas' third or fourth proposal on a contract.

Now, someone on the team piped up in this email thread and said, well, hang on, if Collision successfully demonstrates actual gains, shouldn't we just proceed with a license agreement with them?

And Ms. Oh says, you're absolutely right, but if we decide to adopt C Company, Collision's technology, we'll have to pay for it.

And Samsung didn't want to pay for it.

Now, Collision is sort of oblivious to what's happening, and so you see at the bottom all these green dots. They were trying to continue to working with Samsung and try to find a way to make a deal so they could build this real company. But we know why Samsung kept avoiding that contract starting in January '14 when they made a plan to use in-house personnel or personnel from Russian research institutes to try to develop Collision's technology on their own.

And they acknowledged from the very beginning that there was a risk here. What was that risk? The unlikely event, they thought it was unlikely, that Collision would take legal action after all the progress they made. So, remember, nice guys finish last. They didn't think Collision would ever assert their rights based on this activity.

So what does Samsung do?  Well, so they come up with an excuse--and this is January 28th of 2014--to tell Collision that, oh, well, even though we've been saying such glowing things about your technology, it's not going to be useful for this thing called C-RAN.  It's an acronym that's otherwise totally irrelevant to this case, but that's their excuse for why they're maybe not wanting to work with Collision.

Now, you'd think if that was true and Samsung wasn't seeing the value here, they'd stop thinking about Collision, they'd move on.  But they don't.  And in February 27th of 2014, they're still working with outside universities to try to develop an algorithm comparable to Collision's, and it's an urgent matter and a directive from above.

Now, we don't know what actually happened from those university projects, we don't have any testimony or evidence about that, but we do know that a few weeks later in March of 2014 they declined to move forward with Collision.

We know that around this time Samsung was beginning to realize that this technology that makes the base stations more efficient, it makes them able to receive more signals, means you potentially don't need as much.  And if you don't need as many base stations, Samsung makes less money.  So they're beginning to realize that.  And you saw Mr. Caldwell's very elegant chart demonstrating that fewer sales are bad, more sales are good.

Now, we also know that in October of 2014 when Collision was talking to Samsung Ventures, there was suddenly this influx of interest from the mobile division.  The head of the mobile division of Samsung, J.K. Shin, got involved in those Samsung Ventures conversations after all that previous conversation had been with base stations.  And then we know that in April of 2015, the Galaxy S6 was released, and that's the first phone in this time period with a Samsung chip in it that Dr. Kowalski found is infringing these patents.

And how did they deal with the risk that we talked about earlier?  You saw testimony that Samsung was awarding promotions to certain employees if they would reduce the dispute risk through follow-up actions after non-adoption decisions.  They were stringing Collision along.  They kept talking to them about this Samsung Ventures project.  Then they would invite them to these innovation conferences all the way up to 2019, keep them kind of interested so maybe they wouldn't go and decide to do that unlikely thing of taking legal action.

Now, I'm not sure if you-all could see Mr. Fry's face throughout this trial when he was reading many of these documents and hearing some of this stuff for the very first time.  But I bet you can probably imagine how he was feeling, sort of learning for the first time that all those years of effort when they were actively trying to build a company,

1259

busting their tail trying to get Samsung's business, they were sort of just being undermined the whole time behind the scenes.

All right.  So how does Samsung deal with that risk, how bad this all looks in this trial?  They come up with this new narrative, and they say, well, we actually have been infringing, if at all, even more than you say.  Right?  It wasn't that Galaxy S6 in 2015.  We've been doing the same stuff since 2008 with the LTE standard, or at least 2011 with the next edition, or at least by the Galaxy S4 in early 2013.

And, Mr. Kang, he came all the way from Korea, and he testified that the technology in these particular features has never changed over all that time.  And I'm sure that -- I hope that struck you as odd because they also had Mr. Englehardt say, We're super innovative.  Right?  And here is me at a conference telling me how great all of our products are and how innovative we are, not how great our 2008 technology is.  But they're saying, in these particular features, no, there's no innovation, we did the exact same thing.

The reason why they wanted to do that is because that green arrow there at the bottom.  Right?  If they can convince you that nothing changed in that whole time period, it might draw your attention away from the box up at the top, what they were doing behind the scenes while working with Collision.

And one more important point here is that even if all

this was true, going back to 2008, the patents were issued before all that.  So this wouldn't even matter for infringement.  This is just about trying to pull your attention away from the activities of the Korean research universities and Russian research institutes.

At any rate, when Mr. Kang was cross-examined, and Mr. Nemunaitis sort of put this whole question to rest, because even though Mr. Kang said confidently, we do everything the same through this whole period, he admitted he hadn't really reviewed the code, he wasn't on the algorithm team.

And when Mr. Nemunaitis showed him these documents, it showed that actually in 2013, right around the time they were talking to Collision, both of these features worked one way, and then in a 2018 document that was used for infringement in this case, they are different, they're not the same.  And, in fact, the differences are differences that are exactly relevant to Dr. Kowalski's infringement opinions in this case and why these products infringe the patents.

So you've seen how Samsung deals with companies who try to approach them with a good idea.  And you heard Mr. Pak say in opening statements that here in Texas, we take people's words and their actions very seriously.  I agree with that.  I think you should consider what you saw in this trial about Mr. Fry's and Mr. Farkas' words and actions, what you saw about Samsung's words and actions, and consider that as part of your

deliberations.

Now, I want to pause here and briefly remind you, as the Court instructed you, that while all of that is extremely unsettling and very relevant to Samsung's willful infringement and to the notice that they had of our patents, we don't have to prove any of that in order to show infringement and damages. We don't have to prove that Samsung copied these patents to be able to be entitled to a reasonable royalty for their use.

But we proved, met our burden by a preponderance of the evidence, that Samsung infringes the patents at any rate. And so Dr. Kowalski walked you through detailed technical documents. He showed you three different types of source code that he reviewed, thousands of pages. He went through all of these detailed, complicated equations from Samsung technical documents to show you how they mapped element-by-element each claim of the asserted patents.

He put the white board up there, gave you a little school lesson, hopefully taught you something about how wireless communications work, how channel estimation works.

THE COURT: Fifteen minutes have been used.

MR. STEWART: Thank you, Your Honor.

And he showed you again element-by-element how the CRS IC functionality in Samsung's products meets each claim of the '505 and the '651 Patents. He did the same thing with the

'703 and the '492.  He showed you how the SU-MIMO, the advanced version of SU-MIMO that Collision -- Samsung uses in its products, meets the iterative techniques of the '703 Patent and does the hybrid MUD techniques of the '492 Patent.  And Mr. Nemunaitis checked off every box for each element of every claim of these patents to show you that Samsung does infringe.

Now, turning to damages, Mr. Bergman got up and told you what a reasonable royalty would be for the use made of the invention by the infringer.  That's very important because it's about how much the Defendant is using this invention.  He used this hypothetical negotiation framework, which you heard about in the instructions, and it didn't even have to be that hypothetical in this case because we actually had evidence of real negotiations between Samsung and Collision around the time of the hypothetical negotiation.

He used royalty rates that were actually negotiated between those parties because even though Samsung was stringing Collision along, they kind of were agreeing on a lot of those financial terms, and they talked about royalty rates between 1 and 3-and-a-half percent.  Mr. Bergman settled on 2 percent as a reasonable rate as a starting point in this analysis.

And then he broke all that down.  You heard about apportionment in the instructions.  He separated out that

1263

royalty rate down to just the small portion attributable to these four patents. And as you heard in opening, it's something like 1/12th of 1 percent or 1/6th of 1 percent for each of these patents, and that's the running royalty that Collision would have asked for in a hypothetical negotiation.

He also relied on the simulations that Collision presented to Samsung, and those simulations showed those 15 percent improvement gains. And Mr. Franklyn, our survey expert, was able to quantify how much someone would pay who was buying a Samsung phone for that 15 percent gain and that helped to add additional numerical quantification of the value of these patents.

And then he did some additional steps to again apportion it just down to what's valuable or what matters for these patents by doing a profit split. He gave back certain development costs to Samsung as part of the analysis. And then he took the rates he came up with, and he multiplied it by the almost 270 million units that Samsung has sold using this patented technology to get to his final royalty damages.

These are the running royalties that through the date of this trial, Mr. Bergman opined, are the appropriate reasonable royalty for Samsung's infringement. And you may have already written this down earlier in the trial. If you didn't, this is a good number to write down because this is the number we'll ask you to write in the verdict form at the end of this

case.

All right.  Let's talk briefly before I'm out of time about the defenses you heard from Samsung.  In their defenses they would pretty much say anything to avoid liability.  I think Mr. Caldwell told you at the beginning that they would say, we don't infringe; if we do infringe, we maybe infringe at a different time than you say; if we infringe, then the patents are not valid; even if they're valid, we don't owe damages.  And then even if we owe damages, we should get a haircut because Collision's licensees practice the patents.

But before we even got to any of that, you heard sort of hours of cross examination I think on Monday of Mr. Farkas and Dr. Kowalski, not about the claims and not about any of those defenses, but about a bunch of different acronyms to try to sort of muddy the waters.  You heard about OFDMA, LTE, SIC, C-RAN, MU-SIMO.  I could go on, but the court reporter will get mad at me.  The idea here is that it took Samsung a long time to even engage on the claims of these patents which should tell you something about how confidently they feel in their defenses.

The Court's constructions or instructions told you that in deciding infringement, the only correct comparison is the accused products to the claims.  That's what Dr. Kowalski did when he ran through those claim boards and all of those detailed technical documents.

But when Dr. Mahon got up for Samsung, he didn't compare the claims to the actual products.  He compared them to these chutes-and-ladders diagrams that he wrote himself, I guess, and just sort of declared that these show there's not infringement.

But that's not sufficient.

THE COURT:  Twenty minutes have been used.

MR. STEWART:  You also heard him say that on cross, this idea of encouraging interference.  Right?  They talked a lot about encouraging interference versus canceling it.  Mr. Caldwell had him acknowledge that the portion of a claim in the '505 Patent that even hints at that is not part of the claim that you have to analyze according to the Court's instructions.

Damages was more of the same.  You didn't hear any testimony from Ms. Rowe in her very short presentation about the actual negotiations between these two parties.  She said you should just rely on this other totally unrelated license to a different company and that the damages should maybe be $10 million or maybe zero.  She didn't walk through those *Georgia-Pacific* factors that the Judge instructed you on in any detail the way that Mr. Bergman did.  It was a, you know, 10-minute presentation to draw the conclusion that damages should be $10 million.  And I hope you agree with me it's just not credible.

Now, for invalidity and my last few remaining minutes, they had a clear and convincing evidence burden to prove invalidity. That's the highest burden that anyone has in this case. But Dr. Mahon acknowledged on the stand that the analysis for written description and enablement in his opinions wasn't really something he could rely upon based on the law from the Court.

And for prior art that he analyzed, in about six minutes, I think his analysis was probably shorter than the Court's instructions on invalidity, he tried to say that these were obvious, even though Samsung had been saying for years that Samsung did some studies and validated Collision's technology. So they didn't meet their clear and convincing evidence burden on invalidity.

And, finally, with respect to this issue of whether licensees of Collision practiced the patents-in-suit, that is an attempt to get a haircut on damages. They want you to believe that if one of the licensees who took a license to Collision's patents also practice these same patents, then they should get a get-out-of-jail-free card. But you heard unequivocal testimony from BAE's engineers that they did not end up putting this technology in these patents in their products, not because it's not valuable, but because they just didn't have the right products to transition this into.

And you heard expert testimony from Dr. Kowalski that he

did not see these patents being used by Ericsson or Nokia base stations. They have a license to Collision's patents, but it's for other patents. Right? Collision has a large portfolio.

Finally, even if there was issues with these licensees, the Court instructed you that actual notice by Samsung gets rid of this whole question and damages go all the way back to 2017 the way Mr. Bergman calculated them. And as we've talked about already, you saw tons of evidence that Samsung knew about these patents, knew what they covered, and was on actual notice by Collision.

You heard about how Samsung strung along Collision for years. I'd submit to you that Samsung strung along you throughout this trial with all the misdirection and by throwing every defense they possibly could at you to avoid accountability for their infringement. Because of the jury system, nice guys like Mr. Fry and Mr. Farkas don't have to finish last. This is our opportunity to get redress.

And you'll get to look at all this evidence, judge the credibility of the witnesses, and we hope when you get the verdict form that you'll answer yes to the infringement questions for all the claims, no as to invalidity, and that when you fill out the damages form, you'll find that a reasonable royalty in this case is $445,494,160 as a running royalty and that Samsung's infringement was willful.

1268

Thank you so much.

THE COURT:  Defendants may now present their closing argument to the jury.

THE COURT:  You may proceed when you're ready, Mr. Pak.

MR. PAK:  Thank you, Your Honor.

Good afternoon, ladies and gentlemen of the jury.

First of all, I want to thank you from the bottom of my heart and also on behalf of the thousands of employees that work in Samsung America and thousands more that work worldwide.  This is a very, very important case to us, not because of the money but because of our reputation and this is a serious allegation made by a company against Samsung.

They have alleged that we have wrongfully and willfully taken their property, and we have evidence that we have brought to you and we have always believed that the brand Samsung stands for quality, value, and innovation that you heard about from Mr. Englehardt.  And we wanted to have this opportunity for ladies and gentlemen of the jury to see all of the evidence and consider all of that in making the right decision that you feel is right for you.

So I'm not going to walk you through the verdict form. We believe that you have all the ability in the world, and you've seen evidence that no one has seen to make the right decisions and whatever you feel after your careful

deliberation and careful analysis. And I know all of you have been paying close attention to the evidence as it's come in, that I trust you, Samsung trusts you, to make the right decision.

So my job in the next 39 minutes is to give you my perspective and Samsung's perspective some of the important evidence and put it together in terms of the chronology and some of the issues that you'll have to decide. And ultimately it will be up to you to decide what the evidence tells you because what I say and what the very good lawyers that represent Collision say is not evidence. What the evidence is, what you have seen from the historical records and the sworn testimony of the witnesses that you've heard.

So with that, let me begin.

I need my clicker.

We brought you two witnesses. Mr. Englehardt, who's been sitting here throughout the entire trial, and he talked to you about how long it's taken and the work that Samsung employees around the world and the thousands that work here in the United States had to do to earn the trust of consumers, to earn the trust of network operators. And he told you that we weren't always best of quality, that it took a lot of work, and we had to focus on building value and trust with our consumers and our business partners by focusing on three things--quality, value, and innovation.

You've heard a lot of evidence in this case about the simulation tests and the extensive diligence that Samsung did, because it's important for Samsung to make sure that whether it's our technology or somebody else's technology that we're introducing to our customers and business partners, that it is of the highest quality; that we're getting the performance at the right cost.

And that was the extensive testing in the simulation that you saw that I worked through with Dr. Kowalski to show you that we weren't taking the data and throwing them away; we were taking all of the data that both parties agreed would be the basis to evaluate the performance of the proposed technology.  And we were simulating that against the best available option that Samsung had to make sure that this technology would work and it would work at the right performance and cost price points.

Value is also very important.  You've heard that from Samsung through Mr. Englehardt that we don't want to just deliver the highest performance at the highest cost to our customers and partners; we want to make sure that there's value at every price point and that also applies to our base station company.

You've heard about how important innovation is.  That includes not only technologies that we developed.  You've heard about the thousands of patents that we develop that we

1271

then contribute to industry standards such as 4G and 5G, but we're open to other ideas, not within the four walls of Samsung offices.  And we're open to business collaborations with companies such as Collision.

And you've heard about Samsung Ventures, that we actually have a business within the Samsung family that puts money to support smaller start-up companies.  All these meetings that you heard about in 2015, '16, '17, and '18 is about that.  It's about the idea that Samsung is open to innovation and is open to supporting smaller start-up companies that have good ideas.  And despite the business negotiations not working out between the two companies, we made introductions not only to our venture arm but you heard that we made introductions to Verizon Ventures as well.

Please don't mistake our politeness and respect for Collision as a company for any type of evidence or acknowledgement of guilt.  We believe that we have been above board, we've been very transparent with Collision.  You saw the contract provisions that were agreed to during the negotiations.  We had been very transparent that we needed validation of their technology, we needed it through real testing and simulation, and that if they cannot deliver on what they promised, then we needed the ability to develop comparable solutions using our technology.

One thing we have to keep in mind is, Collision never

shared any of its algorithms or source code.  We never got to see what they actually had under the hood.  That was a black box to us, and we agreed to do that.  That was the reason why we needed all the simulation data, because we didn't have access to the underlying algorithms.  So those tests were important to ensure the quality and value of what we were being asked to deliver to our customers.

We also brought you Mr. Kang, and he told you that this was an important holiday season in Korea.  He came here to testify because he wanted to share with you the technology that Samsung developed based on its own innovation and hard work that has made Samsung phones.  And not only Samsung phones but through contributions to the industry standards process, everyone's phones, 4G and 5G compatible phones, work better, faster.

He talked about the millimeter wave technology that allows higher data speed through better use of higher frequency spectrum.  He talked to you about carrier aggregation where you can take different channels and combine them together to create wider channels for more bandwidth.  He talked to you about beamforming that's used in virtually all the base stations today to direct antennas and to make sure that interference is avoided.

But he also talked to you about the accused technology in this case, the cancellation interference for CRS signals, the

use of MIMO technology, that that was specified in a standard called LTE-A.  And that LTE-A standard was published in 2011.  And that's the reason why Dr. Kowalski, when he testified, told you under oath that any minor differences in the algorithms and the source code among different modem manufacturers such as MediaTek, Qualcomm who've never been exposed to any discussion with Collision still had the same functionality because those modems comply with the same standard.  Everything that Dr. Kowalski and Collision has accused is specified in industry standards that were published in 2011.  That's before any meeting with Collision.

So how can it be that our business negotiations with Collision about base station products could have resulted in any addition or changes to the functionality that the industry standards body published in 2011?  Those are some of the common sense questions that I'm going to ask each of you to consider and to deliberate together.

We also brought you Dr. Mahon.  And you've heard about his contributions not only in the academic world but very, very important technology, contributions that protect all of us.  He is a trusted consultant, advisor, and contributor to some of the most important technologies in our military.  And despite his very significant commitments to the university and his students as an educator, but also to the military and the CIA on classified projects, he took the time -- of course we

1274

compensate him for his time, but he took the time to review the evidence from Dr. Kowalski to study the standards.

And he was the one who walked you through the claim language, because as you heard from His Honor, that's the first question you'll be asked to decide, which is to read every word carefully in each claim and see whether the evidence that was presented by Collision actually checks off every box, connects all the dots. And I talked to you, I think Dr. Kowalski, about the importance of words such as the, said. Those are important words in claim language. And even if one of those words are not present, there is no infringement, and that is Collision's burden to prove.

We also brought you Ms. Rowe to bring in real-world evidence, real-world evidence of signed agreements with various entities, both on the Collision side and Samsung side. She talked to you about the Ericsson and Nokia licenses and the real-world value that Collision was willing to accept based on what His Honor just described as comparable licenses. These are real-world licenses that people have signed.

She also brought you a Samsung license with a company called IVT [sic], and if you consider this *Georgia-Pacific* factor, those are the -- some of the most important pieces of evidence that you should consider.

Of course, from Samsung's perspective, we do not believe that we've ever needed a license to their technology, and that

we don't owe them any past damages or future damages. It's technology that is standard conventional and based on Samsung's work and not Collision's patents. However, that's not our decision to make; it's your decision to make. So we wanted to make sure that you have all of the evidence to consider.

And each of those agreements were lump-sum agreements, not royalties, and those lump-sum agreements were, as you can imagine, based on the numbers that we just saw, a very, very small fraction of the numbers that Collision is asking for in this case.

Every time I'm in this court, I feel incredibly honored as a small kid growing up in Denton to be sitting here. And I think that His Honor does a great job of explaining the value and the importance of the jury system. He talked to all of us about how the jury system goes back to the ancient Greeks and were brought through the Romans, and that we have the benefit of this system that's lasted over 2,000 years, withstood the test of time.

And it's a reminder that just because something is old doesn't mean that it should be discarded. Sometimes the things that are durable and that last and they're proven, those are the things you invest in and those are the things that become a foundation for greater innovation.

And the same is true with technology. So I recently

learned that it was actually the ancient Romans, the same people that brought us the jury system, that invented concrete.  So the beautiful architecture, colosseums, they were made of concrete that is actually better than the concrete that we use.  They are self-healing.  They have certain chemical compounds that we have forgotten about that allows them to heal, and that's why these great beautiful buildings last.

So just like concrete, there is a very old but proven technique called orthogonality, and we've used various metaphors, but we use it in how we design highways and roads.  We have lanes.  We want to make sure that cars don't collide, they don't interfere, and we erect barriers to ensure that interference is avoided.

And in wireless communications where you don't have the ability to cancel out all of the interference, we use traditional, well-known techniques.  And you can imagine that if you have these lanes or channels in wireless communications, they're free of the interference, you can do so much more to make communications faster.  And those are some of the things that Mr. Kang talked to you about.

But they require interference-free channels, not the kind of technology that was developed for the military and may have great applications for avoiding jamming or for allowing simultaneous communication among fighter jets or used for

intelligence gathering.  We don't need that type of technology today for handsets.  We have great technology that's available.

And I believe that we have shown you evidence of that from Collision's own files that they acknowledge that.  They understood what Samsung had, and they acknowledge that what Samsung had and what the industry standard had put into place was in their words good.  SU-MIMO was good for downlink communications inside of a single cell, which is the only accused functionality in this case.

So to take that metaphor, you can imagine these channels, these what were called MIMO layers that are -- they are orthogonal.  And you heard that testimony from Dr. Kowalski that they're designed not to interfere with each other.  And when there is a little bit of interference, you heard about the standard techniques that have been used for many, many decades in wireless communications, which is to cancel out the interfering signals like you would cancel out noise.

And we've heard the term SIC, or successive interference cancellation, and that's the idea and the technology behind taking away signals one at a time until you have the one that you care about.

So the fundamental difference between SIC technology and what's reflected in the actual claim language of these patents is that in SIC you want to eliminate all of the interference

because you want a clear signal, you want a clear orthogonal signal, whereas, as you heard from Dr. Learned, all the inventors who testified through video, they wanted to use the interference, keep the interference, so that you can double stack and triple stack interfering data signals that can be recovered.

But it comes at the cost -- you heard the penalty of complexity that was discussed by some of the inventors, that it's more complicated to do those things. Complicated technologies require more chips, more hardware, and actually is a significant drain on battery life, which is one of the reasons why you've heard in this case that even Collision did not have a solution for handsets in 2014 or '15; that that was a long-term future plan for them to develop technologies that could actually fit inside a mobile phone and deliver any type of performance gain without reducing battery life. They didn't have that solution during this entire time period that Collision's counsel just talked to you about.

I want to thank Dr. Kowalski actually for coming to this trial and providing, I think, some of the most important testimony under oath. And that's the reason why I did my examination with him for a lengthy period of time, because I believed that he would tell us the truth about the technology at issue in this case; that he would tell us the truth about what he's accusing and what he's not accusing.

1279

And he confirmed for us under oath that the accused functionality of a channel estimator is to cancel out all of the interfering signals so that you have one reference signal from the one base station that you're interested in. That's the CRS, or cell reference signal. IC stands for interference cancellation.

This is exactly the opposite of what's being reflected in the claims and the opposite of what you heard about from all the inventors in terms of the Collision patented MUD technology, which wants to use the interference, not cancel it out.

I think this is some of the most important testimony we've heard in the entire case. Dr. Kowalski told us under oath when I asked him these questions that what he's accused, the channel estimator that is in -- that he's identified for every single claim in this case was in 4G standards; that this is standard technology and, in particular, the LTE-A technology standard that was published in 2011. So this is testimony from Dr. Kowalski admitting that what he's accusing is standard technology that was published in 2011 before any meetings took place between Samsung's networking division and Collision.

I also want to thank Mr. Farkas for coming and telling us the truth about what his technology was through his involvement at BAE and he understood the patents as somebody

who's been marketing the patents for a long time.  CTO of Collision.  Successively canceling out interference or SIC technology was known prior to the filing of these asserted patents.  So this is my concrete old technology that works.  But that's not and cannot be the basis of patents that you've heard so much about, which is intended to protect new inventions; not old prior art, but very useful techniques that's been known for decades.

There is some very important testimony from Dr. Kowalski:  In these networks, 4G LTE, including release 10, that's the LTE-A standard, and 5G, you use orthogonal channels.  That's what he calls the MIMO layers.  And you use--this is very important, conventional, which means prior art well-known techniques, for channel estimation based on predefined reference signals.  This is the type of technology that's been known, that was actually distinguished by the inventors as saying this is not our invention in the patents.  He confirmed that.

That is correct.

He also confirmed for us that the CRS signal functionality uses predefined reference signals.

He also confirmed for us that it doesn't matter which phone modem is used in the Samsung products; that they are all complying with the same industry standard and, therefore, regardless of minor differences in algorithms or the source

code, they perform the same functionality.  He saw no difference in terms of those modems.  Despite having access to all the source code, he his infringement theory is exactly the same.

So when counsel for Collision pointed out there was a modem document that's earlier in time to the one that was used in this case, it doesn't matter because the infringement theory is based on LTE-A standard that was published in 2011.  And we know and it is undisputed the first phone in the United States to have this functionality was the Galaxy S4 that uses that modem document and complies with the LTE-A standard.

So I want you to keep this in mind.  I think this is probably the most important timeline to unlocking the questions in this case.  LTE-A standard published in June 2011.  S4 is the first phone, not only from Samsung but anywhere in the United States, that used the same LTE-A MIMO SIC technology released in April 2013.  That same technology is then used in April 2014 with the launch of the S5, the very next model.  S5 is accused of infringing the four patents, but the S4 is not.  And I'll submit to you that something that -- technology that does not use these patents in 2013 because it's based on industry standards that Collision said is not our technology, cannot all of the sudden start to infringe in 2014, the same technology.  And Dr. Kowalski says, I'm using technology that's in the LTE-A standard; I'm relying on this

modem design document that covers not only S5, but S4.

And it's interesting. We heard about this date of first sale for infringement. Collision is not pointing to April of 2014, nor are they even accusing 2013. You may ask yourself why that is, that they are not accusing the S3 and they're not using the April 2014. Because, for example, April 2013, that would be before any of the simulations that you heard so much about that were presented to the base station group.

So again, it doesn't make sense that something that is not using these patents in 2013, the same technology, all of the sudden becomes infringing in 2014 and 2015.

And that was all confirmed by Dr. Kowalski. They're not offering any infringement opinions on the S4, but you are offering infringement opinions on the S5, but both of them are based on LTE-A release so with the same MIMO technology. How can something that does not infringe all of the sudden become infringing a year later? It doesn't make sense. It does not add up.

Same testimony here. When he was confronted with historical documents from Collision's own files, S4 had -- with LTE-A had all the things he was pointing out for infringement, released in 2013, and what Collision was saying in the historical documents was that's not our technology because whatever is in LTE-A and whatever is in phones like the S4 cancels out interference just like it does noise. Not

our technology.  So it's not just a question of willfulness; this is Collision itself telling Samsung that we know what you have because you're complying with LTE standards.

And there were technical meetings between the two companies.  Collision told Samsung, That is not our technology.  And we think that's important evidence for you to consider as you think about the issues of infringement.

Specifically, I know Collision's counsel mentioned some acronyms.  This is a very important.  FeICIC is Collision's accused technology for each of the patents because they're relying on canceling out CRS signals.  This is the successive cancellation technology that was adopted by the LTE-A standard present in all the accused hand phones, and that's the thing that they're pointing to to satisfy every one of the parameter estimator or amplitude estimator limitations of the claims.

And Dr. Kowalski told us under oath that that is in the LTE standard.  It's part of the same technology that Collision said is not our patents.

How did this technology come into existence?  You heard about industry standards, how they work.  Companies and competitors come together and they collaborate.  This is good for not only these companies so they can have products that interoperate; it's good for us as consumers.  We can make choices.  I can buy an iPhone, you can buy a Samsung phone; it all works on equipment run by AT&T using base station

1284

equipment from Nokia and Ericsson, seamless, and it gives all of us better options in terms of how we choose features and pricing.

And you've also heard testimony that neither BAE nor Collision was at this table to set standards. You heard Mr. Farkas say the LTE standard, even going back to 2008, already described how to do SU-MIMO in the downlink direction. You've heard Dr. Mahon describe this as conventional. You heard Dr. Kowalski say the same thing.

And Dr. Mahon is the only expert who walked you through how the claims actually work together by paying attention to every word. And he said, What happens if you plug in this conventional channel estimation unit into the claim language? It doesn't fit. And that makes sense. If you take something that is old and put it into a claim that is meant to cover something new, it doesn't work. And Dr. Kowalski told us and agreed that you have to look at every word and you have to treat the claims the same way for all purposes.

And we heard the testimony from Dr. Mahon who described for us what happens with the claims; that you're supposed to be taking data that had multiple user data in it, and if you follow through all the words, including the 'the' and the 'said', you get this outcome, which Dr. Kowalski admitted. He testified that what you get in the new amplitude estimates should have both user data in it in terms of the estimation of

their amplitude or height.  So multiple users come in and estimates about the amplitude and other parameters on both user data should be at the output.

But what happens if you put the traditional conventional channel estimator with the CRS signals?  Only one comes out and all the rest of the claim language doesn't work because they're all designed to operate on and output signals that contain data from multiple users.  That's why it's a multiuser detection system.  If you put in a filter, a channel estimator that cancels out all the interference, you only get one signal, and from that point on none of the claims work.

And remember there was a rebuttal case.  They had the opportunity -- collision had the opportunity to put on any witness, including Dr. Kowalski, and he did not take the stand to rebut any of this; that what he was calling conventional channel estimator, if you put it into the claim language it doesn't work.  It doesn't work.  And pointing out simply that he's found some things, some code and elements, doesn't mean that he's met his burden as Collision's expert to connect all the dots.

THE COURT:  Thirty minutes have been used.

MR. PAK:  Thank you, Your Honor.

And we saw the testimony from Dr. Mahon walking us through this, and if you just remember what was shown to us from Dr. Kowalski, he pointed out isolated things and

different documents and source code and equations, but he never walked you through the language of the claim to show that all the connections are there.  And that's where the invention is is in the connections and making sure that the multiple user data is processed throughout.

He also confused or identified the same thing for two elements of a claim.  So in this particular patent he was supposed to identify a symbol detector that is different than a joint amplitude estimator, but Dr. Mahon explained to you that it's the same thing that he's pointing to.  You can't do that.  You can't take two limitations of a claim and treat it as one, because then you're missing one of the limitations.  You have to treat every word, every limitation equally importantly.

Same thing happens with the '703 Patent.  If I put the old channel estimator into this initial amplitude estimation unit, that's supposed to create multiple user estimates, I just get one out, and with just one signal going down the rest of the claim language, none of it works.

Same thing with the '505 Patent.  The parameter estimation unit is supposed to operate on multiple user data. What he's pointing to only operates on one.  But for the '505 and the next patent, these are what you heard is means-plus-function.  And you are going to the see that the jury instructions from His Honor--they require you to actually

look at the patent specification. So this is one of the exceptions; otherwise, you would just look at the claim language. But for these means-plus-function limitations, you are actually supposed to go in, look at the patent specification, what are the figures doing, what are the texts describing for the sections identified by His Honor, and you're supposed to find that. And we didn't hear that from Dr. Kowalski at all. And again, that's a complete failure of proof.

Same thing with respect to the '505. If you put the channel estimator in one signal, two comes in, one signal goes out. It doesn't meet the claim language.

'492, same issue--supposed to be a multiple user detector unit, and if you put the channel estimator in it no longer is a multiuser system. Also this decision unit, he could not find the algorithms on the handset because it's the base station that decides whether it's going to send data in two antennas or use one.

Dr. Mahon explained all of that to you. And again, Dr. Kowalski had the opportunity to say this is not right. Never took the stand to make that assertion.

Dr. Mahon also said the base stations are making all the decisions; there's no algorithms in the handset that's required by the claims. And Dr. Mahon went further for this particular language about canceling out the other signals and

only focusing on the newcomer signal, and he explained the CRS does exactly the opposite--you're receiving the CRS signal from the base station that the phone is talking to, you cancel out the newcomers, the interfering signals.  That's the opposite of what the claims are meant to cover.

We also heard some conflicting testimony from Dr. Kowalski.  He said that multiple users for one of the patents are these layers, these MIMO layers, but for the other patents he's pointing to base stations.  And that doesn't make sense because we're supposed to be talking about multiuser detector systems, and he's accusing MIMO systems that Dr. Learned said--and we all saw the video--that this is like apples and oranges; they are completely different systems.

We heard the same testimony from Mr. Farkas.

And I think this is some of the most important testimony that goes to the written description issue that we talked about.  His Honor told you that you are supposed to look at the disclosure in the patent and the claim language, and when I asked Dr. Kowalski in my examination, What is the source of data when you look at MIMO layers as the accused functionality, and he said, Well, MIMO layers are actually just spatial dimensions that are orthogonal.  Just like going north or going west, it doesn't tell you what the source is.  And he couldn't identify a single source because he says it's somewhere in the internet, and that's very different than what

1289

he said during his direct examination where he said the layers are the sources.  He did not say that in my cross examination; he said the opposite--the layers are just where the data is processed, but the actual source of the data is somewhere in the core network.

I want to talk about a very important issue as well--actual notice.  That's going to be something that you will be asked to decide.  Clear as day that they never, they never said Samsung is infringing any patents during this entire period.  And the accused products are handsets.  They were meeting with the base station companies.  Mr. Stanley Fry said, We never gave notice of infringement by Samsung.  We heard the same thing from Mr. Fry--no actual notice, they never accused handsets.

They didn't even accuse the base stations.  And if you believe the story that you were hearing from Collision, the technology, if there was some taking of that technology, which we never had access to because it was a black box to us, it would have ended up in a base station product.  But no base station product is accused in this case of infringing these patents, and they are now pointing to handset technology that goes back to 2011, which throughout the entire engagement they said that's the standard technology, it's the old way of doing things.  None of this adds up.

And I want you to keep in mind that when Samsung first

heard about their patented portfolio, these patents, the parameter estimation patents, Samsung said, We don't see application of that to the base station product that you want us to build.  And when we asked them for questions about how would this work, how would these two apples and oranges work, we already have MU-MIMO, how does that work, we asked for questions on the performance data, MIMO SIC, that is Samsung technology, not Collision's.  And we saw the evidence from Mr. Farkas that he viewed this as being fundamentally different.  That's DX 36.1.

So he testified on that as well, and that's why I asked you to consider all of the evidence.  What did Collision's people say about the accused technology when they were exposed to it from Samsung?  They said --

THE COURT:  Two minutes remaining.

MR. PAK:  Thank you.

-- this is not our accused technology; not our accused technology.  This is standard.

And I heard something very interest from counsel just now.  He said that they were very surprised to hear that their technology wasn't as good as ours.  But we brought you this evidence, January 10th, 2013, before that meeting in Korea: Barry and Joe are having a sinking feeling that they are not going to reach their numbers for Samsung's base station group; the patented algorithms aren't working as strongly; what

1291

Samsung had was better than what we initially understood. It's not a surprise.

Their goal was to meet a hundred percent at the edge. We saw the simulation numbers. Based on real-world testing by Samsung, they didn't get to those numbers. And that is a perfectly fine way to evaluate technology.

I want to show you one more thing that you've seen a lot of this evidence. There was a lot of suggestions about what would happen, what was Samsung's plan if this technology didn't work in the base station. I want you to take a close look at PX 22.9. This is Samsung's internal email that they brought to you--contingency plan for independent development that uses Samsung's SIC functionality. That's why they were engaging with Russian scientists at their research lab in Russia, that's why they were highlighting the Korean university to do independent development.

We're here to clear our name, and we think the evidence has shown that, and everything that you will hear after I sit down is not going to change the facts. These are facts that were delivered to you.

So I thank you very much for your close attention, and I know that you'll make the right decision. Thank you.

THE COURT: All right. Plaintiff may now present its final closing argument to the jury.

Mr. Caldwell, you have 15 minutes and 32 seconds. Would

you like a warning on your time?

MR. CALDWELL:  Your Honor, you said 15 minutes?

THE COURT:  And 32 seconds.

MR. CALDWELL:  Can I have a warning when I have six minutes left and when I have three minutes left?

THE COURT:  Yes, sir.  I'll give you those warnings.

You may proceed with Plaintiff's final closing argument when you're ready.

MR. CALDWELL:  Thank you, Your Honor.

Ladies and gentlemen of the jury, thank you so much for your attention.  You're probably being -- honestly tired of being told that at this point, but, I mean, for those of us who have worked on something like this for three years it's a really big deal, and for those of us who have lived it for 15 years it's an even bigger deal.

You've listened to this stuff for a week.  There's a lot that you've consumed, and I obviously don't have time to deal with all of it, but I just want to show you a few things and see if I can kind of bring this to a close.  Because remember one of the things I said to you on Friday was the best part about the jury system is you walk through that door out there with your common sense and your life experiences and that's what Collision needs you to use today.

May I please have the document camera?

I just want to use one of the slides you just saw where

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1293

this is pitched to you as a critical admission from Dr. Kowalski.  Dr. Kowalski allegedly couldn't identify the sources and said the sources of data that he's pointing to for the claims are just somewhere out on the internet.  And then he was accused of he can't even hold up his position that he gave you on direct.  But what he told you on direct is the sources of data are the MIMO layers that are being transmitted.

And so the way counsel tries to make him look like he's not consistent is what they're highlighting.  What Dr. Kowalski said is, "The source of the data may be one or more datastreams that are transmitted."  And then he goes on to say those datastreams may have come from a source out on the internet.  So the sources he points to as the MIMO layers are the exact datastreams that are perfectly consistent with his theory, but of course the data the base station is sending to you if you're watching a Netflix movie, that data ultimately came further upstream from Netflix.

So they selectively highlight his testimony to try to mischaracterize and make it sound to you like he was unprepared or incompetent or inconsistent.  That's the sort of treatment that you've been given.  It's the sort of treatment that Collision has been given for years.

Now, right after that you saw this slide talking about how what Samsung might have been interested in was turbo MUD

and they didn't have any interest in parameter estimation.

May I have my slides, please?

By the time they studied our portfolio every which way --

May I see slide is 144, please, Mr. Diaz?

You saw this testimony in cross-examining Dr. Mahon, and there he was a document that I was showing him that by the end of studying Collision's portfolio they were referring to Collision as a MIMO parameter estimation company.  So counsel shows you something from like the first minute that Samsung looked at the patents and was first focused on turbo MUD, but over the years they came to really appreciate and value both that Collision work for MIMO technology and it was a parameter estimation company.

And I don't have time to go through everything that's in the slides that misrepresents what the evidence was, but I just want you to understand that that is what you're dealing with and that is why Collision needs your help.

Now, right where counsel started was by saying that this assertion or the infringement theory is the opposite of what you heard from the inventors about using interference.  Do you remember that?  It's the opposite of what you heard from Dr. Learned.  She said it's apples and oranges.  How many times, though, do we have to go through the fact that Dr. Learned also said while MUD and MIMO were apples and oranges, the receiver techniques that they learned from MUD

1295

can be used to make MIMO better.  They just don't like using that part of her testimony.  They want to tell you the part that's convenient and not the part that completely contradicts their theme in this case.

But it doesn't actually matter that Dr. Learned said either of those things, because His Honor just read to you the instructions in this case, and there's three words that stood out to me on this point, and it may ring a bell.  He said the only correct comparison.  He's talking about how do you determine infringement, and the only correct comparison is to the language of the patent claims.  You don't evaluate infringement by saying what did an inventor say, what did someone say in a document off to the side; you actually determine infringement by reference to the claims.

Now, the Defense story line has been this theory that Samsung has done the same thing since 2008 or 2011.  And I'm honestly not sure what their position is because I've heard both of them.  I've heard nothing has changed since 2008 and I've heard nothing has changed since 2011 when things changed to LTE-A, and I'm not actually sure which one is their theory but it doesn't matter.  And in any event, it's not true.

I don't want to belabor you with a lot of slides, but there was no dispute when I'm cross examining Dr. Mahon that Samsung continues to innovate constantly.  There was also no dispute that although the standard says, Here is the signal

we're going to send, it doesn't tell you which code algorithms to put in your receiver to receive them.  Those are implementation details left to the various competitors in the industry, and there is no dispute about that.

So a really, really terrible analogy that's popped into my head, which is probably already bad, but imagine if -- it's like the standard is saying, I'm going to throw you a football.  It's not going to tell you how to catch it.  Right?  You can use receiver gloves, you can be right-handed, you can be left-handed; whatever.  Like I said, terrible analogy.  But the point is the standard says we're going to package up signals and send them this way, and if you can crack the nut of receiving them in a much better way, your phone performs better.

And that may sound crazy because it's like, Well, aren't they still throwing the football at the same speed, but the answer is no.  If your phone receives it better, your phone relates back to the base station I'm not having problems.  Base station says, Fantastic, I'm going to throw it harder and faster and more often.  So your phone gets much better receipt because of the scheduler at the base station hears from your phone that your phone is receiving so much better.  And this is all explained by Mr. Farkas and others in this testimony.

But Samsung keeps sticking to this, Well, no, no, no, they put out the standard in 2008, and it didn't change until

it did change for LTE-A, and everything's been exactly the same since then.  But guys, we know that's not true.

They flew this gentleman Mr. Kang from Korea to testify and to take the stand and say, Phones haven't changed, the receiver hasn't changed.  He is supposedly the authority on this.  Right?  Two things happened.  One, it was just proven that their receiver has completely changed from 2013.

When Mr. Pak keeps telling you, We had the S4 in 2013, nothing's ever changed; we had the S4 in 2013, it's the exact same thing as they're accusing now.  We looked at the programming guide, the programming document that documents the code in those phones, and it was different in 2013 and it has the accused functionality in a later edition.

So at that point Mr. Kang kind of runs from the hills and goes, Well, actually I don't know algorithms, I don't do the programming myself, I don't really know how that works, sorry, and that's where that routine ends, because they did change after they met with Collision.  And it is beyond dispute.

One of the things they complain about is that we rely on that document from 2018 to prove consistently how their phones have behaved from the S6 in 2015 through now.  They complain about that.  But as I believe I pointed out, probably more than you needed, that is because Samsung told us in the discovery process in this case that that particular document

1298

was descriptive of the functionality of all of the later ones. So they themselves knew as of the S6 the technology changed.

THE COURT:  Six minutes remaining.

MR. CALDWELL:  Thank you, Your Honor.

So they've known that this theory just doesn't make any sense.  They met with Collision for years and years and years, they start to cut it off with Collision, and roughly a year and a half later they released a phone that has the algorithms in it that we have proven to you through Dr. Kowalski meets the claims.

Now, I don't want to talk too much about Dr. Mahon, but you just heard that Dr. Mahon told you this and Dr. Mahon told you that and he compared everything to the claims.  What you actually saw on his slides was he had the claim language and then he compared the claim language to a drawing that he had drawn that was his recharacterization of the claim language.

When Dr. Mahon went through the claims.  He showed you virtually -- no; I cannot actually remember a single piece of evidence of the operation of the chips or the code that he showed you; not one.  Not one.  He compared the claims to his own drawing and said, Hey, I've drawn this thing and I don't find it.

But think about Dr. Kowalski.  Now, I could do this at the risk of --

Well, can I have where Dr. Kowalski's technical slides

start?  I think it's about I want to say like 246?  Does that ring a bell?

Dr. Kowalski went -- and this is a selected excerpts of these.  I didn't put every single one of them in there, but Dr. Kowalski went just forever going through elements of the claim and comparing the math and getting back into all of the documents and looking at, for example, the portions of the specification when he needs to, applying the Court's claim construction in great detail.

And if you really pay attention to some of the questions that were asked of the Dr. Mahon, they're like, Did you see him show any evidence?

No I didn't.

He wasn't here.  He couldn't see the foam boards.  He couldn't see the code on the elmo.  He couldn't see the slides on the projector.  So I guess he's telling the truth.

Now, we are accused of not bringing Dr. Kowalski to rebut something?  What's that?  Rebut their invalidity case where Dr. Mahon says, I find that there's no written description and enablement of the '703 and '651, and then he goes, Yep, my written description is toast under the Court's guidance.

And I said you didn't even show anything for enablement, did you?

No, I didn't.

So validity, there is literally not a single reason you

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

could conceivably check 'yes' on the '651 and '703.  Then for the other two, these are where he spent like six minutes and maybe seven minutes with hindsight going back and grabbing things out of the prior art to say, Hey, I could stitch all these things together to look like your claims.  And then he admitted to me you're not allowed to use hindsight when you go and try to do an obviousness analysis.

THE COURT:  Three minutes remaining.

MR. CALDWELL:  Thank you.

I could address so many more things.  Obviously you understand we all have a clock here.

And I hope you understand what we have tried to do was bring you people that are honest, have humility, they are prepared, and they sat there and answered questions to the best of their ability, and that's why I care about you bringing your common sense in.

In 2010 these gentlemen decided to set up on a venture to start a company that they thought would be just an amazing experience for them and groundbreaking and they spent years and years continuously working with Samsung.

Yeah, you've seen documents like that sinking feeling in 2013, and I'm sure that's how they felt.  But now you know that Samsung was cultivating that sinking feeling for Mr. Fry and Mr. Farkas the whole time.  But here we are 15 years later and you've seen what's going on.  The documents that, frankly,

1301

nobody but Samsung knew about, we didn't know about, even the lawyers didn't know about them until some number of months ago when they produced them and we get to see what's going on behind the scenes.

You see documents saying, If Collision successfully builds bids a board shouldn't we pay for it -- or shouldn't we proceed?

Yeah, but then we'd have to pay for it.  If we don't collaborate, it's unlikely they'll take legal action.

They literally assigned staff to just dangle and entertain these guys with emails and Samsung Ventures and potential collaborations so they'd think, I guess I can't go sue Samsung because maybe I'll get a deal with them some day.

They literally rewarded an employee with a promotion for doing a good job at delaying Collision.  Yet, it was an urgent matter, a directive from above, get this Russian and Korean university research involved immediately to get Collision levels of performance.  At the exact time these lawyers are telling you they decided our stuff was no good because they had something better to do.  Does that make sense to you?

So the worst part about all of it is just something that Mr. Stewart alluded to is that these gentlemen never saw any of this until the last week.  So imagine how that feels to them, to literally see via deposition an employee of Samsung talk about how she sent them fake empathy in her emails to

them; I didn't actually wish them well, I just said it.  Fake empathy.

THE COURT:  Mr. Caldwell, your time has expired. Take a few seconds and finish up.

MR. CALDWELL:  Ladies and gentlemen, thank you for your time.  I think in this instance nice guys don't have to finish last, and I believe it's going to come with some consequences for Samsung but it's nothing they're not prepared for.

So on behalf of Collision, on behalf of Mr. Farkas and Mr. Fry, Mr. Stanley Fry, and my team, thank you for performing this important civil service and giving Collision the opportunity to fight back.

THE COURT:  All right, ladies and gentlemen.  I'd like to provide you with a few final instructions before you begin your deliberations.  You must perform your duty as jurors without bias or prejudice as to any party.  The law does not permit you to be controlled by sympathy, prejudice, or public opinion.  The parties in this case expect that you will carefully and impartially consider all the evidence, follow the law as the Court has given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form based on the facts as you find them to be, following the instructions that the Court has given you on the law.  Again, do not decide who

you think should win this case and then answer the questions to reach that result.  One more time, let me remind you that your answers to the questions in your verdict form must be unanimous.

Now, you should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.  This is true in patent cases between corporations, partnerships, other business operations, and individuals.  A patent owner is entitled to protect its rights under the laws of the United States, and this includes bringing a suit in a United States District Court for money damages when it believes its patents have been infringed.

By the very same token, a defendant accused of infringement has the right to defend itself in a United States District Court and it has the right to assert that patent claims brought against it are invalid.  The law recognizes no distinction between types of parties, and all corporations, large or small, partnerships, individuals, or any other organizations stand equal before the law regardless of their size, regardless of who owns them, and they are going to be treated as equals.

Now, when you retire to the jury room to deliberate on your verdict, as I've told you, I'm going to send back with you an individual printed copy of these final jury

instructions for each of you.  And you may refer to them throughout your deliberations.  If you desire during your deliberations to review any of the exhibits which the Court has admitted into evidence and which have been shown to you over the course of the trial, then you should advise me by a written note and signed by your foreperson delivered to the Court Security Officer specifying which exhibit or exhibits you would like to see, and in that case I will send that exhibit or those exhibits to you.  Once you retire, you should select your foreperson and then conduct your deliberations.  If you recess during your deliberations, follow all the instructions that the Court has given you about your conduct during the trial.

After you have reached a verdict, your foreperson is to fill in your unanimous answers to the questions in the verdict form, sign it, date it, and advise the Court Security Officer that the jury has reached a verdict.  Do not reveal your answers until such time as you're discharged, unless otherwise directed by me, and you must never disclose to anyone, not even to me, your numerical division on any unanswered question.

Any notes that you've taken over the course of the trial are aids to your memory only.  If your memory should differ from your notes, rely on your memory and not your notes.  Notes are not evidence.  And a juror who has not taken notes

should rely and must rely on his or her own independent recollection of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

Now, if you want to communicate with me at any time during your deliberations, you should give a message or a question in writing dated and signed by your foreperson to the Court Security Officer, who will bring it to me.  And I will then respond to you as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally.  And you should understand, I will always disclose to the attorneys in this case any question or message you send me and any response I intend to give you before I respond to any question or message.

Now, after you have reached a verdict and the Court has accepted your verdict and discharged you as jurors, at that point, ladies and gentlemen, you are not required to talk with anybody about your service as jurors in this case.  But at that point in time and by the same token, you will be completely free to discuss your service as jurors in this case with anyone of your choosing.  But that decision at that time will be 100 percent yours and nobody else's.

I'm now going to hand eight copies of these final jury instructions and one clean copy of the verdict form to the

Court Security Officer who will deliver them to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate on your verdict. We await your decision.

(Whereupon, the jury left the courtroom.)

THE COURT: Be seated, please.

Counsel, it's 6:15 in the evening. I have no idea how long the jury wants to deliberate this evening. I suspect it won't be long. You are welcome to wait here in the courtroom. If you decide to wait off premises, make sure that your cell phones are on and working, especially those of your local counsel, who we are most likely to contact if we get a message, a question, or a return of a verdict.

Awaiting either a question from the jury or the return of their verdict, we stand in recess.

(Jury deliberates.)

(The proceedings were concluded at 6:15 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                    10/09/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER