# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| COLLISION COMMUNICATIONS, INC. <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., <br><br> Defendants. | Case No. 2:23-cv-00587-JRG <br><br> **JURY TRIAL DEMANDED** |

## DECLARATION OF JARED FRY

My name is Jared Fry. I submit this declaration based on my personal knowledge and following a reasonable investigation. If called upon as a witness, I could and would competently testify to the truth of each statement herein.

1. I live in Norwich, Vermont with my family.

2. I am the COO and Co-Founder of Collision Communications, Inc. I have been involved in Collision since late 2010, with the acquisition of patents and technology from BAE. I was Collision's corporate representative at trial. In that capacity, I testified on behalf of our company, and I watched the rest of trial at counsel's table. My testimony at trial included Collision's attempts to do business with Samsung. Where I think it might be helpful, I cross-reference my trial testimony and some of the evidence I saw for further context.

3. Collision's original business plan was to develop receiver algorithms and software based on technology originally developed and patented by BAE Systems, and then market those

1

algorithms and software to larger cellular equipment and device manufacturers like Samsung, Qualcomm, Nokia, and Ericsson. *See* TT Day 2 at 345:2–25; 348:1–13; 348:25–349:4; 368:4–6.

4. We were a small technology company. To market our algorithms and software, we built and performed complex analyses and simulations to prove that we had superior technology. The plan was to achieve "design wins": if a company wanted our technology and chose us for their product, we would work together to incorporate our software into their cellular products. *See* TT Day 2 at 348:1–13; 351:23–352:10.

5. In my experience, this type of business plan—competing for design wins to be in the "technology stack" of larger companies—is typical for innovative technology companies. Not all technology companies make end products and compete in the market on a unit-by-unit basis. There are many technology companies like Collision that focus on a small slice of a much larger technology stack and compete by innovating in that small slice.

6. I am not a lawyer. But as a businessperson, I understand that if a small company does not have patent rights to protect its technology, more established companies can and will take the smaller company's technology with no recourse. *See* TT Day 2 at 346:20–347:4.

7. For this reason, my experience has shown that patent rights are necessary for small technology companies like Collision to compete and survive. Just as importantly, the rights must be honored, enforced, or both. Ideally, companies would respect others' patent rights as a matter of principle. But as I learned watching the evidence unfold at trial, companies like Samsung view potential enforcement of patent rights as just another business "risk" that must be managed and potentially avoided through strategic maneuvering, *see* TT Day 3 at 810:5–16, or that may not come to pass because the patentee may not assert those rights, *see* TT Day 4 at 1114:5–23. Thus, at a minimum, small companies need for there to be a broad, shared

expectation that the courts will enforce patent rights as a matter of course. Without this expectation, technology becomes a free-for-all, and companies—especially small companies—cannot use their innovations for competitive advantage. Again, I am sharing my views based on my experience with technology companies. The extent to which technology rights are *or are not* enforced in the courts has a direct effect on how technology companies can *and cannot* survive in the real world. If companies cannot rely on the courts to protect patent rights, there is little incentive for companies, venture capital, or individual entrepreneurs to invest the time, money, and talent required to innovate and develop new technologies. There is plenty of risk in the endeavor even without the risk that the courts won't enforce patent rights.

8. Beginning in spring 2011, Collision had extensive interactions with Samsung with the initial aim of entering into a co-development agreement to implement Collision's software into Samsung's base station products. *See* TT Day 2 at 349:17–19. Collision initially pursued the base-station side of the cellular market because we felt that was the fastest path to proving ourselves as a company. *See* TT Day 2 at 349:5–12. But as Mr. Farkas explained, we always made clear to Samsung that our techniques would also work with and could be adapted to Samsung's handsets. *See* TT Day 2 at 226:16–23; 236:17–237:1; JX-10 at 10.12.[1]

9. In our interactions with Samsung, we identified our patents and categorized them by functional technology areas. *See* TT Day 2 at 350:5–16; JX-22 at 22.12; JX-10 at 10.8.

10. Samsung analyzed our patent portfolio, expressed interest in how our technology would perform in their products, and agreed with the overall framework we proposed to

---

[1] To the extent I refer to trial exhibits in this declaration, I am referring to the portions or aspects of the exhibits that were shown or discussed in open court during trial and that I observed while sitting at counsel table.

implement Collision's technology into Samsung's products and receive compensation in exchange. *See* TT Day 2 at 350:21–352:25; JX-6.

11. In our dealings with Samsung, Collision expected Samsung to honor Collision's patent rights.

12. We particularly needed to trust Samsung to honor our patents because Samsung was both a customer and competitor to Collision, since it had its own in-house algorithm team.

13. If Samsung had been upfront with us and told us that they were interested in our technology for their handsets, including the technology claimed in the '492 patent, Collision could have developed a solution for Samsung, and Samsung could have done a fair business deal in exchange for our technology. And if Samsung had honored our patent rights, Samsung would not feel entitled to use our technology without our permission. This would have had the practical effect of giving Collision the final say on the business terms for Samsung's use of our technology, with Samsung always having the option of giving us nothing and not using our technology.

14. This would have been an incredible business opportunity for Collision, and it was destroyed by Samsung's infringement. This is not a case where Samsung just unilaterally designed its products in a way that happened to infringe. Rather, Samsung was aware of and understood our technology and our patent portfolio, liked our technology and the performance improvements we demonstrated to them, but willfully chose to infringe (as the jury found) so that it could take our technology without doing business directly and fairly with us. And by taking Collision's patented technology, Samsung's infringement negated Collision's primary competitive edge—its protected, innovative technology. As a small company, Collision faced many challenges, and eventually Collision could not continue operating. But if Samsung had

4

recognized our design win and had paid royalties for our algorithms or software, I'm confident we could have overcome the other challenges.

15. Samsung told us in March 2014—roughly three years after we first interacted with them in spring 2011—that it was not interested in incorporating our algorithms or software in its products at that time. Samsung had spent three years learning and evaluating our technology while requesting test after test and giving us proposal after proposal of unfair business terms. I gave a detailed history of this at trial. *See* TT Day 2 at 353:4–361:16. And at trial, I saw documents showing that, while Samsung was stringing us along with the prospect of a business deal, they were internally plotting to infringe. *See* PX-17, PX-19, PX-20, PX-22, PX-33. While we were engaged with Samsung, and unaware of their internal efforts to infringe, I was optimistic that we would eventually reach a business arrangement with them because they seemed so interested in our technology. But looking back and in light of these documents, Samsung was just stringing us along and secretly undermining us by developing infringing technology unilaterally. Samsung's conduct suggests that it has a deep-rooted assumption that it is entitled to continue using our patented technology.

16. If the Court were to issue an injunction to stop Samsung from infringing our patent rights, this would bring Samsung to the table and force it to negotiate directly with Collision, instead of through the court system. On behalf of Collision, I am respectfully asking the Court to issue injunctive relief. With an injunction, Collision would have no undue leverage because Samsung could choose to extricate our technology from its products. And ultimately, an injunction would force Samsung to confront how much our technology is worth. Samsung could not simply persist in its assumption that it is entitled to infringe—while it simultaneously argues that the royalties are too high. If Samsung thinks the royalties are too high, it should stop using

5

our technology. Once it stops infringing, if Samsung wants to return to using our technology, they should have to get our permission to do so.

\* \* \*

17.     I have also been asked to discuss Collision's borrowing costs. As I discussed, Collision was a small, technology company. Collision's business profile meant that it could not borrow significant funds from a bank cheaply.

18.     Collision has periodically received loans for company funding directly from Mr. Stanley Fry, who co-founded Collision with me, and other investors. Those loans all accrue interest at the Prime Rate. However, the reason Mr. Fry and other investors granted those loans on those terms—interest at the Prime Rate—is precisely because Collision could not have received a loan from a commercial bank at that interest rate.

19.     Collision has inquired about loans from arms-length third-parties in the past. Collision was never offered a loan bearing only prime rate interest from such entities, much less T-Bill interest.

20.     Collision also has a line of credit from a commercial bank. The interest rate is keyed off of the prime rate, and it is uniformly 50 basis points above the prime rate at any given time. The rate is also supported by personal guarantees from Mr. Stan Fry, further reflecting that Collision could not receive loans bearing prime rate interest without such guarantees. Collision certainly never received funds bearing interest at only the T-Bill rate and could not have done so.

21.     Finally, if Samsung had not failed to pay a royalty for its use of technology as it sold products that have now been found to infringe, Collision would not have had to lay off its technical personnel and cease operations when it did. The harm Samsung caused to Collision is immeasurable, and the reality is that interest at any rate is inadequate to fully capture what

Collision lost from Samsung's failure to pay the royalties it owed on infringing sales when those sales occurred.

I declare under penalty of perjury under the laws of the United States of America and the State of Vermont that the foregoing is true and correct.

Executed December 10, 2025

_____
Jared Fry

7