IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| COLLISION COMMUNICATIONS, INC., | |
| *Plaintiff,* | Case No. 2:23-cv-00587-JRG |
| v. | **JURY TRIAL DEMANDED** |
| SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., | **ORAL ARGUMENT REQUESTED** |
| *Defendants.* | |

### SAMSUNG'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B)

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................1

II. BACKGROUND ...................................................................................................3

III. LEGAL STANDARD.............................................................................................3

IV. JMOL #1: NONINFRINGEMENT OF ALL ASSERTED PATENTS DUE TO IMPOSSIBILITY OF INFRINGEMENT BASED ON THE INFRINGEMENT THEORIES PRESENTED TO THE JURY ...............................................................4

    A. '651 Patent ..................................................................................................5

    B. '505 Patent ..................................................................................................8

    C. '703 Patent ................................................................................................11

    D. '492 Patent ................................................................................................13

V. JMOL #2: NONINFRINGEMENT OF ALL ASSERTED PATENTS BECAUSE SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S FINDINGS .........15

    A. Overall General Failure Of Proof ............................................................16

    B. Dr. Kowalski's Self-Contradictory Testimony On Issues Of Infringement Prohibit A Finding Of Infringement ......................................................21

VI. JMOL #3: NONINFRINGEMENT OF THE '703 PATENT BECAUSE COLLISION FAILED TO SHOW CLAIMED "MULTIPLE SOURCES" IN ACCUSED FUNCTIONALITY ...........................................................................25

VII. JMOL #4: NONINFRINGEMENT OF THE '651 PATENT BECAUSE COLLISION FAILED TO SHOW ACCUSED CRS SIGNALS ARE CLAIMED DIGITAL DATA STREAMS ............................................................................28

VIII. JMOL #5: NONINFRINGEMENT OF THE '505 PATENT DUE TO FAILURE TO PROVE INFRINGEMENT OF MEANS-PLUS-FUNCTION LIMITATION ..........29

IX. JMOL #6: NONINFRINGEMENT OF THE '492 PATENT DUE TO FAILURE TO PROVE INFRINGEMENT OF MEANS-PLUS-FUNCTION LIMITATION ..........31

X. JMOL #7: NO DAMAGES DUE TO USE OF AN UNSUPPORTED AND WRONG HYPOTHETICAL NEGOTIATION DATE ....................................................33

    A. Mr. Bergman's Hypothetical Negotiation Date Has No Support ..........................33

    B. The Wrong Hypothetical Negotiation Date Fatally Undermines Mr. Bergman's Analysis ..................................................................................34

XI. JMOL #8: NO DAMAGES FOR FAILURE TO APPORTION (ALL PATENTS).........37

    A. Because The Simulation Does Not Practice The Asserted Patents, It Cannot Serve As a Basis for Determining Their Value ..................................................38

    B. The Simulation Also Fails As Apportionment For Using The Wrong Baseline...........................................................................................40

XII.    JMOL #9: NO DAMAGES FOR FAILURE TO APPORTION ('505 AND '492 PATENTS)......................................................................................................41

XIII.   JMOL #10: NO PRE-SUIT DAMAGES ..................................................................42

    A.    The Court Properly Granted Summary Judgment That Samsung's *Arctic Cat* Notice Shifted The Burden To Collision .......................................................43

    B.    Collision Failed to Meet Its Burden........................................................................44

        1.    Collision Never Provided Actual Notice .....................................................45

        2.    The Court Correctly Granted JMOL Of No Marking................................47

        3.    Collision Failed To Meet Its Burden of Showing Its Licensees' Products Do Not Practice the Asserted Patents .........................................48

XIV.    JMOL #11: NO WILLFULNESS.............................................................................52

XV.     JMOL #12: INVALIDITY OF ALL ASSERTED PATENTS .........................................56

XVI.    JMOL #13: NO INDUCED INFRINGEMENT .................................................................57

XVII.   CONCLUSION.....................................................................................................58

███████████████

## TABLE OF AUTHORITIES

**Page**

### Cases

*Abraham v. Alpha Chi Omega*,
708 F.3d 614 (5th Cir. 2013) ..................................................................................4

*Afram Carriers, Inc. v. Moeykens*,
145 F.3d 298 (5th Cir. 1998), *cert. denied*, 525 U.S. 1141 (1999)........................28

*Allure Energy, Inc. v. Nest Labs, Inc.*,
No. 9-13-CV-102, 2015 WL 11110643 (E.D. Tex. May 11, 2015) ........................54

*Amer. Med. Sys., Inc. v. Med. Eng'g Corp.*,
6 F.3d 1523 (Fed. Cir. 1993).............................................................................42, 47

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
24 F.3d 1788 (Fed. Cir. 1994).............................................................45, 46, 47, 52

*Ansell Healthcare Prods. LLC v. Reckitt Benckiser LLC*,
No. 15-cv-915, 2018 WL 620968 (D. Del. Jan. 30, 2018) ....................................54

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017)........................................................................43, 44

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
807 F.3d 1283 (Fed. Cir. 2015)..............................................................................39

*Core Wireless Licensing S.a.r.l. v. LG Elecs., Inc.*,
No. 14-CV-00911, 2018 WL 7199139 (E.D. Tex. Sept. 27, 2018)...................53, 54

*CSIRO v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015)....................................................................38, 39, 41

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)................................................................................................38

*Dominion Energy, Inc. v. Alstom Grid LLC*,
725 F. App'x 980 (Fed. Cir. 2018) .............................................................10, 16, 20

*Eli Lilly & Co. v. Aradigm Corp.*,
376 F.3d 1352 (Fed. Cir. 2004)................................................................................4

*Finesse Wireless LLC v. AT&T Mobility LLC*,
156 F.4th 1221 (Fed. Cir. 2025) .............................................16, 20, 22, 25, 27, 51, 52

*Finesse Wireless LLC v. AT&T Mobility LLC*,
No. 2:21-CV-00316-JRG, 2023 WL 5613172 (E.D. Tex. Aug. 30, 2023)................................3

*Fractus, S.A. v. TCL Corp.*,
No. 20-CV-00097, 2021 WL 2483155 (E.D. Tex. June 2, 2021)............................................53

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
616 F.3d 1357 (Fed. Cir. 2010).......................................................................................47

*Gart v. Logitech, Inc.*,
254 F.3d 1334 (Fed. Cir. 2001).................................................................................45, 46

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)...............................................................................................57, 58

*Griffin v. U.S.*,
502 U.S. 46 (1991)...........................................................................................20, 31, 33

*Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*,
897 F.2d 508 (Fed. Cir. 1990)........................................................................................54

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
579 U.S. 93 (2016)................................................................................................53, 54

*Headwater Research LLC v. Samsung Elecs. Co., Ltd.*,
2024 WL 3843760 (E.D. Tex. Jul. 15, 2024) .....................................................................44

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
331 F.3d 860 (Fed. Cir. 2003),
*vacated on other grounds*, 545 U.S. 193 (2005)..................................................33, 34, 36, 37

*Kim v. ConAgra Foods, Inc.*,
465 F.3d 1312 (Fed. Cir. 2006)..................................................................................16, 20

*Lans v. Digital Equip. Corp.*,
252 F.3d 1320 (Fed. Cir. 2001)......................................................................................45

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012).............................................................................33, 36, 38, 42

*Lubby Holdings LLC v. Chung*,
11 F.4th 1355 (Fed. Cir. 2021) ......................................................................................44

*Motorola, Inc. v. U.S.*,
729 F.2d 765 (Fed. Cir. 1984).................................................................................43, 44

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
138 F.3d 1437 (Fed. Cir. 1998).................................................................................42, 43

iv

████████████████████

*Northpoint Tech., Ltd. v. MDS Am., Inc.*,
413 F.3d 1301 (Fed. Cir. 2005)..................................................................................31, 33

*Odetics, Inc. v. Storage Tech. Corp.*,
185 F.3d 1259 (Fed. Cir. 1999)..............................................................................30, 31, 32

*Packet Intel. LLC v. NetScout Sys., Inc.*,
No. 16-CV-00230, 2019 WL 2375218 (E.D. Tex. June 5, 2019), *rev'd on
other grounds*, 965 F.3d 1299 (Fed. Cir. 2020) ...........................................................53

*Plastic Omnium Advanced Innovation & Rsch. v. Donghee Am., Inc.*,
387 F.Supp.3d 404 (D. Del. 2018), *aff'd*, 943 F.3d 929 (Fed. Cir. 2019) ...............................55

*RSA Protective Techs., LLC v. Delta Sci. Corp.*,
2021 WL 4978462 (C.D. Cal. Oct. 20, 2021)..........................................................33

*Solas Oled Ltd. v. Samsung Elecs. Co., Ltd.*,
2022 WL 1912873 (E.D. Tex. May 30, 2022)..........................................................43

*Tercero v. Tex. Southmost College Dist.*,
989 F.3d 291 (5th Cir. 2021) ...................................................................................3

*TGIP, Inc. v. AT&T Corp.*,
527 F.Supp.2d 561 (E.D. Tex. 2007)........................................................................4

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011)..............................................................................38

*Viterbo v. Dow Chem. Co.*,
826 F.2d 420 (5th Cir. 1987) ...........................................................................50, 51

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016)..............................................................................53

## Rules/Statutes

35 U.S.C. § 103....................................................................................................56

35 U.S.C. § 112....................................................................................................56

35 U.S.C. § 112 ¶ 6..................................................................................29, 30, 31

35 U.S.C. § 287(a) ...........................................................................................42, 45, 47

Federal Rule of Civil Procedure 50(a) ..............................................................4, 47, 48

Federal Rule of Civil Procedure 50(b)................................................................3

## I.    INTRODUCTION

No reasonable jury could have found the Asserted Patents were infringed or valid, or found Collision was entitled to any damages even if both were true.  At every step, Collision and its experts simply did not do the work necessary to carry its burden, instead trying the case by serially mischaracterizing the parties' negotiation history in an effort to paint Samsung generically as a bad actor.  But in its haste to show the jury Samsung is "bad," Collision never got around to proving Samsung's products infringe the asserted claims (because they do not) or that Collision is entitled to damages (because it is not), let alone the near half-billion dollar windfall Collision asked for and got.

Regarding infringement, Collision's trial presentation is replete with issues that foreclose any infringement finding of any Asserted Claim.  For every Asserted Claim, it is impossible for Collision's infringement theory to meet every required claim limitation because the functionality in Samsung's products that Collision points to for certain limitations forecloses Samsung's products from meeting other limitations due to the products simply not being able to perform all those required limitations.  Also for every Asserted Claim, the only support in the record that Samsung's products meet numerous limitations is Collision's expert's hand-waving testimony and conclusory statements that the limitations are met without any evidence to support the conclusions.  Collision's expert also provided directly contradictory testimony that certain features do and then do not meet limitations of the Asserted Claims, which renders his testimony insufficient to base an infringement finding on.  Lastly, for every Asserted Patent, Collision and its expert failed to properly apply a relevant claim construction, again foreclosing a finding of infringement as a matter of law.  That Collision could not actually put on a sufficient infringement case is not surprising, as the leader of BAE's group that developed the Asserted Patents testified that the claimed BAE MUD technology was "not even close" to Samsung's accused MIMO technology.

1

Put simply, as a matter of law, Samsung cannot infringe any Asserted Claim. With these issues, Collision also failed as a matter of law to prove any infringement by Samsung—and there was none—was willful as Samsung's conduct was never "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."

Collision's damages case is equally, if not more, deficient. To start with, Collision's entire damages model is based on a hypothetical negotiation date that is not only completely unsupported but flatly contradicted by the undisputed record evidence. That negotiation date was plainly adopted to improperly allow an irrelevant simulation and irrelevant pre-suit discussions to be part of Collision's damages story, and not because that date was the date of first alleged infringement—and indeed Collision offered *no* evidence, not even a conclusory expert statement, that its hypothetical negotiation date was in fact the date of first infringement. Also fatal to Collision's damages case was its "apportionment" analysis of a simulation to show the alleged value of the Asserted Patents with no actual apportionment. For that to be permissible as apportionment, the simulation would have to reflect the value of the Asserted Claims *and nothing else*—in other words, it would have to practice the asserted claims. But Collision and its experts admit the simulation did not practice the Asserted Claims. It thus cannot be a basis for apportionment, and without proving up apportionment, Collision could not prove damages. But even if the Court found Collision could have proven damages, it failed to prove entitlement to pre-suit damages because its licensees undisputedly did not mark their products that practice the Asserted Patents with the Asserted Patents, and because Collision's witnesses squarely admitted they did not accuse Samsung of infringement before filing suit. As such, it was legal error to award any pre-suit damages in this case.

The Court should enter judgment as a matter of law of no infringement, invalidity, and no

2

damages under Federal Rule of Civil Procedure 50(b).[1]

## II.    BACKGROUND

Collision accused Samsung's 4G and 5G cellular compliant phones and tablets ("Accused Products") of infringing U.S. Patent Nos. 7,463,703 (the '703 patent), 7,920,651 (the '651 patent), 8,089,946 (the '946 patent), 7,593,492 (the '492 patent), 9,814,071 (the '071 patent), and 6,947,505 (the '505 patent) ("Asserted Patents").  Tr. at 124:3-125:4, 432:11-18.  Collision specifically alleged that the Accused Products infringed claims 1 and 5 of the '703 patent, claims 1 and 3 of the '651 patent, claim 1 of the '492 patent, and claim 1 of the '505 patent ("Asserted Claims").  Samsung denies any infringement and contends all claims are invalid, and further contends Collision is not entitled to any money damages.  Tr. at 125:22-126:1.  At trial the Jury found all Asserted Claims infringed, that Samsung had not proven invalidity of any Asserted Claim, that Samsung owed $445,494,160, and that Samsung's infringement was willful.  Dkt. 312 (Verdict Form).  The Court entered final judgment in accordance with the Jury verdict, but did hold that "[t]he Court, having seen the evidence, finds that no enhancement of damages is warranted via the Jury's willfulness finding."  Dkt. 331 (Final Judgment).  Any specific facts relevant to a given individual JMOL are discussed in the context of the JMOL below.

## III.    LEGAL STANDARD

Under Rule 50(b), judgment as a matter of law should be granted "if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find for the nonmovant." *Finesse Wireless LLC v. AT&T Mobility LLC,* No. 2:21-CV-00316-JRG, 2023 WL 5613172, at *1 (E.D. Tex. Aug. 30, 2023) (citing *Tercero v. Tex. Southmost College Dist.*, 989

---

[1]  Samsung reserves the right to appeal its objections to all prior Court orders.

F.3d 291, 299 (5th Cir. 2021)).  "Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)).  The non-moving party must identify "substantial evidence" to support its positions.  *TGIP, Inc. v. AT&T Corp.*, 527 F.Supp.2d 561, 569 (E.D. Tex. 2007).  "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

## IV.    JMOL #1: NONINFRINGEMENT OF ALL ASSERTED PATENTS DUE TO IMPOSSIBILITY OF INFRINGEMENT BASED ON THE INFRINGEMENT THEORIES PRESENTED TO THE JURY

For all Asserted Patents, Collision and its expert Dr. Kowalski alleged that the channel estimation performed by the Accused Products met the claimed parameter estimation and/or amplitude estimation in the asserted claims.  Tr. (Kowalski) at 554:15-22 ("Q: … Now, if I understand your testimony for infringement on all the asserted claims, you're pointing to something called a channel estimator. Is that right?  A: In various places, yes.  Q: You mapped what you call the channel estimator in 4G, 5G standards as either the amplitude estimator or the parameter estimator in each of the claims.  Correct?  A: In the patents that include those terms, yes.").  However, as explained below, the channel estimation performed by the Accused Products is very different from the parameter estimation and amplitude estimation requirements of the Asserted Claims.  There is a failure of proof in Dr. Kowalski's mapping of the parameter estimation and amplitude estimation limitations to the channel estimation functionality in the Accused Products because the channel estimation functionality simply does not perform the claimed limitations. As such, no reasonable jury could find infringement of any of the Asserted Claims based on the inadequate evidence Collision provided at trial.

Dr. Kowalski's testimony confirmed that the only functionalities he was accusing of

████████████████████████████████████████████

infringement were the "colliding CRS channel estimation" and "advanced SU-MIMO reception" in Samsung's MIMO utilizing mobile devices. Tr. (Kowalski) at 437:6-437:10. And, as Mr. Farkas, Collision's prior CTO—and a former BAE employee—testified, all four of the Asserted Patents came out of BAE's work on multiuser detection ("MUD") systems led by Dr. Rachel Learned. Tr. (Farkas) at 207:12-209:13. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████ Thus, it is not surprising that Collision only presented an unsupported and impossible infringement theory given that Collision's and Dr. Kowalski's entire theory is based on fitting a square peg (MIMO functionality) into a round hole (claims covering improvements to MUD technology). Collision's and Dr. Kowalski's infringement theory for every Asserted Claim fails as a matter of law because there is no support for every relevant limitation being met by the accused functionalities.

### A.    '651 Patent

For the '651 Patent, Collision and Dr. Kowalski only accuse the CRS interference cancellation functionality of infringement. Based on the infringement theory put forward, it is impossible for Samsung's Accused Products to meet all the claim limitations of the '651 Asserted Claims. Below is the claim language of asserted claim 1:

1. A joint amplitude estimator for a data stream from multiple users, comprising:

a data stream from said multiple users divided into a plurality of observation intervals;

a plurality of processing modules coupled to said observation intervals, wherein said processing modules *calculates interference cancellation values for each of*

5

*said users* and computes a filter for each of said observation intervals, said filter being applied to said data within said observation interval to compute *individual amplitude* estimate**s**; and

*an amplitude estimation unit which processes said individual amplitude* estimate**s** and calculates new amplitude estimate**s**, wherein said new amplitude estimate**s** are *iteratively passed back* to said processing modules either a maximum number of iterations or a desired bit error rate have been reached.

JX-001 ('651 Patent) cl. 1 (emphasis added). What is clear from the plain claim language is the claim requires, a joint amplitude estimator (1) with a plurality of processing modules that calculates interference cancellation values for each user, (2) with a filter that computes individual amplitude estimates (plural), (3) with an amplitude estimation unit which processes said individual amplitude estimates (plural) that come from the filter to calculate new amplitude estimates (plural) by iteratively passing back the new amplitude estimates (plural) from the amplitude estimation unit to the processing modules that calculates interference cancellation values for each user. The key issue for this JMOL is that the claim requires a feature that processes multiple amplitude estimates that come out of the filter feature, and the processing of those multiple amplitude estimates involves iteratively passing back the new amplitude estimates to the processing modules to calculate interference cancellation values for each user. But, as shown below, the CRS interference cancellation functionality that Collision and Dr. Kowalski accuse in the Samsung Accused Products only has *one* amplitude estimate for *one* "user" come out of the filter. It is therefore impossible for there to be any amplitude estimation unit in any Samsung Accused Product which processes multiple individual amplitude estimates that come from the filter to calculate *multiple* new amplitude estimates for each user by iteratively passing back the new amplitude estimates for each user.

Specifically, Dr. Kowalski testified that the CRS signal channel estimator in the Samsung Accused Products is the claimed "joint amplitude estimator," Tr. (Kowalski) at 450:23-451:14, the

6

CRS signals received from the separate cell towers in the Samsung Accused Products are the claimed "data stream from said multiple users," *id*. at 451:15-452:13, the computed channel estimate in the Samsung Accused Products is the claimed "interference cancellation values," *id*. at 454:4-10, and the CRS signal channel estimator in the Samsung Accused Products is the claimed "filter," *id*. at 454:11-455:9. Based on this mapping, in order for there to be any possibility of infringement, there must be multiple amplitude estimates that come out of the filter—alleged as the CRS signal channel estimator in the Samsung Accused Products—that are further processed by an amplitude estimation unit via iteratively passing back the new multiple amplitude estimates to the processing modules to calculate interference cancellation values for each user. Yet, Dr. Kowalski himself admitted that the CRS signal channel estimator in the Samsung Accused Products only outputs a single CRS signal with only its associated channel characteristics for one alleged "user," and the CRS signal channel estimator cancels out and dumps all other CRS signals from any other alleged "users." *Id.* at 559:18-22 ("Q. Isn't it true, sir, that the output of this process with channel estimator and CRS cancellation results in the one useful CRS signal that the user device cares about because the other interfering signals have been canceled out. Yes? A. As well as its channel estimate."), *id.* at 560:2-10 ("So the job of the channel estimator that you mapped to the initial amplitude estimator, the parameter estimators in all of the asserted claims, its job is to receive potentially interfering CRS signals or reference signals from multiple base stations, cancel out all the interfering reference signals, so that what it produces is one CRS signal for the serving base station with its associated channel characteristics. Is that fair? A. Correct."). Therefore, Dr. Kowalski admitted that what he pointed to as the alleged "filter" of claim 1 of the '651 Patent in the Samsung Accused Products only outputs a single CRS signal and a single channel estimate of that one CRS signal. This means it is impossible for the Samsung Accused Products to infringe

7

claim 1 of the '651 Patent under Dr. Kowalski's theory because there are no multiple "individual amplitude estimates" to be fed into any amplitude estimation unit to calculate multiple new amplitude estimates for each user by iteratively passing back the new amplitude estimates to the processing modules that calculate interference cancellation values for each user as further required by the claim.  Dr. Kowalski did not even attempt to identify any iterative process for passing back the amplitude estimates because there is no iteration of any kind.

Samsung's expert, Dr. Mahon, confirmed and explained the impossibility.  Tr. (Mahon) at 929:15-25 ("Q. So if I take Dr. Kowalski's theory that the channel estimator which only produces one CRS signal and I plug that into the initial amplitude estimation unit as Dr. Kowalski does, what's the result in terms of the mapping to the exact language of the claims?  A. Well, it doesn't map. If you look at the red oval circle in the middle, which says, 'An initial amplitude estimation unit,' under the claim you would have two estimates coming out, as I've drawn it here. But based on Dr. Kowalski's accusations, what he's pointing to in the device, you only have one coming out. It's canceling the other."), Tr. (Mahon) at 898:18-899:6 (". . . Q. So two go in and one comes out, as I depicted here.  Is that correct?  A. Correct.  Q. And what's the one CRS signal that comes out after you apply the accused channel estimator?  A. The signal that you're attached to -- from the base station you're attached to.").  Based on this impossibility in Dr. Kowalski's infringement accusation, no reasonable jury could find infringement.

### B.    '505 Patent

For the '505 Patent, Collision and Dr. Kowalski again only accuses the CRS interference cancellation functionality of infringement, and again, based on the infringement theory put forward, it is impossible for Samsung's Accused Products to meet all the claim limitations of the '505 Asserted Claim.  Below is the claim language of asserted claim 1:

1. In a multi-user detection system in which interfering signals are purposely

8

allowed to exist, *a parameter estimation unit* for *use in conjunction with a signal separation unit*, in which each received signal has associated channel transfer functions, comprising:

*a signal processor for determining said channel transfer functions for each received signal*; and,

*means coupled to said channel transfer function determining signal processor for providing uninterrupted estimates of the channel transfer function parameters on a real-time basis* by first deriving the estimated channel transfer function *for each of said interfering signals*.

JX-003 ('505 Patent) cl. 1 (emphasis added). There are two sets of critical claim requirements that are relevant to this JMOL. First, claim 1 requires (1) a parameter estimation unit for use in conjunction with (2) a signal separation unit. Second, claim 1 also requires (3) a signal processor for determining channel transfer functions for each received signal and (4) something else coupled to the signal processor to provide real-time estimates of the channel transfer function parameters for each received interfering signal. Based on these claim requirements, there are two separate reasons why it is impossible for Samsung's Accused Products to infringe this claim.

First, Dr. Kowalski testified that the CRS signal channel estimator in the Samsung Accused Products is the claimed "parameter estimation unit," Tr. (Kowalski) at 459:2-17, but Dr. Kowalski did not actually identify what in the Samsung Accused Products meets the "signal separation unit" requirement, *id*. There is a good reason Dr. Kowalski did not identify anything as meeting the "signal separation unit" requirement—it is impossible for there to be anything based on his infringement read. As just discussed in detail above for the '651 Patent, the CRS signal channel estimator in the Samsung Accused Products only outputs a single CRS signal with only its associated channel characteristics for one alleged "signal" or "user" and cancels out and dumps all other CRS signals from any other alleged "users." *Id.* at 559:18-22, 560:2-10. Thus, in the Samsung Accused Products, once the interfering CRS signals pass through the CRS signal channel estimator, there is only one individual signal that is output. Because there is only one signal output,

9

there is no additional signal separation for any "signal separation unit" to perform—it has already been done—so there is nothing in the Samsung Accused Products that can meet that additional requirement of the '505 Patent. Nor is it possible to treat the CRS signal channel estimator as both the parameter estimation unit and the signal separation unit, as they must be used "in conjunction." There is no conjunction when there is no separate signal separation unit and nothing done to separate any signals after the parameter estimation produces its one signal output. It is not enough for Dr. Kowalski to say that the "signal separation unit" limitation is met when he cites to no evidence. *Dominion Energy, Inc. v. Alstom Grid LLC*, 725 F. App'x 980, 986 (Fed. Cir. 2018) (Expert opinions must have record support, as merely "saying that something is so does not make it true, especially when there is no record support.").

Second, for his infringement theory, Dr. Kowalski testified that the CRS signal channel estimator in the Samsung Accused Products is also the claimed "signal processor for determining said channel transfer functions for each received signal." Tr. (Kowalski) at 459:18-25. So again for all the same prior reasoning, in the Samsung Accused Products, there would only be a single CRS signal with only its associated channel characteristics for one alleged "signal" or "user" output from what Dr. Kowalski alleged is the claimed "signal processor for determining said channel transfer functions for each received signal." In addition, as discussed above, the "means coupled to…" limitation further requires something else be coupled to the signal processor to provide real-time estimates of the channel transfer function parameters for each received interfering signal. But, again, it is impossible for anything in the Samsung Accused Products to meet that additional requirement of the '505 Patent because there is only one CRS signal output from the channel estimator, and there is no way for there to be further "estimates of the channel transfer function parameters…for **each of said** interfering signals" because only one signal

remains saved and used in the Samsung Accused Product operation.  This is yet another impossibility.

Thus, for these two independent reasons, based on the infringement theory put forward by Dr. Kowalski, it is impossible for Samsung's Accused Products to meet all the claim limitations of the '505 Asserted Claim and no reasonable jury could find infringement.

### C.    '703 Patent

For the '703 Patent, Collision and Dr. Kowalski only accuse the advanced SU-MIMO reception functionality of infringement.  While this functionality is different from the CRS cancellation feature just discussed, Dr. Kowalski still relies on the same channel estimator in the Samsung Accused Products to meet certain claim limitations, which for the same related reasons as the two prior patents, makes it impossible for Samsung's Accused Products to meet all the claim limitations of the '703 Asserted Claims.  Below is the claim language of asserted claim 1:

> 1. An apparatus for processing a digital data stream from multiple users, comprising:
>
> *an initial amplitude estimation unit* processing said data stream and *producing initial amplitude estimates on a first iteration*;
>
> *a joint amplitude estimator coupled to* said data stream and *said initial amplitude estimator*, wherein said joint amplitude estimator *produces updated amplitude estimates*;
>
> *a symbol estimator coupled to* said data stream, said *initial amplitude estimator*, and said joint amplitude estimator, wherein said *symbol estimator produces a plurality of symbols estimates for each user*; and
>
> *a bank of decoders coupled to* said *symbol estimator*, *producing* a plurality of symbol likelihood *estimates for each user*, wherein said *symbol likelihood estimates are iteratively fed back to said symbol estimator and said joint amplitude estimator* until a final condition is obtained.

JX-002 ('703 Patent) cl. 1 (emphasis added).  As the plain claim language here shows, claim 1 of the '703 Patent requires:  (1) an initial amplitude estimation unit producing initial amplitude

11

estimates, (2) a joint amplitude estimator coupled to the initial amplitude estimator producing updated amplitude estimates, (3) a symbol estimator coupled to the initial amplitude estimator that produces a plurality of symbols estimates for each user, (4) a bank of decoders coupled to the symbol estimator that produce a plurality of symbol likelihood estimates for each user, and (5) the symbol likelihood estimates are iteratively fed back to the symbol estimator and the joint amplitude estimator.

Dr. Kowalski testified that the individual MIMO layers in the MIMO transmission received by the Accused Products are the "multiple users," Tr. (Kowalski) at 474:4-25, the CRS signal channel estimator in the Samsung Accused Products is the claimed "initial amplitude estimation unit," *id*. at 475:1-11, the amplitude and phase estimators that are associated with the rank 2 and rank 3 and 4 detectors in the Samsung Accused Products are the claimed "joint amplitude estimator," *id*. at 475:14-476:14, the rank 2 and rank 3 and 4 detectors in the Samsung Accused Products are the claimed "symbol estimator," *id*. at 476:15-477:12, and the log likelihood ratios in the Samsung Accused Products are the claimed "symbol likelihood estimates [that] are iteratively fed back to said symbol estimator and said joint amplitude estimator," *id*. at 478:14-479:10.  This read suffers from multiple issues.  First, the users that Dr. Kowalski pointed to are the individual MIMO layers, but then he points to the CRS signal channel estimator in the Samsung Accused Products as being the initial amplitude estimation unit that processes the layers and produces initial amplitude estimates on a first iteration for the users.  But as discussed above, the CRS signal channel estimator performs operations on sets of interfering CRS signals, not MIMO layers. *Id*. at 559:18-22, 560:2-10.  Thus, if Dr. Kowalski wants to read the '703 Patent against the MIMO layers where the MIMO layers are the multiple users, he cannot point to the CRS signal channel estimator as the claimed "initial amplitude estimator" because it simply does not operate on, and

12

provide information about, MIMO layers.  Dr. Kowalski and Collision put nothing in the record that says otherwise.

Second, even if somehow the CRS signal channel estimator can meet claimed "initial amplitude estimator"—it cannot—then as discussed above it would output only one "user" or layer estimate and discard the rest.  *Id*. at 559:18-22, 560:2-10.  Therefore, whatever would be the claimed "joint amplitude estimator" could not produce "updated" amplitude estimates for each layer (user) because the data streams would have already been either cancelled or singled out and removed by the channel estimator to output only one data stream.  And for the same reasons, there could be no "bank of decoders coupled to said symbol estimator" that "produc[e] a plurality of symbol likelihood estimates for each user" because the CRS signal channel estimator would have already removed from the operation all the user signals (layers) except for one, so there would be no possibility that symbol likelihood estimates could be calculated for "each" user (all original layers).  There would also be no situation where "symbol likelihood estimates are iteratively fed back," as once again, Dr. Kowalski does not identify any iteration in this process that would satisfy the claim limitation.

Thus, for at least these two reasons, based on the infringement theory put forward by Dr. Kowalski, it is impossible for Samsung's Accused Products to meet all the claim limitations of the '703 Asserted Claims and no reasonable jury could find infringement.

### D.    '492 Patent

For the '492 Patent, Collision and Dr. Kowalski again only accuse the advanced SU-MIMO reception functionality of infringement, but also again, Dr. Kowalski still relies on the same channel estimator in the Samsung Accused Products to meet certain claim limitations, which for the same related reasons as the three prior patents, makes it impossible for Samsung's Accused Products to meet all the claim limitations of the '492 Asserted Claim.  Below is the claim language

13

of asserted claim 1:

> 1. A hybrid Multi-User Detector System for processing received signals, comprising:
>
> ***a parameter estimator coupled to said received signals providing received data information***;
>
> a multi-user detector decision unit coupled to said parameter estimator and said received signals;
>
> ***at least two multi-user detectors coupled to said parameter estimator*** and said multi-user detector decision unit, said multi-user detector decision unit using decision criteria to determine a selected multi-user detector, ***wherein said selected multi-user detector outputs a plurality of information streams, one stream corresponding to each of said received signals***; and
>
> a bank of decoders coupled to said plurality of information streams, wherein said decoders output a plurality of improved information streams.

JX-004 ('492 Patent) cl. 1 (emphasis added).  As the plain claim language here shows, claim 1 of the '492 Patent requires:  (1) a parameter estimator that provides received data information of the received signals, (2) at least two multi-user detectors connected to the parameter estimator, and (3) the multi-user detectors output a plurality of information streams with each stream being from each received signal.

Dr. Kowalski testified that the CRS signal channel estimator in the Samsung Accused Products is the claimed "parameter estimator," Tr. (Kowalski) at 480:13-18, and that the "multi-user detector outputs a plurality of information streams, one stream corresponding to each of said received signals" limitation is met by the output of each layer from the rank detectors and modulation detectors,[2] *id*. at 483:2-19.  This read suffers from multiple similar issues as the '703 Patent.  First, again, the users that Dr. Kowalski pointed to are the individual MIMO layers, but

---

[2]   As discussed in other JMOLs, Collision and Dr. Kowalski have completely failed to show how multiple limitations in '492 Patent are met.  The statement here is not an agreement that any limitation in the '492 Patent has been adequately shown in the Samsung Accused Products.

then he points to the CRS signal channel estimator in the Samsung Accused Products as being the parameter estimator that processes the layers. But as discussed above, the CRS signal channel estimator performs operations on sets of interfering CRS signals, not MIMO layers. *Id.* at 559:18-22, 560:2-10. Thus, Dr. Kowalski cannot point to the CRS signal channel estimator as the claimed "parameter estimator" because it simply does not operate on, and provide information about, MIMO layers. Dr. Kowalski and Collision again put nothing in the record that says otherwise.

Second, even if somehow the CRS signal channel estimator can meet the claimed "parameter estimator"—again it cannot—then as discussed above it would output only one "user" or layer estimate and discard the rest. *Id.* Therefore, whatever would be the claimed "parameter estimator " could not be coupled to any "multi-user detectors" that "output a plurality of information streams" with each stream being for "each" layer because the CRS signal channel estimator would have already removed from the operation all the user signals (layers) except for one, so there would be no possibility that there could be information streams for all layers (all original layers).

Thus, for at least these two reasons, based on the infringement theory put forward by Dr. Kowalski, it is impossible for Samsung's Accused Products to meet all the claim limitations of the '492 Asserted Claim and no reasonable jury could find infringement.

## V.    JMOL #2: NONINFRINGEMENT OF ALL ASSERTED PATENTS BECAUSE SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S FINDINGS

Collision further failed to meet its burden on proving infringement for all Asserted Patents for two additional separate reasons, each of which independently results in a record where no reasonable jury could find infringement of the Asserted Claims. First, Collision simply failed to provide adequate evidentiary support to prove infringement for every limitation of every Asserted Claim, and second, Dr. Kowalski's contradictory statements regarding why certain features in

licensed third party products do not practice the Asserted Claims—such that marking was not required—but that Samsung's Accused Products infringe despite using those very same said features is insufficient to support a jury verdict of infringement.

## A.    Overall General Failure Of Proof

Collision failed to meet its burden of proving infringement of any of the asserted claims because, for a slew of limitations for each asserted patent, Dr. Kowalski merely testified that "Samsung's products meet this limitation," and said nothing more. Without relying on any record evidence to show limitations are met by Samsung's Accused Products, Dr. Kowalski's conclusory testimony is insufficient as a matter of law. *Dominion Energy*, 725 F. App'x at 986 ("[J]ust saying that something is so does not make it true, especially when there is no record support"); *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (affirming JMOL of noninfringement where "conclusory [expert] testimony" was the basis for infringement); *Finesse Wireless LLC v. AT&T Mobility LLC*, 156 F.4th 1221, 1230 (Fed. Cir. 2025) (reversing denial of JMOL of noninfringement where plaintiff's expert failed to where in defendant's technical documentation showed the claim limitation).

To say Dr. Kowalski's testimony regarding infringement was minimal would be an understatement. As shown below, for many limitations of each asserted patent Dr. Kowalski says nothing more than that his opinion is that the Accused Products meet that limitation:

| Limitation | Dr. Kowalski's testimony |
|---|---|
| '651 Patent, Claim 1 | |
| "a plurality of processing modules coupled to said observation intervals" | Dr. Kowalski merely says that "there are  modulation – modules computing interference cancellation values." Tr. at 453:10-20. Dr. Kowalski does not explain how such modules are coupled to said observation intervals, merely stating that they "operat[e] on a subframe-by-subframe basis." Tr. at 453:21-24. |
| "wherein said processing modules calculates interference cancellation | Dr. Kowalski opines that the interference cancellation values are the "computed channel estimates and the interfering reference signals," but does not identify what the processing module is or |

16

| | |
|---|---|
| values for each of said users" | how it calculates such values for each user. Tr. at 453:25-454:10. |
| "wherein said processing modules . . . computes a filter for each of said observation intervals" | Dr. Kowalski opines that the claimed filter "is the channel estimator," but does not explain how the processing module—which he never identified—computes the filter or what the filter is for each observation interval. Tr. at 454:11-20. |
| "said filter being applied to said data within said observation interval to compute individual amplitude estimates" | Dr. Kowalski opines that the individual amplitude estimates are the channel estimates, but does not explain how the filter is applied to data within the observation interval to compute them. Tr. at 454:21-455:9. |
| "an amplitude estimation unit which processes said individual amplitude estimates and calculates new amplitude estimates" | Dr. Kowalski merely opines that he saw source code that shows this, without identifying the source code. Tr. at 455:10-22. |
| '505 Patent, Claim 1 | |
| "a parameter estimation unit for use in conjunction with a signal separation unit, in which each received signal has associated channel transfer functions" | While Dr. Kowalski maps the parameter estimation unit to the channel estimation unit, he never identifies what is the claimed signal separation unit. Tr. at 458:21-459:17. |
| "a signal processor for determining said channel transfer functions for each received signal" | Dr. Kowalski simply says that "there is a signal processor" without identifying where it is found in the accused products. Tr. at 459:18-460:4. |
| "means coupled to said channel transfer function determining signal processor for providing uninterrupted estimates of the channel transfer function parameters on a real-time basis" | Required Structure<br>*Track timing offset.* Dr. Kowalski merely says the accused products track timing offset. Tr. at 461:7-9.<br>*Track frequency.* Dr. Kowalski merely says the accused products track frequency. Tr. at 461:10-11.<br>*Track phase.* Dr. Kowalski merely says the accused products track phase. Tr. at 461:12-13.<br>*Track multipath structure.* Dr. Kowalski says that the Samsung document "talks about large-scale multipath properties" but does not identify where in Samsung's documents this is shown, does not explain how Samsung tracks multipath structure, and does not explain how such tracking is coupled to the signal processor for providing estimates of the channel transfer function parameters on a real-time basis. Tr. at 461:14-462:6.<br><br>Required Function<br>Dr. Kowalski does not explain how the claimed function is met. He merely repeats each of the components of the structure again. |

17

| | Tr. at 464:18-465:3. |
|---|---|
| **'703 Patent, Claim 1** | |
| "a joint amplitude estimator coupled to said data stream and said initial amplitude estimator, wherein said joint amplitude estimator produces updated amplitude estimates" | Dr. Kowalski merely states that the claimed joint amplitude estimator is the "amplitude and phase estimators that are associated with the rank 2 and rank 3 and 4 detectors" without identifying them in Samsung technical documentation. Tr. at 475:14-25.<br><br>Dr. Kowalski merely states that the updated amplitude estimates are "the update the updated values from the symbol estimator as we iterate through them" without specifically identifying them in Samsung technical documentation. Tr. at 475:19-25. He points to an "argmin function" but does not explain how those are updated amplitude estimates. *Id.*<br><br>Dr. Kowalski opines that there are multiple updated amplitude estimates without any record evidence. Tr. at 476:1-3. |
| "a symbol estimator coupled to said data stream, said initial amplitude estimator, and said joint amplitude estimator, wherein said symbol estimator produces a plurality of symbols estimates for each user" | Dr. Kowalski merely says that the symbol estimator is somewhere "in the rank 2 and rank 3 and 4 detectors." Tr. at 476:21-24.<br><br>Dr. Kowalski does not explain how the symbol estimator is coupled to the data stream, the initial amplitude estimator, and the joint amplitude estimator, merely saying that "you can see that in the argmin function, and -- because they are coupled to the observation interval, the channel estimates, and so forth." Tr. at 477:5-10. |
| "a bank of decoders coupled to said symbol estimator, producing a plurality of symbol likelihood estimates for each user, wherein said symbol likelihood estimates are iteratively fed back to said symbol estimator and said joint amplitude estimator until a final condition is obtained" | Dr. Kowalski does not identify a bank of decoders in Samsung's documentation, and instead says the limitation is met because there is a "box that says bank decoders" in his own demonstrative figure. Tr. at 477:13-15.<br><br>Dr. Kowalski does not show that the bank of decoders produces a plurality of symbol likelihood estimates for each user. Tr. at 478:14-20.<br><br>Dr. Kowalski opines that the decoder transfers information to "the detector" but does not show that symbol likelihood estimates are fed back to both the symbol estimator and the joint amplitude estimator. Tr. at 478:21-479:5.<br><br>Dr. Kowalski does not offer any opinion regarding whether the claimed final condition is obtained. |
| **'703 Patent, Claim 5** | |
| "The apparatus according to claim 1, wherein said bank of decoders are | Dr. Kowalski says, without citing any record evidence, that the "maximum a posteriori decoder is used." Tr. at 479:13-17. |

18

| | |
|---|---|
| decoders selected from at least one decoder of the group consisting of: Soft-output Viterbi, Maximum A Posteriori, and Bahl-Cocke-Jelinek-Raviv." | |
| **'492 Patent, Claim 1** | |
| "A hybrid Multi-User Detector System for processing received signals" | Dr. Kowalski opines, without citing record evidence, that Samsung chips "different detectors based on the rank of the received signal" and "for different modulation schemes." Tr. at 479:25-480:10. |
| "a parameter estimator coupled to said received signals providing received data information" | Dr. Kowalski merely opines that the claimed parameter estimator is the "channel estimator that we've been speaking of" without explain how a channel estimator meets that limitation, or how it is coupled to the received signal providing received data information. Tr. at 480:13-18. |
| "a multi-user detector decision unit coupled to said parameter estimator and said received signals" | Dr. Kowalski opines that Samsung's accused products "decide which MUD to use based on the number of symbols that is signaled to the handset to use based on what's called downlink control information" without showing any record evidence to show this. Tr. at 480:19-482:3.<br><br>Dr. Kowalski opines that Samsung's accused products use criteria including computation complexity without citing any record evidence to show this. Tr. at 482:4-24.<br><br>Dr. Kowalski does not explain how the claimed multi-user detector decision unit is coupled to the parameter estimator and said received signals. |
| "at least two multi-user detectors coupled to said parameter estimator and said multi-user detector decision unit, said multi-user detector decision unit using decision criteria to determine a selected multi-user detector, wherein said selected multi-user detector outputs a plurality of information streams, one stream corresponding to each of said received signals" | Dr. Kowalski merely parrots the examining attorney, without citing to record evidence, that the accused devices have at least two detectors, include different rank detectors and modulation detectors, are coupled to the parameter estimator, and output a plurality of information streams. Tr. at 483:2-19.<br><br>Dr. Kowalski does not explain how the at least two multi-user detectors is coupled to the multi-user detector decision unit or how it uses decision criteria to determine a selected multi-user detector. |
| "a bank of decoders | Dr. Kowalski merely opines that this limitation is met for the same |

19

| | |
|---|---|
| coupled to said plurality of information streams, wherein said decoders output a plurality of improved information streams." | reasons as the '703 Patent. Tr. at 483:20-25. But the '703 Patent requires "a bank of decoders coupled to said plurality of information streams, wherein said decoders output a plurality of improved information streams," and Dr. Kowalski does not explain how this limitation is met. |

Dr. Kowalski's check-the-box exercise is insufficient as a matter of law. *Dominion Energy*, 725 F. App'x at 986; *ConAgra Foods*, 465 F.3d at 1320; *Finesse Wireless*, 156 F.4th at 1229-30  Moreover, Dr. Kowalski's vague references to JX-8 (a 700-page document) and source code without actual citations or references to specific sections do not save his analysis for these limitations, as vague citations to technical documentation without specifically identifying what in the document shows a claim limitation is met is not enough. *Finesse Wireless*, 156 F.4th at 1230.

Dr. Kowalski's opinions are also insufficient as to the Qualcomm and MediaTek chipset products based on his source code testimony because he merely opines that the Qualcomm and MediaTek chipset code is similar to the Samsung code and that his opinions do not change based on differences in the chipsets. *E.g.*, Tr. at 435:9-24, 436:18-21.  Dr. Kowalski cites to no evidence regarding the Qualcomm and MediaTek chipsets in a limitation-by-limitation analysis to show infringement, or why they are similar to Samsung's chipset in all material respects.  Again, Dr. Kowalski's say-so is insufficient. *Dominion Energy*, 725 F. App'x at 986; *ConAgra Foods*, 465 F.3d at 1320; *Finesse Wireless*, 156 F.4th at 1229-30  On these facts, the jury has no ability to find infringement. *Griffin v. U.S.*, 502 U.S. 46, 59 (1991) ("When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.").

In sum, there is simply inadequate evidence from Collision that any Asserted Claim has been infringed by any Samsung Asserted Product, and no reasonable jury could find infringement of the Asserted Claims.

**B.      Dr. Kowalski's Self-Contradictory Testimony On Issues Of Infringement Prohibit A Finding Of Infringement**

The issues with Dr. Kowalski's testimony do not end with a simple lack of evidence—Dr. Kowalski's self-contradictory testimony regarding marking and infringement also warrants judgment as a matter of law of noninfringement.

***First***, Dr. Kowalski did not provide a consistent opinion regarding whether reference signals can meet the asserted claims. While Dr. Kowalski opined that he treated both CRS (cell-specific reference signal) and DMRS (demodulation reference signal) equally for infringement, he testified CRS is infringing but DMRS is not for purposes of his marking opinion—arguing base stations using the same standards as Samsung's devices do not practice the Asserted Claims.

CRS is the reference signal used in 4G LTE for channel estimation, and DMRS is the reference signal used in 5G for channel estimation. Tr. at 555:5-7 (Kowalski) ("Q. In 5G, instead of CRS signals, you also identified DMRS signals for the same functionality. Correct? A. That's right."). Dr. Kowalski's infringement analysis for each of the asserted patents maps CRS channel estimation to at least one claim limitation. *See generally* Tr. at 450:16-484:3; Tr. at 437:6-448:7. But while Dr. Kowalski opines CRS ***does*** infringe the claims, he opines DMRS ***does not*** practice the claims. Specifically, to avoid admitting that the licensed Nokia and Ericsson base station products practice the asserted claims—and thus needed to be marked—Dr. Kowalski testified that because Nokia and Ericsson base station products use DMRS instead of CRS, they do not practice the Asserted Patents:

> Q. Do the Nokia and Ericsson base station products receive CRS signals?
> A. No.
>
> Q. Do they use something called DMRS?
> A. Yes, they do.
>
> Q. How does DMRS handle colliding DMRS signals?
> A. Well, there's two basic ways. First of all, they transmit them in such a way that

they don't interfere with each other, or -- well, actually -- yes, they don't interfere with each other, or they structure them so that any interference is completely minimized.

Q. So if the Nokia and Ericsson base stations are able to use that, what does that tell you about whether or not they use the patents at issue in this case?
A. *They certainly wouldn't be using them.*

Tr. at 495:13-496:2 (emphasis added).  This dichotomy that Dr. Kowalski created—CRS is infringing and DMRS is not infringing—is untenable because *Dr. Kowalski also testified that they are the same for purposes of his infringement analysis to opine both LTE and 5G products infringe and maximize the damages base*:

Q. In 5G, instead of CRS signals, you also identified DMRS signals for the same functionality. Correct?
A. That's right.

Q. And that stands for demodulation reference signal. Is that correct?
A. That's right.

Q. *But you treated them equally*. You said that in practicality, *both CRS and DMRS go through the same process*.
A. *Yes*.

Q. And that process is what you call a channel estimation process. Correct?
A. That's right.

Tr. at 555:5-16 (emphasis added).  Dr. Kowalski cannot both enforce his dichotomy to avoid the marking issue and insist that CRS and DMRS are effectively the same for purposes of Samsung's alleged infringement.  By providing directly contradicting testimony on an issue that bears directly on infringement of all Asserted Claims, Dr. Kowalski's testimony cannot as a matter of law support an infringement verdict.  As the Federal Circuit explained, "[t]his sort of confusing change of course is not sufficient to support the jury verdict [of infringement]." *Finesse Wireless*, 156 F.4th at 1227 "When the party with the burden of proof . . . rests its case on an expert's self-contradictory testimony, we may conclude the evidence is insufficient to satisfy that standard." *Id*.

**Second**, Dr. Kowalski improperly contradicts his infringement opinion that all Asserted

22

Claims are met by Samsung receiving and processing orthogonal signals from base stations by opining that he knows that the Nokia and Ericsson base station products do not practice the asserted claims because the Nokia and Ericsson base station products use and process orthogonal signals. Specifically, as discussed numerous times previously, for every Asserted Claim Dr. Kowalski either accuses the reception and processing of CRS signals from a base station or the reception and processing of SU-MIMO signals from a base station as meeting numerous claim limitations. And, there is no dispute based on the admissions below from Dr. Kowalski that both of these accused signals are sent using OFDMA—orthogonal—technology in all accused implementations.

> Q. So if a base station sends information using OFDMA technology, the user device must support the ability to receive and process signals in OFDMA. Correct?
> A. I -- fair enough.
>
> Q. That's a requirement of the user device to be compatible with the LTE network. Correct?
> A. Correct.
>
> Q. In fact, you -- it is your opinion that LTE standards use conventional orthogonal frequency division multiplexing OFDM as the multiple access scheme for the downlink. Is that right?
> A. That's right.
>
> Q. And the downlink is the messages from the base station to the user device. Correct?
> A. Yes.
>
> Q. And that's the accused scenario in each of the infringement theories for the asserted patents--you're looking at how the information is transmitted in the downlink direction. Correct?
> A. That's right.
>
> Q. And you also talked yesterday about MIMO, multiple input multiple output. For downlink MIMO transmissions in 4G devices, those are OFDM signals. Correct?
> A. Yes.
>
> Q. Orthogonal signals. Is that right?
> A. That's the intention.

23

> Q. So the physical channel that's used to send information down even for multiple input multiple output, sent information in orthogonal waves using OFDM. Correct?
> A. Transmitted that way, yes.
>
> Q. The same is true for 5G.  Correct?
> A. That's right.
>
> Q. In fact, at your deposition you testified that 4G and 5G both use orthogonal signals for transmission.  Correct?
> A. That's right.
>
> Q. And in the downlink MIMO process in LTE, OFDM signals are sent on physical channels that are mapped at different layers. Do you recall that?
> A. Yes.
>
> Q. Layers are what you've been identifying in your presentation as the multiple users required by the Court's construction.  Is that correct?
> A. Correct.

Tr. at 552:21-554:13.  Thus, there is no dispute that the signals Dr. Kowalski points to and relies on to meet required claim limitations in every Asserted Claim for every one of his infringement theories are orthogonal signals.  And, as just noted above, Dr. Kowalski admitted that in his analysis and opinion, CRS signals operated the same as DMRS signals.  Tr. at 555:5-16 ("Q. *But you treated them equally*. You said that in practicality, *both CRS and DMRS go through the same process*. A. *Yes*.") (emphasis added).  Thus, Dr. Kowalski also admitted that DMRS signals are orthogonal signals.

Yet, as also just noted above, Dr. Kowalski testified that it was his opinion that the licensed Nokia and Ericsson base station products do not practice any of the Asserted Claims because, and only because, they receive and process the orthogonal DMRS signals.

> Q. Do the *Nokia and Ericsson base station products* receive CRS signals?
> A. No.
>
> Q. Do they *use something called DMRS*?
> A. *Yes*, they do.

Q. *How does DMRS handle colliding DMRS signals*?
A. Well, there's two basic ways. First of all, *they transmit them in such a way that they don't interfere with each other*, or -- well, actually -- yes, they don't interfere with each other, or *they structure them so that any interference is completely minimized*.

Q. So if the Nokia and Ericsson base stations are able to use that, *what does that tell you about whether or not they use the patents at issue in this case*?
A. *They certainly wouldn't be using them.*

Tr. at 495:13-496:2 (emphasis added). Dr. Kowalski's testimony trying to absolve Collision and its licensees of any marking requirement based on the Nokia and Ericsson base station products not practicing any Asserted Claim based solely on their use of orthogonal signals is plainly contradicted by his infringement opinions that Samsung's products' receipt and processing of orthogonal signals meet limitations in the Asserted Claims. Again, this directly contradictory testimony involving issues on which Collision bears the burden—infringement and marking— renders it impossible to sustain any infringement finding for any Asserted Claim. *Finesse Wireless*, 156 F.4th at 1227

## VI.    JMOL #3: NONINFRINGEMENT OF THE '703 PATENT BECAUSE COLLISION FAILED TO SHOW CLAIMED "MULTIPLE SOURCES" IN ACCUSED FUNCTIONALITY

Asserted Claim 1 of the '703 Patent requires, in relevant part, "an apparatus for processing a digital data stream from multiple users. JX-002 ('703 Patent) at cl. 1. In its Supplemental Claim Construction Order, the Court construed the term "multiple users" from the '703 Patent as "multiple sources of digital data streams for transmission." Dkt. 269 at 12. As is plainly evident from the Court's construction, there must be more than one source of digital data streams for transmission in order for this term to be met by an Accused Product. This is the construction both Collision's expert, Dr. Kowalski, and the jury, had to apply.

On direct examination regarding his infringement opinion of Claim 1 of the '703 Patent, Dr. Kowalski testified that "the data stream for multiple users" was met by "the data stream that

25

arrives [at the Samsung Accused Products] from each of the MIMO layers" transmitted by the base station and that "the multiple sources of digital data streams for transmission" were met by "the MIMO layers."   Tr. (Kowalski) at 473:23-474:14.   Thus, Dr. Kowalski testified on direct examination that the claimed "multiple sources of digital data streams" were "the MIMO layers."

However, on cross-examination, Dr. Kowalski was forced to admit that he had previously testified under oath that there is only *one* source of the digital data streams, not multiple, from what Dr. Kowalski referred to as the "core network": "***The source of the data*** may be one or more data streams that are transmitted from some source that -- that as far as what we're talking about here, ***comes from the core network*** to the base station…."  Tr. (Kowalski) at 638:11-640:11.  Thus, Dr. Kowalski admitted it was his opinion that the actual "multiple sources of digital data streams" was not the MIMO layers, but instead the singular "core network" behind the base station.  This singular "core network" cannot possibly meet the Court's construction of "multiple users" of "***multiple sources*** of digital data streams for transmission."  Dkt. 269 at 12 (emphasis added). What's more, Dr. Kowalski also admitted during cross-examination that MIMO layers are merely "a spatial dimension." Tr. (Kowalski) at 637:16-22.  "A spatial dimension" cannot be the source of any data, as they are simply used for data transmission.  Therefore, by Dr. Kowalski's own admission, the MIMO "layers" he claims meets the "multiple users" limitation cannot be the "source" of any data given that they are just a "spatial dimension" used for data transmission, and as a result the "MIMO layers" in the accused functionality cannot possibly meet the "multiple users" limitation as construed by the Court.  Accordingly, Dr. Kowalski presented unambiguous sworn testimony that makes his infringement opinions regarding the '703 Patent "multiple user" term an impossibility, and therefore no reasonable jury could find Samsung's Accused Products infringe the '703 Patent.

And even if Dr. Kowalski's new testimony during his direct is credited, at best, Dr. Kowalski presented self-contradictory opinions regarding infringement of the '703 Patent.  As the Federal Circuit recently held, "[t]his sort of confusing change of course is not sufficient to support the jury verdict [of infringement]."  *Finesse Wireless*, 156 F.4th at 1227  The Federal Circuit further explained that "[w]hen the party with the burden of proof . . . rests its case on an expert's self-contradictory testimony, we may conclude the evidence is insufficient to satisfy that standard."  *Id*.  *Finesse* is directly on point here: Collision bears the burden of proof on infringement, and "rests its case on [Dr. Kowalski's] self-contradictory testimony."  That testimony is therefore insufficient to carry Collision's burden of infringement of the '703 Patent and Collision has, therefore, failed to meet its burden as a matter of law.  *Id*.

To the extent that the Court does not grant this JMOL of noninfringement, then Collision's and Dr. Kowalski's own admissions and arguments at trial regarding the scope of this term run headlong into the indefiniteness issue for the "multiple user" term that Samsung and the Court raised during claim construction.  In the Supplemental Claim Construction Order, the Court noted that "Samsung expressed concern that Collision's construction was untethered from the actual application of multi-user detection, Hr'g Tr., Dkt. No. 102 at 27 (asking whether a "source" might be an application like Facebook or a video camera, and whether if two or more such "sources" combined into one bit stream would, under Collision's construction, be considered "multiuser" transmission)," and that the indefiniteness issue "was also a concern of the Court, but Collision quelled that concern" by confirming Collision would not argue that the "source" could be data from an application like Facebook.  Dkt. 269 at 10 n.2; Dkt. 102 (CC Hearing Tr.) at 33:20-35:11.  The Court even explained that while its construction of this term was "close to Collision's construction," the construction "clarifies the source ***cannot be just any source*** of a data stream."

27

Dkt. 269 at 12. (emphasis added). Yet, that is exactly what Collision and Dr. Kowalski have said the "source" is in the accused functionality by pointing to the "core network" as the source. Critically, in closing, counsel for Collision attempted to explain away Dr. Kowalski's admission that the source of the transmitted data "comes from the core network to the base station" by telling the Jury "the sources [Dr. Kowalski] points to as the MIMO layers are the exact datastreams that are perfectly consistent with his theory, but of course the data the base station is sending to you if you're watching a Netflix movie, that data ultimately came further upstream from Netflix." Tr. (Collision Closing) at 1293:14-23. Thus, Collision's counsel did exactly what he said he would not do to avoid the indefiniteness issue at claim construction by admitting the "source" of the digital data in Collision's infringement read could be anything, including an application like Netflix—which is exactly the same as the Facebook issue Samsung raised at the Markman hearing. In short, if the Court allows the Jury's infringement finding to stand despite Collision's and Dr. Kowalski's admissions at trial, the Court would be allowing Collision to make an argument it expressly and unequivocally disavowed to the Court in order to avoid an indefiniteness issue at claim construction. Judicial estoppel exists to prevent exactly this sort of chicanery. That doctrine "applies to protect the integrity of the courts" by "preventing a litigant from contradicting its previous, inconsistent position when a court has adopted and relied on it"—exactly what Collision did here. *Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298, 303 (5th Cir. 1998), *cert. denied*, 525 U.S. 1141 (1999). Therefore, the failure to grant this JMOL of noninfringement would be tantamount to an endorsement of Collision's interpretation of the "multiple user" term that allows the source of the digital data to be literally anything, thus reviving the indefiniteness issue both the Court and Samsung noted at the Markman hearing and making this term invalid.

## VII.    JMOL #4: NONINFRINGEMENT OF THE '651 PATENT BECAUSE COLLISION FAILED TO SHOW ACCUSED CRS SIGNALS ARE CLAIMED DIGITAL DATA

STREAMS

The '651 Patent requires a "joint amplitude estimator for a data stream from *multiple users*."  The Court construed "multiple users" as "multiple sources of digital data streams for transmission."  Dkt. 269 at 14.  However, Collision failed to show the accused CRS signals are "digital data streams" in the accused CRS interference cancellation functionality and there is no legally sufficient evidentiary basis from which a reasonable jury could find that Samsung infringes.

Dr. Kowalski opines that CRS signals meet the "digital data stream" limitation.  Tr. at 451:15-21.  But the evidence is clear that a CRS signal is simply a "reference signal," *not data*.  Tr. 557:21-23.  Indeed, Dr. Kowalski explained that CRS is used to help "account for the effects of the channel . . . so that you can then apply that knowledge to get *the information that is transmitted with the reference signal*"—i.e., *the data*.  Tr. at 558:23-559:4.  According to Dr. Kowalski, the CRS signal is analogous to golfers tossing grass in the air to determine wind speed and other environmental characteristics, while the golf ball represents the data "transmitted" through that environment.  Tr. at 202:21-203:4, 425:21-426:4.  In other words, the CRS signal is not a digital data stream, nor is it part of the digital data stream—it is known reference signal transmitted before the data stream to test the channel.  By estimating the channel, the receiver can recover "what was actually transmitted which represents the bits that are trying to be communicated."  Tr. at 203:14-24.  These bits—*not the CRS*—are the "digital data stream for transmission."  Because Collision and Dr. Kowalski agree that CRS signals are not "digital data streams for transmission," this limitation of the '651 Patent is not met, and substantial evidence cannot support the Jury's finding of infringement.

## VIII.   JMOL #5: NONINFRINGEMENT OF THE '505 PATENT DUE TO FAILURE TO PROVE INFRINGEMENT OF MEANS-PLUS-FUNCTION LIMITATION

The parties agreed the limitation "means coupled to said channel transfer function

determining signal processor for providing uninterrupted estimates of the channel transfer function parameters on a real-time basis" is governed by 35 U.S.C. § 112 ¶ 6. Dkt. 91 at 5. Specifically, the Court construed the function and structure as follows: "*The claimed function is providing uninterrupted estimates of the channel transfer function parameters on a real-time basis by first deriving the estimated channel transfer function for each of said interfering signals*. The corresponding structure is a parameter tracking unit and equivalents thereof as discussed at fig. 1, 5:20–40, 6:9–23, fig. 3, fig. 4 (item 90, 90', 90'), 7 45–8:40." *Id.* at 6.

Dr. Kowalski's analysis of this claim term was cursory at best but, critically, was limited to the claimed **structure**. *See, e.g.,* Tr. (Kowalski) at 460:5-465:5. Despite acknowledging that to prove infringement, Collision "need[s] to show that the claimed function is performed by the corresponding structure in the Court's construction" (*id.* at 460:8-13), **Dr. Kowalski did not address the claimed function**—"providing uninterrupted estimates of the channel transfer function parameters on a real-time basis by first deriving the estimated channel transfer function for each of said interfering signals"—**at all**. Instead, after agreeing he is required to show the claimed function, he jumped directly into analysis of whether the Accused Products have the claimed "parameter tracking unit" as shown in Figure 3—the claimed **structure**. *Id.* at 460:12-22. Indeed, the entirety of his analysis for the means term focuses on aspects of the structural portion of the construction. *See id.* at 460:5-465:5. Notably, Dr. Kowalski does not use the words "uninterrupted estimates," "real-time basis," or "estimated channel transfer function" anywhere in his testimony, including for the '505 Patent. *See id.* Yet these words, all outright ignored by Dr. Kowalski and Collision, are all part of the function portion of the means-plus-function limitation.

The law is well-settled that "[l]iteral infringement of a § 112, ¶ 6 limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and

30

be identical or equivalent to the corresponding structure in the specification. ***Functional identity and* either *structural identity or equivalence are both necessary*.**" *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) (citations omitted, emphasis added). Dr. Kowalski failed to establish—or even attempt to establish—functional identity, and as a result has failed to meet his burden on literal infringement of the means-plus-function term in the '505 Patent. *Id.*

Moreover, under the clear language of *Odetics* and its progeny, structural equivalence is not a solution to Collision's failure of proof of the claimed function. Even if Collision had introduced evidence of structural equivalency—it did not, Dr. Kowalski does not discuss equivalents in his testimony on the means-plus-function term (Tr. (Kowalski) at 460:5-465:5)—it would *still* be required to show functional identity *in addition to* that structural equivalency. *Odetics*, 185 F.3d at 1267. Put simply, both function and structure are required for infringement, and Collision failed to address the function.

Collision has, therefore, failed to meet its burden as a matter of law. *Id.* And by failing to address the claimed function, Collision left the jury in an impossible position, leaving them to infer or guess whether and how the legal requirements of the claims were satisfied. The law is clear that this paltry level of evidence, on a legally inadequate theory, is insufficient to defend against JMOL. *See Griffin*, 502 U.S. at 59 ("When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error."); *see also Northpoint Tech., Ltd. v. MDS Am., Inc.*, 413 F.3d 1301, 1311-12 (Fed. Cir. 2005) (collecting cases).

## IX.    JMOL #6: NONINFRINGEMENT OF THE '492 PATENT DUE TO FAILURE TO PROVE INFRINGEMENT OF MEANS-PLUS-FUNCTION LIMITATION

The parties agreed the limitation "multi-user detector decision unit using decision criteria to determine a selected multi-user detector" is governed by 35 U.S.C. § 112 ¶ 6. Dkt. 91 at 3.

31

Specifically, the Court construed the function and structure as follows: "*The claimed function is 'using decision criteria to determine a selected multi-user detector,'* and the corresponding structure is 'MUD decision unit 220 (or decision logic unit 520) configured to perform one or more of the algorithms described at 8:12–18, 13:35–14:40, 15:3–21, 19:43–48, 19:56–62, and 20:41–49; and equivalents thereof.'" *Id.* at 3-4.

Dr. Kowalski's analysis of this claim term was relegated to the end of his infringement testimony on the '492 Patent, spanning barely 2 pages of the trial transcript, and was exceedingly cursory. *See, e.g.,* Tr. (Kowalski) at 480:19-483:1. As with the means-plus-function term in the '505 patent, he began by acknowledging that the claim construction "require[s] a claimed function [and] structure." *Id.* at 480:19-25. And, as with the '505 Patent, Dr. Kowalski's subsequent analysis is exclusively limited to the **structure**. *Id.* at 481:1-483:1. Dr. Kowalski does not mention any "decision criteria" in his testimony. As a result, he did not establish where the claimed function, which requires "using decision criteria," is present in the Accused Products.

Samsung expects Collision will argue that Dr. Kowalski testified that the Samsung Accused Products use an algorithm that "make[s] a decision on which MUD to use [] based on the number of symbols that are being detected in a specific MUD window," and that the number of symbols is a "decision criteria." *See, e.g., id.* at 481:5-19. Crucially, however, the link between the "number of symbols" algorithm, which Dr. Kowalski testified satisfied the claimed **structure**, and the decision criteria required by the claimed **function**, is completely absent from Dr. Kowalski's testimony. At best, based on Dr. Kowalski's testimony, the Jury was left to guess how the claimed function is met.

This is insufficient as a matter of law. *Odetics*, 185 F.3d at 1267 ("Functional identity and either structural identity or equivalence are *both* necessary.") (emphasis in original). Collision's

32

failure to address one of the two principal requirements of literal infringement for means-plus-function terms renders its proof legally insufficient and the Jury's verdict without foundation. *See Griffin*, 502 U.S. at 59; *see also Northpoint Tech.*, 413 F.3d at 1311-12.

## X.    JMOL #7: NO DAMAGES DUE TO USE OF AN UNSUPPORTED AND WRONG HYPOTHETICAL NEGOTIATION DATE

Collision's damages award in this case is based on the assumption that, in April 2015, Samsung would have agreed to pay Collision over $445 million for technology ***Samsung already had in its phones at the time and thus could not be the date of the hypothetical negotiation as alleged by Collision***. Because no reasonable jury could have come to that conclusion using the wrong hypothetical negotiation date, Samsung respectfully asks that the Court grant judgment as a matter of law that Collision failed to prove up damages.

### A.    Mr. Bergman's Hypothetical Negotiation Date Has No Support

The hypothetical negotiation framework requires a damages expert to assume the parties would have negotiated a license ***just before*** the alleged infringement began. *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003), *vacated on other grounds*, 545 U.S. 193 (2005). Correctly setting that hypothetical negotiation date "is ***essential*** for properly assessing damages" under the hypothetical negotiation framework. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012) (emphasis added). This *ex ante* licensing scenario cannot be based on an "after-the-fact" assessment because using a later date would "skew[]" the damages analysis. *See id.* at 75–76. Nor is this merely an issue for cross-examination: in *Integra*, the Federal Circuit remanded for further proceedings on damages based on this issue, reasoning that changing the hypothetical negotiation date would "change the risks and expectations of the parties," and therefore it was "critical" in analyzing the hypothetical negotiation. 331 F.3d at 870. Other courts have similarly held that it is "clear that using the wrong hypothetical negotiation date

33

is not harmless error." *RSA Protective Techs., LLC v. Delta Sci. Corp.*, 2021 WL 4978462, at *5 (C.D. Cal. Oct. 20, 2021).

This case illustrates why choosing the correct hypothetical negotiation date is critical. Collision's damages expert, Mr. Bergman, assumed a hypothetical negotiation date of April 2015. Tr. 729:16-24; 786:12-17. Mr. Bergman based this assumption on his "understanding [that] that's the date of first infringement when Samsung first started using the patents in this case." Tr. 729:21-24. But he offered *no* testimony explaining the purported basis for that assumption, and for good reason: there was none. The sum total of Dr. Kowalski's testimony on the topic was that "Samsung identified a representative chipset, and the source code for that [] is how we should think of how the phones work in the accused products *with Samsung chipsets*" and that "the first product represented by the representative chip" was released in "April 2015." Tr. 435:3-8 (emphasis added); 436:9-12. In other words, Dr. Kowalski did *not* opine that April 2015 is the date of first infringement. Nor could he offer any such opinion: Dr. Kowalski admitted he did no analysis of—and indeed did not even look at source code or technical documents for—Samsung products released before December 2017. Tr. 594:17-595:6. Moreover, Dr. Kowalski also accuses Samsung products with Qualcomm chipsets of infringement, including the S5, for which it is undisputed that it was released in 2014, *prior* to April 2015. Thus, based on the accusations Dr. Kowalski has made and the actual analysis he performed, there might be support for a hypothetical negotiation date when the S5 was released in 2014 or December 2017, but *there is no support* for Mr. Bergman's assumed hypothetical negotiation date of April 2015, and the evidence in the record actually refutes that being the correct date.

**B.** **The Wrong Hypothetical Negotiation Date Fatally Undermines Mr. Bergman's Analysis**

There is thus <u>nothing</u> in the record supporting Mr. Bergman's April 2015 hypothetical

negotiation date.  That alone is enough to vacate the damages award.  *See Integra*, 331 F.3d at 870.  But the facts of this case make Mr. Bergman's use of the wrong hypothetical negotiation date particularly problematic and JMOL particularly warranted.   Samsung engineer Mr. Kang's undisputed testimony was that Samsung's accused MIMO and IRC technologies work the same now as they did in all Samsung phones going back to the Galaxy S4, the first LTE-A compliant phone.  865:5-869:8.  It is undisputed that the Galaxy S4 was first sold in the United States in April 2013, and the Galaxy S5 in 2014.   589:13-20 (Kowalski), 786:22-787:10 (Bergman); JX-62.  Notably, the S5 is accused in this case.  Dr. Kowalski admitted that he is "offering infringement opinions regarding the Galaxy S5 that is released in April of 2014" and that both that phone and the S4 comply with LTE-A Release 10.  594:2-16 (Kowalski).  There is therefore ***undisputed*** testimony that the allegedly infringing functionality was in Samsung's products ***before*** Mr. Bergman's hypothetical negotiation date.

No Collision witness has said otherwise.  Dr. Kowalski cannot because, as noted above, he did not look at code or technical documents for any Samsung products released before December 2017.  Tr. 594:17-595:6.  Without having done that—without having compared the code for products released before April 2015 to code for products released after April 2015—he cannot opine that those products released after April 2015 infringe but those released before do not.  And recall that he tellingly did ***not*** opine that.  The closest he came was to (1) refer to a Samsung interrogatory response in which Samsung represented that all accused products ***with Samsung chipsets*** functioned the same way with respect to the infringement allegations in this case, and (2) assert that the first accused product ***with a Samsung chipset*** was released in April 2015.  Tr. 435:3-8; 436:9-12.  But that representation does not support a finding that products released before April 2015 do not infringe because it says nothing about products with non-Samsung chipsets.

Importantly, the Galaxy S4 and S5 had Qualcomm chipsets. PX-14. For Samsung's representative product interrogatory response to support an April 2015 date of first infringement, there would have to be some material difference between Samsung and non-Samsung chipsets with respect to the infringement allegations in this case. Dr. Kowalski *expressly opined that there is no such difference*, testifying that his "review of the evidence show[ed] that [Qualcomm] chips also work in substantially the same way" as Samsung chips. Tr. 436:18-21; *see also* 435:21-24. This is of course entirely consistent with Mr. Kang's testimony that the accused products have worked the same way for purposes of the infringement allegations in this case since at least the Galaxy S4. 865:5-869:8.

Thus, the undisputed evidence from both Samsung fact witnesses and Collision's own expert shows that the accused functionality was already in Samsung's phones at the time of Mr. Bergman's April 2015 hypothetical negotiation. As a matter of both law and common sense, this undisputed fact fatally undermines Mr. Bergman's damages opinions and thus the jury's damages award. Mr. Bergman's opinion violated the well-settled rule that the hypothetical negotiation must take place on the eve of infringement. *Integra*, 331 F.3d at 870; *LaserDynamics*, 694 F.3d at 75. Particularly given the facts here, Mr. Bergman's use of the wrong hypothetical negotiation date not only "skews" the damages analysis, *LaserDynamics*, 694 F.3d at 75, it twists that analysis beyond recognition.

That is true because Mr. Bergman's hypothetical negotiation, and his damages analysis more broadly, were based in large part on the parties' real-world negotiations. Most importantly, Mr. Bergman's damages analysis relies heavily on the simulation that Collision claims showed certain of Collision's patented technology led to a 15.4% increase in download speeds. Collision presented those simulation results to Samsung in August 2013 (PX-1; Tr. 782:6-9)—before Mr.

36

Bergman's April 2015 hypothetical negotiation. The issues with using that simulation as the basis for Collision's damages theory are discussed in more detail in connection with JMOL #8. For now, it suffices to say the simulation could only support damages, even in principle, if the simulation results reflected the benefit of the patented technology as compared to the technology Samsung already had. If the allegedly infringing functionality was already in Samsung's phones as of the August 2013 simulation—and again, the undisputed evidence shows that that functionality was in Samsung's phones going back to at least April 2013—then the simulation could not possibly have reflected the benefit of that functionality. It follows that the purported 15.4% increase in average data download speed could not have reflected the benefit of Collision's technology and thus could not serve as a basis for a damages award.[3]

This is thus a paradigmatic case in which changing the hypothetical negotiation date would "change the risks and expectations of the parties." *Integra*, 331 F.3d at 870. Indeed, on these facts, using the correct hypothetical negotiation date would have driven damages to zero, based on the common-sense principle that Samsung would not have paid for technology it already had. Samsung thus respectfully requests judgment as a matter of law that Collision's use of an unsupported and wrong hypothetical negotiation date precludes it from proving up damages.

## XI. JMOL #8: NO DAMAGES FOR FAILURE TO APPORTION (ALL PATENTS)

Collision's damages case depends entirely on a simulation that Collision's own expert admits does not practice the asserted patents. If the simulation does not practice the patents, then

---

[3] Mr. Bergman's use of the wrong hypothetical negotiation date undermines his analysis in other ways as well. The hypothetical negotiation date is set on the eve of infringement because the hypothetical negotiation is presumed to occur in the world as it existed just before the alleged infringer began infringing. If the hypothetical negotiation were two years into the alleged infringement—such that the alleged infringer had already invested two years of development and manufacturing into the allegedly infringing products—the negotiation posture could change drastically.

the simulation results cannot reflect the benefits of the patented technology. Samsung respectfully asks that the Court enter judgment as a matter of law that Collision failed to prove up damages by failing to apportion to the footprint of the claimed invention.

### A.      Because The Simulation Does Not Practice The Asserted Patents, It Cannot Serve As a Basis for Determining Their Value

To carry its burden of proving damages, a patent owner must "sufficiently tie the expert testimony on damages to the facts of the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)). The Federal Circuit has "repeatedly held" that "[a]pportionment" is "the essential requirement for reliability under *Daubert*[.]" *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotations omitted). To apportion, the patentee must "in every case" separate its damages between the patented feature and the unpatented features based on reliable and tangible evidence. *LaserDynamics*, 694 F.3d at 67 (Fed. Cir. 2012).

Here, Collision's purported apportionment relied on a simulation Collision presented to Samsung in August 2013, which Collision claims showed that some of Collision's technology led to a 15.4% increase in data download speeds in a base station. Dr. Kowalski opined that that 15.4% would map directly onto handsets like the accused products (Tr. 628:7-23), Mr. Franklyn conducted a survey purporting to measure what respondents were willing to pay for a 15% increase in download speeds in a smartphone (Tr. 689:7-10), and Mr. Bergman used that willingness to pay as the foundation for his damages analysis (Tr. 739:3-741:6). That could only be permissible as a basis for apportionment—for separating out the value of the patented features—if the 15.4% were attributable to Collision's patents *and nothing else*. In other words, unless the simulation *practices* Collision's patents, it cannot apportion to their value.

The undisputed evidence showed that the simulation does not practice the patents. Dr.

38

Kowalski expressly testified that the simulation does not practice the '703 or the '651 patent. Tr. 501:4-5 (Kowalski), 767:15-19 (Bergman). As a matter of logic, that means there must be *some* difference between what the simulation does and what the patents do. As a matter of law, that difference cannot just be that the simulation is a simulation. The Federal Circuit has held that a simulation that meets every limitation of a claim practices that claim. *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1297 (Fed. Cir. 2015). It necessarily follows that, if a simulation does *not* practice a claim, it must not meet every limitation of that claim. It thus does not reflect the benefits of the patented technology and cannot serve as a basis for apportioning value to those benefits. Additionally, Dr. Kowalski admitted that the simulation included components, such as Turbo MUD and decoding, that are not part of Collision's patented technology. Tr. 620:6-13. Neither he nor Mr. Franklyn nor Mr. Bergman did anything to separate out the value of those components—in other words, no one apportioned.

Importantly, each of Mr. Bergman's opinions depends on the 15% figure and Mr. Franklyn's resulting willingness to pay. Mr. Bergman used that willingness to pay number (which he slightly modified) directly to calculate the royalty rate for the '703 and '651 patents. Tr. 741:1-746:5. And he used the 0.91% total royalty for the "simulation patents," in connection with his overall 2% royalty for "Collision's technology," to determine the value attributable to the remaining asserted patents. 746:6-10; 751:1-759:24. Thus, each of Mr. Bergman's royalty rates ultimately depends on the 15% increase in download speeds that Collision admits ***does not reflect the patented technology***. The Federal Circuit has "repeatedly held" that "the essential requirement for reliability under *Daubert* is that the ultimate reasonable royalty award must be based on the incremental value that ***the patented invention*** adds to the end product. In short, apportionment." *CSIRO,* 809 F.3d at 1301 (emphasis added, citations and quotations omitted). Here, by Collision's

39

own admission, Mr. Bergman's damages opinion cannot be based on the incremental value of the patented inventions because it is based on a simulation that ***does not practice those inventions***.

      **B.**     **The Simulation Also Fails As Apportionment For Using The Wrong Baseline**

Separately but relatedly, for the simulation to have provided a basis for determining the value of the patented technology, it would have had to compare that technology to the next-best commercially acceptable alternative. Mr. Bergman admitted this, agreeing that the "income approach" that formed the basis for his damages analysis for the '703 and '651 patents "involves determining the value that's attributable to a patent by comparing the patented technology to the next-best commercially-available alternative." Tr. 773:1-9. He also agreed that failing to do so— "undervalu[ing] the baseline"—leads to a "risk of overvaluing the patents." Tr. 774:15-24. But Mr. Bergman committed exactly that error. Mr. Farkas effectively admitted that the "baseline" comparator in the simulation was *not* the next-best commercially acceptable alternative—a then-current LTE base station. Mr. Farkas acknowledged that single-user MIMO, with multiple antennas per single user device and successive interference cancellation, were known in the industry, but Collision did not model them as part of the baseline in the simulation. Tr. 301:15-23; *see also id.* 299:19-24, 300:4-7 (agreeing that "single user MIMO technology … was not being simulated as the baseline in this simulation"), 301:1-9 (agreeing that the simulation "did not include simulating anything about successive interference cancellation in the baseline"), 301:24-302:3 (agreeing that "Collision never provided [Samsung] any simulation of its MUD technology where it was being compared to SU-MIMO with SIC"), 336:11-18 (agreeing that "the simulation for Samsung … did not involve single user MIMO technology which used multiple antennas for performance improvements in a single cell"). Thus, *even if* the simulated Collision software practiced the patents (and again, the undisputed evidence is that it did not), the simulation could not reflect the incremental benefit of the patents because it was compared against a baseline that

did not include the next-best alternative, which was a Samsung MIMO receiver with successive interference cancellation.

In sum, Collision entirely failed to provide the jury any basis to determine the "incremental value that the patented invention[s] add[] to the end product." *CSIRO*, 809 F.3d at 1301 (internal quotations omitted). Samsung thus respectfully asks that the Court enter judgment as a matter of law that Collision failed to prove up damages for failure to apportion.

## XII. JMOL #9: NO DAMAGES FOR FAILURE TO APPORTION ('505 AND '492 PATENTS)

Even assuming the simulation could serve as a basis for apportionment for the patents whose benefits it supposedly reflects, it certainly cannot support apportionment to the value of patents whose benefits it concededly does *not* reflect. Dr. Kowalski admitted that the simulation does not reflect the benefit of the '492 or '505 patents, and that he did nothing to quantify the technical benefits of those patents. Samsung thus respectfully requests judgment as a matter of law that Collision has failed to prove up damages for the '492 and '505 patents.

Dr. Kowalski opined that the simulation reflected the benefits of the '703 and '651 patents. For the reasons explained above, he is wrong about that—or, at minimum, the simulation did not reflect *only* the benefits of the '703 and '651 patents. But putting that aside, Dr. Kowalski expressly did *not* opine that the simulation reflects the benefits of the '505 or '492 patents, and admitted that he never quantified the technical benefits of those patents. Tr. 619:22-620:5. Mr. Bergman understood that the '492 and '505 patents' benefits were not reflected in the simulation. Tr. 768:22-25. He also understood, consistent with Dr. Kowalski's testimony, that Dr. Kowalski did nothing to quantify the technical benefits of either patent. Tr. 769:15-19. Mr. Bergman admitted that he was aware the '492 and '505 patent are different patents, with different inventors, different titles, different claims and claim scope, and that Collision accused different Samsung

41

functionalities as allegedly infringing them.  Tr. 770:4-25.  He admitted that he is not a technical expert and that he "did not undertake a technical analysis of those patents to understand precisely how they may benefit a phone."  Tr. 771:10-14.

Thus, the undisputed evidence is that no one ever quantified the technical benefits of the '492 or '505 patents.  Mr. Bergman, despite admitting that he "didn't assume [those patents] had the same technical benefit[s]," nonetheless awarded them the same royalty rate "down to the thousandth of a percent."  Tr. 769:3-8; 771:15-19.  It would be hard to find a clearer example of royalty rates that "appear[] to have been plucked out of thin air based on vague qualitative notions of the relative importance of the [asserted] technology."  *LaserDynamics*, 694 F.3d at 69.

Because no one quantified the technical benefits of the '492 and '505 patents, and because there is thus no evidence in the record from which a reasonable jury could have apportioned the value of those patents, Samsung respectfully requests that the Court enter judgment as a matter of law that Collision failed to prove up damages as to those patents.

## XIII.  JMOL #10: NO PRE-SUIT DAMAGES

Because no reasonable jury could have found that Collision provided either actual or constructive notice prior to filing the Complaint, Samsung respectfully asks that the Court grant judgment as a matter of law that Collision failed to prove entitlement to pre-suit damages.

35 U.S.C. § 287(a) provides that a patent owner that makes, offers for sale, or sells within the United States any patented article, or imports any patented article into the United States, may recover damages for patent infringement only after providing (1) actual notice to the accused infringer or (2) constructive notice to the public through marking the patented article or its package with the applicable patent number(s).  *See Amer. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1535 (Fed. Cir. 1993).  "The marking statute serves three related purposes: 1) helping to avoid innocent infringement, []; 2) encouraging patentees to give notice to the public that the article is

patented, []; and 3) aiding the public to identify whether an article is patented[.]" *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1443 (Fed. Cir. 1998) (citations omitted). As a result, the law focuses on the patentee's actions, and the patentee bears the burden of proving compliance by a preponderance of the evidence. *Id.* at 1446. In particular, "[t]he patent owner-plaintiff must plead before trial and then show at trial that he had complied with the requirements of the statute." *Motorola, Inc. v. U.S.*, 729 F.2d 765, 770 (Fed. Cir. 1984).

## A. The Court Properly Granted Summary Judgment That Samsung's *Arctic Cat* Notice Shifted The Burden To Collision

The Court has already granted summary judgment that Collision bears the burden of showing it complied with the marking statute.[4] "[A]n alleged infringer who challenges the patentee's compliance with § 287 bears an initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to § 287. To be clear, this is a low bar. The alleged infringer need only put the patentee on notice that he or his authorized licensees sold specific unmarked products which the alleged infringer believes practice the patent. The alleged infringer's burden is a burden of production, not one of persuasion or proof." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1368 (Fed. Cir. 2017).

The Court granted summary judgment that Samsung carried its initial burden of identifying products that it believes practice the asserted patents and thus should have been marked. Dkt. 302 at 3. To the extent Collision opposes this motion for JMOL by arguing that the Court erred in granting summary judgment, Collision is wrong. As this Court has pointed out, "[t]he *Arctic Cat* burden of production is a low bar predicated upon belief, not proof." *Solas Oled Ltd. v. Samsung Elecs. Co., Ltd.*, 2022 WL 1912873, at *2 (E.D. Tex. May 30, 2022). That makes sense because

---

[4] To the extent that the Court were to reverse this finding, then a new trial would be required because the burden would shift from Collision—as the case was tried—to Samsung on the marking issue.

43

the purpose of the *Arctic Cat* notice is to avoid "a large scale fishing expedition and gamesmanship" given that, without such a notice, the "universe of products for which [the patent owner] would have to establish compliance would be unbounded." *Arctic Cat*, 876 F.3d at 1368. Providing a list of specific unmarked products, as Samsung undisputedly did here, accomplishes that purpose. Indeed, the Federal Circuit held that a defendant met its *Arctic Cat* burden by merely "pointing to" a product listed on the plaintiff's website in an objection to the plaintiff's damages claim filed the day before trial. *Lubby Holdings LLC v. Chung*, 11 F.4th 1355, 1359-60 (Fed. Cir. 2021). This Court has similarly held that a "broad" notice that used "groupings" that "may … not line up with particular product numbers used by" the licensee was sufficient. *Headwater Research LLC v. Samsung Elecs. Co., Ltd.,* 2024 WL 3843760, at *2 (E.D. Tex. Jul. 15, 2024). It is thus clear that Samsung, by providing Collision with a list of specific products that it contends should have been marked, did all the law requires. At the summary judgment hearing, Collision's counsel all but conceded that its contrary position is unsupported as a matter of law, "admit[ting] … there's not a case that says exactly that." 8/26/2025 Hrg Tr. at 163:10-14.

The Court thus correctly held that Samsung had "satisfied its *Arctic Cat* burden and shifted the burden back to the Plaintiff." *Id.* at 174:25-175:10. As a result, Collision bore the burden at trial of proving that "it had complied with the requirements of the statute." *Motorola,* 729 F.2d at 770.

### B. Collision Failed to Meet Its Burden

Collision could in theory have carried that burden in one of three ways. *First*, Collision could have shown that it provided Samsung actual notice of the alleged infringement before filing suit. *Second*, Collision could have shown that its licensees marked the products Samsung identified in its *Arctic Cat* notice. Or *third*, Collision could have shown that those products do not practice the asserted patents and were thus not required to be marked. No reasonable jury could

44

have found that Collision proved any of the three.

### 1.    Collision Never Provided Actual Notice

The first way Collision could have carried its burden, but failed to, is by providing Samsung with actual notice of alleged infringement.  Under § 287(a), failure to mark precludes the patentee from recovering pre-suit damages prior to the time when the infringer received actual notice of alleged infringement; if the patentee never provided actual notice to the accused infringer before filing suit, no pre-suit damages are recoverable.  *Amsted Indus. Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178, 187-88 (Fed. Cir. 1994).  The statute states in pertinent part:

> In the event of failure to [] mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was ***notified of the infringement*** and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.

35 U.S.C. § 287(a) (emphasis added).  "The requirement of actual notice is designed to assure that the accused infringer knew of the adverse patent and the alleged infringement during the period in which its liability accrues."  *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1345 (Fed. Cir. 2001).  Mere "notice of the patent's existence or ownership" is insufficient to constitute actual notice.  *Id.*

To comply with the statute, the patentee must inform the recipient of the identity of the patent and the activity that is believed to be an infringement.  *Lans v. Digital Equip. Corp.,* 252 F.3d 1320, 1327 (Fed. Cir. 2001).  The notice requirement is "met when the recipient is notified, with sufficient specificity, that the patent holder believes that the recipient of the notice may be an infringer."  *Id.* (citations omitted).  Accordingly, "[a]ctual notice requires the affirmative communication of a ***specific charge of infringement*** by a ***specific accused product***."  *Amsted Indus.,* 24 F.3d at 187 (emphasis added) (patentee's general notice letter advising entire industry of patent and instructing industry not to infringe did not provide actual notice because it was not notice of the "infringement").

45

████████████████████████████████

Here, Collision's witnesses all squarely admitted that Collision did not "communicat[e] a specific charge of infringement by a specific accused product" prior to filing suit. *Amsted Indus.*, 24 F.3d at 187. Mr. Farkas admitted that he "never notified Samsung that it was infringing any of the asserted patents." Tr. 247:20-248:4 (Farkas). If there were any doubt or ambiguity in that, Mr. Farkas later admitted again that "during this entire time period Collision, to [his] knowledge, never told Samsung that the handsets it was making and selling to consumers that use MIMO, OFDM, LTE, successive interference cancellation, was infringing any of the asserted patents in this case." Tr. 318:15-25. Jared Fry testified similarly, admitting that "nobody at Collision said anything to Samsung about patent infringement." Tr. 382:20-22; 384:23-25; 389:21-24. Stan Fry also admitted that "prior to the filing of this lawsuit, Collision did not accuse Samsung of infringing the patents asserted in this case." Tr. 881:24-882:1, 882:9-13.

These clean, unqualified admissions are dispositive on the issue of whether Collision "communicat[ed] a specific charge of infringement by a specific accused product" prior to filing suit. *Amsted Indus.*, 24 F.3d at 187. By its own witnesses' repeated sworn admission, it did not. Collision's only effort to avoid this at trial was to point to a set of slides Collision provided Samsung in 2011, which included one slide listing certain patents Collision purported to own. JX-22.12.[5] As a matter of law, that slide did not provide actual notice to Samsung. The Federal Circuit has expressly held that mere "notice of the patent's existence or ownership"—the most that slide could be construed to provide—does not constitute actual notice because it is not "a specific charge of infringement." *Gart*, 254 F.3d at 1345; *Amsted Indus.*, 24 F.3d at 187.

Thus, there is <u>no</u> evidence in the record from which a reasonable jury could have concluded

---

[5] Notably, the slide listed only the '703 and '505 patents. Thus, even if it could provide actual notice as to those patents (they cannot), it plainly could not provide actual notice of the '651 and '492 patents, which it did ***not*** list. JX-22.12.

that Collision provided actual notice to Samsung of any of the asserted patents prior to filing suit, and actual notice cannot be a basis for pre-suit damages.

### 2.    The Court Correctly Granted JMOL Of No Marking

The second way in which Collision could have shown compliance with the marking statute, but did not, would be to show that its licensees marked their products with the asserted patent numbers.  A patentee fails to comply with the marking provision of § 287(a)—and thus has not given the public constructive notice of the patent—unless it has properly marked "substantially all" of its patented products.  *Amer. Med.*, 6 F.3d at 1538.  It is not enough to mark merely some products: "once marking has begun, it must be substantially consistent and continuous in order for a party to avail itself of the constructive notice provisions of the statute."  *Id.* at 1537.

"A licensee who makes or sells a patented article does so 'for or under' the patentee, thereby limiting the patentee's damage recovery when the patented article is not marked."  *Amsted Indus.*, 24 F.3d at 185.  In other words, a **licensee's** failure to mark patented products prior to suit limits the **patentee's** recovery of damages.  *Id.* ("Since there is no dispute that the patented articles sold by Amsted's customers were never marked, Amsted is precluded from recovering damages prior to the date that Buckeye, the accused infringer, 'was notified of the infringement.'").  Like the patentee's own patented products, a licensee's products must be marked substantially, consistently, and continuously.  *See Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1375 (Fed. Cir. 2010).

Here, it is undisputed that BAE, Nokia, and Ericsson are all licensed to the asserted patents, and all made products that Samsung notified Collision should have been marked.  JX-5 at 5.8 (BAE); JX-28 at 28.2 (Nokia); Tr. 368:23-369:1 (Ericsson); Tr. 397:4-7 (Nokia and Ericsson); 398:7-11 (Nokia and Ericsson).  It is also undisputed that none of those companies ever marked a single product with any of the asserted patent numbers.  As a result, prior to the verdict, the Court

███████████████████████████

granted judgment as a matter of law under Rule 50(a) on "the issue of constructive notice brought about by marking patents numbers on products either directly or indirectly" because "there is no evidence and no reasonable jury could find to the contrary that there is no constructive [notice]." Tr. 1195:19-1196:1 ("there is no constructive [notice] in this case").   Based on Collision's counsel's repeated representations throughout trial, Samsung understands that Collision does not dispute this finding—in other words, does not dispute that none of the products Samsung identified in its *Arctic Cat* notice were ever marked with the asserted patent numbers.

### 3.    Collision Failed To Meet Its Burden of Showing Its Licensees' Products Do Not Practice the Asserted Patents

As an initial matter, when the Court granted judgment as a matter of law under Rule 50(a) on the issue of constructive notice, it necessarily found that not only did Collision's licensees not mark, but also that they were required to mark because Collision did not prove that the licensee products did not practice the asserted patents.  If the second point were not true, the Court could not have granted judgment as a matter of law as to constructive notice in the entirety, as it did. This was also the clear intent of the Court, because, as the Court noted when it granted judgment as a matter of law under Rule 50(a) on the issue of constructive notice, the ruling only "leaves open the issue of actual notice." Tr. at 1195:19-1196:1.  Thus, this issue has already been resolved. However, to be clear, Collision failed to meet its burden of showing its licensees' products do not practice the Asserted Patents.

In the event any portion of the constructive notice issue is still live, the only remaining way for Collision to show compliance with the marking statute, and thus establish entitlement to pre-suit damages, would be to prove that the products Samsung identified do not practice the asserted patents.  It was not Samsung's burden to prove the products practice; it was Collision's to prove

48

███████████████████████████████████████████████

that they do not.  Dkt. 302 at 3.  Collision entirely failed to carry that burden.[6]

a.  <u>Collision Failed To Show BAE's Products Do Not Practice</u>

The undisputed evidence showed that at least two types of BAE products Samsung

identified practice the asserted patents.  ████████████████████████████

███████████████████████████████████████  ██████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████  █████████

██████████████████████████████████████████  ██████

██████████████████████████████████  █████████████████

███████████████████  ████████████████████████  ██████  ████

███████████████████████████████████████

Collision introduced no contradictory evidence.  Dr. Kowalski was careful not to expressly

opine that the Link 16 does not practice, instead only generically claiming that, for the Link 16, "it

just isn't appropriate to use the patents in this case."  Tr 494:6-9.  Dr. Kowalski could do no more

than that because, despite knowing Collision bore the burden of establishing the Link 16 does not

---

[6]  To be clear, given the differences in operation between the Accused Products and the Collision licensee products, it is Samsung's position that the licensee products practice the Asserted Patents, but Samsung's Accused Products do not.

[7]  A third BAE witness, Brandon Hombs, testified ███████████████████████ ██████████████████  Tr. 884:20-24.  No BAE witness testified that the Link 16 does not implement MUD technology.

███████████████████████████████████

practice the asserted patents, ███████████████████████████████

███████████████████████████████████████████████

███████████████████████ "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so'" does not create a fact dispute. *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 424 (5th Cir. 1987).

The second BAE product that practices is a prototype BAE produced for the Defense Advanced Research Projects Agency's (DARPA) Interface Multiple Access program, often abbreviated DIMA. The undisputed record evidence showed that the DIMA prototypes also practice the technology claimed by the asserted patents in this case. DX-101, JX-31. The undisputed evidence also showed that BAE shared this prototype with the government under a DARPA contract. JX-39. Collision's witnesses practically admitted that the DIMA prototype practices. Mr. Farkas expressly referenced the DIMA video (JX-31) in describing how the technology BAE developed and sold to Collision uses ███████████████████████ ████████████████████████████████████ Tr. 195:18-196:1. Dr. Kowalski did not substantively testify about the DIMA prototype at all.

Thus, Collision has entirely failed to carry its burden of showing that either identified BAE product (Link 16 and the DIMA prototype) did not practice the asserted patents. This failure of proof means that no reasonable juror could have found that those products do not practice.

b. Collision Failed To Show Nokia's Products Do Not Practice

Collision suffers from a similar failure of proof as to the Nokia products Samsung identified as practicing. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████ ███████████████ 399:14-400:3. As with BAE, Dr.

Kowalski simply did not do the work to prove those base stations do not practice. Indeed, despite knowing Collision had the burden to show the identified Nokia products do not practice, Dr. Kowalski chose to review *none* of the confidential documents Nokia produced in this case, instead relying only on publicly available documents. Tr. 609:14-613:17. Given that, it is unsurprising that his analysis could generously be called conclusory. Dr. Kowalski's only effort to argue the identified Nokia products do not practice was to claim that Nokia base stations use a demodulation reference signal (DMRS) for channel estimation, instead of the CRS signals called for by the patents. Tr. 495:13-496:2. Such a conclusory opinion would be insufficient to carry Collision's burden in any event. *Viterbo*, 826 F.2d at 424. But Dr. Kowalski's opinion is not just conclusory— it directly conflicts with his own testimony that **CRS and DMRS are "the same functionality."** 554:19-555:16. Dr. Kowalski further admitted that "he treated [CRS and DMRS] equally" and that "in practicality, both CRS and DMRS go through the same process." *Id.*

Dr. Kowalski and Collision cannot have it both ways. If CRS and DMRS are different, his infringement theory falls apart because he specifically said they worked the same way to prove infringement and allege that both LTE and 5G products infringe. If, as he testified, they are the same, then the Nokia products practice. Either way, Dr. Kowalski's testimony fails to carry Collision's burden. As the Federal Circuit recently held, "[w]hen the party with the burden of proof . . . rests its case on an expert's self-contradictory testimony, we may conclude the evidence is insufficient to satisfy that standard." *Finesse Wireless*, 156 F.4th at 1227 *Finesse* is directly on point here: Collision bears the burden of proof on marking, and "rests its case on [Dr. Kowalski's] self-contradictory testimony." That testimony is therefore insufficient to carry Collision's burden

51

██████████████████████████████

of showing the identified Nokia products do not practice.[8]

### c. Collision Failed To Show Ericsson's Products Do Not Practice

The analysis is largely the same for Ericsson. ████████████████████

████████████████████████████████████

████████████████████████████ 399:14-400:3. As

with Nokia, the sole basis for Dr. Kowalski's opinion that the identified Ericsson base stations do not practice is his claim that those base stations use DMRS signals instead of CRS signals. As just explained, that testimony flatly contradicts Dr. Kowalski's testimony unequivocally equating DMRS and CRS, and thus fails to carry Collision's burden to show that the Ericsson products do not practice. *Finesse Wireless*, 156 F.4th at 1227.

Thus, Collision provided the jury with no reasonable basis to find that Collision carried its burden of proving compliance with the marking stature. "Since there is no dispute that the patented articles sold by [Collision's licensees] were never marked, [Collision] is precluded from recovering damages prior to the date that [Samsung], the accused infringer, 'was notified of the infringement.'" *Amsted*, 24 F.3d at 185. That date is December 12, 2023—the date Collision filed its complaint in this case.

## XIV. JMOL #11: NO WILLFULNESS

Because the undisputed evidence shows that Collision never put Samsung on pre-suit notice of any of the asserted patents, and that Samsung's conduct was reasonable and did not rise to the level of deliberate and intentional conduct that would establish willfulness, Samsung respectfully asks that the Court enter judgment as a matter of law that Samsung's alleged

---

[8] Notably, Dr. Kowalski admitted that he did ***not*** opine that the products Samsung identified do not practice the '492 patent. Tr. 617:4-11. And, as noted above, the slide Collision provided Samsung in 2011 did not list that patent either. *Supra* at 46 n.5. Thus, at a minimum, Samsung is entitled to JMOL of no pre-suit damages for the '492 patent.

infringement was not willful.  Samsung understands that the Court already found that damages should not be enhanced, Dkt. 331 (Final Judgment), which Samsung agrees with, but the Court should still grant this JMOL as Samsung was not an infringer here, let alone a willful infringer.

Willfulness requires proof of knowledge of an issued patent and that defendant engaged in conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-04 (2016); *Core Wireless Licensing S.a.r.l. v. LG Elecs., Inc.*, No. 14-CV-00911, 2018 WL 7199139, at *2 (E.D. Tex. Sept. 27, 2018) (Gilstrap, J.) (citing the *Halo* standard).  Knowledge of the existence of the asserted patents alone is not sufficient to establish willfulness.  *Fractus, S.A. v. TCL Corp.*, No. 20-CV-00097, 2021 WL 2483155, at *4 (E.D. Tex. June 2, 2021). Willfulness requires "some sort of intentional conduct—whether it be subjective or objective."  *Packet Intel. LLC v. NetScout Sys., Inc.*, No. 16-CV-00230, 2019 WL 2375218, at *3 (E.D. Tex. June 5, 2019) (Gilstrap, J.), *rev'd on other grounds*, 965 F.3d 1299 (Fed. Cir. 2020).

"Knowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages."  *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) (citing *Halo*, 579 U.S. at 105-06).  Here, Collision's witnesses all freely admitted that they did not tell Samsung it was infringing any of the asserted patents prior to filing suit.  Tr. 247:20-248:4; 318:15-25 (Farkas); 382:20-22 (J. Fry); 881:24-882:-1 (S. Fry); 882:9-16 (S. Fry).  The only document Collision could even theoretically point to as telling Samsung about the asserted patents was a set of slides it provided Samsung in 2011 that included a list of patents. JX-22.12.  But that document did not say, or even suggest, that anything Samsung was doing infringed or would infringe the asserted patents; rather, it simply listed two of the four asserted patents (the '703 and the '505) on a long list of patents Collision claimed to own.  *Id.*  It thus did not provide Samsung with

53

[k]knowledge of the patent alleged to be willfully infringed." *WBIP*, 829 F.3d at 1341. Notably, even that slide did *not* list the '651 or the '492 patents. Thus, even if the slide could have put Samsung on notice of the patents it listed (and for the reasons just described, it could not), it plainly could not have put Samsung on notice of patents it did *not* list. Judgment as a matter of law is thus proper at least as to the '651 and '492 patents.

If Collision contended Samsung infringed the asserted patents, it had over a decade in which to tell Samsung as much. It never did until the day it filed this lawsuit. If Collision itself did not believe Samsung was infringing, no reasonable jury could have found that Samsung itself knew it was infringing. Because knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness (*Halo*, 579 U.S. at 105), this lack of knowledge warrants judgment as a matter of law of no willfulness.

Judgment as a matter of law of no willfulness is also warranted because no reasonable jury could have found that Samsung's conduct rose to the level of "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate" as required to establish willfulness. *Halo*, 579 U.S. at 103-04; *Core Wireless Licensing S.a.r.l.*, 2018 WL 7199139, at *2. Indeed, the only thing Samsung has done, either pre- or post-suit, is to continue to sell the accused products. As a matter of law, that is not unreasonable conduct giving rise to willfulness. *See, e.g.*, *Allure Energy, Inc. v. Nest Labs, Inc.*, No. 9-13-CV-102, 2015 WL 11110643, at *2 (E.D. Tex. May 11, 2015) ("The only argument that Plaintiff makes of post-suit knowledge is that Defendants could have turned off the 'Auto Away' feature. . . . [T]his argument is insufficient to meet Plaintiff's clear and convincing burden regarding the '518 Patent. Plaintiff has failed to go beyond the pleadings to show that there is an issue of material fact."); *see also Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990) ("Nor is

54

there a universal rule that to avoid willfulness one must cease manufacture of a product immediately upon learning of a patent, or upon receipt of a patentee's charge of infringement, or upon the filing of suit."). Indeed, as one other court recently recognized, there must be some evidence of "egregious post-complaint infringement behavior" beyond "continued sales of the accused [product]." *See, e.g.*, *Ansell Healthcare Prods. LLC v. Reckitt Benckiser LLC*, No. 15-cv-915, 2018 WL 620968, at *7 (D. Del. Jan. 30, 2018) (internal quotation marks omitted); *Plastic Omnium Advanced Innovation & Rsch. v. Donghee Am., Inc.*, 387 F.Supp.3d 404, 421-22 (D. Del. 2018) (holding that allegations of continued post-suit infringement are insufficient to survive summary judgment), *aff'd*, 943 F.3d 929 (Fed. Cir. 2019).

Indeed, the only willfulness story Collision told was that, following the parties' negotiations from 2011-14, that Samsung snuck behind Collision's back to develop similar technology. But the undisputed evidence showed that Samsung did no such thing, and indeed told Collision up front and in writing that it would try to develop similar software. PX 9.9. Plaintiff's exhibit 9 was a draft agreement between Samsung and Collision, to which Collision had made several proposed edits in track changes. *Id.* One provision Collision did ***not*** suggest changing was Section 3.3, reproduced below:

> 3.3  Collision acknowledges and agrees that Samsung is engaging in and will be engaging in the development of the same and/or similar software function and/or purpose with those of Collision's software.

*Id.* Confronted with this document on cross, Jared Fry had no explanation for Collision's agreement to this provision, which squarely refutes Collision's willfulness theory that Samsung hid its actions from Collision. Tr. 380:16-382:8.

Thus, no reasonable jury could have found either of the predicates for willful infringement: (1) knowledge of the asserted patents and (2) deliberate or intentional conduct. Samsung

respectfully asks that the Court enter judgment as a matter of law that any alleged infringement was not willful.  Samsung also respectfully submits that, because the issues of willfulness and actual notice should have never gone to the jury, the evidence that Collision presented on those issues—including its extensive reliance on the parties' pre-suit negotiations—never should have been before the jury either.  That evidence was highly prejudicial and, because it went to issues on which Collision as a matter of law could not have met its burden, of no probative value.  Samsung further respectfully submits that, even if the Court disagrees with the remainder of its JMOL arguments, this one alone warrants a new trial on all issues.

## XV.    JMOL #12: INVALIDITY OF ALL ASSERTED PATENTS

At trial, Samsung's expert Dr. Mahon presented complete, and unrefuted, testimony that all the asserted claims of the '703 and '651 Patents were invalid under 35 U.S.C. § 112 for lack of written description[9] and all the asserted claims of the '505 and '492 Patents were invalid under 35 U.S.C. § 103 based on prior art meeting Samsung' burden on invalidity for all Asserted Claims.  Given that Collision did not even present a rebuttal witness regarding validity, Dr. Mahon's opinions are unrefuted and no reasonable jury could have found any Asserted Claim not invalid.

Specifically, even taking into account the Court's rulings excluding certain testimony from Dr. Mahon regarding 35 U.S.C. § 112, Dr. Mahon presented unrebutted testimony that the asserted claims of the '703 and '651 patents are invalid for lack of written description under 35 U.S.C. 112.  Tr. (Mahon) at 951:22-954:1-12, 960:12-19.  As Collision did not put on any rebuttal case, Dr. Mahon's opinions on these issues is unrebutted and Samsung has met its burden on both of these issues and is entitled to judgment as a matter of law.

---

[9]  Samsung maintains its objection to the Court's ruling at sidebar that Dr. Mahon could not present the entirety of his written description and enablement opinions and nothing in this JMOL should be considered a waiver of Samsung's right and intent to seek appropriate relief of that ruling.

For the '505 Patent, Dr. Mahon presented unrebutted testimony that the asserted claim of the '505 patent is invalid as obvious in view of JX-48 (Hottinen) and JX-47 (Lilleberg). Tr. (Mahon) at 960:22-967:5. For the '492 Patent, Mahon presented unrebutted testimony that the asserted claim of the '492 patent is invalid as obvious in view of JX-45 (Texas Instruments) and JX-44 (Egnor). Tr. (Mahon) at 967:12-972:20. Again, as Collision did not put on any rebuttal case, Dr. Mahon's opinions on these invalidity issues is also unrebutted and Samsung has met its burden on both of these issues and is entitled to judgment as a matter of law.

Given that Samsung more than met its burden on invalidity for all Asserted Claims, and Collision did not even challenge Samsung's positions with a rebuttal witness, no reasonable jury could have found any Asserted Claim not invalid.

## XVI.   JMOL #13: NO INDUCED INFRINGEMENT

In the jury charge, the Court instructed the jury on the legal requirements for induced infringement. Tr. (Jury Charge) 1227:15-1229:4. Among other things, the Court instructed the jury it is not "sufficient that the company accused of inducing another's direct infringement merely had knowledge or notice of an asserted patent or had been aware that the acts of another allegedly constitute direct infringement." *Id.* at 1228:18-22. Instead, as the Court instructed, Samsung must have "been aware of the asserted patents and [] known that the acts of its end users, distributors, resellers, and retail partners constitute infringement of the asserted patents, or Samsung was willfully blind to that infringement." *Id.* at 1228:5-9. This instruction was fully consistent with controlling precedent that induced infringement "requires ***knowledge that the induced acts constitute patent infringement***." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) (emphasis added).

It was undisputed and reinforced repeatedly at trial that while Collision may have notified Samsung of the existence of some of its patents, Collision never put Samsung on notice ***of***

57

*infringement*. Tr. (Farkas) 247:20-248:4 (testifying he "never notified Samsung that it was infringing any of the asserted patents" and that "the purpose of those meetings was not to communicate to Samsung that Samsung was infringing [those] patents."), 318:15-25 (testifying "during [the] entire period" Samsung and Collision were communicating, Collision "never told Samsung that the handsets it was making and selling to consumers that use MIMO, OFDM, LTE, successive interference cancellation, was infringing any of the asserted patents in this case"); *id.* (J. Fry) 382:20-22 (agreeing that "nobody at Collision said anything to Samsung about patent infringement"); *id.* (S. Fry) 881:24-882:1 ("Q. In your meetings with Samsung, did you provide notice to Samsung of any infringement of the Collision patents? A. No."), 882:9-16 (confirming that "prior to the filing of this lawsuit, Collision did not accuse Samsung of infringing the patents asserted in this case" and that "Collision did not provide any claim charts mapping the claims" to "Samsung's products").

Thus, the undisputed evidence establishes that Samsung falls squarely into the exception that the Court plainly laid out for the jury. At worst, Samsung had knowledge *of the patents*, not knowledge of *infringement* of those patents. And without the requisite knowledge, Samsung cannot have induced infringement of the asserted patents as a matter of law. *See Global-Tech*, 563 U.S. at 766 ("induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement").

## XVII.  CONCLUSION

For all of the foregoing reasons, Samsung respectfully submits that the Court should grant judgement as a matter of law on all issues raised herein.

███████████████████████████████

Dated:  December 10, 2025

Respectfully submitted,

*/s/ Melissa R. Smith*
Victoria F. Maroulis
California Bar No. 202603 (admitted in E.D. Tex.)
victoriamaroulis@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Tel : 650-801-5000
Fax: 650-801-5100

Sean Pak
California Bar No. 219032 (admitted *pro hac vice*)
seanpak@quinnemanuel.com
Brian E. Mack
California Bar No. 275086 (admitted in E.D. Tex.)
brianmack@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: 415-875-6600
Fax: 415-875-6700

Kevin Hardy
D.C. Bar No. 473941 (admitted in E.D. Tex.)
kevinhardy@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street, N.W., Suite 900
Washington, DC 20005
Tel: 202.538.8000
Fax: 202.538.8100

Melissa R. Smith
Texas State Bar No. 24001351
melissa@gillamsmithlaw.com
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Phone: (903) 934-8450
Fax: (903) 934-9257
*Counsel for Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc*

59

████████████████████████████████████

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on December 10, 2025, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system.

Dated:  December 10, 2025          */s/ Melissa R. Smith*
                                   Melissa R. Smith